1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE NORTHERN DISTRICT OF TEXAS

3    DALLAS DIVISION

4  THE HERITAGE ORGANIZATION,   *
   L.L.C.,                      *   NO. 04-35574-BJH-11
5                               *   (Chapter 11)
        Debtor                 *
6  _____
   DENNIS S. FAULKNER,         *
7  TRUSTEE,                     *
                               *
8       Plaintiff              *
                               *
9  VS.                         *   ADV. NO. 05-3568
                               *
10 L. ROSS LOVE, JR.,          *
                               *
11      Defendant              *

12

13

14        ORAL DEPOSITION OF GARY M. KORNMAN

15              **DUPLICATE**

16              **ORIGINAL**

17        ORAL DEPOSITION OF GARY M. KORNMAN, produced as a

18 witness at the instance of the Plaintiff, and duly sworn,

19 was taken in the above-styled and numbered cause on the 5th

20 day of June, 2007, from 9:30 a.m. to 7:14 p.m., before

21 Linda A. Kaiser, CSR in and for the State of Texas,

22 reported by computerized transcription, at the offices of

23 Munsch, Hardt, Kopf & Harr, P.C., 3800 Lincoln Plaza, 500

24 N. Akard Street, Dallas, Texas, pursuant to the federal

25 rules of civil procedure.

GOVERNMENT
EXHIBIT
9

```
 1                A P P E A R A N C E S
 2
 3   FOR THE DEBTOR:
          MR. JEFFREY M. TILLOTSON
 4        LYNN, TILLOTSON & PINKER, L.L.P.
          750 North St. Paul Street
 5        Suite 1400
          Dallas, Texas 75201
 6        Phone:  214-981-3800
          Fax:  214-981-3839
 7        Email:  Jtillotson@lynnllp.com
 8   FOR THE PLAINTIFF:
          Mr. E. Lee Morris
 9        Ms. Deborah Perry
          MUNSCH, HARDT, KOPF & HARR, P.C.
10        3800 Lincoln Plaza
          500 N. Akard Street
11        Dallas, Texas 75201-6659
          Phone:  214-855-7521
12        Fax:  214-978-5322
          Email:  Lmorris@munsch.com
13
     FOR THE SKINNER TRUSTS:
14        Ms. Holly Anne Harris
          KIRKPATRICK & LOCKHART PRESTON GATES ELLIS, LLP
15        925 Fourth Avenue
          Suite 2900
16        Seattle, Washington 98104-1158
          Phone:  206-370-8256
17        Fax:  206-370-6280
          Email:  Holly.harris@klgates.com
18
     FOR MERALEX, LP AND HOWARD JENKINS:
19        Mr. James G. Munisteri
          GARDERE WYNNE SEWELL, LLP
20        1000 Louisiana
          Suite 3400
21        Houston, Texas 77002-5011
          Phone:  713-276-5752
22        Fax:  713-276-6752
          Email:  Jmunisteri@gardere.com
23
24
25
```

Gary Kornman - 6/5/2007

3

```
1    FOR SANDWITH AND MIKRON:
          Mr. Robin E. Phelan
2         HAYNES AND BOONE, LLP
          901 Main Street
3         Suite 3100
          Dallas, Texas 75202-3789
4         Phone:  214-651-5612
          Fax:  214-200-0649
5         Email:  Phelanr@haynesboone.com

6    FOR W. RALPH CANADA, JR.:
          Mr. John P. Lewis, Jr.
7         Attorney at Law
          1412 Main Street
8         Suite 210
          Dallas, Texas 75202
9         Phone:  214-742-5925
          Fax:  214-742-5928
10

11

12   ALSO PRESENT:
          Mr. Dennis Faulkner
13        Mr. W. Ralph Canada
          Mr. Michael Korman
14

15

16

17

18

19

20

21

22

23

24

25
```

4

## INDEX

|  | PAGE |
|---|---|
| GARY M. KORNMAN | |
| EXAMINATION BY MR. MORRIS | 6 |
| EXAMINATION BY MS. HARRIS | 42 |
| EXAMINATION BY MR. PHELAN | 122 |
| EXAMINATION BY MR. MUNISTERI | 224 |
| EXAMINATION BY MR. MORRIS | 254 |

## EXHIBITS

| NO. | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 1 - | Proof of claim document filed by Gary Kornman | 42 |
| 2 - | Proof of claim document filed by Michael Kornman | 53 |
| 3 - | Counterclaim filed against Gary Kornman by Winston & Strawn, LLP | 55 |
| 4 - | Letter from the IRS to Heritage dated February 21, 2001 | 89 |
| 5 - | Letter from the IRS to Heritage dated May 2001 | 91 |
| 6 - | Letter from the IRS to Heritage dated February 14, 2002 | 93 |
| 7 - | Fax to Gary Kornman from Ed Adrens dated May 11, 2001 | 102 |
| 8 - | Fax to Gary Kornman from Ed Adrens | 109 |
| 9 - | Document to Gary Kornman from Ed Adrens dated December 27, 2000 | 114 |
| 10 - | Heritage initiator's training manual | 114 |
| 11 - | Consent in lieu of special meeting | 210 |

12 -  Consent in lieu of special meeting          211

13 -  Note purchase agreement with              211
      Sandwith/Mikron

14 -  Codicil to Ron Sandwith's will            214

15 -  Power of attorney for Ron Sandwith        214

16 -  Durable power of attorney for Ron         215
      Sandwith

17 -  Draft of note for Ron Sandwith and        216
      Mikron to Heritage

18 -  Draft of note for Ron Sandwith and        217
      Mikron to Heritage

19 -  Summarizing memo by Brian Czerwinski      221

Gary Kornman - 6/5/2007

1              GARY M. KORNMAN,

2    being first duly sworn, testified as follows:

3                   EXAMINATION

4    BY MR. MORRIS:

5        Q.   Would you please state your full name for the

6    record?

7        A.   Gary Morton Kornman.

8        Q.   Okay.  And you're appearing here today pursuant

9    to subpoena in connection with the confirmation of the plan

10   that's proposed in the Heritage bankruptcy case?

11                   MR. TILLOTSON:  I think technically, it's a

12   notice, Lee.  I don't think we got a subpoena.

13                   But -- if you know.  I'm sorry, go ahead.

14                   THE WITNESS:  I don't know.

15                   MR. MORRIS:  Okay.

16                   THE WITNESS:  I was told to be here, and I'm

17   here.

18                   MR. MORRIS:  Jeff, just so you know, there

19   was a subpoena that was provided, which includes a trial

20   subpoena.  So make sure you take a look at that.

21                   MR. TILLOTSON:  I will.  I'm sorry, I didn't

22   recall that, off the top of my head.

23                   MR. MORRIS:  Okay.

24                   MR. TILLOTSON:  If it's a trial subpoena,

25   sure.

Gary Kornman - 6/5/2007

7

1     Q.   Mr. Kornman, you're aware that there's a first

2  amended joint plan of liquidation that's been proposed in

3  connection with the Heritage Organization bankruptcy case,

4  correct?

5     A.   Yes, sir.  Vaguely.

6     Q.   Okay.  And that there's also a proposed

7  settlement between the trustee, Dennis Faulkner, and the --

8  what's been referred to as the client claimants and Mikron

9  Industries in the bankruptcy case, correct?

10    A.   Yes.

11    Q.   Okay.  And we're here, obviously, in connection

12 with those two matters.

13              Well, let me back up.  You're also aware,

14 aren't you, that there is a motion filed by the trustee for

15 approval of a settlement with Carl Berg, correct?

16    A.   Yes.

17    Q.   And you're familiar with all of those three

18 things?

19    A.   I'm familiar that they have been filed.  I'm not

20 familiar with the -- completely with the terms of all of

21 them.

22    Q.   Okay.  Today's deposition is in connection with

23 those three things.  Okay?

24    A.   Okay.

25    Q.   All right.  As well as matters related thereto.

1    All right?

2        A.    Okay.

3        Q.    Let me first start by asking you, I think we all

4    know that you've had your deposition taken before in this

5    case.

6        A.    Yes, sir, many times.

7        Q.    Okay.  What we're going to do, just to go through

8    the normal drill, is, you know, obviously, we'll ask

9    questions.  And if at any point there's a question that you

10   don't understand, please don't guess, just let me know, so

11   that we can clear that up.  Okay?

12       A.    That will be fine.  I won't speculate.

13       Q.    All right.  And along the same lines, if we can

14   both be sure to give verbal responses, as opposed to head

15   nods, so that she can pick it up on the record.

16       A.    That's fine.

17       Q.    Okay.  And if we need to take a break at any

18   point in time, just let me know, and we'll take a break.

19   Okay?

20       A.    Thank you.

21       Q.    All right.  Let's start first with just

22   establishing some connections that are related to the

23   Heritage Organization.

24             You understand that the Heritage

25   Organization, LLC, is in the bankruptcy case in front of

1   Judge Hauser, correct?

2        A.   It's the debtor, yes, sir.

3        Q.   And if I refer to Heritage in short, can we have

4   the understanding that we're talking about the Heritage

5   Organization, LLC?

6        A.   Yes, sir.

7        Q.   If I refer to any other Heritage, for example,

8   the Heritage Organization, Inc., I'll be sure to specify

9   that.  Okay?

10       A.   You're aware there's two Heritage Organization,

11  Inc.'s.

12       Q.   I wasn't.  But either way, if it's anything other

13  than the Heritage Organization, LLC, we'll be sure to make

14  sure that that's clear in the questions.  Okay?

15       A.   That's fine.

16       Q.   All right.  Thank you.

17            Now, Heritage was organized at the end of

18  1994; is that correct?

19       A.   That's correct.

20       Q.   All right.  And was that at your direction?

21       A.   I would have to say yes.

22       Q.   Okay.

23       A.   It's based on in my capacity that I had at the

24  time.  I was trustee for one of the major owners.

25       Q.   All right.  And what was Heritage set up for?

1    What was -- why was it organized?  What was its business

2    going to be?

3        A.   To do the same thing we had been -- that

4    Heritage, Inc. had done -- not the public Heritage, Inc.,

5    but Heritage, Inc., to do insurance type sales.

6        Q.   Okay.  And was there a particular reason -- well,

7    let me -- you've indicated that it was to do the same thing

8    that Heritage, Inc. had been doing.

9             Was there a particular reason that you --

10   that the decision was made to set up a new limited

11   liability company instead?

12       A.   Yes.

13       Q.   Okay.  And what was that?

14       A.   Limited liability companies had less formalities,

15   easier to deal with.  And for estate planning purposes, one

16   of the famous ways for estate planning, which was what we

17   were involved in, is to set up trusts for children and

18   grandchildren.

19       Q.   Okay.  Help me understand that, because maybe I'm

20   missing it a little bit.

21            When you say it was easier to set up trusts

22   and the like vis-a-vis the Heritage as the limited

23   liability company, what do you mean by that?

24       A.   I don't understand your question.

25       Q.   Well, let's back up and try again, because I

1    think maybe I'm just missing it.

2           When you started the limited liability

3    company to do what Heritage, Inc. had been doing, tell me

4    again what was the rationale there.

5           A.   I just told you that.

6           THE WITNESS:   Do you want to read it back to

7    him.

8           MR. TILLOTSON:   If you could answer his

9    question, you should.

10          A.   Same answer as before.   Ease of operations and

11   estate planning.

12          Q.   Okay.   And it's the estate planning that I think

13   I'm confused with.

14          What benefits does the limited liability

15   company have with respect to estate planning?

16          A.   Any business that's owned by something other than

17   an individual, i.e., partnerships or trusts -- partnerships

18   or trusts or other entities, is not included in someone's

19   taxable estate.

20          Q.   Okay.   So the benefit of having the limited

21   liability company was, it had benefits to the equity

22   owners, is that what you're saying?

23          A.   Excuse me a second.   I thought this was about the

24   confirmation?

25          MR. TILLOTSON:   You -- he's allowed some

Gary Kornman - 6/5/2007

1    latitude and to ask some questions about it, so you can

2    generally answer.  It's okay.

3         A.   Okay.  Say it again, Lee.

4         Q.   I'm really -- I don't -- I'm not planning to go

5    down this very far.  I'm just trying to understand if

6    there's a business angle here.

7              So I'm asking just simply, when you're

8    talking about the estate benefits, estate planning

9    benefits, are you simply -- is that in reference to the

10   owners of the limited liability company, as opposed to, you

11   know, any business benefit?

12        A.   If you have a business that the ultimate owner,

13   for example, is a trust, that trust is not included in

14   someone's taxable estate unless they were the ones that set

15   up the trust.

16        Q.   Okay.  Tell me generally -- give a little bit of

17   a historical background of what it is that Heritage did

18   between 1994, when it was first set up, and the time of the

19   bankruptcy filing.

20        A.   It had two principal businesses.  One was to

21   educate people on the use of life insurance for estate and

22   business planning.  We wrote large amounts of life

23   insurance for estate and business planning purposes.

24             We didn't write it, we educated people and

25   they bought it from insurance companies.  Sorry, I didn't

Gary Kornman - 6/5/2007

13

1   say that clearly.

2           And to educate people on estate planning and

3   asset planning, as far as how they could set their assets

4   up to accomplish whatever they were trying to accomplish.

5           It was all educational.  We didn't practice

6   law, we didn't practice accounting.  We were licensed to

7   sell life insurance.

8       Q.   All right.  So we -- there was a life insurance

9   aspect of the business, estate planning/asset planning

10  aspect of the business.

11          Did it do anything else?

12      A.   Had some management agreements, provided some

13  management services to some other entities.

14          That's all I remember right now.  There

15  might have been something else.

