1    would have to have more information.

2        Q.    Did you ever become aware of an amnesty program

3    with regards to the 752 abusive tax shelters offered by the

4    Internal Revenue Service?

5        A.    Yes.

6        Q.    When did you become aware of that amnesty

7    program?

8        A.    I'm sure I became aware of it shortly after it

9    was put in place.

10        Q.    Was it put in place somewhere in the neighborhood

11    of January of 2002?

12        A.    I'm sorry, I don't remember the dates.

13        Q.    Did you disclose that amnesty program to any

14    Heritage client?

15        A.    I don't remember.  It was -- it was in the Wall

16    Street Journal.  I mean, all of our clients took bets; so,

17    I presume they saw it.

18        Q.    The answer is, no, you didn't?

19        A.    That's correct.  I said -- no, the answer is not,

20    no, I didn't.  The answer is, I don't remember, because --

21    I don't remember, because I could have well discussed it

22    with several of the clients.

23        Q.    Who were you talking to in January of 2002?

24        A.    Excuse me, can you --

25                MR. TILLOTSON:  Object to the form.

1      A.    -- narrow that down just a little bit?

2      Q.    Which clients were you referring to, in January

3  of 2002?

4      A.    I'm -- still your question makes no sense to me.

5  I'm sorry.

6      Q.    You said you might have disclosed the existence

7  of an IRS amnesty program for 752 clients.  I'm trying to

8  find out who you might have disclosed that to.

9      A.    I might have disclosed that to -- not disclosed

10  it.  Our clients knew about it because they'd already seen

11  it in publications.  But I might have discussed it with the

12  people who I had worked with on trans -- various

13  transactions.

14     Q.    Mr. Kornman, you have described Heritage's role

15  as educating people.

16            If you were educating people, why weren't

17  you educating them about the amnesty program?

18            MR. TILLOTSON:  Object to the form.

19     A.    We had no obligation to do that.

20     Q.    You get them into the mess, you don't have to get

21  them out?

22            MR. TILLOTSON:  Don't answer that.

23  That's --

24     Q.    Exhibit 7.  Mr. Kornman, do you recognize Exhibit

25  7?

Gary Kornman - 6/5/2007

1    A.    I'm not familiar with these types of documents as

2    such, but it looks like it's a field advice on something,

3    is what it looks like.

4    Q.    Why don't we start with the cover page.  Do you

5    recognize the cover page?

6    A.    Uh-huh.  This looks like it's to me from Ed at

7    Ahrens & DeAngeli.

8    Q.    Do you remember receiving this fax from Ed Ahrens

9    on or about May 11th of 2001?

10    A.    I'm sure I did.  This would have come directly to

11    me.

12    Q.    When you say, it would have come directly to you,

13    what do you mean by that?

14    A.    It's got my name on it.

15    Q.    Okay.  The message from Mr. Ahrens says:   IRS

16    methodology to attack short sale 752 transactions -- or

17    transaction, pardon me.

18                  Did you have a conversation with Mr. Ahrens

19    regarding this fax?

20    A.    I don't remember that far back.

21    Q.    Did you have conversation with Mr. Canada about

22    this fax?

23    A.    Again, I'm sorry, I just don't remember.

24    Q.    Did you share this fax with any Heritage client?

25    A.    I just don't remember --

1    Q.   Did you share the fact that you had come to learn

2    that the IRS was attacking 752 short sales in May of 2001

3    with any Heritage client?

4         MR. TILLOTSON:  Object to the form.

5    A.   Will you let me finish my answer?  Just let me

6    finish my answer, and I'll give you an answer.  Okay?

7    Don't cut me off.

8         I knew that the IRS was attacking these

9    types of transactions the first time I ever looked at them.

10   That was obvious from the Fulcrum case and Salina partners

11   case.

12        The fact that they're attacking these is

13   nothing unusual.  We explained to every client that there

14   was a risk they would be attacked.

15        Our agreement said that they were likely to

16   be attacked, that they would have to go to court and have a

17   court case over these type of things when they were

18   attacked; and if they wanted to go to Federal District

19   Court, they would have to pay the tax up front.  There

20   is -- we disclosed this.

21        And I just see things in here, for

22   example --

23   Q.   Mr. Kornman, let me stop you and ask you a

24   question, if I may.  When you said, we disclosed this, who

25   is the we in that statement?

Gary Kornman - 6/5/2007

1    A.    The Heritage -- the typical Heritage client

2    agreement for capital gains transactions discloses this.

3              Now, I don't know specifically about who

4    signed what, but I know it was our policy, unless somebody

5    changed our agreement unbeknownst to the top management,

6    that this -- that that was our policy, that people were

7    told that this was a risky transaction; that the government

8    was attacking it; that the most they would get from an

9    opinion letter from a major law firm was a more likely than

10   not opinion.

11             These people were successful, knowledgeable

12   business people who were -- who -- you asked me about

13   disclosure, who it was disclosed, and it was our agreement

14   from the very first and in every meeting we had with them.

15   Q.    Disclosed in the agreement, you will be audited

16   if you implement this strategy?

17   A.    It says, you're likely to be audited.

18   Q.    Okay.  Okay.

19   A.    I believe -- now, understand, I'm talking about a

20   prototype agreement.  I have not seen the agreement with

21   your client or knew who signed it.

22   Q.    Okay.  Okay.  When did you begin putting in the

23   prototype agreement that you've described, the you will

24   likely be audited language you're referring to?

25   A.    I don't know.  I would have to -- what I was

1   trying to tell you earlier is, the agreements we used with

2   clients evolved over a 20- or -- 25-year period.  So, I

3   don't know who did them over a period of 25 years or when

4   something was changed.

5       Q.   When did the Heritage Organization begin telling

6   clients of the 752 transaction that it's likely you will be

7   audited, when did that begin?

8       A.   I tried to answer your question.  I didn't know

9   when that was put in the agreements.  But each client would

10  be able to look at their agreement and see if it says that.

11      Q.   Let me refer you to the article that Mr. Ahrens

12  sent you, if I may.  It's page 3, the Bates at the bottom

13  is APP 1983.

14          Do you see that, Mr. Kornman?

15      A.   1983?

16      Q.   Yes, sir.

17      A.   Yes, I see that.

18      Q.   I'll draw your attention to what's identified as

19  section five.  It says:  This case, although similar to the

20  Salina partnership LP, FLP Group, Inc. versus Commissioner,

21  et cetera, is factually distinguishable from Salina.  And

22  I'll represent to you it says it is a stronger case for the

23  Service.

24          Do you see that?

25      A.   I guess I would -- what case are they talking

Gary Kornman - 6/5/2007

107

1   about?  I'm sorry, I haven't read this whole thing.

2       Q.   Feel free to take as much time as you need to

3   review it.

4       A.   Okay.

5            MR. TILLOTSON:  As he does that, could you

6   read the pending question, just so I know what she's

7   asking.

8            (Record read.)

9       Q.   Mr. Kornman, the question pending is just do you

10  see that.

11      A.   Yes, ma'am, but I still don't know what case

12  they're referring to.

13           This case, although similar to Salina

14  partnership LP, FLP, Florida Light & Power Group versus

15  Commissioner, is factually distinguishable and is a

16  stronger case for the Service.  The resolution of this case

17  should not depend on any -- I guess it says depend there, I

18  can't see it -- on the outcome of any appeal in Salina.

19      Q.   My question to you --

20      A.   Now, excuse me.  Would you identify for me what

21  the case they're talking about is?  Because I still haven't

22  figured that out.

23      Q.   Well, the document speaks for itself, so I won't

24  characterize it.

25           But what I'm asking you is, did you discuss

1   this point with Mr. Ahrens when you received this fax?

2          MR. TILLOTSON:  Object to the form.

3      A.   Ma'am, if I don't know what the case is they're

4   talking -- it says, this case is an abusive tax shelter

5   similar to the shelter outlined in Notice 2000-44.  Now, I

6   have yet to figure out, I'm sorry to tell you, by reading

7   this, what they're talking about.

8          Now, if you can direct me to where it says

9   what this case is, then maybe I can give you an intelligent

10  answer.

11     Q.   Mr. Kornman, did you have any conversations with

12  Mr. Ahrens regarding this document that he sent you?

13     A.   I don't remember it, but it would not have been

14  unlikely.

15         (Witness and counsel confer.)

16     Q.   Let's go to Exhibit 8.

17         I apologize, Mr. Kornman, if I've asked

18  this, but do you remember sending what's been marked as

19  Exhibit 7 to any of the client claimants?

20     A.   If I can't understand it today, I doubt very

21  seriously if I understood it then, so...

22         And since I would strongly disagree with --

23  just take number one.  It says, the transaction --

24     Q.   Mr. Kornman, I'd ask you to answer my question.

25         MR. TILLOTSON:  Just let her -- let her --

1    let her ask her question, give her an answer, try to be

2    responsive.

3         Q.   Did you send this document to any of the client

4    claimants?

5         A.   No, I did not.

6         Q.   Did you direct anyone else in Heritage to send

7    this document to any of the client claimants?

8         A.   No.

9         Q.   To the best of your knowledge, is there any

10   reason to believe that the Heritage Organization shared

11   this document with any of the client claimants?

12        A.   I have no knowledge either that they did or they

13   did not.

14        Q.   Turning to Exhibit 8, sir.  Mr. Kornman, do you

15   recognize what's been marked as Exhibit 8?

16        A.   I don't remember it; but it's a fax addressed to

17   me from Ed Ahrens, so I presume I read it at the time.

18        Q.   Okay.  You have no reason to doubt that you would

19   not have received this on or about that time?

20        A.   That's correct.

21        Q.   Okay.  Mr. Kornman, did you share this document

22   with any of the client claimants?

23        A.   No.

24        Q.   Did you direct anyone at Heritage to share this

25   document with any of the client claimants?

Gary Kornman - 6/5/2007

1     A.   This document says that it was --

2     Q.   Mr. Kornman, if you could just answer my

3 question, with all due respect, we'll get out of here a lot

4 faster.

5     A.   No.

6     Q.   Mr. Kornman, I direct your attention to the

7 message section of the fax cover sheet.  It reads:  Gary,

8 this is the NY Times R we discussed last Saturday.  Several

9 more faxes will follow today.

10         Mr. Kornman, I'll represent to you that, in

11 fact, in the documents we received in response to

12 discovery, we did not receive additional faxes as described

13 in this fax.

14         Do you remember receiving additional faxes

15 on that same day from Mr. Ahrens?

16     A.   No, ma'am.

17     Q.   I'll turn your attention to Exhibit 9.

18         MS. HARRIS:  Exhibit 9 is designated as

19 attorneys' eyes only.  This portion of the transcript

20 should also be designated accordingly.

21         (Exhibit 9 testimony bound separately.)

22         MS. HARRIS:  That concludes the attorneys'

23 eyes only designation.

24     Q.   Mr. Kornman, could you describe what practices or

25 procedures Heritage had in place to try and stay abreast of

1    the IRS's position regarding the 752 strategies?

2         A.    Well, we constantly read various publications.

3    We read what the Wall Street Journal had.  Everybody in the

4    company was constantly looking for information on that

5    point.

6         Q.    What publications did you read, other than the

7    Wall Street Journal?

8         A.    We subscribed to a couple of dozen publications,

9    and I can't name them all.

10        Q.    Mr. Kornman, did Heritage encourage people to

11   have counsel present when they considered whether to sign

12   the Heritage customer agreements?

13        A.    No.

14        Q.    And why didn't you want counsel there?

15             MR. TILLOTSON:  Object to the form.

16        A.    We told them not to waste their money, because in

17   our entire history, we never had a lawyer tell a client to

18   sign our agreement.

19             So we told them that if they wanted to call

20   their attorney and have them tell them not to sign -- have

21   their attorney tell them not to sign our agreement, then

22   they were free to do so, but it was a waste of their money,

23   because in a long period of time, nobody had gotten an

24   answer -- a positive answer.

25        Q.    Did you instruct other Heritage employees to

1    convey that same message to potential clients?

2        A.   I didn't instruct anybody, but other people heard

3    me say that.

4        Q.   So do you know whether other Heritage employees

5    made the same communication to potential clients?

6        A.   I have no idea.

7        Q.   Did Heritage actually affirmatively discourage

8    people from bringing counsel to the meeting before they

9    signed the Heritage contract?

10       A.   We explained to them what I just said, and that

11   was that we had never had an existing client's attorney,

12   except in maybe one or two occasions, in 30 years recommend

13   that they sign our agreement, so we never encouraged them

14   to bring counsel.

15            It was obviously up to them.  Sometimes they

16   did, sometimes they didn't.

17       Q.   Of those one or two times, was one of them the

18   Behnke transaction, when Ed Ahrens was the only attorney

19   representing the potential client?

20       A.   I know nothing about the Behnke transaction.

21       Q.   What were the two -- the two instances you were

22   just describing?

23       A.   I can't remember, but I remember there were at

24   least a couple.

25       Q.   So it was Heritage's position that the potential

Gary Kornman - 6/5/2007

1   client shouldn't waste her time bringing in counsel to

2   advise on the contract; is that correct?

3             MR. TILLOTSON:  I'll object to the form.

4       A.    That's not what I said.

5       Q.    I think you said, don't waste your money, I've

6   never seen somebody recommend signing this contract.

7       A.    We told them that that was up to them, who they

8   wanted to bring in.