16      Q.   Okay.  As -- anything else that you can think of?

17      A.   Not right now.

18      Q.   Okay.  Within the category of estate and asset

19  planning, was part of that component to do work in

20  connection with income tax planning?

21      A.   Well, taxes are part of everything you do.

22      Q.   Okay.  Well, let me ask it a different way.  When

23  you describe asset planning, tell me the kinds of things

24  that Heritage did.

25      A.   Depends on who the client was, Lee.  If they --

Gary Kornman - 6/5/2007

14

1    what did they want, what were their goals.

2           Sometimes it was diversification.  Sometimes

3    it was financing for a business.  Sometimes it was helping

4    them with a personal matter.  We did whatever a client

5    needed to have done.

6        Q.    Okay.

7        A.    Many times we didn't even get paid for what we

8    did.

9        Q.    Right.  Let's just focus specifically on capital

10   gains tax planning.  Okay?

11          When did Heritage begin working with clients

12   with respect to capital gains reduction or elimination

13   planning techniques?

14       A.    The first one I remember, and I'm not going to

15   give names, was one in California, where we had done a very

16   large estate plan and had sold a $10 million life insurance

17   premium.

18          And there was some question about whether or

19   not there was going to be a capital gains at that person's

20   death from the estate planning, and their attorneys

21   developed a strategy for avoidance of that capital gain.

22          And we participated in educating them, and

23   actually had some participation in the -- in what the

24   attorney designed.  And it was audited, went through audit

25   just fine.

Gary Kornman - 6/5/2007

15

1    Q.    Do you remember what time frame?

2    A.    It went on for a period of time.  It was a very

3    complicated transaction.  There were bank loans involved.

4    It was a very -- they designed something that was very

5    complicated.

6          Maybe -- all I can say is, between maybe

7    probably '90 and '95, somewhere in that area.

8    Q.    Okay.

9    A.    I'm sorry I can't be more specific.

10   Q.    No, that's fine.  That's actually a pretty good

11   range.

12         Was Ed Ahrens involved in that project from

13   Arthur Andersen?

14   A.    No, sir.

15   Q.    When did you first meet Ed Ahrens?

16   A.    Again, we're talking about things years ago, so

17   the dates -- I can tell you the circumstances.  I can't

18   tell you the dates.

19         There was a case in Oakland, California,

20   where we were trying to educate people to buy a large

21   amount of life insurance.  I don't remember the client's

22   last name.  I remember his first name was Tom.

23         It was a security company.  And Arthur

24   Andersen's San Francisco office or Oakland office -- one of

25   the two, I don't really know -- was involved in that case.

Gary Kornman - 6/5/2007

16

1              And they came up with some structures

2      that -- best way to say it, it didn't accomplish what was

3      trying to be accomplished.  And they really didn't have the

4      expertise to deal with either the case or some of the

5      things we were educating them about, and they brought Ed

6      Ahrens in from -- I don't know whether he was in Boise at

7      the time, I think he might have been in Boise or Seattle,

8      one of the two, obviously, to help them on that case.  And

9      we met him on that case.

10         Q.   Okay.  And do you know the time frame you're

11     talking about?

12         A.   Again, I would have to say it was in the early

13     '90s.

14         Q.   Okay.  And Ed Ahrens was with Arthur Andersen at

15     that point in time?

16         A.   Yes, sir.

17         Q.   Let me try to focus in more specifically to some

18     of the issues involved in the bankruptcy case.  Okay?

19         A.   Okay.

20         Q.   And then we'll circle back and just talk about

21     kind of who's who a little bit.

22         A.   Okay.

23         Q.   You understand that the -- what we call the

24     client tax claims in the bankruptcy case are claims

25     associated with the -- what's been referred to as the 752

1   transaction.  Are you familiar with that?

2       A.   It's an investment transaction, but I understand

3   it's been referred to as 752.

4       Q.   Okay.  And the 752 reference is in reference to

5   Section 752 of the Internal Revenue Code.

6       A.   That's correct, part of it.

7       Q.   And the concept there is that an interpretation

8   of Section 752 -- well, strike that.

9            You understand that the reference to the 752

10  transactions relates to the transactions designed to

11  eliminate capital gains tax that might otherwise be payable

12  absent the transaction?

13      A.   That's one of its purposes.

14      Q.   Okay.  The client claimants that are at issue in

15  the bankruptcy case -- well, let me ask you this:  Have you

16  reviewed the disclosure statement that's been filed in the

17  bankruptcy case?

18      A.   No.

19      Q.   Okay.

20      A.   I mean, I know -- I know that there's a document.

21  I haven't read it.

22      Q.   Okay.  The -- let me just kind of run through

23  the -- who the client claimants are in this case, just so

24  that you're aware of it.

25           You've got Meralex and Howard Jenkins.

1    You're familiar with them, correct?

2        A.   Yes.

3        Q.   You have the Fluharty family.  Are you familiar

4    with that name?

5        A.   I'm familiar with the name.  I don't know the

6    people.

7        Q.   Right.  The Rainwater family.  Again, are you

8    familiar with the name?

9        A.   I'm familiar with the name.  I don't know the

10   people.

11       Q.   Okay.  The Trout family?

12       A.   Again, I'm familiar with the name.  I don't know

13   the people.

14       Q.   Okay.  Ross Love?

15       A.   Again, I'm familiar with the name.  I've never

16   met him, I don't believe.

17       Q.   Okay.  The Behnke family?

18       A.   Again, I'm familiar with the name; but to my

19   knowledge, I've never met them.

20            MR. MORRIS:  Who am I forgetting?

21            MR. TILLOTSON:  Woodruff, Patterson.

22            MS. HARRIS:  Patterson.

23       Q.   Right.  Paul Woodruff and Kent -- I'm sorry,

24   Kent -- yeah, Paul Woodruff and Kent Patterson, same idea.

25       A.   Yeah, I've heard the names, but I've never met

Gary Kornman - 6/5/2007

1    the people.

2        Q.    I'll represent to you that all of these

3    individuals and entities that we've just referred to have

4    filed claims in the case based upon a transaction that's

5    generally referred to as the 752 transaction in the

6    bankruptcy case.   Okay?

7        A.    I accept that.   If you say that, I accept what

8    you're saying.

9        Q.    And what I want to do is get an understanding of

10   when it was that Heritage first learned about the 752

11   technique.

12       A.    When you say, learned about the 752 technique,

13   it's a nebulous term.   And the reason is because I might

14   have heard that there was a capital gains type structure

15   that could be done, but I didn't know what it was.

16            There's Gerry Tracey, who was Ed Ahrens

17   partner at one time, told us that he had various things

18   from both an estate tax -- various estate tax strategies

19   and income tax strategies that would -- would be effective

20   to minimize the taxes.   He never told us what they were.

21            So I'm saying, I don't know what he was

22   speaking of specifically.

23       Q.    Okay.   When was -- when did you learn about

24   how -- well, let me back up.

25            When do you recall the first time learning

1    about how the 752 transaction structure could be used to

2    eliminate capital gains tax?

3         A.   The first time we seriously investigated that

4    was, a client of ours, who you're familiar with, Howard

5    Jenkins, asked -- we had done an estate -- some estate work

6    for him, educated him on some estate stuff that his

7    attorneys had implemented.  And he asked us, he said that

8    his brother-in-law had formerly been with Arthur Andersen,

9    I believe that's -- and that his brother-in-law had told

10   him that there were some strategies out there to eliminate

11   capital gains taxes.  He wanted us to go out and find them.

12        And so, we have a contact -- we've had

13   contacts with law firms, attorneys all over the United

14   States, and we started asking around.

15        And the first thing we came up with was

16   what's known as a charitable -- a short-term charitable

17   remainder annuity trust.  And I don't know who invented

18   that particular strategy, but using certain rules, you

19   could minimize capital gains taxes.

20        Jonathan Blatmachr takes credit for that.

21   Ed Ahrens also knew about it.  It was known by the more

22   sophisticated attorneys in the country.

23        And we presented that to him, and because it

24   required a 5 percent contribution to charity, he rejected

25   that.  He said, I don't want to do anything that requires a

Gary Kornman - 6/5/2007

1  charitable -- any more charitable contributions.  We have a

2  very large charitable foundation.

3            So then we started asking around again.  And

4  as a result of having talked to Ed Ahrens about the

5  short-term charitable remainder annuity trust, or SCRAT, if

6  you'll allow me not to say the whole mouthful, he said,

7  well, there's this other transaction that Arthur Andersen's

8  been using.  And that's when he introduced us to it.

9       Q.   And was that in the 1998 time frame?

10      A.   '97, '98.

11      Q.   Okay.  Let me back up and make sure that we make

12  a couple of connections here.

13            Jonathan Blatmachr, at least at that point,

14  was an attorney with Milbank Tweed; is that right?

15      A.   That's correct.

16      Q.   And then Ed Ahrens, at that point in time, was

17  still with Arthur Andersen, correct?

18      A.   No.  At this point in time, Ed Ahrens had -- was

19  part of a firm -- and I don't know the exact history of his

20  firm, but there was Edgar, Betz, Tracey, Ahrens; and then,

21  it changed over to Ahrens & DeAngeli, so...

22            I don't know the time frame, but he was no

23  longer with Arthur Andersen.  I'm fairly sure of that.

24      Q.   Prior to that point in time when Ed Ahrens was

25  still with -- I'm sorry, when Ed Ahrens was still with

1    Arthur Andersen, had you approached Mr. Ahrens to be

2    employed by Heritage?

3         A.    There was a case in Iowa -- I'm trying to think

4    where it was.  It wasn't Muscatine.  I'll think of it in a

5    minute.

6              But anyhow, it was a very large family.

7    There was six or eight siblings who had many children.  And

8    it was an electrical supply company called Crescent

9    Electric Supply Company, and one of the children of one of

10   the siblings was a -- I think she was a professor of tax at

11   some college.  Her husband was an attorney.  And this was

12   the daughter of one of the male siblings.

13             And we had made a proposal to do some

14   insurance work, and how they could do some business

15   planning.  And it got real mixed up, is the best way to

16   describe it.

17             There was lots of different thoughts among

18   50 people in the family, and I don't remember whether we

19   hired Arthur Andersen through Ed Ahrens or whether they

20   hired Arthur Andersen through Ed Ahrens.  I just don't

21   remember.

22             But Ed was involved in that case, and came

23   down and spoke to a group meeting of the family at the

24   company.  And we ended up placing, through various

25   insurance companies, a large amount of life insurance.

1       They never implemented any of the business

2  planning that was ever proposed by anybody.  We educated

3  them, Ed gave them some -- some information.  Their

4  attorneys gave them some information.  But anyhow, nothing

5  ever happened, except they purchased a lot of life

6  insurance.

7       Somewhere after that, I think Ed told me

8  that he was considering leaving Arthur Andersen.  And I

9  believe I might have said, well, would you have any

10  interest in joining us?

11       So there was no, if you'll say, detailed

12  discussion.  It was a pretty casual, you know, what do you

13  want to do?  What are you going to do?  What do you want to

14  do?  Would you have any reason to join us?  That kind of

15  thing.

16       It wasn't a real big negotiation or

17  something.

18     Q.   Okay.  So in connection with another matter that

19  was involved in a presentation that Mr. Ahrens was involved

20  in, you learned that he was thinking about leaving Arthur

21  Andersen and approached him to see whether he'd have an

22  interest in coming to Heritage?

23     A.   Yeah.

24     Q.   Is that right?

25     A.   Yeah, casual cup of coffee kind of thing.

Gary Kornman - 6/5/2007

24

1      Q.    And as part of that, you suggested to him that

2    you ought to talk to Ralph about being at Heritage,

3    correct?

4      A.    I can't remember that far back, Lee.

5      Q.    Okay.  So is it your testimony that there weren't

6    any terms ever presented to Mr. Ahrens for coming over to

7    Heritage?

8      A.    I -- I can't remember.

9      Q.    Okay.

10     A.    That was 10, 15 years ago.

11     Q.    All right.  Part of what could potentially have

12   been appealing to Heritage, though, if Ed Ahrens came over,

13   is that it would eliminate a source of competition for

14   Heritage, right?

15     A.    Not really.  I don't --

16     Q.    You don't recall --

17     A.    I mean, yeah, everybody's a competitor.  But he

18   was with Arthur Andersen's family wealth planning group, or

19   whatever it was, and they weren't going to close down that

20   group because he left, whether he went to Heritage or went

21   out to practice law on his own.

22               So I don't think that's an accurate

23   statement.

24     Q.    Okay.  But now, you didn't really view Arthur

25   Andersen as really being a competitor, per se.  You viewed

25

1    Ed Ahrens as a competitor, didn't you?

2         A.   No, I viewed Arthur Andersen as a competitor.

3    They hired one of our top marketing guys away from us and

4    were using him to get into cases.

5         Q.   Okay.  So --

6         A.   I -- definitely, Arthur Andersen was a much

7    bigger competitor than Ed Ahrens ever would have been.

8         Q.   All right.  So you don't recall any conversations

9    with Ed Ahrens talking about how, if you could bring him on

10   board at Heritage, it would eliminate the competition that

11   he presented to Heritage?

12        A.   Just what I said earlier, I don't remember that.

13   But Ed would be -- that's like saying that any good estate

14   attorney is competition to Heritage.  It's like saying Jon

15   Blatmachr, who we got a lot of information from and he did

16   a lot of work for our clients, was a competitor.

17             I mean, you know, if we could have gotten

18   all the estate attorneys in the United States to join us, I

19   guess we would have eliminated all of our competitors.

20             I don't mean to be cute, but one out of

21   thousands doesn't really make any difference.