9             Many times, in Mr. Jenkins' case, I

10  specifically asked him if he wanted to have our agreement

11  reviewed by outside counsel.  But after a certain period of

12  years, we had never had success in getting an outside

13  counsel -- maybe one or two to -- and those people had

14  worked with us before in some way.

15            And so, we said that if you want to waste

16  your money to get -- to hear the answer, don't do this,

17  feel free.

18            That was the comment.  It was said in a

19  joking manner, but it happened to be the truth.

20      Q.    Do you think it's fair to ask a client to sign

21  that contract without counsel advice?

22            MR. TILLOTSON:  Object to the form of that

23  question.

24            You can answer it, if you're able.

25      A.    That's a silly question.  It's my determination

1    of what's fair?

2        Q.    Yeah.

3        A.    These are sophisticated businessmen.   In

4    specific, Howard Jenkins, for example, said, I've reviewed

5    dozens of contracts, I can read this as well as my lawyer.

6    And I believe that was the case with most of our clients.

7              These were not unsophisticated people.   They

8    were people who had done many deals and had read many

9    contracts.

10       Q.    Let's turn to Exhibit 10.

11             Mr. Kornman, if it was no big deal, why was

12   it the Heritage company policy not to have advisors there?

13             MR. TILLOTSON:   I object to the form of the

14   question.

15             If you can answer what she's asking...

16       A.    I'm not going to answer that.   It assumes facts

17   not in evidence.

18       Q.    Well, let's get those facts in evidence.   Exhibit

19   10, Mr. Kornman.

20       A.    Okay.

21       Q.    Did Heritage have an initiator's manual, a

22   training manual, Mr. Kornman?

23       A.    Well, this says it came from that, so I would

24   presume it does.

25             MR. TILLOTSON:   Well, she's not asking about

Gary Kornman - 6/5/2007

1  this particular excerpt yet, she's just asking generally.

2  So if you know, answer.  If you don't, answer it that way.

3  She'll get to this particular excerpt.

4      A.    I don't -- I don't know.  I don't remember seeing

5  one.

6      Q.    You didn't --

7      A.    It would not be unusual that there was one.

8      Q.    You didn't know before just a minute ago that

9  Heritage had a training manual for its initiators; is that

10  true?

11      A.    No, that's not what I said.  I said I had not

12  seen one.

13      Q.    What about a contractor's manual, did you ever

14  see the Heritage contractor's manual?

15      A.    On a couple of occasions, I saw the book.

16      Q.    Okay.  Mr. Kornman, to the extent that you can,

17  can you tell me what the purpose of those training manuals

18  was?

19      A.    The reason I'm hesitating is, I didn't write the

20  manuals, I didn't use the manuals for training, so I don't

21  have that information.

22      Q.    You don't know the purpose of the training

23  manuals, is that --

24      A.    You're using the term training manuals, and I

25  would -- without being cute, I would presume they were for

1    training.

2         Q.    Okay.  Training who?

3         A.    Whoever the manual was for, whether it was

4    initiators or contractors or whoever else.

5         Q.    And just so that we're all on the same page, who

6    were the initiators at Heritage?

7         A.    The telemarketers.

8         Q.    Okay.  And who were the contractors?

9         A.    The junior salesmen who went out and first met

10   with potential clients.

11        Q.    Could you identify those people by name for me?

12        A.    Some of them.  I might not get them all.

13              Well, now, this -- wait a minute.  The

14   problem is, there were a lot of them.

15        Q.    Ah.  Just those that you can remember.

16        A.    Joe Van Voorhees.  I'll start up front with the

17   most recent ones and try and go back.  Joe Van Voorhees;

18   Collin Moore; Jim Edwards; Andy Williams; Steve somebody,

19   starts with an H, it was either Harst or something like

20   that.

21        Q.    Let me stop you there.  Maybe this will help:

22   Could you tell me what the contractor's job was with regard

23   to the Heritage process or education process?

24        A.    Their function was to go out and try to do two

25   things -- actually, try to do three things:  First, explain

Gary Kornman - 6/5/2007

117

1   to a client what we did, try to -- what our services were,

2   what our educational services were; try to get some

3   information from the client, so that they could find out

4   what might be the client's problems, whether or not we

5   could have anything that might accomplish their goals; and

6   try to set up another meeting, the next meeting.

7        Q.   If that effort was successful and they did set up

8   another meeting, sort of who was the next -- who was next

9   in the process from the Heritage perspective?

10       A.   That varied.  Sometimes the contractor themselves

11  went back for another meeting, if they didn't -- it just

12  depended on who was available.  Sometimes one of the

13  principals, either myself, Mr. Canada, or Mr. Bird went

14  back with them.

15       Q.   Okay.  Mr. Kornman, can you turn to the last page

16  of Exhibit 10.

17            Have you ever seen this document before, Mr.

18  Kornman?

19       A.   I think I answered that a minute ago, and said

20  no.

21       Q.   I'll give you an opportunity to review the page.

22            Have you had a chance to review the text?

23       A.   You want me just to review the last page?

24       Q.   Yes, please, sir.

25       A.   Okay.

        Q.    Mr. Kornman, it says, we will not provide an
initial consultation with such advisors present.

        A.    It says, with an outside advisor present.

        Q.    Oh, I'm sorry, I'm in the first paragraph.  I did
not identify that.

        A.    I'm sorry, I thought you were --

        Q.    Yeah, first paragraph, the last sentence there.
And it says, earlier in that paragraph, outside advisors
are attorneys, accountants, life insurance agents, and
estate planners who have other clients besides Mr. PC.

             Help me.  Mr. PC, do you know what that
means?

        A.    Potential client.

        Q.    Okay.  The training manual that Heritage provided
says, we will not provide an initial consultation with such
advisors present.

             Do you have any explanation for that
statement?

        A.    Sure.  The reasons are stated in the next
paragraph.  I would say they're fairly accurate.

        Q.    You stand behind this training manual?

        A.    No.  I said, the reasons that were given to
answer your question are given in the second paragraph.

        Q.    And you stand behind these assertions in the
second paragraph?

1    A.    They were typical.

2    Q.    What's a loop, Mr. Kornman?

3              MR. TILLOTSON:  In the context of this?

4              MS. HARRIS:  Yes, I'm sorry.

5    Q.    You'll see the reference in paragraph three,

6    consult the loops section.  What's a loop?

7    A.    How to meet an objection.

8    Q.    So if a client wanted to bring her attorney with

9    her, Heritage employees were instructed to respond with a

10   loop; is that correct?

11   A.    They were supposed to encourage them not to bring

12   those people with them because it was a waste of our time.

13   Q.    Mr. Kornman, what's your current net worth?

14   A.    I'm not going to answer that.

15             MR. TILLOTSON:  Object, instruct not to

16   answer.

17   Q.    Mr. Kornman, why do you object to the trustee's

18   proposed settlement with the Skinner Trusts?

19   A.    I believe the Skinner Trusts owe something like

20   $4 million to the estate.  They have the money to pay

21   the -- to pay the $4 million.  The notes are valid notes.

22             The trustee is forgiving -- my understanding

23   is, and stop me if I say something incorrect, that the

24   trustee is forgiving those notes; and in addition, giving

25   them an allowed claim of 65 percent of the fees they paid

Gary Kornman - 6/5/2007

120

1    to Heritage.

2                    I guess it would be the notes, because from

3    what I saw, it didn't look like they paid any fees, except

4    make payments on the notes; so, giving them a claim for the

5    65 percent of their prior note payments.

6                    And when you have $4 million of good notes,

7    I can't see why you should release those and then give

8    somebody an allowed claim for additional funds.

9        Q.    Is there a settlement that you think would be

10   fair with the Skinner Trusts?

11       A.    Yeah, I think it would be fair for them to pay

12   their notes.

13       Q.    100 percent?

14       A.    Those notes are collectible.

15       Q.    Mr. Kornman, are you personally recording today's

16   conversation?

17                    MR. TILLOTSON:  Oh, that's --

18                    MR. PHELAN:  That's a fair question.

19                    MR. TILLOTSON:  That's an underhanded blow.

20                    No, he's not.  Are you?

21                    MR. MUNISTERI:  Let him answer the question.

22                    MR. TILLOTSON:  Are you trying to make him

23   agitated?  Are you here with a gun today?

24                    MS. HARRIS:  I'm asking if he's recording

25   today's conversation.  I understand he's had a practice of

121

1    recording depositions, and I want to know if he's doing

2    that today.

3            MR. TILLOTSON:  Can you identify a single

4    deposition that you know he's personally recorded?

5            MS. HARRIS:  There's a pending question.

6        Q.  Mr. Kornman, would you answer the question?

7        A.  This lady is taking down every word I say.

8    Wouldn't it be foolish for me to be recording something

9    when she's a lot more accurate than I am, and I would have

10   to transcribe or listen to another tape?

11           That makes absolutely no sense, and it is

12   offensive.

13       Q.  Just to be clear, and I want to give you the

14   chance, is it your testimony that you've never recorded a

15   deposition that you have -- during which you've been

16   deposed?

17           MR. MICHAEL KORNMAN:  Ah, come on.

18       A.  I'm not going to answer that question.

19           MR. TILLOTSON:  What's the relevance of that

20   for the confirmation hearing.

21           MS. HARRIS:  At this point, I think I'll

22   hand over the questioning to somebody else.

23           MR. TILLOTSON:  Can we take a short

24   five-minute restroom break?

25           MR. PHELAN:  Sure.

Gary Kornman - 6/5/2007

122

1          (Recess 2:30 to 2:42.)

2                EXAMINATION

3    BY MR. PHELAN:

4       Q.   Mr. Kornman, do you happen to have a business

5    card with you?

6       A.   No, I don't even have my billfold.   Sorry.

7       Q.   Do you keep it someplace other than your

8    billfold?

9       A.   All I have on my business card --

10              MR. TILLOTSON:   That's all he wants to know,

11   if you have a card.

12      Q.   The second question is:   What is on your business

13   card?

14      A.   My name and my phone numbers, my home phone

15   numbers, and maybe my cell.   My home fax.   I believe one of

16   my cells may be on there, and my home phone number.

17      Q.   Would the letters JD be after your name?

18      A.   On my present business card?   I don't think so,

19   but I'm not sure.

20      Q.   Okay.   What about your Heritage business card

21   when you were with Heritage, did the letters --

22      A.   It had JD after my name.

23      Q.   When did you cease being a licensed lawyer in

24   Alabama?

25      A.   I -- basically, what you're asking is, when did

Gary Kornman - 6/5/2007

123

1   my license go inactive.  And I'm sorry, I don't know when

2   that was.  It's been quite some time.

3        Q.   Do you have a ballpark of what decade?

4        A.   I'm sorry, I don't.  Somebody else -- just

5   somewhere along the line I said, why do I have to keep

6   paying these --

7              MR. TILLOTSON:  Well, he's --

8        A.   No, I don't.

9              MR. TILLOTSON:  Keep with the program here.

10             THE WITNESS:  Okay.

11       Q.   What was the business of Heritage?

12       A.   At what point in time?

13       Q.   Let's see, from 1997 to its demise.

14       A.   Educating its clients about uses of life

15  insurance, estate and business planning, educating about

16  that, and educating them about asset planning.

17       Q.   Could you elaborate on what you meant by asset

18  planning?

19       A.   I really can't.  It was very specific to an

20  individual client.

21             Sometimes it was helping them getting

22  financing for something.  Sometimes it was talking to them

23  about callers on stocks.  I mean, just all kinds of things.

24  It's impossible to define that.  It's just very specific to

25  the client.

1     Q.    Did it have anything to do with tax planning?

2     A.    Many times it did.  All of it had to do with tax

3     planning.

4            (Mr. Morris left the room.)

5     Q.    Could you describe the 752 strategy that was

6     educated by Heritage?

7            Syntax wasn't very good on that question,

8     but I think you understood what I said.

9     A.    That's okay.

10    Q.    The reason is, I had trouble fitting the two

11    concepts.

12    A.    Can I give you a -- they were all based on what

13    the client's position was, so they all involved an

14    investment in a short sale of government securities.

15           I'm going to try to give you the common

16    factors and then tell you that things changed after that.

17           They all involved the transfer of the

18    brokerage account holding, the obligation to replace the

19    security sold short, and the cash that was received from

20    the short sale of securities, transferring that to a

21    partnership.

22           Now, wait just a second.  I need to stop

23    just a second and correct myself.

24           There was a transaction done by Mr. Canada

25    that didn't use this structure.  He could explain it better

Gary Kornman - 6/5/2007

125

1       than I could.  I don't know much about it.

2                   And there was a transaction done for someone

3       else that didn't use the structure that I did, but the

4       guy -- the person never -- just never used the transaction.

5                   And at that point, it stopped -- the

6       transactions -- the similarities stopped.

7                   There were various partnership provisions

8       that were used to attach the basis generated by the cash

9       that went into the partnership, to attach that basis to

10      some other asset.

11                  (Mr. Morris entered the room.)

12          A.    That pretty much sums up the transaction.

13          Q.    Okay.  What was the objective of that strategy?

14          A.    Well, most of our clients, their first objective

15      was not to lose any money, was to make money.

16                  But the various clients, some of them made

17      money, some of them lost money; and that was a major

18      objective, and a major objective was to have something that

19      might save them taxes.

20                  There were other objectives in the -- in the

21      signing up of partnerships for the advantages of having a

22      partnership, protection of various kinds as a limited

23      partner.  They were what I call the structural advantages

24      of the legal entities, as well.