22        Q.   Okay.  All right.  So in this 1997, 1998 time

23   frame, Mr. Ahrens brings the 752 transaction concept to

24   Heritage; is that right?

25        A.   Yes.

1    Q.    Okay.  Was there -- at the time that that

2    occurred, was there any financial relationship -- or I

3    mean, sorry, financial terms for that with Mr. Ahrens or

4    his firm?

5    A.    That goes back to Gerry Tracey.  We had had a lot

6    of discussions about, they had this and they had that.

7    They may have showed us even some other things that I

8    didn't particularly -- wasn't impressed with.

9              We're very choosy about the law and

10   substance of what we do.

11             So there may have been some discussions.

12   I've seen some documentation where we were going to pay

13   them this many thousands of dollars for information.

14             I think we may have paid them -- when I say

15   we, I'm referring to Heritage -- we may have paid them

16   $100,000 to show us some of this stuff.

17             I remember there was a payment of that

18   amount, and I don't remember what it was for.  Could have

19   well been from what I call R&D, research and development.

20             And so, there were discussions all through

21   this period of time over various different kinds.

22             I'm sure you've got plenty of little

23   diagrams.  Ed's famous for doing his little drawings of

24   various strategies that he thinks of.

25             And so, yeah, there was some discussion of

economics.  But, you know, I think that when we got down to

the -- to actually talking about 752, I think I said to him

that I thought it would be reasonable to pay him a 5

percent royalty, pay his firm a 5 percent royalty, when

we -- of the gross revenues that we got from 752

transactions, from those investment transactions dealing

with 752.

So that's -- I don't think we had a long

discussion.  I think that's what I said, and he said fine.

Q.    Okay.  At this point in time, you'd mentioned the

Edgar Betz -- we'll call it the Edgar Betz firm --

A.    Right.

Q.    -- that Mr. Ahrens had been involved with after

he left Arthur Andersen, right?

A.    Right.

Q.    By the time that 752 technique was brought to

Heritage, Mr. Ahrens had split away from that and formed

Ahrens & DeAngeli, to your understanding?

A.    I'm not -- I'm not really sure.  Tracey may have

still been with him.

I mean, Betz -- they kind of fell out one at

a time.  I remember the guy Edgar, I remember him one time,

he fell out.  I don't know the history of the firm.

Q.    Okay.  On the 5 percent royalty that you had

referenced, that was going to be paid, not to the law firm,

Gary Kornman - 6/5/2007

28

1  but to a separately established entity?

2       A.   No.

3       Q.   No?

4       A.   No.

5       Q.   Okay.

6            MR. TILLOTSON:   Listen to his question and

7  then answer his question.   I'm not sure he'd finished.

8            THE WITNESS:   Okay.

9       A.   I'm assuming you're asking originally?

10           Originally, the deal was that we would pay

11  his law firm, whoever that was at the time, 5 percent of

12  the gross revenue that we derived, minus any expenses that

13  we had to pay.

14           So, for example, if we, for whatever reason,

15  had some extraordinary expense -- for example, we also paid

16  finder's fees if somebody brought us a potential client.

17  And so, that would have come off the top before we paid

18  them anything.

19       Q.   So the concept was the 5 percent royalty on the,

20  I mean, truly net net gross dollars?

21       A.   Yeah.   When I say yeah, not our general operating

22  expenses; but if we paid somebody else for a reference or

23  something, as far as a stockbroker or an insurance agent or

24  something like that, then that came off the top.

25       Q.   Right.

1     A.    There may have been something else, but that's

2  the thing I remember.

3     Q.    Okay.  At some point in time, it changed, though,

4  and payment was made to FWP Technologies, Inc; is that

5  correct?

6     A.    That's correct.

7     Q.    And do you recall when that was?

8     A.    No, I don't.

9     Q.    Do you remember why it changed from the law firm

10 to FWP?

11    A.    My understanding, and I wasn't a party to all

12 this, was that they primarily saw themselves as being in

13 the estate planning, charitable planning arena, and this

14 took a lot of their time.

15             These were very detailed, long, tough cases.

16 Dealt with -- had to do a lot of client contact, a lot of

17 meetings.  And they -- his partners, I think, were not

18 comfortable being involved, doing this kind of work and

19 giving opinion letters on these types of transactions.

20             And I think he told them, well, you know --

21 I didn't ever say that the 5 percent was to Ahrens or his

22 partners, it was to the firm.  And so, I think he cut some

23 kind of deal with his partners that they allowed him to set

24 up a separate company to continue to get the 5 percent.  I

25 don't know what happened, but I do know that it was

30

1   something internally with them.

2       Q.   Okay.  And then, at some point, once FWP

3   Technology was formed, then the 5 percent royalty was paid

4   by Heritage to FWP directly, right?

5       A.   I believe so.

6       Q.   Okay.  After Mr. Ahrens had brought the 752

7   technique to Heritage, there was a period of years that

8   Heritage presented that technique to various clients,

9   correct?

10      A.   Yes.  Howard Jenkins was the first one.

11      Q.   Okay.  When did Heritage stop presenting the

12  technique to clients?

13      A.   Either in 2002 or 2003, I'm not really sure

14  when -- which.

15      Q.   And was there any particular reason that Heritage

16  stopped presenting that to clients?

17      A.   I don't think it was as much that we stopped

18  presenting it as people stopped being willing to take the

19  risk.

20           By that time, the Internal Revenue Service

21  was very active dealing with anything regarding taxes,

22  whether it was a corporate tax benefit or an individual tax

23  benefit.  And at that point in time, I don't -- I think it

24  was a foregone conclusion that they were going to challenge

25  for sure anything that was done that had tax benefits to

Gary Kornman - 6/5/2007

1       it.

2                       And I think people just quit saying, you

3       know -- the interest -- two things happened.  First thing

4       that happened -- and on top of that, the stock market, if

5       you'll pardon me for using a little word there, went to

6       hell.  And so, people that had big gains in '99, 2000 and

7       2001, by 2002, those gains, a lot of them vanished.

8           Q.   Okay.  We'll probably circle back on some of

9       these things, but what I want to do now is just shift gears

10      here a little bit and talk about the who's who.  I

11      mentioned to you that we would do that.

12                      When Heritage was organized in late 1994,

13      were you an officer with Heritage?

14          A.   I don't remember that far back what the first

15      structure was, because there was some changes made over

16      time.

17                      The managing member was GMK Family Holdings,

18      and I was the manager of that LLC.  So there was effective

19      control by that LLC, but I don't remember specifically what

20      officers or who had what roles or anything like that.

21          Q.   Okay.  Let me back up and try to mainstream this

22      a little bit.

23                      When Heritage was first formed, do you

24      recall that the managing member was actually the Heritage

25      Organization, Inc.?

1      A.    Could have been.  That's what I'm saying, it's
2  been so long ago, I just don't remember how it was done.
3      Q.    Okay.  But in any event, at some point, GMK
4  Family Holdings, LLC became the managing member of
5  Heritage, right?
6      A.    That's right.  I'm sorry, I just forgot that Inc.
7  was ever involved in it.
8      Q.    Okay.  And you were saying that you were the
9  manager of GMK Family Holdings, LLC?
10     A.    Yes, sir.
11     Q.    Were you also -- and I'm going to focus on the
12  time frame that GMK Family Holdings was the managing member
13  of Heritage, and rolling forward from there.  Okay?
14             During that time frame, were you also the
15  chief executive officer of Heritage?
16     A.    Well, let me qualify.  You're taking a period
17  from here to there, and I can say that at some point during
18  that period, I was the chief executive.  I don't know what
19  times we're talking about here, but, yes, I was the chief
20  executive, in addition, actually, of the Heritage
21  Organization, LLC.
22     Q.    Okay.  And let's try to hone in on time frames,
23  so that we can make it a little cleaner.
24             In April of 2004, it's my understanding that
25  you essentially resigned from all positions involving

1   Heritage, is that accurate?

2       A.   I don't remember the time frame.  I mean, I don't

3   know the date or the month.  It was -- that sounds close.

4   It could have been March, April, something like in there,

5   but I'm not sure.

6       Q.   Okay.  Do you remember when Heritage -- well, let

7   me back up.

8            Heritage filed for Chapter 11 protection

9   starting the current bankruptcy case we're dealing with on

10  May 17th, 2004.  Okay?  In reference to that date --

11           Well, do you recall when the filing took

12  place?

13      A.   I would presume you have the date correct.

14      Q.   Well, I mean, were you aware of the fact that

15  Heritage had filed bankruptcy at the time?

16      A.   I don't remember.

17      Q.   Okay.  Well, let me try it this way:  Do you

18  remember when Ralph Canada obtained his arbitration award

19  against Heritage?

20      A.   I remember that he got one, yes.

21      Q.   Okay.  And were -- had you resigned from Heritage

22  at that point in time?

23      A.   Again, I don't want to speculate.  I'd have to

24  look at company records to be certain of all this.  I'm

25  just not going to speculate.

1       Q.   All right.  Well, let's try and do it this way:

2    What I want to do is, I want to focus on the time frame

3    between 1998, when discussions took place with Mr. Jenkins

4    on the 752 technique, okay, and extend through the time

5    period of when Heritage was working with the Sandwith

6    family on the estate planning technique in 2003.  Okay?

7       A.   I don't understand your question.

8       Q.   All right.  Did you work with the Sandwith family

9    on some estate planning?

10      A.   We educated -- they hired us, I believe, in 2002

11   to educate them on what they might be able to do, from a

12   business planning and estate planning, for Ron Sandwith.

13   It wasn't the Sandwith family, it was Ron Sandwith.

14      Q.   Okay.  And some of that activity trickled into

15   2003, right?

16      A.   Yes, sir.

17      Q.   Okay.  So what I'm saying is, to try and put a

18   frame of reference on things, I'm going to start from the

19   time that Heritage was working with Mr. Jenkins on the 752

20   technique and extending through this period in, we'll call

21   it early 2003, when Heritage was working with the Sandwith

22   family.  Okay?

23      A.   I understand the dates.

24      Q.   Okay.  And my question is:  Were you the chief

25   executive of Heritage during that entire time frame?

Gary Kornman - 6/5/2007

35

A.   That would have been from '98 to 2000, early --
late '98, you're saying, to 2000 -- early 2003.  I'd have
to look at the company records to be certain, but I believe
I was.

          I'm not -- you know, when you start talking
about dates of a long period of time, who knows.  I mean, I
don't --

Q.   Okay.  If the books of Heritage reflect that
during that same period of time you were the vice president
of Heritage, you don't have any reason to dispute that, do
you?

A.   No, if that's what the records show, that would
be --

Q.   Okay.  During that same time period, GMK Family
Holdings, LLC was the manager of Heritage, correct?

A.   Again, whatever the records show, but I believe
so.

          I don't know -- when you said Inc., I don't
know what that time period was that Inc. might have been
the manager.

Q.   During that same time period, late 1998 through
early 2003, you were the manager of GMK Family Holdings,
LLC, correct?

A.   If that's what the records show, that's what it
was.

1    Q.    Okay.  And you were a member of GMK Family

2    Holdings, LLC during that period, correct?

3                   (Mr. Lewis left the room.)

4    A.    Yes.

5    Q.    Okay.  Are you still a member of GMK Family

6    Holdings, LLC?

7    A.    I'm not certain.  I'd have to look at the company

8    records to see.

9    Q.    Okay.  You don't have any knowledge of that

10   changing after early 2003, though, do you?

11                   (Mr. Lewis entered the room.)

12   A.    Just what I said, I'd have to look at the company

13   records to be certain.

14   Q.    Okay.  Are you currently the manager of GMK

15   Family Holdings, LLC?

16   A.    I don't believe so, but I'm -- again, I'd have to

17   look at the company records.

18         These are lots of different things and

19   times, and I don't -- I'm pretty sure I'm not the manager

20   at this moment of GMK Family Holdings, LLC.

21   Q.    Okay.  I will represent to you that the schedules

22   filed in the bankruptcy case for Heritage were signed by

23   Michael Kornman, as the manager of GMK Family Holdings for

24   Heritage.  Okay?

25   A.    Okay.  What date was that?

Gary Kornman - 6/5/2007

1    Q.    Sometime after May 17th, 2004 and before

2    August 13th, 2004.

3    A.    Okay.  Well, that probably established that I'm

4    not the manager anymore.

5    Q.    Okay.  Well, that's what I'm getting to, is -- is

6    if that ever changed back from Michael Kornman to you.

7    A.    Again, I'd have to look at the company records.

8    Q.    All right.  But if -- let's put some frame of

9    reference on this.

10         Michael Kornman is your son, correct?

11   A.    Yes, sir, one of two.

12   Q.    And if he signed something as the manager of GMK

13   Family Holdings, LLC, you would find that to be accurate,

14   right?

15   A.    I don't understand what you mean to be accurate.

16   Q.    Well, if he signs something in a particular

17   capacity, do you believe that he would accurately be

18   reflecting --

19   A.    He just walked in behind you.

20              (Mr. Michael Kornman entered the room.)

21              MR. MICHAEL KORNMAN:  Hello, everybody.  Did

22   y'all miss me?

23              THE WITNESS:  You were just the topic of

24   conversation.

25              MR. MICHAEL KORNMAN:  I'm Michael.

Gary Kornman - 6/5/2007

38

1          MR. MORRIS:  Let's go off the record.

2          (Recess 10:23 to 10:24.)

3     A.    Okay.  Would you repeat the question?

4          MR. TILLOTSON:  Could we just take a short

5     two-minute break?

6          MR. MORRIS:  That's fine.

7          (Recess 10:24 to 10:31.)