25                  You know, sometimes it was a hedge against

1    some either direct or indirect other asset.

2        Q.    When Heritage -- did Heritage have a marketing

3    program?

4        A.    We were a marketing company.

5        Q.    And when you market -- when Heritage marketed its

6    services, did it market the market to its potential

7    clients, its ability to help them make money, as opposed to

8    saving taxes?

9        A.    I would have to answer that yes, that was -- I

10   mean, that -- for example -- now, I won't give you

11   examples.  But the answer is, sometimes that was their --

12   that was their total objective.

13              You're talking about estate cases, sometimes

14   that wasn't their objective.  You're talking about income

15   tax cases, that was usually their objective.

16              The question is very broad, so...

17       Q.    Go ahead and give me some examples.

18       A.    Would you repeat the question?

19       Q.    Sure.  When Heritage engaged in its marketing

20   programs, did it market to its potential clients the

21   ability to make money?

22              For example, we can help you make a lot of

23   money selling treasury short.  We can help you make a lot

24   of money buying options.  We can help you make money

25   trading in stocks.

1       A.   Okay.   The answer to your question was, we were

2   not an investment advisory firm.

3       Q.   It sort of answered my question, but not exactly.

4            MR. TILLOTSON:   Might not be the answer you

5   wanted to get.

6       Q.   But it was the -- in conclusion, that may, in

7   fact, be accurate.

8            But the real question is, as I indicated,

9   did Heritage market those services in its literatures, in

10  its marketing materials, in its structured marketing

11  presentations?

12      A.   Well, the best thing to say is, we were not an

13  investment advisory firm, so we didn't market investment

14  advisory services.

15      Q.   Conversely, in its marketing materials, did

16  Heritage market its ability to save its clients taxes?

17      A.   As part of what we were doing, yes.

18      Q.   Did Heritage ever prepare marketing materials

19  that claimed to -- that Heritage could eliminate estate

20  taxes?

21      A.   Yes.

22      Q.   Did Heritage ever disseminate those marketing

23  materials?

24      A.   Yes.

25      Q.   How did the Heritage 752 strategy differ from 752

1    programs marketed by Heritage's competitors?

2         A.    Could you be more specific about the programs

3    marketed from competitors?  Because there were a number of

4    different ones.

5              We saw things from department -- bad

6    accounts from Japanese department stores, to loans picked

7    up on the street -- loan notes in Indonesia.

8         Q.    Let me just stick with domestic for the time

9    being.

10             You described the 752 program -- you

11   described Heritage's 752 program.  Were there programs

12   being marketed by people like, oh, the guys over there in

13   that building, KPMG, for example, that the Internal Revenue

14   Service would consider similar?

15             That was just happenstance.  That was not

16   planned.

17        A.    I understand.  The Heritage -- let's put it this

18   way:  The Internal Revenue Service might consider them

19   similar.  We didn't.

20        Q.    And I think my question was, that the Internal

21   Revenue Service would consider similar.

22             MR. TILLOTSON:  Well, object to the form.

23        Q.    Did you understand my question?

24        A.    And I answered it.

25        Q.    Well, not really.  Let me try it again.

Gary Kornman - 6/5/2007

129

1          Were there tax strategies involving section

2     752 of the Internal Revenue Code that were marketed by

3     Heritage's competitors that the Internal Revenue Service

4     would consider similar?

5          MR. TILLOTSON:  Object to the form.  Calls

6     for speculation.

7          You may answer, if you're able.

8     A.   I don't know what the -- what their opinions

9     were.

10    Q.   From time to time, did the Internal Revenue

11    Service express its opinions in notices and other

12    publications?

13    A.   Again, it's not -- I mean, other publications?

14    What do you mean?  I'm sorry.

15    Q.   Let's start with notices, Internal Revenue

16    Service notices.

17    A.   Let me be specific.  I don't know the answer to

18    everything they did.  I might have missed something, but

19    section -- but Notice 2000-44 did not describe a short sale

20    transaction.

21    Q.   No, it didn't.  But did it describe a transaction

22    involving Section 752 of the Internal Revenue Code?

23    A.   Yes, it did.

24    Q.   And did it describe the transaction involving the

25    use of partnerships?

1    A.    Yes, it did.

2    Q.    And did it describe transactions where, as you, I

3    think, stated, the basis would be transferred to some other

4    asset?

5    A.    Yes, it did.

6    Q.    Okay.  Are those elements common elements -- are

7    those elements that are utilized in connection with the

8    Heritage 752 transactions?

9    A.    I just said they were.

10    Q.    Okay.  So how did Heritage's 752 strategy differ

11    from -- let me back up.  Let me give you another background

12    question.

13    Were -- name some competitors of Heritage in

14    the tax strategy business during the period 1999 through

15    the demise of Heritage.

16    A.    Major accounting firms, major law firms, major

17    investment banks, just regular old banks.

18    Q.    Okay.  And did many of those entities have tax

19    strategies that employed the elements we've just discussed

20    that were -- employ the elements that we've just discussed?

21    A.    I don't know.  There were so many of them out

22    there, I don't know who did what.

23    Q.    Were you familiar with the KPMG COBRA

24    transactions that Jenkens & Gilchrist were involved in?

25    A.    I'm sorry, which one?

Gary Kornman - 6/5/2007

131

Q.    The KPMG COBRA transactions that Jenkens &
Gilchrist was involved in.

A.    Yeah, I don't know whether they were COBRA, but
I'm familiar with generally how their transactions worked.

Q.    How did their transactions work?

A.    I'm not saying this was all their transactions,
because I'm sure they varied.

But by and large, their transactions used an
option for foreign currencies, something colloquially
described as a digital option.  And the way they had it
structured -- it's my understanding, I don't know this to
be fact -- that because it was a foreign currency, you
could choose whether you had an ordinary loss.

Some were a capital loss.  I think that
was -- there was some provisional code that allowed you to
do that.

That's pretty much all I know about it.

Q.    Okay.  Now, what common elements did it share
with the Heritage 752 strategy?

A.    The use of partnerships, the use of brokerage
accounts of some kind.

I don't know enough about their option
transactions to know how those were done, whether they were
derivative contracts or brokerage accounts or what, so I
really don't know the answer to that part of it.

Gary Kornman - 6/5/2007

132

1      I didn't spend much time on their

2  transaction because we didn't think it was valid.  We

3  didn't --

4      Q.   Well, why were theirs -- why did you think theirs

5  were not valid but Heritage's -- but the Heritage strategy

6  was valid?

7      A.   I could only refer to -- to their transactions at

8  a certain period of time, because their transactions may

9  have evolved over a period of time.

10      The ones that I thought were invalid were

11  the ones that were using these current -- digital currency

12  options.  We just didn't believe they had any economic

13  substance.

14      Q.   Okay.

15      A.   That was the primary reason.  We didn't know

16  enough about the technicals of how they were doing them to

17  make a judgment on anything else, but it just -- it didn't

18  have much, if any, economic effect.

19      Q.   Because the digital options were hedged with a

20  long and a short position?

21      A.   Yeah, and they were -- I don't know enough about

22  them to tell you real specifically, but it was enough that

23  we weren't comfortable with it, even looking at it.

24      Q.   Okay.  And then the Heritage 752s, many of those

25  were not hedged; is that correct?

1        A.    None of them were hedged.

2        Q.    It was just a short position, none of them were

3    hedged?

4        A.    None of them were hedged.

5        Q.    Mr. Jenkins' transactions was not hedged --

6        A.    No, sir.

7        Q.    -- with a long position?  There was no offsetting

8    position?

9        A.    We reinvested his proceeds in repos.  I mean,

10    that's just money management.

11        Q.    Now, what was the -- the longest duration of an

12    open short that you can remember for any of the client

13    claimants that had a Heritage 752 strategy?

14        A.    I'm sorry, I just don't have any way of

15    remembering those issues.

16        Q.    Do you remember any of them, the duration of any

17    of the open shorts?

18                For the record, short positions on the

19    treasuries.

20        A.    Not specifically.

21        Q.    None, zero?

22        A.    I don't even remember --

23        Q.    Again, for the record, you don't remember any?

24        A.    I don't even remember my own, the ones that we

25    did for -- any that I was associated with.

1     Q.   Do you remember the -- what is the shortest

2  position that you remember for an open short position?

3             Let me forget that one.  That's really bad.

4             MR. LEWIS:  Robin is going to need to be

5  really careful, or we're going to get to Buchmeyer pretty

6  sure.

7             MR. PHELAN:  That was really bad.

8     Q.   What is the shortest period of time that a short

9  position was open in connection with a Heritage 752

10  strategy, that you can remember?

11    A.   I'm sorry, I just -- that's not one of those

12  things I made an effort to remember.  I'm sorry, I don't

13  know.

14    Q.   Well, in structuring the Heritage 752 strategy so

15  that it would be --

16    A.   When I say, I don't know, you understand that I

17  don't remember.

18    Q.   I understand.  You said you don't remember.

19    A.   Sometimes I say that when I mean I don't

20  remember.

21    Q.   Okay.  I understood.

22             Who structured -- who devised the 752

23  strategy for Heritage?

24    A.   Are you talking about -- when we originally got

25  it from Ahrens?

135

1        Q.   Got it from Ahrens and you decided to use it for

2   Heritage.

3        A.   Ahrens told us how to do it.

4        Q.   Okay.  Did he tell you to use treasury

5   securities?

6             MR. TILLOTSON:  Hold on a second.  Before

7   you answer that, I don't know if that would be considered

8   privileged information.

9             MR. MORRIS:  I don't think --

10            MR. PHELAN:  It started as a legal advice,

11  or is he peddling a product?

12            MR. TILLOTSON:  It's just not my call.  Can

13  you answer that?

14            MR. MORRIS:  I think it's part of the

15  strategies that are at issue.

16            MR. TILLOTSON:  Okay.  You may answer that,

17  if you're able.

18       A.   I think he talked to us about Fulcrum and Salina

19  cases where treasury securities were used.  I don't

20  remember him specifically saying that; but I mean, it was,

21  like I said, the only two cases.  They were in tax court,

22  used treasury securities, so...

23       Q.   Well, let me ask you this:  The Heritage 752

24  strategy would comply with the Internal Revenue Code or not

25  comply with the Internal Revenue Code irrespective of the

1   type of short position that was taken, wouldn't it?

2       A.   Are you talking about irrespective of a security

3   that was shorted?

4       Q.   Correct.

5       A.   My understanding is, that is correct, but let me

6   add something to that.  The amount of margin that you had

7   to put up greatly affected your return on investment.

8            If you had to put up a 1 percent margin and

9   you made 1 percent, then you had 100 percent return on your

10  money.  If you had to put up a 50 percent margin, as in a

11  stock, and you made 1 percent, you had a 2 percent return

12  on your money.

13      Q.   Why would a brokerage house require a higher or

14  lower margin on a particular security, stocks versus

15  treasuries?

16      A.   It's two answers, two things:  The financial

17  statement of the person doing the transaction and the

18  perceived volatility of the security.

19      Q.   Given it would be the same person doing the

20  treasury or the stock, that eliminates that variable,

21  correct?

22      A.   Uh-huh.

23      Q.   So is the volatility of the security; is that

24  correct?

25      A.   That's correct.

Gary Kornman - 6/5/2007

137

Q.   Okay.   Treasuries, for example, would have a
lower volatility than stocks?

A.   Hopefully.

Q.   I don't know, a lower or higher than corn
futures?

A.   Right.

Q.   That was a question.

A.   Oh, excuse me?

Q.   Yes.   Are treasuries lower or higher than corn
futures, in terms of volatility?

A.   I know nothing about corn futures.

Q.   You didn't look into corn options for Heritage?

A.   No.

Q.   Did Heritage ever consider anything other than
shorting treasuries in connection with the programs it was
educating its clients about?

A.   Not to my knowledge.   I mean, it may have been a
casual thing.   We looked into foreign currencies at one
point in time, but didn't like the risk of them.

And let me also say, all I can speak for is
what I did.   I don't know what Ralph Canada did or Anthony
Bird did with their clients.   I have no information on any
of their clients and what they did.

Q.   So they could have been selling corn futures,
shorting corn futures, for all you know?

Gary Kornman - 6/5/2007

138

1     A.    God, I hope not.

2     Q.    But you don't know?

3     A.    No.  If a client had said, I want to use corn

4     futures, they could have --

5              MR. TILLOTSON:  Well, you -- listen to his

6     question.

7              THE WITNESS:  Okay.

8     Q.    Did any of the potential clients of Heritage ever

9     specifically say, I want to use treasuries instead of some

10    other security?

11    A.    Could you define who you're speaking of?

12    Q.    Potential clients of Heritage who were contacted

13    by Heritage, to your knowledge.

14    A.    I had one client that had some assets overseas.

15    At this moment, I don't even remember what they were.  I

16    think they were stocks of some kind, but I'm not sure.  And

17    he wanted to use those assets.

18              I believe Canada had a client that's not one

19    of the client claimants that may have used some other

20    asset.

21    Q.    So treasuries were picked because they were

22    extremely low-risk of volatility; is that correct?

23    A.    No, they were picked because they had the

24    highest -- because of their low volatility, they had low

25    margin, so you could make a high percentage profit on a

Gary Kornman - 6/5/2007

1    relatively small investment.

2        Q.   Could you also lose a lot on a relatively small

3    investment?