8     Q.    We're back on the record.

9          Mr. Kornman, when we left off, we were

10    talking about various connections.  And just to continue

11    along those lines, to set the who's who, one of Heritage's

12    current members is Steadfast Investments, LP, correct?

13    A.    Yes.

14    Q.    And the -- who was -- do you have an association

15    in one form or another with Steadfast?

16    A.    I probably am related in some way to the general

17    partner.

18    Q.    Okay.  And the general partner of Steadfast is

19    Kornman & Associates, Inc., correct?

20    A.    That sounds reasonable.

21    Q.    Okay.

22         MR. TILLOTSON:  Well, if you remember, tell

23    him yes.  If you don't have a basis to dispute it, tell him

24    that as well.

25    A.    Yeah, I believe that's correct.

Gary Kornman - 6/5/2007

39

1     Q.    There is another member of Heritage called

2   Tikchik.  Are you familiar with that entity?  Tikchik.

3     A.    I'm familiar with the entity.  I don't remember

4   that it's a member of Heritage.

5               Well, wait a minute, maybe it is.  That was

6   owned by -- yes, you're right, it is a member of Heritage.

7               I believe that entity is owned by Steadfast.

8   That's what confused me.

9     Q.    Okay.  And you answered my next question, which

10  is that one's owned by Steadfast now, as well?

11    A.    Uh-huh.

12    Q.    Okay.  I want to talk about two other entities.

13  One is called Strategic Leasing, LP, I believe.  Are you

14  familiar with that entity?

15    A.    I know there's a Strategic Leasing.  I'm not sure

16  of what its -- I'd have to look at the records.  I don't

17  know whether it's an LLC or an LP.

18    Q.    Okay.  Do you know who the general partner or

19  managing member of that entity is?

20    A.    I'm sorry, I just don't remember.

21    Q.    We'll circle back on that after a break, because

22  I don't have that in front of me either.

23    A.    Okay.

24    Q.    Let's just talk about a couple of other folks.

25               We referenced Michael Kornman a little bit

40

1    earlier today.  He was -- at the time of the -- in May of

2    2004, he was the manager of GMK Family Holdings, LLC,

3    correct?

4        A.    I believe so.

5        Q.    Is he currently the manager of GMK Family

6    Holdings, LLC?

7        A.    I don't have any information that that's changed.

8    So the answer, I guess, is yes.

9        Q.    Let's talk about Vickie Walker.  You're familiar

10   with her, correct?

11       A.    Yes, I've known her for 30 years.

12       Q.    Okay.  Does she have a position with GMK Family

13   Holdings currently, to your knowledge?

14       A.    Again, Lee, it's like Michael, I don't know if

15   something's changed that I don't know about.

16             She was maybe the treasurer or secretary at

17   one point in time.  I don't know.  I would presume she

18   still is.  I don't know of anything -- any change that's

19   taken place.

20       Q.    Okay.  Would that be the same with respect to

21   Kornman & Associates, Inc.?

22       A.    I'm sorry, it's the same?

23       Q.    That she's secretary, treasurer of that entity.

24       A.    I believe so.

25       Q.    Okay.  Steadfast Investments, as well?

Gary Kornman - 6/5/2007

1      A.    No, she doesn't have a position with Steadfast.

2      Q.    Okay.  Is that Claudia McElwee, does she have --

3      A.    Steadfast doesn't have any officers.

4            You're talking about the LP?

5      Q.    Right.

6      A.    It's a partnership, so it's -- doesn't have

7   officers.

8      Q.    All right.  Does Claudia McElwee have a position

9   with Kornman & Associates, Inc.?

10     A.    I just don't remember, Lee.  I'm sorry.

11     Q.    All right.  Would Vickie Walker be in the best

12  position to be able to talk about those types of things?

13     A.    Yes.

14     Q.    Okay.

15           MR. MORRIS:  Can we take a quick break?

16           MR. TILLOTSON:  Sure.

17           (Recess 10:38 to 10:46.)

18           MR. MORRIS:  As I had indicated to Mr.

19  Kornman and Mr. Tillotson, regrettably, I've had something

20  come up that I need to attend to.  So I'm going to pass the

21  ball here to the rest of the folks and come back.  And I

22  apologize for that, but...

23           MR. TILLOTSON:  No problem.

24           THE WITNESS:  No problem.

25           MR. MORRIS:  Thank you.

Gary Kornman - 6/5/2007

1              (Mr. Morris left the room.)

2              (Ms. Perry entered the room.)

3                    EXAMINATION

4    BY MS. HARRIS:

5        Q.   Good morning, Mr. Kornman.  I know I introduced

6    myself earlier, but I'm Holly Harris, and I'm here on

7    behalf of the Skinner Trusts.

8              I hope to divide -- I think we divided up

9    the questions, so you won't have to hear me talk for very

10   long.

11             MS. HARRIS:  I'd like to go ahead and have

12   this marked as Exhibit 1.

13             (Exhibit No. 1 marked.)

14       Q.   Mr. Kornman, please review that and let me know

15   when you've had a chance to review the document.

16       A.   Okay.

17       Q.   Mr. Kornman, do you recognize this document?

18       A.   I do, yes.

19       Q.   And is this the proof of claim that you have

20   filed in this case on behalf of yourself?

21       A.   Yes, ma'am.

22       Q.   And is that your signature at the bottom of the

23   page?

24       A.   Yes, ma'am.

25       Q.   Okay.  What I'd like to do is ask you a couple of

1    questions about this, if I may, to better understand the

2    nature of your claim.

3              If you'll turn to Exhibit A, which is page

4    2, the spreadsheet.

5         A.   I see that.

6         Q.   Do you see the first line item there.  I'm not

7    going to read the whole thing, but legal fees, costs and

8    expenses in the amount of approximately 5.2 million

9    dollars.

10             Do you see that entry?

11        A.   Yes, ma'am.

12        Q.   Would you please identify the law firms that are

13   represented by that amount for us?

14        A.   Okay.  I cannot do that.  My counsel has advised

15   me that they are preparing a schedule to provide that

16   information.  So that will be coming, and it will -- you'll

17   get that information as an additional part of this.

18             MR. TILLOTSON:  I don't think he can

19   identify all of them.

20             I'll encourage him to identify any he can

21   remember, but we'll provide a complete list and I'll have

22   them verify all the law firms that make up that claim, if

23   that will help.

24             MS. HARRIS:  It would, Jeff.  And as you

25   know, we've asked for that material.  It's now more than a

1   week late in coming.  So, we ask that you get that to us.

2             At this point, we will need to move to go to

3   the Court and ask that that issue be addressed.  But we'll

4   deal with that at a later time.

5             MR. TILLOTSON:  I can provide it to you

6   before his deposition is concluded, if you want to question

7   him about it.

8             MS. HARRIS:  Well, whenever you can get us

9   the information.

10            As I said, it is late, and it has not been

11   provided to date, as you said it would be.  We'll do the

12   best we can, moving forward.

13            MR. TILLOTSON:  Okay.

14   Q.   Mr. Kornman, could you identify those firms that

15   you do remember with regard to your 5.2 million dollar

16   claim?

17   A.   Lynn, Tillotson & Pinker; Hill & Gilstrap;

18   Burleson, Pate & Gibson; Hoffman DeAngeli -- Hoffman

19   DeAngeli -- Angeli, I'm sorry.

20            Robbins, et al.;  Winston & Strawn; Sullivan

21   & Worcester; Janvee -- or somebody and Janvee.  Something

22   and Mickelson.  I will think of the guy's name in a minute.

23            There's more, that's just --

24   Q.   I'm just asking for your best --

25   A.   There's several more, I'm sure.

Gary Kornman - 6/5/2007

1    Q.    Okay.   Okay.   What I'd like to do is identify

2   each of those, and I'm going to ask you whether you have

3   paid these law firms -- whether you've paid them in full or

4   whether there is an outstanding bill.

5    A.    Okay.

6    Q.    And I'll do the best I can, based on the list

7   you've provided.

8         With regard to the Lynn Tillotson firm, do

9   you have an outstanding bill with them --

10   A.    I believe I do.

11   Q.    -- with regard to the Hale group?

12         MR. TILLOTSON:  Hill.

13         MS. HARRIS:  Hill.

14   A.    Gilstrap.

15   Q.    Gilstrap.

16   A.    I don't think so.  If it is, it's minor.

17   Q.    Okay.  Burls and something?

18         MR. TILLOTSON:  Burleson, Pate & Gibson.

19   Q.    Do you have an outstanding bill?

20   A.    No.

21   Q.    What about Hoffman & Angeli?

22   A.    Yes.

23   Q.    And Robbins -- is it Dreuser?

24   A.    Robbins --

25   Q.    Russell.  And do you have an outstanding bill

Gary Kornman - 6/5/2007

46

1    with Robbins & Russell?

2        A.    Yes, ma'am.

3        Q.    And Winston?

4        A.    Yes, ma'am.

5        Q.    And Sullivan, and I didn't get the second name.

6        A.    Worcester.  It's W-O-R-C-E-S-T-E-R, I think.

7              THE WITNESS:  Is that right?

8        A.    They're in Boston.

9        Q.    And do you have an outstanding bill with them?

10       A.    Yes.

11       Q.    And blank and Janvee, or a portion of that name.

12       A.    Krage & Janvee.

13             MR. TILLOTSON:  K-R-A-G-E.

14       A.    I don't think so.

15       Q.    And the last one was the Nicholson and --

16   something and Nicholson.

17       A.    Mickelson, M-I-C-K-E-L-S-O-N.  I don't think so.

18       Q.    Okay.  Mr. Kornman, could you, for us, describe

19   the basis why you think the estate should indemnify that

20   5.2 million dollar claim?

21       A.    It all came as a result out of my activities --

22   my -- what I was doing for Heritage, basically.  Sales call

23   I made for Heritage.

24       Q.    Anything else?

25       A.    Well, you want to know the basis for it?

Gary Kornman - 6/5/2007

47

1          There's an indemnity provision in our -- in

2     our -- excuse me, in Heritage's corporate records -- I

3     mean, entity records.

4          Q.   I'm giving you the opportunity to explain as

5     fully as you want.  So if that's it...

6          A.   Well, if you just look at the -- make the

7     question more specific, if you would, please.  Let's try it

8     again.

9          Q.   I'm trying to understand why you believe the

10    estate should indemnify this 5.2 million dollar claim that

11    you've identified on Exhibit A.

12         A.   Well, because it arose out of my connection with

13    Heritage, and because Heritage basically guaranteed that to

14    me.

15         Q.   And guaranteed by -- by what action or what

16    document?

17         A.   The corporate -- the company documents.

18         Q.   Could you identify which company documents that

19    you're referring to?

20         A.   Probably the operating agreement.

21         Q.   Any others?

22         A.   Not that come to my mind right now.

23         Q.   Okay.  Mr. Kornman, let's move on to the second

24    line item.  Again, I'll just summarize legal fees, costs

25    and expenses, this time in the amount of $249,338.99.

1          Mr. Kornman, could you identify the law

2    firms associated with this claim?

3          A.    No, ma'am, I can't.  I can't break them out.

4          Q.    And would you explain your basis for claiming

5    that the estate should indemnify you for this amount?

6          A.    I served as the chief executive of Heritage, I

7    served as a salesman for Heritage, and I was indemnified in

8    those positions.

9          Q.    Expense -- I'm moving on to the third line item.

10   Expenses and costs incurred directly by Gary Kornman in

11   connection with SEC matters and the indemnified lawsuits in

12   the amount of $342,630.93.

13          Mr. Kornman, would you please identify the

14   nature of those expenses and costs for us?

15          A.    Travel, assistants, lodging, legal research, just

16   a whole bunch of stuff that's relative to the SEC matter in

17   these indemnified lawsuits.

18          Q.    What documentation do you have to support the

19   travel in the 300 -- approximately $342,000 claim?

20          A.    Typical stuff, credit cards, plane tickets,

21   receipts, that type stuff.

22          Q.    Mr. Kornman, do you have some explanation for why

23   that hasn't been provided in response to discovery?

24          A.    I didn't know it had been asked for.

25          Q.    Just to give you a little bit of background, Mr.

Gary Kornman - 6/5/2007

49

1   Kornman, we've asked for all of the documentation that

2   supports your claim.  Like any other claim in the

3   bankruptcy, if you have documents that support your claim,

4   we've asked for that material, and we have not been

5   provided any.

6           Do you have any explanation?

7           MR. TILLOTSON:  Well, there's objections

8   pending, Holly, to it, so...

9           MS. HARRIS:  Fair point.

10          MR. TILLOTSON:  The objections have not been

11  ruled on, so...

12          He's produced what we have directed him to

13  produce pursuant to those objections, so that would be his

14  basis for what he has produced.

15          If you want to ask him if he can produce it

16  or how difficult it is to do that, but -- that would be

17  fine.  But that's the legal basis for why certain materials

18  haven't been produced.

19      Q.   Your travel expenses, Mr. Kornman, you described

20  as credit cards, receipts, et cetera.

21          Where is that material located?

22      A.   It may be at my attorneys', it may be somewhere

23  in my records of my -- the people that keep my accounting

24  records.

25      Q.   By your --

50

1    A.   I don't know, to be honest with you.

2    Q.   When you say, your attorneys, could you identify

3  which attorneys you're referring to in that statement?

4    A.   Lynn Tillotson or Crouch & Ramey.

5    Q.   Did Mr. Tillotson's office ask you to collect

6  any --

7          MR. TILLOTSON:  I'm not going to let you ask

8  him what I asked him.

9          If you want to make inquiries as to what was

10  done, you can address it to me.  My discussions with him

11  would be privileged.