4        A.   Yes, it's -- could be one against you.

5        Q.   So is the risk less than the risk involved in

6    other forms of investments?

7        A.   These people generally believed that they were

8    making an investment that was based on the economic factors

9    at the time.  They were expecting to make a profit.

10       Q.   So how come you guys weren't -- Heritage

11   wasn't -- you said earlier that Heritage wasn't an

12   investment advisor.  If it's giving investment advice,

13   was --

14           MR. TILLOTSON:  Objection, form.

15       A.   It wasn't giving investment advice.  That's what

16   I just said.  The clients picked what they wanted.

17       Q.   And what choices were suggested by Heritage?

18       A.   I can only deal with the people I spoke to, but

19   my clients knew what their choices were.  They were

20   sophisticated investors, and they understood everything

21   about it and picked whatever they wanted.

22           That's why I said, this one guy picked

23   foreign offshore currencies.

24       Q.   So with possibly one exception, who had foreign

25   option currencies, everybody else picked treasuries?

1      A.    Understanding the risk return ratios, yes.

2      Q.    And Heritage educated them about those risk

3  returns and ratios?

4      A.    I think we usually gave them some examples of

5  what -- what would happen at various interest rate

6  structures.

7      Q.    Did you give them any examples with respect to

8  other securities?

9      A.    I can't remember.  We may have.

10      Q.    Did -- back up.

11            Who determined the position of Heritage with

12  respect to outside advisors?  Whose call was that, was that

13  yours, Mr. Canada's?

14      A.    I'm sorry, I don't understand the question.

15      Q.    Heritage had a position of discouraging the use

16  of outside advisors.  I think you already indicated that.

17      A.    That's correct.

18      Q.    All right.  And who --

19      A.    At initial meetings.

20      Q.    Okay.

21      A.    Understand that they were required to have

22  outside advisors after they became a client of ours.

23      Q.    We're going to get to outside advisors, that

24  definition, in a second.  But let's talk about before the

25  initial meeting.

1          Who determined that policy, was that you,

2     Mr. Canada, Vickie Walker, somebody else?

3          A.   It was a consensus of all of us.

4          Q.   Okay.  Was one of the reasons because outside

5     advisors would steal the strategies of Heritage?

6          A.   Let's talk about -- let's talk about the time

7     we're talking about.

8               We're talking about the time of trying to

9     get engaged by a potential client, right?

10         Q.   Right now.

11         A.   Is that what you're explaining?

12         Q.   That's the time frame we're talking about right

13    now.

14         A.   Okay.  Outside advisors would very commonly ask

15    what it was we were going to do, so they could make an

16    intelligent judgment as to whether or not they thought it

17    worked.  That put us in the position of not being able to

18    tell them that, because the clients hadn't signed an

19    agreement, they could just do what they wanted to do, using

20    our information, which was valuable.

21              So the long and short of it was, it was a

22    very awkward position, because the outside advisor -- let's

23    talk about two situations, because there were two

24    situations.

25              There was one where someone referred, you go

Gary Kornman - 6/5/2007

1    see my attorney, go see my accountant.  We just got to the

2    point that we just never were successful, that I remember,

3    more than maybe once or twice in 30 years, by going to see

4    those people.  So we just had an operating philosophy that

5    we wouldn't waste our time.

6           Many times someone would say, well, I have

7    someone who is an in-house attorney or an in-house CPA, and

8    they are going to sit in; and we'd say, fine.  In other

9    words, some professional that was representing the client

10   but -- but wasn't afraid of losing the client, is a better

11   way of saying it.

12          And so, many times we'd go to meetings with

13   those types of people.  Occasionally, depending on who it

14   was, sometimes we'd go to a meeting with outside; but

15   generally speaking, these were hard and fast rules.

16          Every one of them was looked at a little bit

17   on a situational basis, but by and large, there was

18   always -- there was usually a breakdown when they said,

19   well, tell us what you're going to do, so we could evaluate

20   it, and we couldn't tell them what we were going to do.  So

21   the meetings usually ended up in kind of an awkward

22   situation.

23       Q.   Getting back to the original question, which is:

24   What was it that they could steal?  Was it the fact that

25   you used treasuries to short sale --

Gary Kornman - 6/5/2007

143

1      A.    No.

2      Q.    -- and the fact that it wasn't hedged?

3            What elements of the 752 Heritage strategy

4   were different than the 752 strategies that were used by

5   other people?

6      A.    I can't answer that question.  That requires

7   speculation and everything else.  I couldn't begin to

8   answer it.

9      Q.    You can speculate.  You knew what your

10  competitors were doing, didn't you?

11     A.    No.

12     Q.    You didn't?  Do you know what the literature said

13  about 752 types of structures?

14            MR. TILLOTSON:  Object to the form.

15            You may answer, if you're able.

16     A.    What literature are you referring to?

17     Q.    The literature that discusses tax shelters and

18  tax structures.

19            MR. TILLOTSON:  Same objection.

20     A.    I'm sorry, I can't answer that question.

21     Q.    Let's back up to a question that came up earlier.

22  What publications did Heritage subscribe to, to stay

23  abreast of changes in tax -- the tax world that might

24  affect their products -- its products?

25     A.    Major -- major publications related to those

Gary Kornman - 6/5/2007

144

1    subjects, 15, 20, 25, 30 of them.  There were a lot of

2    subscriptions.  I can't begin to tell you.

3         Q.   Start naming the ones that you can remember.

4         A.   Lots of different tax journals.

5         Q.   Name them off.  Daily Tax Review, Tax Codes?

6         A.   Daily Tax Report, the NA, CCH, Taxation for

7    Attorneys, Taxation for Accountants, Estate Planning, Trust

8    and Estates, Life Insurance Selling CLU journal.

9              There's more, I just -- that's a quick and

10   best.

11        Q.   On which of those did you personally read?

12        A.   Just depends on what my schedule was.  I might

13   have perused the index on some of them.  Just different

14   people.  We just passed them around.  We read what we had

15   time to read.

16        Q.   Any that you read on a regular basis?

17        A.   No, just a lot of them.

18        Q.   Did Heritage view outside advisors as potential

19   competitors?

20        A.   How do you mean, competitors?

21        Q.   I mean, competitors as used in the Heritage

22   training manual for initiators.

23        A.   Want to give me a page number?

24        Q.   Sure, if it had a page number, I'd give it to

25   you.  But -- oh, yeah, wait a minute.  The little circle

1   with the slash through it over outside advisors, as

2   appearing on page number -- but the Bates number is

3   APP2307.

4        A.   I got it.

5        Q.   Okay.  And in the paragraph there it says, second

6   paragraph, it talks about potential investors.

7             MR. TILLOTSON:  Wait for the question.

8        A.   Our definition of a competitor, according to this

9   second paragraph, was someone who was likely to keep a

10  client, a potential client from engaging us.  It's not that

11  they could perform the same services, it's that if they

12  could not -- that they would do everything in their power

13  to keep whoever we were talking to from hiring us.

14            So -- so that's -- that's our -- if you want

15  to use that as your definition -- and this, by the way,

16  is -- like I said, I didn't write this, but it's awful

17  black and white --

18       Q.   It would probably be better if it was in color,

19  from a marketing organization.

20       A.   No, no.  It says, we will not provide an initial

21  consultation with an outside advisor present.

22            I just told you it wasn't the case.  It

23  wasn't necessarily an absolute thing at all.  We would

24  evaluate each one as it happened.

25       Q.   Who prepared this training manual or initiator's

1   manual?

2       A.   I have no idea.  Probably was written over a

3   period of time.

4       Q.   Who in the Heritage organization would have been

5   in charge of something like preparing an initiator's

6   manual?

7       A.   It varied over a period of time.  Different

8   people were responsible for different things.

9       Q.   So you just -- just really don't know what the

10  initiators were telling the potential clients, right?

11      A.   I don't think that's accurate.

12      Q.   Why would that not be accurate, if you didn't

13  know what they were -- how they were being trained and what

14  they were being trained to say?

15      A.   I made a point to meet with initiators as

16  frequently as possible to discuss what was going on.

17      Q.   Let's talk about after the initial meeting.  I

18  think you indicated that prior to that time, you

19  discouraged the use of outside advisors.

20              How did outside advisors fit after the

21  initial meeting?

22      A.   Well, since we were salespeople --

23      Q.   Right.

24      A.   -- there was a conflict of interest between us

25  and the clients, in that all we were trying to do was

Gary Kornman - 6/5/2007

1       educate them.

2                     And I believe Holly made a point that you

3       wouldn't want to be taking advice from someone that had a

4       conflict of interest.  And since we were being paid, if

5       they executed, we viewed that as a conflict of interest.

6                     So we required them to have their advisors,

7       whoever they were, whoever they wanted to pick, give them

8       opinions, take our recommendations, change them, give them

9       information regarding whether they thought what we had said

10      to them was accurate, did we leave out anything.  And so,

11      we required that they make an independent decision with

12      other advisors.

13                    Now, when you say, outside advisors,

14      sometimes they were outside advisors.  Sometimes they were

15      inside advisors, attorneys or CPAs who were in-house, so...

16                    But we just felt like that they had to rely

17      on someone besides us, because we didn't practice law, we

18      didn't practice accounting, we didn't give advice.

19           Q.   Let me make sure I understand the program, then.

20      If a potential client is contacted, the potential client is

21      discouraged from bringing his normal lawyer, or, say, a tax

22      lawyer from his normal law firm until he signs a client

23      agreement; is that correct?

24           A.   Uh-huh.

25           Q.   Okay.  Signs a client agreement, pays his

1    $22,500, and then he has a meeting with someone from

2    Heritage.  Is that the next step?

3        A.    Yes.

4        Q.    Okay.  And if he brings his tax lawyer from his

5    outside law firm, what happens then?

6        A.    Well, he has signed -- excuse me -- one of our

7    agreements that says that -- that he can use any advisor he

8    wants, as long as they sign an agreement not to remarket

9    what it is we're going to show them.

10           Attorneys have a knack for going to meetings

11   and giving away their best ideas, to show how smart they

12   are, and destroying the value of what we've created.

13       Q.    Okay.  Now, given that certainly many elements of

14   the 752 Heritage strategy were utilized by other parties,

15   how could an attorney determine whether any such

16   utilization would constitute a violation of your marketing

17   agreement?

18       A.    I think it was spelled out sufficiently.

19           You have to remember something else.  We

20   didn't know what everybody else was doing.  You're

21   inferring that we knew that all these transactions were out

22   there and we knew how they worked, and the answer to that

23   is, we didn't.

24           We knew just what -- we knew more about the

25   Jenkens & Gilchrist transaction than anybody else's, and we

Gary Kornman - 6/5/2007

149

1  just told you what we knew about that.  And you're implying

2  that this is like common knowledge, but it wasn't common

3  with us.

4      Q.   Did you know what a COBRA was?

5      A.   Did I know what COBRA was?

6      Q.   Yes.

7      A.   Are you referring to specifically the Jenkens &

8  Gilchrist term?

9      Q.   No, I'm referring to the generic use of the term

10 COBRA, in tax parlance as opposed to Indian --

11             MR. MICHAEL KORNMAN:  Snake charming.

12             MR. PHELAN:  Snake charming.  Thank you.

13     A.   We didn't know -- we learned them a little at a

14 time, over a period of time.  Over a period of time, we

15 learned about CARDS and POPS and all kinds of names, but we

16 didn't necessarily know what those were.

17             And we didn't -- we didn't have names -- we

18 did one particular thing, and we didn't have a name for it,

19 depending on what the client wanted to do.  So we didn't --

20 we never knew who a client might pick, who knew what or

21 didn't know what.

22     Q.   How does the Heritage 752 strategy differ from

23 the generic COBRA?

24     A.   I'm sorry, but will you describe the generic

25 COBRA to me?  I don't know what you're speaking of.

1      Q.   You don't know what I'm talking about?

2      A.   No.

3      Q.   Okay.

4      A.   I might know the transaction.  I don't know it by

5  that name.

6      Q.   Right.  Did the Internal Revenue Code -- or

7  excuse me, the Internal Revenue Service ever describe any

8  particular transaction as a COBRA?

9      A.   To who?

10     Q.   In any either written publication or in the tax

11  publications that were subscribed to by Heritage.

12     A.   I don't remember.

13     Q.   You don't remember.

14     A.   And again, it's a matter of timing.  What -- you

15  know, this all transpired over a period of four, five

16  years.

17     Q.   How many outside attorneys -- by outside

18  attorney, I mean someone who did not, as you indicate, work

19  for the client, potential client on a full-time basis --

20     A.   Right.

21     Q.   -- for the law firm or whatever.

22          How many outside attorneys executed the

23  advisor agreement that you discussed earlier, to the best

24  of your knowledge?

25     A.   I don't know the exact answer to that, but I can

1  tell you, the larger the firm, the less likely they were,

2  because of firm policies.

3          Q.   Mr. Ahrens and his firm did, right?

4          A.   Uh-huh.

5                   MR. MUNISTERI:  Wait.  Wait.  We didn't get

6  an answer.

7          Q.   I thought it was a yes.

8          A.   Ahrens did not.

9          Q.   He did not?

10         A.   He knew the strategy before he ever met us.  It

11 would have been silly for him to ask us to --

12         Q.   Did anybody in his firm ever execute the advisory

13 agreement?