12          MS. HARRIS:  Okay.

13    Q.   With regards to assistants, I don't understand

14  what you mean by that.

15          What is assistants?

16    A.   Well, when I come back from a trip or something,

17  I give my expenses to someone who files them, records them,

18  does something to it, puts them somewhere, keeps a record

19  of it.

20    Q.   Could you identify that person for us?

21    A.   It could be one of any of several people.  Could

22  be Vickie Walker, could be Linda Kent, could be my wife,

23  could be several people.

24    Q.   Okay.

25    A.   Could be Bill Reitzer-Smith.

1     Q.   Sir, is that your accounting firm that does your

2  accounting?

3     A.   No.

4     Q.   Could you identify your accountant for us, then?

5     A.   I don't have one.

6     Q.   Who keeps -- I'm sorry, maybe I'm confused.  I

7  thought you said earlier the records might be with your

8  attorney or maybe your accountant.  I must have misheard

9  you.

10     A.   I said, the person who does my accounting.

11     Q.   Ah, my apologies.

12        Who is the person who does your accounting?

13     A.   I've just given you the names of the people who

14  may be involved in it.

15     Q.   Okay.  Have you undertaken any effort to collect

16  those records in response to discovery?

17        MR. TILLOTSON:  You can answer as to what

18  you've specifically done; but in doing that, don't reveal

19  any communications you've had with me.

20        So, if you've taken a physical act, you can

21  describe that.  If you haven't, you can tell her that.

22     A.   I've understood that that's subject to objection,

23  and I haven't -- that hasn't been resolved.

24     Q.   Let's move on to lodging.  With regard to

25  lodging, could you describe the records you have that

52

1    support your claim for lodging?

2         A.   Again, credit card receipts, bills, hotel bills.

3         Q.   And could you identify the person or persons who

4    would have those records?

5         A.   Same people I just identified.

6         Q.   And have you undertaken any effort to direct them

7    to produce that material in response to discovery?

8         A.   Same answer as I gave you before, it's still open

9    for objection.

10        Q.   With regard to legal research, Mr. Kornman, I'm

11   afraid I don't understand that.  Could you describe that

12   claim for me?

13        A.   Are you familiar with Westlaw, Lexis?

14        Q.   Yes, I am.  I'm afraid I still don't understand.

15             MR. TILLOTSON:  You need to describe for her

16   the basis of the expense with respect to that item, if you

17   can.

18        A.   Subscribing to Westlaw, subscribing to Lexis,

19   subscribing to other services that we used in preparation

20   for these lawsuits.

21        Q.   This is research that you, yourself, performed,

22   Mr. Kornman?

23        A.   Not necessarily.  Some -- the people that worked

24   for me used primarily.  I did some myself, too, but...

25        Q.   So you're seeking to have the estate reimburse

1    you personally for the cost of a Westlaw or Lexis

2    subscription; is that right?

3        A.    That's correct.  It was an expense related to

4    this litigation.

5        Q.    Okay.  Could you identify that amount for me?

6        A.    No, ma'am.

7        Q.    Mr. Kornman, can you identify any of the amounts

8    associated with these claims?

9        A.    Not at this point.

10       Q.    Let's move on to the fourth line, legal fees,

11   costs and expenses associated with the Heritage

12   Organization matters.

13             Could you identify the law firms who have

14   assisted you in that regard?

15       A.    Again, I'm sorry, but I can't -- law firms --

16   many law firms have helped me with the same matters, so

17   it's -- you'll get a complete list.

18             I'm not going to, you know, try to figure

19   out who did what right here off this.  You will get what

20   you need.

21       Q.    Okay.

22             MS. HARRIS:  Please mark this as Exhibit 2.

23             (Exhibit No. 2 marked.)

24       Q.    Mr. Kornman, after you've had a chance to review

25   that, let me know.

Gary Kornman - 6/5/2007

54

1    A.    Okay.

2    Q.    Are you ready?  Okay.

3          Mr. Kornman, do you recognize Exhibit 2?

4    A.    No.

5    Q.    Do you recognize the signature on the bottom of

6    the page?

7    A.    First page, yes, it looks like my son Michael

8    Kornman's signature.

9    Q.    If I told you that this was the proof of claim

10   that Michael Kornman filed in this case, would that refresh

11   your recollection as to what this document is?

12   A.    Well, that's what it looks like.

13         If you tell me that's what it is, I'll

14   accept your designation.

15   Q.    Okay.  If you would, sir, please turn to the

16   second page, and again, referring to Exhibit A.  I'd like

17   to draw your attention to the second line item, legal fees,

18   costs and expenses.

19         Do you see the amount in the second line

20   item, Mr. Kornman?

21   A.    You're referring to the 249,000 and change?

22   Q.    Yes, I am.

23   A.    Okay.

24   Q.    Would you look at your own proof of claim in the

25   second line item.  Are those amounts identical, Mr.

Gary Kornman - 6/5/2007

1    Kornman?

2        A.   They seem to be.

3        Q.   Do these proofs of claim purport to claim the

4    exact same amounts for both you and your son?

5        A.   It looks like somehow that the exact same amounts

6    were put on both of our proofs of claim.  Obviously, only

7    one of them would be -- I don't know, was -- to use the

8    term valid, but would be reasonable.

9        Q.   So you're not trying to recover both amounts from

10   the estate; is that correct?

11       A.   That's correct.

12       Q.   Okay.

13       A.   I'm -- I don't know who's trying to -- since I

14   didn't see his and he didn't see mine, I don't know who did

15   what.

16       Q.   You can put Exhibit 2 off to the side, Mr.

17   Kornman.

18       A.   Okay.

19            MS. HARRIS:  Let me have this marked as

20   Exhibit 3, please.

21            (Exhibit No. 3 marked.)

22       Q.   And Mr. Kornman, let me know when you've had a

23   chance to review this document, please.

24       A.   Okay.

25       Q.   Mr. Kornman, do you recognize this document?

Gary Kornman - 6/5/2007

1    A.    No.

2    Q.    Mr. Kornman, are you aware that the law firm of

3  Winston & Strawn, LLP, has filed suit against you claiming

4  breach of contract, fraud, and theft of services?

5              MR. TILLOTSON:   You may answer that yes or

6  no.

7    A.    No.

8    Q.    You did not know until this moment that Winston &

9  Strawn had sued you?

10   A.    Well, according to this, I'm suing them.  And is

11 this a counterclaim?

12   Q.    It is, sir.  I think, if you turn to page 3,

13 you'll see the recitation of the counterclaim.

14              Would you like an opportunity to review it?

15   A.    Well, okay.  It is what it is.  Yes, ma'am, here

16 it is.

17   Q.    Is it your testimony that this is the first time

18 you have learned of the fact that Winston & Strawn is

19 bringing a claim against you?

20              MR. TILLOTSON:   I am going to object to that

21 question because I believe that might call for

22 attorney/client communication.

23              He's represented by a different lawyer in

24 that matter, and I don't know what he told them, but --

25   Q.    I'm trying to understand, do you personally

Gary Kornman - 6/5/2007

57

1  know --

2      A.   I'm just going to say that that's privileged

3  information.

4          MR. TILLOTSON:  Well, let me -- let me

5  rephrase it this way.

6          You may answer a question if you can without

7  revealing any communications or information you learned

8  from your counsel in that matter.

9          THE WITNESS:  Okay.

10          MR. TILLOTSON:  If you can't, then I would

11  instruct you not to answer that question.

12      A.   I'm going to refrain from answering because of

13  privilege.

14      Q.   I will represent to you that in this

15  counterclaim, the law firm of Winston & Strawn is seeking

16  approximately $920,000 from you based on the claims of

17  breach of contract, fraud, and theft of services.

18          Mr. Kornman, is it your contention that the

19  estate should indemnify you for that approximately $920,000

20  claim?

21      A.   If -- if -- yes, it is.

22      Q.   Is that $920,000 claim part of the 5.2 million

23  dollar claim we discussed earlier in your proof of claim?

24      A.   I'm sorry, ask that question again.

25      Q.   Sure.  Exhibit 1, Mr. Kornman, the second page --

1   I think it's line item number one, which purports to claim

2   approximately 5.2 million dollars.

3          I'm trying to understand, is the $920,000

4   counterclaim filed by Winston & Strawn included in that 5.2

5   million dollar claim?

6      A.   I'm not sure.  I believe it might be, because

7   none of these other figures --

8          MR. TILLOTSON:  Whoa.  Hold on one second.

9          (Witness and counsel confer.)

10          MR. TILLOTSON:  Holly, we'll stipulate that

11   it is.  I mean, it is included.

12          MS. HARRIS:  So it's not 5.2 million plus

13   the 920,000?

14          MR. TILLOTSON:  No.  We'll stipulate that

15   the 920,000 alleged by Winston & Strawn has been incurred

16   by this person and is included in that proof of claim,

17   although it has not been paid.  And we'll make that

18   stipulation, to help you along.

19          MS. HARRIS:  Okay.

20      Q.   Mr. Kornman, if you would, turn to page -- I

21   believe it's page 6, and I'll draw your attention to

22   paragraph 20.  Let me know when you find that.

23      A.   Okay, I'm there.

24      Q.   Paragraph 20 of the Winston Strawn counterclaim

25   purports to describe the outstanding amount due to Robbins

1    & Russell.

2              Mr. Kornman, do you have an outstanding

3    balance based on legal services provided to you by the

4    Robbins & Russell firm in the amount of approximately

5    $149,021.29?

6        A.   I'm sorry, that number -- I mean, I don't know

7    that exact number.

8              There is a Robbins claims, there is an

9    outstanding bill of some -- close to $150,000.

10       Q.   Is that amount of approximately $150,000 included

11   in your 5.2 million dollar claim in your proof of claim?

12             MR. TILLOTSON:  We'll stipulate that it is.

13   And it is not paid, but it's been alleged by Russell

14   Robbins to be --

15             MS. HARRIS:  And it might be easier,

16   Counsel, if we can just accept that stipulation on behalf

17   of paragraph 21 with regard to the Monico Pavich.

18             MR. TILLOTSON:  That is not included.  And

19   the 45,000 in paragraph 22 is not included.

20       Q.   Mr. Kornman, is it your intention to ask the

21   estate to include in your claim the $20,000 in legal

22   services referenced in paragraph 21?

23       A.   It's my intention to ask the estate to indemnify

24   me for anything that I'm required to pay.

25       Q.   Mr. Kornman, the $21,000 outstanding --

Gary Kornman - 6/5/2007

60

1     A.   That's the answer to my question.

2     Q.   And with regard to Foley & Lardner, is it your

3 intention that the estate should reimburse or indemnify the

4 approximately $45,000 that you have outstanding with that

5 firm?

6     A.   Same exact answer.

7     Q.   Do you have any additional explanation as to why

8 the estate should -- or anything else to add as to why the

9 estate should indemnify you for these amounts?

10    A.   They were incurred relative to -- matters

11 relative to the Heritage Organization, LLC.

12    Q.   Mr. Kornman, could you describe for us the

13 Heritage point system?

14    A.   You'll have to be more definite.  I don't

15 understand your question.

16    Q.   I'll represent to you that the Heritage training

17 manuals describe a point system for Heritage employees,

18 that they are awarded certain points for certain conduct

19 with clients.

20            Are you familiar with such a system?

21    A.   You'll have to show me the documentation.  I

22 can't comment on it, unless I see what you're talking

23 about.

24          MR. TILLOTSON:  She's just asking if you're

25 familiar with it, and you can answer yes or no.

Gary Kornman - 6/5/2007

1      A.    I'm not going to answer that, because there were

2   many systems of compensation, and this may be one that did

3   not exist but for a short period of time.

4          So unless you make it available to me and I

5   can look at it, I can't tell you anything about it.

6      Q.    Mr. Kornman, no reason to get upset.

7      A.    I'm not upset.

8          MR. TILLOTSON:   I think he's mad at me.

9   Don't worry about it.   Go ahead.

10     Q.    I'm just asking if you're familiar with it.

11     A.    I am not going to -- to deal with anything unless

12  you show me what you're talking about.   I'm not going to

13  answer any questions.

14         So if you want to show it to me, I'll be

15  happy to comment on it, tell you what it's about, give you

16  the best of my information, but I'm just not going to pull

17  things out of the air when I don't know what you're talking

18  about.

19         Am I familiar with it.   I'm familiar with a

20  lot of things.   I don't know what you're talking about.

21     Q.    Is it your testimony that you don't know whether

22  Heritage had a point system as a means of compensating its

23  employees?

24     A.    I know Heritage had many point systems.

25     Q.    Could you describe those that you do --

Gary Kornman - 6/5/2007

1    A.    No, ma'am, I'm not going to do that.  If you want

2  to talk about one --

3                MR. TILLOTSON:  Let her finish your question

4  before you respond.

5                THE WITNESS:  Okay.

6                MR. TILLOTSON:  Let her get out her

7  question, and you can answer.

8    Q.    I'm actually just trying to get an answer,

9  sitting here today, what it is you remember --

10   A.    Okay, let me --

11   Q.    -- of those point -- Mr. Kornman, if I may.

12                MR. TILLOTSON:  Let her --

13   Q.    -- of those point systems that you remember that

14  were a part of the Heritage compensation structure, could

15  you identify those that you do remember?

16   A.    Okay.  I'm going to give you an explanation.

17  There were many point systems over a period of many years.

18  They changed regularly.  I have no idea how many there were

19  or what they were or who they applied to.

20                They apply to different people at different

21  times in different ways, so it is impossible for me to give

22  you that information.

23   Q.    Did Heritage employees ever receive a greater

24  number of points if a Heritage client signed a contract

25  without the representation of counsel?