14         A.   No.

15         Q.   Okay.  But you -- what about Mr. Mulligan?

16         A.   Yes.

17         Q.   And how about attorneys in his firm?  Lewis Rice.

18         A.   I know of at least one other.

19         Q.   Okay.  Were there any other attorneys, outside

20 attorneys that you know of that executed the advisory

21 agreement?

22         A.   I've seen several from some of the client

23 claimants.  I just wouldn't have -- I wouldn't be able

24 to -- first of all, I couldn't remember it.  But second of

25 all, there were other outside attorneys, including some of

1    the client claimant attorneys, who did that.

2        Q.   All right.  Let's get back to the sequencing.

3    Potential client signs client agreement and then has a

4    meeting.

5             With respect to the client claimants --

6        A.   We're talking about the tax claimants now?  Who

7    are we speaking of here?

8             Remember, I only met two of these groups of

9    people, Jenkins and Sandwith, right?

10       Q.   Right.  But you're the guy in charge of Heritage,

11   you were the CEO of Heritage, you were -- right?

12       A.   At some points, yes.

13       Q.   Who was in charge at other points?

14       A.   Well, that's a good question.

15       Q.   Prior to the trustee's appointment.

16       A.   Well, I believe Michael Kornman was, at some

17   point.

18             And then, in the early days of Heritage,

19   Holly pointed out that the Heritage Organization, Inc. was

20   the manager.  I'd forgotten about that.

21       Q.   Yeah, but who ran that?  Who ran the Heritage

22   Organization, Inc.?

23       A.   I was an officer.  I don't remember which one.

24   Maybe -- I don't know.  That's -- we had an unusual

25   situation where maybe I was vice president.

Gary Kornman - 6/5/2007

153

1      Q.   Not to quibble too much, but during the time

2   period we're talking about, say 1998 through the demise of

3   Heritage, were you the -- were you the guy in charge?

4      A.   I was the guy in charge up until the time I

5   resigned.

6      Q.   Okay.

7      A.   And when you say, in charge --

8      Q.   That's fair.

9      A.   -- I was chief executive and the manager of

10   the -- the manager of -- the manager of Heritage.

11      Q.   Okay.  Let's talk about the -- the two that you

12   were directly involved with, Mr. Jenkins and Mr. Sandwith.

13           After they signed the client agreements, was

14   there a meeting with personnel from Heritage to discuss the

15   tax strategy or the -- in the Sandwith case, the estate

16   planning?

17      A.   Yes, sir.

18      Q.   Were there PowerPoint presentations made at that

19   point in time?

20      A.   The first meeting was very often to gather

21   information about what the client wanted to do, so I don't

22   know if the first meeting had a PowerPoint presentation.

23           I know the Sandwiths were very interested

24   and very anxious to get going.  That was one of their

25   questions, of how fast could this be implemented, so...

1          I don't know specifically whether we used a

2  PowerPoint.

3          With most of our clients, the first meeting

4  was finding out their assets, their liabilities, what they

5  wanted to do.  So I can't answer your question with the

6  Sandwith with a yes or no.  It could have been, it could

7  have not have been.

8      Q.   Did you subsequently use a PowerPoint in

9  connection with the meeting with the Sandwiths?

10     A.   Yes.

11     Q.   Were you present at those meetings?

12     A.   Yes.

13     Q.   What was the subject matter of those meetings?

14  Education, I assume.

15     A.   Yeah, that's -- that's what it was.  I know you

16  were going to --

17     Q.   And what were -- what was the subject matter of

18  those educational sessions?

19     A.   Various strategies that they could use to

20  accomplish what they had told us they wanted to do.

21     Q.   And did you use PowerPoints -- did you -- who

22  conducted those educational sessions?

23     A.   I was always the one that made the presentations.

24     Q.   And did you use PowerPoints to assist you in your

25  educational activities?

Gary Kornman - 6/5/2007

155

1     A.    A large percentage of the time.

2     Q.    Okay.  Now, switching from the Sandwiths to other

3    Heritage presentations for other clients that you did not

4    participate in, did you direct the Heritage parties in any

5    manner, shape or form regarding how the presentation should

6    take place?

7     A.    Not that I remember.  I don't believe so.

8     Q.    Do you know if they utilized PowerPoints?

9     A.    Again, I wasn't there, so I don't know.

10     Q.    As the CEO, you -- what steps did you take to

11   ensure that quality control was being maintained in

12   connection with these educational presentations?

13     A.    I relied on some very smart people and some

14   very -- who I thought were at the time honest people with

15   integrity.  Mr. Canada, Mr. Bird, the people in the

16   analytical department who prepared these.

17     Q.    How did you know that Mr. Canada or Mr. Bird or,

18   I guess, Mr. Van Voorhees as well -- was he involved?

19     A.    I don't know if he ever -- he didn't make any

20   presentation except one time.

21     Q.    Let me back up.  Who made the presentations on

22   behalf of Heritage other than yourself?

23     A.    Mr. Canada or Mr. Bird.

24     Q.    Okay.  And how did you know what they were

25   telling the clients?

1       A.    Well, I could -- since I wasn't there, I

2  couldn't -- I obviously couldn't know.  I trusted them to

3  tell the clients the truth.

4       Q.    Did you ever ask them what they were telling the

5  client?

6       A.    We discussed cases, I guess, from time to time,

7  how's it going, or something like that.

8       Q.    At these PowerPoint presentations, were there

9  discussions of Internal Revenue Code sections?

10      A.    Yes.

11      Q.    At the PowerPoint presentations, were there

12  discussions of case law?

13      A.    There were illustrations, there were

14  presentations of a case.  There were no interpretations of

15  the case.  It would be a -- what the taxpayer alleged, what

16  the government alleged, and what the court found.  It's

17  just a statement of fact.

18      Q.    Were there any discussions at these presentations

19  of how the Heritage 752 strategy -- how the Heritage

20  strategies, let's put it that way, differed from the

21  court's conclusion in any cases?

22      A.    Wait a minute.  Where are we -- who are we

23  talking about, when, how?  I'm sorry.

24      Q.    Anytime that you are aware of, were there any

25  discussions --

Gary Kornman - 6/5/2007

157

1      A.    Wait a minute.   You're giving me too broad of

2    a --

3      Q.    Okay.

4      A.    Are you talking about a meeting with the

5    Sandwiths, are you talking about a meeting with somebody

6    else?  What are you talking about?

7      Q.    What I'm talking about now is a meeting with

8    anybody that was a client that you're aware of where cases

9    were discussed and the Heritage representative, be that

10   you, Mr. Canada, or Mr. Bird, to your knowledge, explained

11   why the Heritage strategy was different than the strategy

12   that they dealt with in that case?

13     A.    In what case?  I'm sorry.

14     Q.    In any cases that were discussed.

15     A.    I'm sorry --

16           MR. TILLOTSON:  Are you -- are you asking

17   what was -- was there ever a discussion he's aware of with

18   a potential client where there was a discussion of

19   distinguishing the Heritage strategy from some legal case?

20           MR. PHELAN:  Correct.

21           MR. TILLOTSON:  Do you understand that

22   question?

23     A.    No.

24     Q.    Okay.

25           MR. TILLOTSON:  I tried.

Gary Kornman - 6/5/2007

1          MR. PHELAN:  I understand.  You got it.

2      Q.   You mentioned a moment ago that at the client

3   educational sessions, sometimes legal cases were discussed.

4   I think you indicated that --

5      A.   Wait, let's -- let's talk about the term

6   presented.  This is what the case held.  That's a fact.

7      Q.   Right.  Okay.  And the question is:  At these

8   educational sessions, were there ever discussions of why

9   the Heritage strategy differed from the strategy that was

10  dealt with in the cases that were discussed?

11     A.   Let me explain as to where I think the confusion

12  is.

13          You're speaking of the Heritage strategy.

14  The Heritage educational sessions were education on a group

15  of different subjects, so there was no way to -- to answer

16  your question because it just -- it just didn't make --

17  doesn't make sense, because it was -- what is an

18  irrevocable trust?

19     Q.   Presumably, one that can't be revoked.

20     A.   I mean, it was very -- I mean, it just -- I'm

21  sorry, your question is so broad.  It's as broad as it is

22  long.  I can't answer it.

23     Q.   I'm going to narrow it real quick for you.

24          If, for example, in an educational session

25  the Salina case was discussed, was there ever an instance,

1   to your knowledge, where the Heritage strategy under

2   consideration -- or strategies under consideration were

3   distinguished from the facts of Salina?

4       A.   I don't believe so.

5       Q.   Okay.

6       A.   I'm not sure of that for other people.  I'm

7   just -- the Salina case was a very important case that we

8   always discussed.

9       Q.   At any of these PowerPoint sessions, did -- were

10  there discussions of how taxes could be eliminated?

11              MR. TILLOTSON:   I'm sorry, can you say it

12  one more time?

13      Q.   At any of these educational sessions -- I use the

14  term PowerPoint sessions, but educational sessions.

15      A.   Okay.

16      Q.   Was there a discussion of how taxes could be

17  eliminated?

18      A.   Again, are you talking about estate taxes?  Are

19  you talking about any tax?

20      Q.   Either one.

21      A.   Sure.

22      Q.   At the PowerPoint sessions, did you -- were there

23  any discussions of the use of trusts?

24      A.   Again, you're just very, very broad, so I'll --

25  you know, if it was an estate case, there was an example of

Gary Kornman - 6/5/2007

160

1      a use -- yes, we talked about trusts.  I think that's what

2      you're asking.

3          Q.   At any of these educational sessions, were there

4      discussions of the effect of trusts on taxes?

5          A.   I'm sorry, but every one of our clients, without

6      exception, knew that a trust was not included in somebody's

7      taxable estate if they didn't set it up, so...

8               We're dealing with very, very bright people

9      here who had considered estate planning before.  And so, I

10     mean, some of it is self-evident.

11         Q.   Other than the self-evident things, which I

12     assume did not result in the dissemination of knowledge by

13     Heritage to the potential clients, was there anything that

14     Heritage discussed at these educational sessions regarding

15     the effect of trusts on taxes?

16         A.   Yes.

17         Q.   And what would that have been?

18         A.   Just what I said, that assets owned by a trust

19     meeting certain conditions, that is, if the grantor is not

20     the beneficiary or if somebody -- some other conditions,

21     that he's given control over it, is not taxable in the

22     grantor's estate.

23         Q.   To your knowledge, when did the Sandwiths engage

24     Mike Mulligan as their counsel?

25         A.   I'm sorry, I don't know the exact date.

1    Q.    Do you know the month -- do you know the year?

2    A.    There's an engagement letter floating around

3    somewhere.  And so, they had engaged --

4    Q.    Okay.

5    A.    -- I don't know whether they engaged him orally

6    at the first meeting.  I just don't know.  I'm sorry.

7    Q.    Was he at the first meeting that Heritage -- when

8    Heritage first met with the Sandwiths?

9    A.    When I say the first meeting, I say, the first

10   meeting he was at.

11   Q.    Did Mr. Mulligan conduct these educational

12   presentations?

13   A.    No, that was -- that was what we did.

14         Okay.  Let's go back a second.  Before

15   Mr. Mulligan got there, we had educated the Sandwiths on a

16   number of different options that they had, if they wanted

17   to get more information and investigate.

18   Q.    Who recommended Mike Mulligan to the Sandwiths?

19   A.    They asked who could get this done the quickest,

20   who knew the most about it, and I suggested Mike Mulligan.

21   Because Jon Blatmachr is awfully good, but he is sometimes

22   tied up.

23   Q.    Do you know when the Sandwiths implemented the

24   estate planning strategies recommended by Heritage?

25   A.    Let's get something straight here.  The only

1    person who implemented an estate tax strategy is Ron

2    Sandwith.  It's not the Sandwiths.  The children had little

3    or nothing to do with it.

4         Q.   Okay.  When did Ron Sandwith implement the estate

5    planning strategy suggested by Heritage?

6         A.   It started in late '02.  It may have been

7    finished in late '02, I don't remember.

8         Q.   Okay.

9         A.   And wait just a second.  These were things -- you

10   said -- repeat the question, because it assumes, again,

11   something that's not true.

12            Repeat the question, please.

13        Q.   No, I don't remember it.

14            THE WITNESS:  Can you read it back?

15        Q.   Let me think of another question.

16            MR. TILLOTSON:  If he needs to correct his

17   answer, then --

18            THE WITNESS:  I want to correct my answer.

19            MR. TILLOTSON:  Would you read the question

20   back, please.

21            (Record read.)

22        A.   He didn't implement the estate planning strategy

23   suggested by Heritage, he implemented various strategies

24   that Mike Mulligan helped develop and approved.

25            We did not -- he did not -- that's one of

1    the things that happens when the outside counsel comes in.

2    We modify every -- our agreement calls for this.  They

3    approve or disapprove or change the plans or whatever.  We

4    may have -- we may have recommended one thing, they may

5    have recommended something else.

6              We very often -- it's not uncommon for the

7    analytical department to work with the lawyers and change

8    the presentation to meet with what the lawyers say they

9    want to do.  That is almost 100 percent of the time.

10             You're implying that he did what Heritage

11   recommended, as if we advised him.  That is not correct.

12        Q.   What significant changes did Mr. Mulligan make to

13   the strategy suggested by Heritage?

14        A.   I have no recollection of that.  That would have

15   been going on through his attorneys in his office,

16   Mr. Mulligan himself, and the analytical department.  I

17   wasn't involved in that.

18        Q.   So if you look at what was actually implemented,

19   it would differ significantly from what Heritage

20   recommended?