1       A.    No.

2       Q.    Did Heritage employees ever receive additional

3    compensation points if they signed the contract before

4    their counsel was involved?

5       A.    No.

6       Q.    Did a Heritage employee --

7       A.    Let me just stop a second.  I don't know if

8    you're talking about a manual.

9            I didn't create these manuals.  So if you

10   have something that you can show me that -- I don't -- I

11   didn't authorize that.  Now, if you want to show me a

12   document that contradicts what I'm saying, I'll be happy to

13   look at it.

14           MR. TILLOTSON:  Well -- can I consult with

15   him before you ask your next question?

16           MS. HARRIS:  Certainly.

17           (Witness and counsel confer.)

18           MR. TILLOTSON:  All right.  I'm sorry.  Go

19   ahead.

20           MS. HARRIS:  Could you read back the pending

21   question?

22           (Record read.)

23      Q.    Mr. Kornman, did -- to the best of your

24   knowledge, sitting here today, did Heritage employees

25   receive a greater number of points -- a greater number of

Gary Kornman - 6/5/2007

64

1    points if they implemented a strategy based on an Ed Ahrens

2    or Ahrens & DeAngeli legal opinion?

3        A.   I can't answer that question, because I just --

4    lots of things happened over a long period of time, and I

5    can't answer that question.

6        Q.   To the best of your knowledge, did Heritage

7    employees receive a greater number of points with regard to

8    their compensation if they did not get outside advisors to

9    sign the outside advisor consultation agreement?

10       A.   Same answer.

11            MR. TILLOTSON:   I'm just going to object to

12   the form.

13            Go ahead, you may answer.

14       A.   Same answer.

15       Q.   Okay.  I'd like to follow up on some discussions

16   we had earlier this morning with regards to Mr. Ahrens and

17   the law firm of --

18            MR. TILLOTSON:   If you'll just hang on one

19   second.

20            MS. HARRIS:   Sure.

21            (Interruption in proceedings.)

22       Q.   Mr. Kornman, just following up on some

23   conversation that -- or the conversation we had with

24   regards to Mr. Ahrens and Ahrens & DeAngeli.  Whose idea

25   was it to set up FWP Technologies?

Gary Kornman - 6/5/2007

65

1      A.    I don't remember now.

2      Q.    If, while we're talking, I refer to FWP in the

3  short form, do you understand what I'm referring to?

4      A.    I presume it's FWP Technologies.

5      Q.    Okay.  How many different strategies did FWP sell

6  to Heritage?

7      A.    The only one I ever remember them getting a

8  royalty for was the one that they got from Arthur Andersen.

9      Q.    And is that what we've described earlier this

10  morning as the 752?

11      A.    Yes, ma'am.

12      Q.    Okay.  Did the royalty --

13      A.    They may have been paid for some other research

14  or something else.  Ed Ahrens may have come up with some

15  other strategy that we may have paid him a token amount,

16  but I don't know of anything that we paid him a continuing

17  royalty on.

18      Q.    You described a 5 percent royalty that you paid

19  to Mr. Ahrens, and ultimately FWP --

20      A.    Or his firm.

21      Q.    Good point.  Started out as, I think, one of the

22  predecessors to Ahrens & DeAngeli, and then ultimately went

23  over to FWP, after FWP was incorporated; is that correct?

24      A.    I'm not sure it was to a predecessor of Ahrens &

25  DeAngeli because I don't know their time frame.  But it was

1  to --

2      Q.   I get confused in that.

3      A.   It was to a law firm that Mr. Ahrens was

4  associated with, and then it went over to FWP Technologies.

5      Q.   Did the 5 percent royalty remain the same

6  throughout that time?

7      A.   It was adjusted for payments to others, as I

8  tried to explain to -- earlier.

9      Q.   But the starting royalty remained 5 percent,

10  subject to individual adjustments --

11      A.   Right.

12      Q.   -- as appropriate?  Okay.

13            How much in total did Heritage pay FWP?

14      A.   I'm sorry, I don't have that -- any recollection

15  of that amount.

16      Q.   How much in total for what you've described as

17  R&D, or research and development, did Heritage pay Ahrens &

18  DeAngeli?

19      A.   I have no recollection of that amount.

20      Q.   Mr. Kornman, in your opinion, why is a law firm

21  offering research and development services?

22            MR. TILLOTSON:  Well, object to the form.

23      A.   Yeah, you'll have to ask that --

24            MR. TILLOTSON:  And I think fact-based

25  testimony is okay, if he has some knowledge of it; but

1    asking him to give an opinion regarding that matter is

2    inappropriate.

3                 If you have some fact-based testimony

4    regarding that, you may offer it.

5        Q.    It is your testimony this morning that Ahrens &

6    DeAngeli provided Heritage research and development

7    services, isn't that correct?

8        A.    Yes.

9        Q.    When the -- when Mr. Ahrens brought the 752

10   strategy to Heritage, who was the primary point of contact

11   at Heritage with regards to that relationship?

12       A.    I don't believe there was one.  It was discussed

13   with several people.

14       Q.    Could you identify those people for us?

15       A.    Myself, Ralph Canada, Anthony Bird a little

16   later, Brian Czerwinski, Brian Turchi.  Probably some other

17   people in our analytical department.

18       Q.    What did the analytical department do, Mr.

19   Kornman?

20       A.    They prepared educational presentations to our

21   clients.

22       Q.    Would those be included among that description of

23   various PowerPoint presentations that were shared with the

24   clients, or potential clients?

25       A.    Yes.

Gary Kornman - 6/5/2007

1    Q.   Who provided -- I'm not asking the nature of the

2    advice, but who provided the advice to the analytical --

3    legal advice, to the extent that you needed any, to the

4    analytical department?

5    A.   There was no legal advice provided, except to --

6    to the analytical department.  Except many times, after a

7    client had hired a law firm to represent them, to give them

8    opinions on -- on the validity and give them advice and to

9    give them information about what we had told them, many

10   times the law firm would come back and say, well, we don't

11   like it this way, we want to do it this way.

12             And somebody in the analytical department

13   would have talked to somebody in the law firm and put it on

14   a piece of paper.

15   Q.   I'll represent to you that the presentations

16   shared with multiple members of the client claimants

17   included assertions regarding legal authorities,

18   discussions of cases, discussions of Revenue rulings.

19             Who came up with that material?

20             MR. TILLOTSON:  Well, I object to the form

21   of the question.

22             You may answer, if you're able to without

23   necessarily accepting the factual premise of it.

24   A.   I started to say, I don't agree with your factual

25   premise, but I don't know the answer to your question

1    anyhow.

2        Q.   Have you ever seen any client claimant

3    presentation that Heritage made to a client?

4        A.   I can't recall whether I have or not.  It would

5    not -- they didn't -- they didn't customarily pass through

6    me for any reason, so...

7             With the exception of Howard Jenkins, if

8    he's a client claimant -- I believe he is.

9        Q.   He is.

10       A.   With the exception of Mr. Jenkins, I don't

11   believe I saw -- I don't have any recollection of seeing

12   anybody else's presentation.

13            MR. TILLOTSON:  Holly, I just want to make

14   sure, when you said client claimant, you're referring to

15   the client claimants that are part of the bankruptcy

16   proceeding.

17            MS. HARRIS:  I think I said client,

18   actually.

19            THE WITNESS:  You said two things.

20            Thank you, Jeff.  I took it to mean, you

21   meant client claimants.

22       Q.   If I understand your position, it's that Mr.

23   Jenkins -- you might have seen the Jenkins but you're

24   not --

25       A.   I'm sure I saw Jenkins.

Gary Kornman - 6/5/2007

1    Q.   Okay.  With regard to any of the other client

2  claimants, do you recall ever seeing the PowerPoint

3  presentations presented to those clients?

4    A.   I want to make one other thing clear.  You're not

5  including -- I want to -- I would have to say, if the

6  Sandwith -- if Ron Sandwith is included or Mikron is

7  included as a client claimant, I've seen their materials.

8    Q.   Okay.  So you've seen the Howard Jenkins

9  materials, you've seen the Sandwith and Mikron materials.

10  Have you seen --

11    A.   There's nothing for Mikron.

12    Q.   Okay.  With regard to any of the other --

13    A.   I saw what Ron Sandwith saw, I saw what Meralex

14  saw, which was the client in that case -- Jenkins was not

15  the client.

16         Do you want to run down the names with me

17  real quick again?

18         I don't remember -- they might have come --

19  they might have -- somebody might have walked up and said,

20  here is so-and-so's presentation, and I might have thumbed

21  through it.  But I'm talking about, as far as studying and

22  analyzing it and looking at it for any extended period of

23  time, I'm sure I have not.

24    Q.   Mr. Kornman, I'm going to try to ask you, let's

25  do our best to try to not talk over one another.  It tends

Gary Kornman - 6/5/2007

71

1    to drive the court reporter crazy.

2         A.    That's fine.  I appreciate her problem.

3         Q.    I think it's important that I understand your

4    testimony.

5              Are you telling us today that you do not

6    know whether legal authorities or discussions of legal

7    authorities were ever presented to the client claimants?

8         A.    Wait a minute.  Are you -- who are you referring

9    to now as the client claimants?

10        Q.    All of the client claimants in this group.  And

11   that would include the Meralex, Jenkins group, as well as

12   the Sandwith.

13             In any of those instances, do you remember

14   seeing legal authorities included in the presentations --

15        A.    Excuse me.

16        Q.    Let me finish.

17             Any discussion of legal authorities, as

18   broad as you can define that term, do you remember seeing

19   those included in the presentation materials provided to a

20   client claimant?

21        A.    Okay.  Now, I'm going to ask you to define legal

22   authorities.

23        Q.    Mr. Kornman, are you an attorney?

24        A.    No.

25        Q.    Are you currently licensed?

1     A.    No.

2     Q.    When did you -- when did you -- when did you, I

3     guess, lose your license or decide not to renew your Bar

4     license?

5     A.    It's been inactive for years.

6     Q.    You were an attorney, right?  You practiced law?

7     A.    Excuse me?

8     Q.    You did practice law?

9     A.    Never.

10    Q.    Did you go to law school?

11    A.    Yes.

12    Q.    Were you a member of the Alabama Bar?

13    A.    Yes.

14    Q.    When I refer to legal authorities, I'm asking

15    you, as an attorney, as a member of a Bar, to describe that

16    as broadly as you possibly can, up to, including cases,

17    Revenue rulings, regulations, statutes.

18          Is it your testimony today that you do not

19    know whether any legal authority was ever presented to a

20    Heritage client?

21    A.    I'm sorry, but now you're talking about all

22    Heritage clients.  You're going to have to -- when you say

23    legal authority, a case?

24          If -- if you consider a case a legal

25    authority or a copy of a revenue ruling legal authority,

Gary Kornman - 6/5/2007

73

1   those types of things may have been presented to some of

2   the client claimants --

3        Q.   Who --

4        A.   -- by me.

5             And I'm referring to Mr. Jenkins and

6   Mister -- and Ron Sandwith, because those are the only

7   people I've ever met.

8        Q.   Mr. Kornman, who decided what legal authority

9   would be included in the PowerPoint presentations?

10       A.   That's a general -- that's an open-ended

11  question.  You're not giving me -- whose PowerPoint

12  presentations, when?

13       Q.   Let's start with Jenkins.

14       A.   It would have been someone from the analytical

15  department.  It would have been Mr. Canada or myself.

16       Q.   And who decided what legal authorities would be

17  included in the Behnke transaction PowerPoints?

18       A.   Everybody but myself.  Could be the same ones,

19  could be others, I don't know.  Could be Mr. Bird.

20       Q.   How did Mr. Ahrens learn how many 752

21  transactions had been implemented by Heritage clients?

22       A.   I don't know that.

23            MR. TILLOTSON:  Object to the form.  You may

24  answer.

25       A.   I don't know.

Gary Kornman - 6/5/2007

74

1      Q.   Well, how -- could you describe for us the -- the

2    financial arrangement between Heritage and FWP?  How did

3    FWP get paid?

4      A.   By check.

5      Q.   Could you describe the nature of those payments?

6      A.   When Heritage collected money as a result of an

7    implementation of an investment transaction involving 752,

8    there was a running total of that kept.  And from time to

9    time, a check was sent to originally Mr. Ahrens' law firm,

10   and then, after a period of time, FWP, to pay down whatever

11   that royalty had accumulated to.

12           And it was always a running total because it

13   was never -- I don't remember if he ever got -- I don't

14   remember if he ever got paid exactly 5 percent of a

15   particular matter or it was just checks given to him as a

16   running total of what -- of what the royalty would have

17   been.

18     Q.   Where was that running tally kept, or who kept

19   that tally?

20     A.   The accounting department at Heritage.

21     Q.   Do you know where those records are?

22     A.   No, ma'am.

23     Q.   Do you know if they were turned over to the

24   trustee in this case?

25     A.   I have no idea.

Gary Kornman - 6/5/2007

1    Q.   Could you identify the Heritage employees that

2    were involved in either calculating or ultimately paying

3    either Mr. Ahrens' law firm or FWP?

4    A.   I'm sure it was people in the accounting

5    department at any given time.  I don't know who that would

6    have been.

7    Q.   Mr. Kornman, would you tell Vickie Walker to cut

8    Mr. Ahrens a check, in response to his inquiries?

9    A.   She may have come to me and said that we owe him

10   so much money, and I may have said, yeah, cut him a check.

11   Q.   Could you describe the fee -- or pardon me, the

12   compensation structure -- if you presented a potential

13   client a Heritage technique and they ultimately implemented

14   that, could you describe for us how the money was

15   distributed, in a general manner?  Who would get paid out

16   of that?