21        A.   I don't know that it would differ significantly.

22   There would be changes made that would be -- that would

23   show up.

24        Q.   Describe the estate planning strategy that was

25   recommended by Heritage to the Sandwiths.

Gary Kornman - 6/5/2007

164

1    A.   Here we go again.

2         THE WITNESS:  Can I have the pen, please.

3         MR. TILLOTSON:  Why don't you tell him what

4    it is, if you can answer his question.  If there are any

5    documents you need to do that, you should alert him to

6    that.

7    A.   Rephrase -- ask the question again.

8    Q.   Would you describe the estate planning strategy

9    that was recommended to Ron Sandwith by Heritage?

10   A.   I couldn't do that without -- no, I cannot do

11   that, without looking at documents.

12   Q.   Okay.

13   A.   And we did not -- I'm going to say this one more

14   time.  He implemented what Mike Mulligan advised him would

15   work.

16        Mike Mulligan issued a should opinion

17   letter, where he outlined every point of what he

18   recommended, and gave the highest tax opinion that a tax

19   attorney can give.

20   Q.   Is that correct?  That's the highest tax opinion

21   that --

22   A.   A should opinion.

23   Q.   A should opinion?

24   A.   To my knowledge.

25   Q.   Not a would opinion?

Gary Kornman - 6/5/2007

1    A.    I guess somebody's brave enough to give a would

2    opinion, but I've never met them.

3    Q.    Okay.  Let's go back to the 752 for a minute.  As

4    utilized by Heritage, what is the economic substance of

5    this 752 transaction, as used in -- by the Internal Revenue

6    Service?

7    A.    Say that one more time.

8    Q.    Let me back up.

9         Are you familiar with the economic

10   substance --

11   A.    Yes.

12   Q.    -- theory of the Internal Revenue Service?

13   A.    Sure.

14   Q.    How does the Heritage 752 strategy satisfy the

15   economic substance doctrine?

16   A.    There's economic substance -- there's two terms,

17   and they're used by different courts, but they're somewhat

18   interchangeable.

19        You can start looking at the court cases,

20   it's J. Smiley, because we have been through this.  There's

21   business purpose and economic substance, and those two

22   things are used not necessarily interchangeably but

23   somewhat related.

24        The court in the Salina case ruled that it

25   was not a sham transaction, that there was -- I don't

1    remember whether they said economic substance or business

2    purpose in the transaction, as it was put together, which

3    was basically the same as what we were doing.

4            So it's a very important part of it, but we

5    felt very comfortable after the Salina case specifically

6    ruled that it was not a sham -- that the transaction itself

7    was not a sham transaction.  In other words, it didn't lack

8    economic substance and business purpose.

9       Q.   To the extent you remember -- let me back up.

10           I think you said you were comfortable that

11   it satisfied the business purpose and economic substance

12   test, it being a 752 Heritage strategy.  Why?

13      A.   I'm sorry, is that a trick question?

14      Q.   No.

15      A.   What did I just say?

16      Q.   You said you were comfortable after reading the

17   Salina opinion.

18      A.   Because the Salina opinion was virtually the

19   identical transaction, and the court ruled -- as much as

20   they ruled against the legal principal, they ruled in favor

21   of the transaction as being -- as having business purpose

22   and economic substance.

23      Q.   Describe the Salina transaction to the best of

24   your recollection.

25      A.   It involved the sale of a -- a short sale of

1    securities involving partnerships.

2        Q.    To the best of your recollection, how much was

3    paid by Heritage to Ed Ahrens over the course of his

4    relationship with Heritage?

5        A.    Your question says paid to Ed Ahrens.  To my

6    knowledge, all payments were made either to Ed Ahrens' law

7    firm or to -- I'm sorry.

8              THE WITNESS:  What was the name of the

9    company?

10             MS. HARRIS:  FWP.

11       A.    FWP Technologies.

12       Q.    Let's look at them collectively, Mr. Ahrens, his

13   law firm, or FWP.

14       A.    I'm sorry, the answer is, I do not know.

15       Q.    Okay.  You indicated earlier that the analytical

16   department of Heritage determined the content of the

17   PowerPoints; is that correct?

18       A.    Along with the principal involved in that case.

19       Q.    How did the analytical --

20       A.    And then -- and then -- excuse me one second.

21             And then, in conjunction with the law firm

22   that had been brought in to analyze, make changes, make

23   recommendations.

24       Q.    But that was after the PowerPoints were utilized

25   for these educational purposes, right?

1    A.   Well, there were PowerPoints used throughout.  In

2    other words, the PowerPoints were changed from meeting to

3    meeting.  And for example, if the outside attorney said, I

4    want to do a guarantee this way, that was incorporated into

5    the PowerPoints.

6    Q.   Where did the analytical department get the case

7    authority that was initially in the PowerPoints?

8    A.   Articles and magazines, books, all those --

9    periodicals, speeches at the University of Miami, all these

10   various sources.  Attorneys we talked to.

11   Q.   Did anyone from Heritage ever discuss the rule

12   against perpetuities with Ron Sandwith?

13   A.   I'm sure we made him aware of that.

14   Q.   You, being Heritage?

15   A.   Yeah.  Forbes Magazine had already published

16   articles on that.  This is no secret.

17              MR. TILLOTSON:  Listen to his question.

18              THE WITNESS:  Sorry.

19              MR. TILLOTSON:  It's all right.

20   Q.   Did Mr. Mulligan ever help Heritage with the

21   client agreements?

22   A.   Not to my recollection.  I don't believe so.

23   Q.   When you were around, Mr. Mulligan -- okay.

24   Withdraw that.

25              Who is █████████

Gary Kornman - 6/5/2007

169

1    A.   Okay.  There's -- is there some kind of

2  protective order, a gag order on talking about a specific

3  client or something?

4            I -- I'm looking at Dennis and Lee.

5            MR. MORRIS:  I think that that name was

6  disclosed in discovery.  That was provided by GMK Family

7  Holdings.  That was not provided under any kind of

8  protection, so it's already kind of out there.

9            MR. MUNISTERI:  It's out there.

10            THE WITNESS:  Everybody will assure me --

11            MR. TILLOTSON:  Mr. Munisteri is

12  guaranteeing it.  You can look to them.

13            THE WITNESS:  Thanks.

14            MR. TILLOTSON:  Say anything you want, and

15  Jenkins is good for it.  So, you're okay.

16            THE WITNESS:  Okay.

17    A.   And I'm sure Howard is willing to guarantee

18  everything he says.

19            Okay.  Excuse me.  Who is ███████ --

20    Q.   Who is ███████████?

21    A.   He was a client of Heritage that -- I worked on

22  it, and in fact, Canada worked on it, too.  Canada and I

23  worked on it as the principals.

24    Q.   Did you ever tell ███████████ the 752 strategy is

25  the safest you'd ever seen?  To the best of your

1    recollection.

2        A.   I might well have said that, because the

3    authority for it -- in fact, the Western District Court of

4    Texas has already ruled that the law was good law.

5                MR. TILLOTSON:  Listen to his question.

6        A.   Yeah, I might have well said that.

7        Q.   What case was that?

8        A.   Clamith (phonetic) case.

9        Q.   If an IRS agent showed up at the Heritage offices

10   in 2001 to hand deliver a letter, who would be authorized

11   to accept the letter for Heritage?

12       A.   We've been through that before.  There were

13   certain people who were authorized, and I don't know who

14   they were at the time.  Six years ago.

15       Q.   Who would do the authorizing?

16                MR. TILLOTSON:  Who authorized the person to

17   accept it?

18       Q.   Right.  Who decided who was authorized and who

19   wasn't?

20       A.   I'm sure the management of Heritage.  May have

21   been Canada, may have been me, may have been Vickie Walker.

22       Q.   So any one of you could decide to accept hand

23   deliveries from the IRS?

24       A.   We might have discussed it.  I mean, it was a

25   very small company.  It was run in a very informal manner.

1    It wasn't like we had a resolution that these people can do

2    this and these people can't.

3            But the receptionist, for example, was

4    instructed not to take anything.

5        Q.    Right.  So assuming for the moment that one of

6    these authorized parties, in the time frame of February to

7    May 2001, was hand delivered such a letter, who would that

8    party -- what would happen to the letter?  Where would it

9    go?

10       A.    It depends on what it was and who it's addressed

11   to and lots of factors.

12       Q.    Dear Heritage:  We don't like the tax shelters

13   you're selling.  If it was something along those lines --

14   and we want to know who your clients are -- what would have

15   been the procedure for where it would go?

16       A.    I hate to say this, but we didn't have a firm

17   procedure.  I think I answered Holly's thing on that.

18   Various things went to wherever they were supposed to go.

19       Q.    Where were they supposed to go?

20       A.    Who they were addressed to.

21       Q.    Okay.  Let's look at the letters that Holly gave

22   you, then.

23       A.    Yeah, I've got them right here.

24       Q.    I think they're Exhibits 4 and 5.

25       A.    Yes.

1      Q.    Exhibit 6, to some degree.

2            And they basically, if I was in the tax

3      shelter business, would be pretty significant

4      correspondence, would you agree that that's pretty

5      significant correspondence for somebody like Heritage?

6      A.    Would I agree with -- now you're asking me about

7      the text of this?

8      Q.    Yeah.

9      A.    I said I didn't believe that this was correct as

10     of today.  It says, see Salina partnership.

11           No, I don't agree with what they're saying

12     today.

13     Q.    Okay.  You don't agree, but from the standpoint

14     of, hey, the IRS doesn't agree with you, isn't this a

15     pretty significant piece of correspondence for a firm like

16     Heritage?

17     A.    They didn't agree with Turner Communications or

18     Florida Power & Light either, but they settled with them.

19     Q.    And the significance of that comment is, Florida

20     Power & Light didn't take letters like this seriously or

21     what?

22     A.    I don't know what Florida Power & Light got.  I'm

23     just telling you that those cases were effectively won by

24     the taxpayers.

25     Q.    The question I've got is, you got a letter here

Gary Kornman - 6/5/2007

173

1    from the IRS that says the tax advice you're giving or

2    recommending or educating people on, or however you want to

3    characterize it, is not agreed to by the IRS; that these

4    transactions, that they lack economic substance; and that

5    the investors in such transactions may claim artificial tax

6    losses, and they want to know who your customers are.

7              Did you consider -- would you have

8    considered that to be a significant piece of

9    correspondence, had you received that letter?

10   A.    Let's put it this way:  I would have done

11   something about it because of the request for our

12   customers.  I wouldn't have gotten excited about it simply

13   because I think they're just dead wrong.

14             And in fact, the Salina partnership held

15   that there was economic substance.  So when they quote a

16   case completely different from what the way the case held,

17   and when you realize what Salina -- that Salina was settled

18   with Florida Power & Light and they got almost all of their

19   tax benefit in that case or other cases, I wouldn't have

20   gotten too excited about it.

21             What they asked for, I would have dealt

22   with.

23   Q.    But as the CEO of Heritage, is it your testimony

24   that Exhibits 4 and 5, two letters from the Internal

25   Revenue Service, one of which the Internal Revenue Service

Gary Kornman - 6/5/2007

1    agent says he hand delivered, the one on May 2nd, those

2    just fell into a black hole where the IRS agent is lying?

3                MR. TILLOTSON:  Objection to the form.  It's

4    argumentative.

5         A.   I'm not going to answer that question.

6         Q.   I'd like you to answer that question.

7                You said you don't know anything about them,

8    they just never showed up, you never saw them before this

9    litigation.

10        A.   You're beginning to badger me, and I'm not going

11   to keep doing that.

12        Q.   What are you going to do about it, if you don't

13   want me to badger you?  You want me to stop?

14                MR. TILLOTSON:  Stop.

15                MR. PHELAN:  You can do whatever you want to

16   do.

17                MR. TILLOTSON:  This is not a book club

18   debate, so ask him a question and move on.

19                MR. PHELAN:  Yeah.

20                MR. TILLOTSON:  There was about seven

21   questions in that question.

22        Q.   All right.  Start over again.

23                You're telling me -- your testimony is that,

24   as the CEO of Heritage, two letters, one of which was --

25   the IRS agent says it was hand delivered, absolutely -- and

Gary Kornman - 6/5/2007

175

1    with -- which had been produced from the records of

2    Heritage, never came to your attention?

3         A.   I've answered that question on at least two

4    occasions.

5         Q.   And the answer is no?

6              MR. TILLOTSON:  He -- he -- no one's

7    technically asked that question, so you can answer it.  You

8    should.

9         A.   What's the question again?

10        Q.   The question is:  You've never seen Exhibits 4, 5

11   and 6, correct?

12        A.   No.

13        Q.   All right.  And you don't know if anyone else in

14   the Heritage organization ever saw Exhibits 5 and 6?

15        A.   No, no, you didn't ask -- you misinterpreted my

16   answer.  You said to me, you've never seen Exhibits 4 and 5

17   before; and I said no, that's not correct.

18              I've been through this with Holly.  I've

19   seen them several times as a result of this -- all this

20   stuff.

21        Q.   Prior to the demise of Heritage, have you ever

22   seen Exhibits 4 and -- did you ever see Exhibits 4 and 5?

23              MR. TILLOTSON:  You equate demise with

24   bankruptcy?

25              MR. PHELAN:  Start with that, yeah, that's

1    good enough.

2              MR. TILLOTSON:   Prior to the bankruptcy

3    filing.