17   A.   Say that one more time.  I want to make sure I

18   got your question, please.

19   Q.   I'm just asking generically right now.  If you

20   take a Heritage client and they implemented one of these

21   techniques -- and I understand the Heritage fee was based

22   on the amount of tax savings, and ultimately, as the

23   contract was drafted, as determined by Heritage, does that

24   sound correct to you?

25                MR. TILLOTSON:   Object to the form.

Gary Kornman - 6/5/2007

1        You may answer, if you're able.

2        A.    It's not -- you said, the amount of the tax

3    savings?  Okay.

4        Q.    The tax that would have been paid, but for the

5    transaction.

6        A.    No, no.  You're using too broad a term.

7              Are you talking -- are you speaking of a

8    capital gains transaction, an estate tax transaction, an

9    income tax transaction?

10       Q.    That's a fair point.  Let's start with the

11   capital gains side.

12       A.    Okay.  The agreements say that the fee was

13   25 percent of the projected taxes that would have been

14   paid.

15       Q.    So of that amount that went to Heritage, what

16   percentage went to the person who presented the pitch to

17   the client?

18       A.    That was -- that's -- people drew salaries,

19   people drew compensation for a consideration -- drew

20   consideration for a covenant not to compete.  People drew

21   points.  Mr. Canada, through an arbitration, claimed a

22   percentage of a fee.

23             It's -- there's a variety of different ways.

24   There's no way to describe it.

25       Q.    Okay.  Of that gross amount, would you deduct the

1   research and development fees associated with that

2   particular technique from the Heritage fee before paying

3   out to anybody else?

4        A.   Would you be more specific?

5              You're so general and you're talking about

6   such a long period of time and so many different

7   transactions and so many different people that I cannot be

8   sure of what you're speaking of.

9        Q.   Let me be as specific as I can.  Did FWP's cut of

10  the Heritage strategies come off the top before anybody

11  else was paid?

12       A.   I've already explained that if we paid a fee to a

13  stockbroker, a life insurance agent or someone else who

14  brought us a client, that came off the top.

15       Q.   Did you tell your clients that?

16       A.   I don't know.  I don't know who told them.  If it

17  came -- if it came from somebody that had a -- I don't know

18  that I was involved.  I have to think about this.  I'm not

19  sure I was involved in any cases that were brought to us by

20  a third party.

21       Q.   Was Ed Ahrens a third party?

22       A.   No.  Ed Ahrens -- wait just a second now.  He

23  could have been -- he could have been in both roles.  He

24  could have been getting a fee for introducing us, and he

25  could have been getting a royalty fee as well.  He could

Gary Kornman - 6/5/2007

1    have been in both roles.

2                    I'm not sure of that.  I just -- I don't --

3    my recollection is -- it's hard at this point in time, but

4    that could have happened.

5         Q.   Well, actually, he could have been in three

6    roles, I think.  He could receive the finder's fee that you

7    described earlier; is that correct?

8         A.   Uh-huh.

9         Q.   He could receive the R&D fee that you've

10   described earlier; is that correct?

11        A.   No, there was no R&D fee.  Remember, I said there

12   was a royalty.

13        Q.   Good point.  I stand corrected.

14                    The royalty percentage --

15        A.   Right.

16        Q.   -- he could receive that, right?

17        A.   That's correct.

18        Q.   And then did Mr. Ahrens' law firm provide legal

19   services to Heritage at any point in time?

20        A.   On other matters, yeah.

21        Q.   What are other matters?

22        A.   Whatever we asked him to research and give us

23   opinions on.

24        Q.   Is it your testimony that Mr. Ahrens' law firm

25   never provided Heritage legal advice with regard to tax

1    strategies?

2              MR. TILLOTSON:  Hold on.  Before you answer

3    that, I -- I don't know what you guys have done with

4    respect to the privilege.  So before he answers what Ed

5    Ahrens' legal advice was provided to Heritage, I need to

6    know whether you claim privilege on that or you're going to

7    let him ask about it.

8              MS. PERRY:  Can you read back the question.

9              (Record read.)

10             MS. PERRY:  Can we just take a brief break?

11             MR. TILLOTSON:  Sure, that's fine.

12             (Recess 11:38 to 11:55.)

13        Q.   Mr. Kornman, I believe there is a question

14   pending, but I want to be clear, when I ask you this

15   question, I just want a yes, no.  I don't want any of the

16   nature of the discussions.  I simply want a yes, no answer.

17             MS. HARRIS:  And if -- I would ask the court

18   reporter to read back the pending question.

19             (Record read.)

20        A.   No.

21        Q.   No, he did not provide that?

22        A.   Yes.

23             MR. TILLOTSON:  I think he's saying, no,

24   that's not my testimony.

25        A.   That's not my testimony.  He did.

1    Q.    Okay.  So the answer is, yes, Ahrens & DeAngeli

2   did provide Heritage tax (sic) advice on the tax

3   strategies?

4    A.    On all of it, constantly.

5    Q.    Mr. Kornman, if you were considering going into a

6   deal, would you want to know if your attorney was going to

7   get a cut from that deal?

8              MR. TILLOTSON:  Object to the form.

9    A.    I think it depends on the circumstances.

10    Q.    Well, if you were relying on your attorney to

11   provide you legal advice regarding whether you should enter

12   into a particular transaction -- do you understand my

13   hypothetical so far?

14    A.    Yeah.  But in other words, are you -- are you

15   assuming that the attorney -- sometimes the attorney brings

16   you something and they're kind of in a role of giving

17   advice, and also being part of whatever it is that you've

18   been brought.

19              So your question is not -- I'll try to

20   answer your question.  It's just not specific enough.

21    Q.    Well, let me keep it as simple as I can.

22    A.    Okay.

23    Q.    If you went to your attorney and asked your

24   attorney for legal advice, would you want to know whether

25   she was going to get a percentage of the deal if you

1    implemented that agreement?

2        A.   Yes.

3        Q.   You think it's fair for a client --

4        A.   An attorney has a legal -- has an ethical

5    obligation to tell their clients if there's a conflict of

6    interest.

7        Q.   And under the scenario I just described, are you

8    suggesting that would be a conflict of interest?

9                MR. TILLOTSON:   Object to the form.

10       A.   I'm sorry, what would be a conflict of interest?

11       Q.   If the attorney did not disclose that she had an

12   economic interest in the transaction that she was advising

13   you on.

14                MR. TILLOTSON:   Object to the form.

15       A.   I'm not an expert on legal ethics.  Okay?  But my

16   understanding is that if there's a conflict, it should be

17   disclosed between the attorney and the client.  And I don't

18   know how else to say that.

19       Q.   But if you were the client, you would want to

20   know; is that right?

21                MR. TILLOTSON:   Object to the form.

22       A.   Let me give you a specific example.  If I was

23   buying a piece of real estate and the attorney that was

24   advising me on the real estate -- on the legalities of

25   whatever that complicated transaction may be was going to

1    get a fee on that, I would expect that to be disclosed.

2        Q.   Mr. Kornman, let me talk to you a little bit

3    about the Heritage customer agreements.

4             If I use that phrase, do you understand what

5    I'm referring to?

6        A.   Well, we had many agreements at many different

7    times, so I really -- you'd have to be more specific,

8    but...

9        Q.   Well, let me refer to it generally.

10       A.   If you'd like to show me one, I'd be happy to

11   deal with a specific one.

12       Q.   Let's -- let's try to keep it more general and in

13   the hope that we can move it along a little bit faster.

14   That's my goal.  I'd just like to ask some generic

15   questions.

16            MR. TILLOTSON:  Let her ask her questions,

17   and then we'll -- go ahead.

18       Q.   Well, it -- let's use the customer agreements --

19   strike that.

20            The Heritage clients signed a customer

21   agreement with Heritage; is that correct?

22       A.   May have signed more than one.

23       Q.   Is it your position that the Heritage customer

24   agreement that each of the respective client claimants

25   signed precludes any claims or defenses they have asserted

1    in this case?

2              MR. TILLOTSON:  Object to the form.

3              You may answer the question, if you're able.

4         A.   Okay.  Let's go back.  If you'll show me what

5    they signed, I will give you what I think the intent of the

6    parties was.

7              I don't know who signed what.  I don't know

8    what -- I just don't know what you're talking about.  For

9    example -- I just don't -- I can't -- you're just not being

10   definite enough.

11             If you give me something specific, I'll try

12   to answer, but...

13        Q.   Well, let's pick one.  Let's pick the first one.

14   Let's pick the Jenkins case.

15             You were personally involved in the Jenkins

16   matter, in the Meralex matters, you testified earlier to

17   that today, correct?

18        A.   Uh-huh.

19        Q.   Are you familiar with the customer agreement that

20   Mr. Jenkins signed?

21        A.   He signed four of them.

22        Q.   Okay.  So are you familiar with those four

23   customer agreements?

24        A.   I'd have to have them in front of me.

25        Q.   Okay.  Let's do it a different way.

Gary Kornman - 6/5/2007

84

1          (Witness and counsel confer.)

2          MR. TILLOTSON:   Go ahead, I'm sorry.

3     Q.   Mr. Kornman, who drafted the Heritage customer

4  agreements?

5     A.   Let me think about that.   That was a long time

6  ago.

7          You're talking about the very first ones,

8  the last ones?

9          There were -- I mean, it evolved over a

10 period of years.

11    Q.   Why don't you identify all of the people you can

12 who played a role in drafting the Heritage customer

13 agreements.

14    A.   There was a law firm that Mr. Canada was involved

15 with, who I don't remember the name.   In fact, there may

16 have been two law firms.   There was one or two, I just

17 don't remember the names.

18          Mr. Canada himself was very active in that.

19          I don't remember whether or not -- it's been

20 so long.   I mean, you're talking about something going

21 back --

22    Q.   Mr. Kornman, did you have any involvement in

23 drafting any of the Heritage customer agreements?

24    A.   Sure.

25    Q.   Could you describe your personal involvement in

Gary Kornman - 6/5/2007

85

1    that process?

2         A.    No, I can't, because it's privileged.  It's my

3    privilege with my attorneys, and it started out long before

4    Heritage existed.

5                   MR. TILLOTSON:  Well --

6                   MS. HARRIS:  Counsel, I'm afraid I don't

7    understand that.

8                   MR. TILLOTSON:  I think she's asking you,

9    not necessarily the changes you made or consulted with

10   lawyers, but your physical involvement.  Like, you drafted

11   them, you prepared them --

12        A.    No, the reason --

13                  MR. TILLOTSON:  -- you negotiated them.

14                  Given that guidance, can you answer her

15   question without revealing privileged information?

16                  THE WITNESS:  No.

17                  MR. TILLOTSON:  Holly, I would suggest this:

18   Is it appropriate to take a lunch break and discuss the

19   subject matter?

20                  MS. HARRIS:  That would be great.

21                  (Recess 12:03 to 1:31.)

22                  (Exhibit Nos. 4 through 10 marked.)

23                  (Mr. Morris entered the room.)

24                  (Miss Perry and Mr. Canada left the room.)

25        Q.    Mr. Kornman, when was the first time that you had

Gary Kornman - 6/5/2007

86

1    any concern as to the validity of the 752 strategies that

2    Heritage was selling?

3        A.    Never.

4        Q.    When was the first time that Mr. Ahrens expressed

5    any concern to you regarding the 752 strategies that

6    Heritage was selling?

7        A.    I think he expressed some concern before the

8    Salina and Fulcrum settlements came down.  Once those cases

9    settled, I don't think he had much concern.

10       Q.    After those cases settled, did he renew his

11   concern regarding the validity of the strategies?

12       A.    It's been so long ago, I can't remember.

13       Q.    Did Mr. Ahrens ever tell you that he was

14   concerned that the Heritage 752 strategies might be covered

15   by what is known as Notice 2000-44?

16       A.    Again, you're asking me about casual

17   conversations.  I just can't remember that far back.

18       Q.    When was the first time that you learned that the

19   IRS was attacking 752 tax strategies, generally?

20            MR. TILLOTSON:  Object to the form.

21            You may answer, if you're able.

22       A.    In the mid-'90s, when they were going after

23   Fulcrum and Salina.

24       Q.    How many times, to the best of your knowledge,

25   did the IRS hand deliver Heritage correspondence?

1    A.    Could you put a time frame on that?  Because I've

2  seen a lot of stuff that they claim they delivered as a

3  result of this litigation.

4           So if you want to talk about when they

5  delivered it or -- I mean, I know that they tried to

6  deliver two things to us sometime, I guess, in '02, but I

7  don't -- I don't know -- I learned that as a result of this

8  litigation.

9    Q.    Let's break that out a little bit.

10           Based on your personal knowledge, how many

11  documents did the IRS personally or hand deliver to the

12  Heritage organization?

13    A.    Based on my personal knowledge, that I got them

14  or saw them at that time?  Or are you talking about today?

15           In other words, my question is a matter of

16  timing.  If you can give me a time reference, I'll be happy

17  to answer it.

18           MR. TILLOTSON:  But by personal knowledge

19  she means things you know because you participated in it,

20  saw it, heard it, not things you've learned in connection

21  with this lawsuit.  That's what she's asking, when she says

22  personal knowledge.

23           So given that instruction, if you can answer

24  her question.

25    A.    I did not know of any of them.

Gary Kornman - 6/5/2007

88

1    Q.   When did you first learn that the IRS was sending

2    out promoter letters to 752 tax shelter promoters?

3    A.   I just don't remember.

4    Q.   Can you give me any --

5    A.   No.

6    Q.   -- any idea?

7    A.   I just -- it's a long time ago.  I just don't

8    remember.