4         A.   I don't think so.  I don't remember seeing them.

5         Q.   To the best of your knowledge, you know of no one

6    else at Heritage that ever saw those letters prior to the

7    bankruptcy?

8         A.   That I didn't say.

9         Q.   I'm asking you.

10        A.   I don't know.  I don't remember.  And I don't

11   know who else might have seen them.

12             Claudia McElwee -- I don't know if she says

13   she got them or she didn't get them.  I don't know what

14   happened.  I don't have any knowledge of that.

15        Q.   Was Heritage licensed as an insurance company?

16        A.   No.

17        Q.   Was Heritage licensed as an insurance broker?

18        A.   No.

19        Q.   Was Heritage licensed as an insurance agent?

20        A.   No.

21        Q.   Did Heritage have any licences relating to the

22   insurance business?

23        A.   No.

24        Q.   How many total dollars did you take out of

25   Heritage?

Gary Kornman - 6/5/2007

1            MR. TILLOTSON:  Object to the form.  What do

2  you mean, take out?

3            MR. PHELAN:  Take out in any manner, shape

4  or form.

5            MR. TILLOTSON:  Him personally, as

6  compensation?

7            MR. PHELAN:  Him personally, in any manner,

8  shape or form.

9            MR. TILLOTSON:  Well, I'll ask you,

10  compensation for him personally, otherwise --

11            MR. PHELAN:  Why is it limited to

12  compensation?

13            MR. TILLOTSON:  Because I don't know what

14  you're talking about, when you say any money taken out.

15            MR. PHELAN:  You can get a check for loans,

16  you can get a check for compensation, you just take

17  money --

18            MR. TILLOTSON:  You need to break it down,

19  if you want to -- if he got loans.

20            MR. PHELAN:  Can't break it down until I

21  know how much he took.

22            MR. TILLOTSON:  He can't answer how much he

23  took until he knows how much the universe is.

24            MR. PHELAN:  Why don't you break it down by

25  whatever categories you want to break it down by.

Gary Kornman - 6/5/2007

178

         MR. TILLOTSON:  Can you give me the time

period again?

         MR. PHELAN:  From the time he started

Heritage until the time of the bankruptcy.

         MR. TILLOTSON:  Can you -- I object to the

form of this question.

         Are you able to answer how much money you

took out from 1995 to 2004?

         THE WITNESS:  I don't understand his

question.

    A.   And I think I answered for Holly that I didn't

know how much compensation in the form of salary I took

from Heritage during that period of time.

    Q.   You see, that's why -- that's why I asked the

question, because you answered it that way.

         In addition to compensation, did you take

anything else out?

         MR. TILLOTSON:  You personally, did you take

anything else out, in addition to compensation.

    A.   That's a -- I'm sorry, that question is so

nebulous that it's just impossible to answer.

    Q.   You understand what dollars are, correct?

    A.   Sure do.

    Q.   Okay.  Do you understand the concept of

Heritage's dollars?

1       A.    I think so, yes.

2       Q.    Okay.  So when Heritage's dollars went from

3   Heritage to you, how many of those little dollar bills were

4   transferred, over the course of the Heritage existence?

5       A.    That is still such a ridiculously broad question

6   that I cannot answer it.

7             If you want -- look, I can't even answer how

8   much compensation I got during that period of time because

9   I don't remember.  Okay?

10             So if I don't remember how much I was paid

11   in compensation, I don't even know what you're talking

12   about, about the rest of it.  So...

13       Q.    See, I can live with an I don't remember answer.

14   The answer you just gave makes no sense.

15             MR. TILLOTSON:  Hold on.

16       A.    The question's --

17             MR. TILLOTSON:  That's a good comment, but

18   next question.

19             He doesn't understand your answer, so ask a

20   follow-up.

21       Q.    Did you ever receive any of Heritage's dollars in

22   any form other than compensation?

23       A.    I know I probably received some expense

24   reimbursements.

25       Q.    Anything other than compensation or expense

1    reimbursement?

2         A.   I don't know.  I just can't remember.  I mean, I

3    just --

4         Q.   Well, let's get to more entertaining things.

5              Did any entities that are affiliated with

6    you in any manner, shape or form, through ownership,

7    control or otherwise, receive any of the Heritage dollars?

8         A.   Yes.

9         Q.   And to the best of your knowledge, what's the

10   total quantum of those dollars?

11        A.   I'm sorry, I just don't remember.

12             MR. MICHAEL KORNMAN:  Excuse me --

13        Q.   Is there an approximation --

14             MR. MICHAEL KORNMAN:  I really have an

15   appointment to go to.  If we want to work out a schedule,

16   now is the time to do it.  I apologize.

17             MR. PHELAN:  Let's go off the record.

18             (Recess 4:08 to 4:24.)

19        Q.   Mr. Kornman, there's been some rumor --

20             MR. MORRIS:  Real quick, what we decided to

21   do with Michael Kornman is move his deposition from

22   tomorrow to Thursday at 10:00 a.m.  And Vickie Walker will

23   be generally on call, so that she can swing over here as

24   soon as we wrap up with Michael.

25             To the extent that we can't resolve any

1   deposition issues, that's our stipulation.

2          MR. TILLOTSON:  Correct.  So agreed.

3      Q.   All right.  Mr. Kornman, it's been rumored there

4   was approximately $4 million in cash held by Heritage

5   shortly prior to the filing, the bankruptcy filing.

6          Do you know what happened to that cash?

7      A.   It was deposited in Heritage's bank account.

8      Q.   And where did it go from there?

9      A.   That's not relevant to this discussion.

10         MR. TILLOTSON:  He means, once it was

11  deposited in Heritage's accounts and it was Heritage's

12  money, what happened to it.  If you know.

13     A.   I don't know.  It was used -- it was used for a

14  variety of things, and I don't have any idea.

15     Q.   You don't know what it was used for?

16     A.   No.

17     Q.   Okay.

18     A.   I mean, that should be in the records of

19  Heritage.  You've got the general accounts.

20     Q.   You don't know, is your answer.

21     A.   Okay.

22         MR. TILLOTSON:  Wait just a second.

23         (Witness and counsel confer.)

24         MR. TILLOTSON:  Sorry.

25     Q.   I'm going to ask you to pick up Exhibit 7 again.

Gary Kornman - 6/5/2007

182

1       A.    Okay.

2       Q.    Mr. Kornman, are you familiar with the

3    publication tax notice today?

4       A.    Is that the little one, or is that the one from

5    BNA?  I'm not sure which one it is.

6       Q.    I don't know.  That's why I asked you.  I asked

7    you if you were familiar with it, not whether I was

8    familiar with it.

9       A.    It's the today that's got me.  There's one from

10   BNA that comes out daily, and that may be what it is.  And

11   there's one that comes out, I think, monthly.

12      Q.    Would you turn to the second page of Exhibit

13   Number 7.

14      A.    Okay.

15      Q.    You're a tax guy, right?  You understand tax?

16      A.    A little bit.

17      Q.    That was your business, you were an estate

18   planning lawyer, right?

19      A.    No, I wasn't a lawyer.  Now, come on.

20      Q.    You were at one once upon a time?

21      A.    I was never -- I never practiced law.

22      Q.    You were -- answered as an attorney at one point?

23      A.    In a small town in Alabama.

24      Q.    Okay.  Does this appear to you to be excerpts

25   from a publication describing an Internal Revenue Service

Gary Kornman - 6/5/2007

183

1    legal memorandum which describes a transaction and suggests

2    an additional language to Form 870 P of the Internal

3    Revenue Service regarding adjustments relating to the

4    described transaction?

5        A.    I haven't been able to make heads or tails out of

6    this thing.

7        Q.    Okay.

8        A.    I don't understand what it is.  I mean, it's

9    something -- it's obviously a government publication from

10   the IRS.  I just don't know.

11       Q.    Are you kind of curious now, since this seems to

12   describe a transaction somewhat similar to the description

13   you gave to the Heritage 752 transaction?

14       A.    See, what it's -- it looks like to me -- and this

15   is all -- this is just a bad guess, that somebody, Karen

16   Chandler, asked for advice from the chief counsel's office,

17   and the advice came back in this memorandum.  The bottom of

18   the page 2 constitutes chief counsel advice.

19            Chief counsel advice is not binding on

20   examination or appeals and is not a final case

21   determination.

22            This document is not to be used or cited as

23   precedent.

24       Q.    Right.

25       A.    Well, that's pretty -- pretty strong language to

Gary Kornman - 6/5/2007

1   whatever it said.

2           And from there, it says, this -- on page 3,

3   it says, this case is an abusive tax shelter.  And I don't

4   even know what -- I mean, I don't know what they got in

5   from Mrs. --

6       Q.   It's assuming a shelter outline, without being

7   too specific, it goes on to talk about shelters.

8       A.   Yeah, I mean, you know...

9       Q.   Let me ask you this:  Front page, this is from Ed

10  Ahrens to you and Ralph Canada.  It says, IRS methodology

11  to attack 752 transactions.

12           When you got it, what were you thinking

13  about?  What did you think it meant?

14      A.   There is absolutely nothing different about this

15  than the information we already had.

16      Q.   Okay.

17      A.   I mean, they're talking about the anti-abuse

18  rules, which is in the opinion letters.  They're talking

19  about economic substance.  And they're talking about no

20  liability for purposes of Section 752.  There's nothing

21  new.

22      Q.   You said earlier that the Behnkes should pay the

23  $4 million note; is that correct?

24      A.   Yes.

25      Q.   What do they get for the money that they paid and

Gary Kornman - 6/5/2007

1    the obligation that you believe they have under the $4

2    million note?

3         A.   They got the opportunity to save a lot of money,

4    three times as much as the amount of the note, I presume.

5    I don't know that.  I just know that's what -- if the note

6    was 25 percent, I don't believe they paid any fees.

7              If it had been successful, I don't think

8    they would have sent any money to us.

9         Q.   What's the significance of an independent law

10   firm for an independent tax opinion?

11             MR. TILLOTSON:  Object to the form of the

12   question.

13             You may answer, if you're able.

14        A.   I don't understand the question.  Try it a

15   different way.  Maybe I can.

16        Q.   Do you need an independent opinion -- opinion

17   from an independent firm to be somewhat protected from

18   penalties in connection with tax transactions?

19        A.   Definitely.  For example, if your people across

20   the street, KPMG, helped implement a transaction, explained

21   it, implemented it, and then gave an opinion, that opinion

22   would be virtually worthless to protect from penalties.

23        Q.   What makes a law firm not independent, for

24   purposes of a tax opinion, in your understanding?

25        A.   I'm sorry, I just don't know the law on that.

Gary Kornman - 6/5/2007

186

1    Obviously, it's been defined somewhere.

2         Q.   Okay.  Could you describe a son of boss

3    transaction, as utilized in tax parlance?

4         A.   That has been bastardized in so many ways.  I

5    don't even know what boss was.  And everybody and their

6    brother says this, this, that, or the other is son of boss;

7    and I'll be honest with you, I just don't know.

8         Q.   What does the IRS say a son of boss transaction

9    is?

10        A.   Anything using 752, usually.  That's their broad

11   definition.

12        Q.   So son of boss, according to the IRS, would

13   include the Heritage 752 transactions?

14        A.   Well, I don't actually know.  I'm trying -- I've

15   seen a lot in the publications -- not IRS publications, the

16   lay publications.  I don't know how -- maybe, I just don't

17   know.

18        Q.   Given the position of the Internal Revenue

19   Service with respect to son of boss transactions, would you

20   consider them to be high risk or low risk?

21        A.   Since I don't know what it is, I don't know.

22        Q.   Okay.  With respect to a COBRA transaction, would

23   you consider that to be a high risk or low risk?

24        A.   Again, I still don't know.

25        Q.   Okay.  Do you know what an MLD transaction is?

Gary Kornman - 6/5/2007

187

1      A.    No, sir.

2                 MR. TILLOTSON:   Letters M-L-D?

3      Q.    Letters M-L-D.

4      A.    No, sir.

5      Q.    Do you know what a HOMER is?  H-O-M-E-R, capital

6   letters.

7      A.    I think I do.

8      Q.    What is that?

9      A.    Barton Homer, I think, is a grant type situation

10  for estate planning purposes.

11     Q.    Okay.  Would you explain the mechanics of that?

12     A.    I couldn't.  That's somebody else's deal.

13     Q.    Okay.  You just -- you don't know the mechanics

14  of a Barton transaction?

15     A.    No.

16     Q.    Okay.  Do you know the mechanics of a HOMER

17  transaction?

18     A.    Well, I think they're related, but I'm not sure.

19     Q.    It's a different -- different answer to a

20  different question.  If I'd asked you, are they related,

21  that would have been a good answer.

22                Do you know the mechanics of a HOMER

23  transaction?

24     A.    No.

25     Q.    Do you know -- could you describe the -- describe

1    a PICO, P-I-C-O?

2             MR. MORRIS:  As opposed to a de Gillo.

3        A.   At one time, I knew a lot of these things; but

4    it's not something you keep under your pillow.  I just

5    don't remember these things.

6        Q.   Okay.  Describe a coin transaction, if you can.

7        A.   Same thing.  I just don't -- it's -- at one time,

8    we looked at all these things, didn't particularly care for

9    them, and I just don't remember.

10       Q.   Can you describe a BLIP transaction?

11       A.   I think it stands for bond linked investment plan

12   or program.  That's all I know about it.

13       Q.   You can't describe the mechanics of a BLIP, can

14   you?