9    Q.   I will represent to you that we have talked with

10   various Heritage employees and they have described that

11   Heritage had a practice or policy to dissuade employees

12   from signing for documents.

13           Are you familiar with such a practice?

14           MR. TILLOTSON:  I'll object to the form.

15           You may answer, if you're able.

16   A.   I don't understand your question.  I'm sorry.

17   Signing for documents?  What does that mean?

18   Q.   When a messenger or UPS or Fed Ex or someone came

19   and asked someone to accept a document on behalf of the

20   Heritage organization, Heritage employees have told us

21   during depositions that Heritage's policy was to refuse to

22   sign for things.

23           Are you familiar with such a policy?

24   A.   I think some people were authorized to take stuff

25   and others weren't.  I think that may be the case, but -- I

1    don't know who told you what, but -- but like I said, I

2    think -- I don't think it was a universal thing.

3                    Obviously, if -- if, you know, Ralph

4    Canada -- Ralph's not here -- could have signed for

5    something.  Somebody that was -- there could have been

6    somebody that was authorized, but the receptionist couldn't

7    sign for something.

8        Q.    Was Claudia McElwee -- I believe she served as a

9    vice president of Heritage for some period of time; is that

10   correct?

11       A.    Yes.

12       Q.    Would she have been an authorized person to sign

13   for documents sent to Heritage?

14       A.    You keep -- sign for documents.  Are you

15   referring to -- well, I don't know whether she got the mail

16   or not.  I just don't remember.  I'm sorry.

17       Q.    Who were the people who were authorized --

18       A.    I don't remember.

19       Q.    You don't remember who you authorized to sign for

20   documents that came to Heritage?

21       A.    This has been -- this has been almost five or six

22   years ago.

23       Q.    Okay.  Let's go ahead and I'll hand you what has

24   been marked as Exhibit 4.

25                    Mr. Kornman, I'd ask that you review that

90

1    document and let me know as soon as you've had an

2    opportunity to do so.

3         A.    Okay.

4         Q.    Mr. Kornman, when is the first time you remember

5    seeing what's been marked as Exhibit 4?

6         A.    Sometime during this litigation.

7         Q.    Is it your position that Heritage did not receive

8    this document on or about the date on the front of the

9    first letter, which appears to be February 21st of '01?

10                MR. TILLOTSON:  I'm going to object, when

11   you say is it his position.  I think he has factual

12   knowledge, yes.  He doesn't really have a position about a

13   fact.

14                If he knows they received it, if he didn't,

15   I'll let him answer that.  So, if you want to rephrase.

16                MS. HARRIS:  I will, Jeff.  Thanks.

17        Q.    Mr. Kornman, do you have any facts that suggest

18   that Heritage did not receive this letter on or about

19   February 21st of 2001?

20        A.    Yes, ma'am.

21        Q.    And what are those facts?

22        A.    Well, first of all, this return receipt is not --

23   is not signed.

24                Second of all, I don't ever remember seeing

25   this.

1  Q.   Any other facts?

2  A.   No, ma'am, that's it.

3  Q.   Mr. Kornman, I'll represent to you that this was

4  produced by your counsel in response to discovery.

5       Do you have some explanation for how it

6  ended up in the Heritage file?

7  A.   I have no idea.

8  Q.   Did Heritage have problems receiving mail?

9  A.   From time to time.

10  Q.   And could you describe those instances?

11  A.   It was a process that it went through various

12  people, because we were in the life insurance business.

13  There was different kinds of correspondence that was

14  supposed to go to different people, and it -- sometimes it

15  didn't get where it was supposed to go.

16  Q.   Including certified mail, sir?

17  A.   Ma'am, I don't know, I wasn't there.

18  Q.   I'll hand you what's been marked as Exhibit 5,

19  ask that you review it and let me know as soon as you're

20  done.

21  A.   Looks like virtually the same letter, just

22  retyped.

23  Q.   I would agree with your assessment.

24       Could you tell us when the first time you

25  remember seeing this document?

1      A.    Again, as part of this litigation.

2      Q.    In May of 2001, was Claudia Walker -- sorry,

3  Claudia McElwee, pardon me, a vice president of Heritage?

4      A.    I'm sorry, when?

5      Q.    May of 2001, the date of this letter.

6      A.    I'd have to look at the records to know.  I'm

7  sorry, I just can't tell you that.  I don't know.

8      Q.    Do you remember having a conversation with

9  Miss McElwee regarding an IRS agent hand delivering this

10  letter to her in May of 2001?

11      A.    No, ma'am.

12      Q.    Is it your testimony that Miss McElwee never

13  received a document and told you that she'd received that

14  document from an IRS agent?

15            MR. TILLOTSON:  Object to the question as

16  compound.

17            You may answer, if you're able.

18      A.    It's compound.  Break it up, and I'll try to

19  answer it.

20      Q.    Did Miss McElwee come to you with this letter

21  from the IRS and deliver it to you?

22      A.    Not that I remember.

23      Q.    Did Vickie Walker ever come to you and tell you

24  that the IRS had sent this letter to the Heritage

25  Organization?

Gary Kornman - 6/5/2007

1      A.    Again, not that I remember.

2      Q.    Do you remember anyone at Heritage coming and

3  disclosing the existence of this letter to you on or about

4  this date?

5      A.    No, ma'am.

6      Q.    Mr. Kornman, Exhibit 6.  Let me know when you've

7  had a chance to review that.

8      A.    I'm sorry, it's been so long ago, I just don't

9  remember.

10          The first thing I remember getting from the

11 Internal Revenue Service was subpoenas, and we started to

12 comply with them.  We bought new copiers and all kinds of

13 stuff.

14     Q.    Let me back up a little bit, Mr. Kornman.

15          Do you remember receiving this document on

16 or about February 14th of 2002?

17     A.    No, ma'am, I said -- I just said I don't

18 remember.  Doesn't mean I didn't, but I just don't

19 remember.

20          I would have done something, I presume, if

21 I'd gotten it.

22     Q.    You said that the first thing you remember were

23 the subpoenas.  Could you describe what you meant by that?

24     A.    We got a subpoena from the Internal Revenue

25 Service asking for various -- well, it was client

1    information on everybody who had done any type of

2    transaction dealing, I think, with 752.

3              And we went out and bought a bunch of new

4    copiers and started putting the stuff together.  And at the

5    time, I hired a law firm to advise us on it.

6              And we started to do it, and then we got a

7    letter from the IRS withdrawing their subpoenas.  And

8    again, we asked the law firm what that meant.  We just

9    dealt with it as they advised us.

10       Q.    If I understand your testimony, Mr. Kornman,

11   you're testifying that you did not receive the

12   February 2001 notice letter from the IRS?

13       A.    February 2001?

14       Q.    Which was Exhibit 4.

15       A.    No, no.  Understand what I'm saying.  When you

16   say that we did not receive, I have said I didn't see

17   these.

18       Q.    Okay.

19       A.    I don't know what happened somewhere in between,

20   wherever, whatever.

21       Q.    Okay.  You don't remember seeing this document,

22   Exhibit 4 --

23       A.    That's right.

24       Q.    -- on or about the time it was sent?

25       A.    Right.

Gary Kornman - 6/5/2007

1    Q.   You don't remember receiving Exhibit 5, the May

2  notice letter of 2001, on or about the time it was sent; is

3  that correct?

4    A.   That's correct.

5    Q.   You don't remember receiving Exhibit 6, the

6  February --

7    A.   I --

8    Q.   Let me finish my question, sir.

9         The February 14th, 2002 letter from the IRS,

10  is that also correct?

11    A.   I'm just straining my brain to think if I've seen

12  it before.

13         I'm sorry, at this point in time, I just

14  don't remember.

15    Q.   Mr. Kornman, you said the first thing you do

16  remember receiving on or about the day the IRS sent it was

17  a subpoena to the Heritage Organization; is that correct?

18    A.   Yes, ma'am.  I don't remember the date of it, but

19  that's the first thing I remember.

20    Q.   Mr. Kornman, if you had not seen any of these

21  documents, were you surprised when you received a subpoena

22  to the Heritage Organization from the IRS?

23    A.   No.

24    Q.   I'll represent to you that we have not received

25  any correspondence to the IRS from Heritage.

Gary Kornman - 6/5/2007

1      Do you know if -- if you wrote the IRS and

2  said, what are you talking about?  Was there any

3  correspondence?

4      A.    Not to my knowledge.  I didn't participate in

5  any, I know that.

6      Q.    So the IRS sends a subpoena to the Heritage

7  Organization claiming its a promoter of an abusive tax

8  shelter and you have no memory of any correspondence?

9      A.    Wait a minute, wait a minute.  I'm sorry, I

10  misunderstood what you said.

11          You're talking about the first subpoena we

12  got?

13      Q.    Yes.

14      A.    I would suspect that either our lawyers or

15  somebody said, we will respond to this, and then we'll

16  prepare -- obviously, it takes time to copy as many files

17  as there were.  That's why we went out and we literally

18  organized a whole room and put copiers in it and had people

19  start copying stuff.  So, I didn't understand your

20  question.

21          If you're saying, did we -- did we -- did

22  somebody correspond with the IRS?

23          We hired a law firm by the name of

24  Sutherland, Asbill & Brennan, a fellow by the name of Brook

25  Vogt, I believe, and I would presume that he contacted them

Gary Kornman - 6/5/2007

97

1  and told them we were getting the stuff together.

2       Q.   And to the best --

3       A.   Unfortunately, he's deceased.

4       Q.   And to the best of your recollection, when was

5  that?

6       A.   Sometime after we got the subpoenas.  I don't

7  know the dates.

8       Q.   Was it late 2002?

9       A.   Ma'am, I'll have to look at the dates.

10           If you want to show me the subpoenas, I can

11 tell you it was shortly thereafter that we contacted and

12 hired them.

13      Q.   When Heritage received the subpoenas from the

14 IRS, did you notify any of your clients that you had been

15 subpoenaed -- that Heritage had been subpoenaed?

16      A.   No, ma'am.  I don't know whether we did or not.

17 I don't -- I don't know.

18           I think we might have told some of the

19 clients that we were going to have to turn in those files.

20 I don't remember that we -- we didn't send out a mass

21 mailing.  Whether we told some and maybe not told others, I

22 just don't remember.

23      Q.   How did you decide who you would tell and who you

24 wouldn't?

25      A.   I think it was a very informal process.  I just

1    think it was who we saw.

2        Q.    Who you saw.  I don't --

3        A.    Who we spoke to, whether we called them or they

4    called us or whatever the --

5        Q.    People -- clients you were still interacting with

6    on a regular basis, is that what you mean?

7        A.    Or that there was some -- yes, if there was some

8    interaction.

9        Q.    In 2002, Heritage was still involved with the

10   Behnke family.

11              Do you know that Heritage never told the

12   Behnkes that they were under investigation or had received

13   subpoenas from the IRS?

14              MR. TILLOTSON:  Object to the form.

15       A.    I never met the Behnkes.  I don't know what they

16   were told.

17       Q.    So, who was notified that Heritage had received

18   subpoenas in connection with the abusive tax shelter

19   investigation?

20       A.    I just don't remember that far back.  I'm sorry.

21       Q.    Who did you put in control of that process?

22       A.    We didn't have a formalized process.  We had the

23   three principals, which were myself, Ralph Canada, and

24   Anthony Bird.  Each had our own clients that we had dealt

25   with, and to my knowledge, we did whatever -- whatever they

1    did or whatever I did, I just don't remember.

2               It was not an organized, you're responsible

3    to send out a mailing to all these people or call all these

4    people.  It never happened that way.

5        Q.   Mr. Kornman, how much did you personally make as

6    a result of your relationship with Heritage?

7        A.   I don't know.  I'd have to look at my statements.

8    I can't remember.

9        Q.   More than 10 million?

10       A.   No.  Well, I don't know.  Heritage -- I just

11   don't remember.  I just can't even give you a number.

12       Q.   More than 20 million?

13       A.   What part of "I can't remember" are you having

14   trouble with?

15       Q.   I'm asking if you know that it's more than

16   20 million.

17       A.   I've said I don't remember.

18       Q.   Do you have any idea how much money you made as a

19   result of your work with Heritage?

20               MR. TILLOTSON:  The total amount of his

21   wages and compensation as an employee of Heritage from 1995

22   to 2004, is what you're asking, if he remembers that?

23               If you do, you may answer.  If you don't...

24       A.   I don't remember.  It changed over time.

25       Q.   Mr. Kornman, the IRS contacted Heritage and began

Gary Kornman - 6/5/2007

100

1   an investigation to allege that Heritage was the promoter

2   of abusive tax shelters.

3           Can you tell me anything about your response

4   to that investigation, other than what you've just

5   described?

6       A.   No.  You're talking about the subpoenas?  What

7   are you speaking about?

8       Q.   Let's start with the subpoenas.

9       A.   Well, we -- as I told you, we -- we hired a law

10  firm in Washington by the name of Sutherland, Asbill &

11  Brennan, specifically, a tax attorney by the name of Brook

12  Vogt, and we started preparing to respond.

13      Q.   Did you tell Ahrens & DeAngeli you were under

14  investigation?

15      A.   You say under investigation.  Do you have the

16  subpoenas?  I don't remember what they said.

17          I mean, I remember they asked for client --

18  our client materials.  I don't know whether they said we

19  were under investigation or not.  I'd have to see the

20  subpoenas.

21          I don't remember that they asked for

22  anything but our clients, which implies that our clients

23  were under investigation.

24          So when you say that we were under

25  investigation, I'm not sure that's a correct statement.  I