15       A.   I could at one time, five years ago, maybe.

16       Q.   Could you describe for me the substance of

17   Internal Revenue Service Notice 1999-59?

18       A.   I just don't remember.

19       Q.   Okay.  Can you describe for me the substance of

20   Internal Revenue Service notice 2000-44?

21       A.   The substance of it?

22       Q.   Uh-huh.

23             MR. MORRIS:  Forty-four or 45?

24       A.   Again, my recollection is faded.  But basically,

25   it dealt with loan premium plans, may have dealt with

189

1    option plans, and something else.  I don't remember what

2    the other one was.  I think there were three different

3    examples.

4         Q.  Did either notice 19 --

5              MR. MORRIS:  Robin, I'm sorry, just real

6    quick.  Which one were you asking about?

7              MR. PHELAN:  Right there, I was asking about

8    2000-44.

9              MR. MORRIS:  I'm sorry.

10        Q.  Did either 1999-59 or 2000-44 purport to cover

11   transactions such as the Heritage 752 transaction?

12        A.  Not at the time they were issued.  Not to my --

13   not -- not to my recollection at the time they were issued,

14   no, sir.

15        Q.  Did they change after they were issued?

16        A.  Yeah, the government tried to claim that the --

17   the short sale was covered by 2000-44; but it wasn't

18   originally, I don't believe.

19        Q.  Did 2000-44 specifically mention a short sale,

20   either by inclusion or exclusion?

21        A.  I don't think so, but, again, I'm -- I have to

22   look at it to see.

23              It's just -- you're asking me technical

24   questions that I knew real good five years ago.  Excuse me,

25   real well.

190

1    Q.    If the --

2         MR. TILLOTSON:  That's that Alabama in you

3    coming through.

4    Q.    If the client agreement says that the client is

5    not relying on the representations made by Heritage, does

6    that mean that Heritage can flat-out lie to them?

7         MR. TILLOTSON:  I'm sorry, can you reread

8    that?  I was chatting with him.  It sounded like a trick

9    question.

10        MR. PHELAN:  It is.

11   Q.    If the client agreement says that the client

12   waives its right to rely on the representations of

13   Heritage, does that mean Heritage is free to lie to the

14   client?

15        MR. TILLOTSON:  Object to the form.

16        You may answer, if you're able.  It is a

17   trick question, but -- so be careful.

18        MR. PHELAN:  No.

19   A.    I can't answer that.

20        MR. PHELAN:  I was quite up front about it.

21        MR. LEWIS:  That was the same objection made

22   to Mr. Canada's deposition, as well.

23        MR. TILLOTSON:  If you can answer this

24   question, do it.

25   A.    I can't answer your question.

Gary Kornman - 6/5/2007

191

1    Q.   Okay.  Did Heritage know more about tax

2  strategies than the clients did?

3              MR. TILLOTSON:  Object to the form.

4    A.   That can't be answered, because we had some very,

5  very sophisticated clients.

6    Q.   To your knowledge, which ones knew more about tax

7  strategies -- which of the clients knew more about tax

8  strategies than Heritage, the personnel at Heritage?

9    A.   I'm sorry, I just can't answer a question that

10  requires memory from 15, 20 years ago.

11              MR. TILLOTSON:  Well, you don't need to

12  explain why you can't recall something, unless he asks you.

13              THE WITNESS:  I'm sorry.

14    A.   I don't remember that.

15    Q.   Can you recall any Heritage client that knew more

16  about tax strategies than Heritage?

17    A.   I can remember one that knew virtually as much on

18  an estate case.

19    Q.   And who would that have been?

20              THE WITNESS:  Again, can we just say client

21  names out, Dennis?  Is that --

22    Q.   Was this someone -- any of the client claimants?

23    A.   Oh, yes, it's someone other than the client

24  claimants.  I don't know what the client claimants knew.

25    Q.   Okay.

1      A.    Except the ones I dealt with, let me qualify.

2      Q.    The two you dealt with?

3      A.    Right.

4      Q.    Could the tax strategies of Heritage be described

5  as conservative?

6      A.    Very.

7      Q.    And what were the clients told about the risks

8  about these various tax strategies?

9      A.    I can tell you what I told the people I worked

10  with.  We recorded some meetings where we could -- you

11  asked earlier about quality control.  Sometimes, where it

12  was legal, Canada and Bird may have recorded meetings.

13  Sometimes that was kind of a quality control measure,

14  whether it was done very often or not.  It was hard to get

15  compliance.

16         Say that one more time.  I'm sorry, I missed

17  your question.

18      Q.    What did the -- what did Heritage tell the

19  clients about the risk of the Heritage strategies?

20         And I include in that both the 752 and the

21  estate planning, as well.

22      A.    We've told every client for years and years and

23  years that they should not do the transaction if they're

24  not prepared to be audited and to defend it in court.

25         The IRS does not like people to save money

1    on their taxes.  And our agreements and everything else

2    tells people that if you're -- and I used to tell my

3    clients very specifically, if you're not willing to defend

4    this in court, don't do it.

5        Q.    Did you tell them anything else about the degree

6    of risk involved?

7        A.    We told them there's always risk.  That's common

8    sense.

9              These are not stupid people.  They've been

10   audited before, and they've done things before.

11       Q.    Did you tell them anything else about the degree

12   of risk?

13       A.    Well, on all -- let's take what you call the 752

14   transaction.  That -- that was a very risky transaction in

15   the form that the best that they would get from a law firm

16   was an opinion that it was more likely than not.

17             Now, more likely than not means that the law

18   firm will only tell them that it's 51 percent in favor,

19   49 percent against.  So, that's slightly better than a coin

20   toss.

21             So they understood that, and they were told

22   that from the very first time, and -- at least, my clients

23   were, and everybody else was supposed to.  And so, they

24   understood risk, everyone understands risk.

25       Q.    So the clients were told that the Heritage 752

Gary Kornman - 6/5/2007

194

1   strategy was no better than a -- absolutely better than a

2   toss-up?

3       A.   If, more likely than not -- I don't know how

4   you'd interpret that, but that's what I'd say it was.  I

5   don't know if they were told that specifically.  I mean,

6   other people's clients...

7       Q.   You mentioned that some of the presentations were

8   recorded.

9           Are you aware of any presentations regarding

10  the 752 strategy that were recorded?

11      A.   I haven't seen any of the tapes.  I haven't

12  listened to any of the tapes.  They were delivered to the

13  trustee, as far as I know.

14          MR. TILLOTSON:  He's just -- he doesn't need

15  all that.  He's just asking you if you know.

16      A.   The answer's no.

17          MR. MUNISTERI:  I'm sorry, I didn't hear the

18  answer.

19          MR. PHELAN:  No.

20      Q.   Who directed that these presentations be

21  recorded?

22          MR. TILLOTSON:  Well, I thought you just

23  asked him if any were, and he said no.

24          MR. PHELAN:  Back up.  That's fair.

25      Q.   You testified that certain presentations were

1  recorded.  At whose direction were those presentations

2  recorded?

3       A.   It was like a company policy to try to do it when

4  we could, because -- you were asking about how did we

5  control stuff.  We trusted -- we literally, you know,

6  trusted the people that were acting as principals, Mr.

7  Canada, and Mr. Bird.  But occasionally, we get them to try

8  to record a meeting, if it was legal to do so, see what was

9  being said.

10           It was difficult to get them to do that,

11  though.  They didn't follow.

12           MR. TILLOTSON:  You need to listen to his

13  question.

14       Q.   Was the recording at your direction or someone

15  else's?

16       A.   It was a company policy to try to -- if -- you

17  say I said company policy, I don't know if that's correct.

18           But I mean, we would discuss it, and we'd

19  discussed that was the way to do things, and it made sense.

20  We had group meetings on most of these things.

21       Q.   Do you remember if you had a group meeting on

22  this particular issue?

23       A.   No.  It was probably discussed at a group

24  meeting.

25       Q.   I think you indicated that the seven -- that the

Gary Kornman - 6/5/2007

196

1  Heritage strategies were conservative.  What made them

2  conservative?

3      A.   They followed statutory law and case law for 25

4  years.

5      Q.   Okay.  Are COBRAs conservative?

6          MR. TILLOTSON:  Object.  I thought this was

7  asked and answered.  Maybe you didn't.

8      Q.   I'm sorry.  COBRAs.

9          MR. TILLOTSON:  You can answer, if you know.

10     A.   I don't know.

11     Q.   Did Heritage register any of its strategies as

12  tax shelters, in accordance with Treasury Regulation

13  301.611-2?

14          MR. TILLOTSON:  Object to form.  No one

15  knows what you're talking about.

16          MR. PHELAN:  If he doesn't know what I'm

17  talking about, he can say he doesn't know.

18     A.   The answer to your question is no.

19          MR. TILLOTSON:  My objection was foundation,

20  actually.

21          MR. PHELAN:  I'm talking to a tax guy.

22          MR. TILLOTSON:  Assumes it had to be

23  registered.

24          THE WITNESS:  That's right.  It wasn't.

25          MR. PHELAN:  That's why I asked him, did he

Gary Kornman - 6/5/2007

197

1    ever.

2              All right.  Never mind.

3         Q.   Do you know what the partnership anti-abuse rules

4    are?

5         A.   Yes.

6         Q.   Could you describe those for me?

7         A.   Basically, it says that anytime the commissioner

8    doesn't like the result of a transaction dealing with a

9    partnership, they can change the tax characterization of

10   them, even if their change is directly in violation of a

11   statute.

12        Q.   Does it have something to do with the intent of

13   subchapter K?

14        A.   It's subjective discussion of what the

15   commissioner thinks the intent of subchapter K was, but the

16   result is as I described it.

17        Q.   Okay.  You've objected to the settlement with Mr.

18   Love.  What specifically do you object to with respect to

19   the settlement with Love?

20        A.   Well, first of all, Mr. Love owes the estate a

21   note, which is perfectly good, perfectly collectible.

22              He knew when he gave the note for the fee

23   that there was a chance that the transaction would be

24   disallowed and that he would have to go to court to defend

25   it, which he did not.  And so, he -- and the fact that he's

1    getting an allowed claim for anything and getting his note

2    released strikes me as preposterous.

3            Based on the agreement, there's no reason

4    why he should have an allowed claim.  He knew he was taking

5    the risk.  He knew there was no refund provision.  The

6    agreements are very clear that they're doing this at their

7    own risk.

8        Q.   What would be a fair settlement with Mr. Love, in

9    your estimation?

10       A.   That he paid his notes and he got no allowed

11   claim.

12       Q.   Do you know specifically what Mr. Love's defenses

13   are and what he believes supports his claim against the

14   estate?

15       A.   I know that basically he's claiming the note is

16   not owed due to parole evidence, which clearly is not the

17   case.  The note's clear on its face.

18           I think his claims regarding the claim -- I

19   believe he may be one of the ones claiming the unauthorized

20   practice of law, isn't he?

21           MR. TILLOTSON:  If you know or remember.  If

22   you don't --

23       A.   I believe he may be claiming the unauthorized

24   practice of the law, which is disclaimed in the agreement,

25   which he had -- two advisors did sign.  He is one of the

Gary Kornman - 6/5/2007

199

1    ones that did have advisors sign the agreement and looked

2    at the transaction.  I don't remember his advisors' names,

3    but I do remember that.

4            So he was well-advised by independent people

5    that he picked.  He signed an agreement that said he took

6    the entire risk, and he signed notes that said he would

7    pay.  And the notes had no qualification to them.

8        Q.   Have you estimated the cost to the estate to

9    litigate the Love objection to inclusion through appeals?

10       A.   I don't have a copy of the Love note in front of

11   me, but most of these notes --

12           MR. TILLOTSON:  Well, he's --

13           THE WITNESS:  Let me just say something.

14       A.   I haven't done that because most of these notes

15   carried a provision from cost of collection, so that would

16   be Mr. Love's burden when it was over.

17       Q.   What specifically do you object to with respect

18   to the settlement with the Sandwith parties?

19       A.   Well, Ron Sandwith was an honorable guy.  And he

20   gave us -- he gave us what he believed the fee was, and we

21   agreed to take a note for the balance.

22           He let Mikron, which he controlled, make the

23   note with him.  It makes no sense to me.

24           There is, I don't know, by this time,

25   probably close to $7 million in escrow with Bank of America

1    to cover that note.  The fact that nobody's sued Bank of

2    America and had them interplead the money, it strikes me as

3    a little unusual.

4              And they have a should opinion, which I have

5    a copy of here, from Lewis Rice.  The tax transaction they

6    did was very conservative, other than the -- I don't know

7    how they reported valuation issues.

8              I explained to them that they could screw it

9    up by using the wrong valuations.  But on the technicals,

10   Mike Mulligan, who is one of the best tax -- estate tax

11   attorneys in the United States, gave them a should opinion

12   on each part of the transaction and on the total

13   transaction.

14             Obviously, he didn't -- he didn't speak to

15   the valuations because I don't know what valuation they

16   finally used.  So why should somebody who has a transaction

17   that should withstand scrutiny ever not pay a note that

18   they incurred for that benefit.

19             To my knowledge -- and again, it's to my

20   knowledge, I don't have any -- they have never paid any

21   substantial amount of estate taxes in Ron Sandwith's

22   estate; that the children sold the company for

23   $205 million, which was the value Ron Sandwith had agreed

24   to use for the calculation of the fee.

25             They had had prior appraisals of