1    to cover that note.   The fact that nobody's sued Bank of

2    America and had them interplead the money, it strikes me as

3    a little unusual.

4                And they have a should opinion, which I have

5    a copy of here, from Lewis Rice.   The tax transaction they

6    did was very conservative, other than the -- I don't know

7    how they reported valuation issues.

8                I explained to them that they could screw it

9    up by using the wrong valuations.   But on the technicals,

10   Mike Mulligan, who is one of the best tax -- estate tax

11   attorneys in the United States, gave them a should opinion

12   on each part of the transaction and on the total

13   transaction.

14               Obviously, he didn't -- he didn't speak to

15   the valuations because I don't know what valuation they

16   finally used.   So why should somebody who has a transaction

17   that should withstand scrutiny ever not pay a note that

18   they incurred for that benefit.

19               To my knowledge -- and again, it's to my

20   knowledge, I don't have any -- they have never paid any

21   substantial amount of estate taxes in Ron Sandwith's

22   estate; that the children sold the company for

23   $205 million, which was the value Ron Sandwith had agreed

24   to use for the calculation of the fee.

25               They had had prior appraisals of

1    $290 million.  And you take 70 percent of $290 million, and

2    you're about at $200 million.

3              Any way you cut it, I think they owe the

4    note and the interest and should not have any claim because

5    they didn't have any -- the children -- basically, what's

6    their claim?  They got $200 million virtually tax free up

7    to this time, as far as I know.  So their claim for

8    whatever it is, $3 million, whatever it is, I don't know if

9    it's that much, strikes me as ridiculous.

10             Want my real opinion?

11   Q.    If there's anything to add, yeah.

12   A.    I'll just keep it clean.

13   Q.    Let me ask you this:  As part of the Sandwith

14   recommendation or education that was made by Heritage,

15   there was a sale of some nonvoting stock of Mikron to a PAS

16   trust, right?

17   A.    Yes.

18   Q.    Okay.  Did Heritage recommend how that note

19   should be valued?

20   A.    No.

21   Q.    Is there any recommendation that the note should

22   be valued at face?

23   A.    Heritage explained that they need to have a --

24   correct, good, conservative appraisals for every part of

25   this transaction.

1       Q.    Sure.

2       A.    And that's what Heritage always tells people, and

3  that's what Mike Mulligan always tells people.

4       Q.    Let me get a little more specific here.  You have

5  the --

6       A.    Heritage is not an appraiser.  That's in our

7  agreement.

8       Q.    I'm sorry, what?

9       A.    We don't act as an appraiser.

10      Q.    I understand.  But the Mikron nonvoting stock

11  that was sold to that PAS trust, that has to be valued, is

12  that your understanding?

13      A.    Yes.

14      Q.    Okay.  And you get a note back.  Do you

15  independently value -- did Heritage recommend that that

16  note be independently valued, or did Heritage recommend

17  that that note be valued at the face amount of the -- of

18  the valuation of the assets that were transferred to the

19  trust?

20      A.    Those kinds of decisions were not something that

21  Heritage was even educating them on.

22            Again, the statement was, the assets need to

23  be valued appropriately, and that was up to some

24  professional appraiser to tell them what the various assets

25  should be appraised at.

203

1      Q.   So there was no discussion by Heritage -- or no

2   education by Heritage regarding when the note that was

3   received on the sale of the stock to the trust could be

4   valued at face?

5      A.   I don't remember what -- what was in the original

6   educational stuff; but Lewis Rice looked it over, and

7   whatever they said was probably right.  They were willing

8   to put their name on the line with a should opinion.

9      Q.   Who devised the educational presentation for the

10  Sandwiths?

11     A.   You talking about before Mr. Mulligan was brought

12  in or after?

13     Q.   I'm talking about the educational presentation

14  that Heritage made.

15     A.   Well, you understand that changed as the -- as

16  Mr. Mulligan and Lewis Rice came in.  Are you aware of

17  that?

18              MR. TILLOTSON:  Well, try as best you can to

19  answer his question, because he's not going to answer

20  yours, so...

21     A.   I can't answer your question if you don't give me

22  a time frame.

23     Q.   A relatively short time period we're talking

24  about here with the Sandwiths.  From the time that you

25  initially met with Ron Sandwith until the time that Ron

1    Sandwith implemented the transaction, who devised the

2    Heritage presentation?

3        A.    Okay.  I'll answer it this way, since you put it

4    up onto -- to the time of implementation.

5            Before Mike Mulligan was engaged by the

6    Sandwiths, the analytical department, along with myself,

7    along with -- that would be -- that would be pretty much

8    it.  The people in the analytical department and myself put

9    together the educational materials for the Sandwiths.

10           Once Mr. Mulligan was engaged by the

11   Sandwiths, the analytical department made changes in the

12   presentations to coincide with whatever Mr. Mulligan and

13   his associates told them they wanted to do.

14       Q.    Do you know if Mr.  Mulligan made any changes to

15   the educational structure that was presented by Heritage?

16       A.    It was normal practice for there to be a lot of

17   communication between whoever the attorney was that was

18   hired by the client and our analytical department to make

19   whatever changes they felt appropriate.

20       Q.    Okay.  Let's try the question again, rather than

21   the question I would have asked for that answer.

22           Do you know if Mr. Mulligan made any changes

23   to the educational -- the structure of the educational

24   presentation that was made by Heritage to the Sandwiths?

25       A.    I just don't remember.  I'd have to look at it

Gary Kornman - 6/5/2007

205

1   all over again.

2        Q.   So it could be anywhere from a none to a lot,

3   right?

4        A.   Right.

5        Q.   But you just don't know?

6        A.   I just don't know.

7        Q.   All right.  What did Heritage -- what was

8   Heritage's function once the attorney was engaged, as a

9   general rule?

10       A.   We adjusted the presentations to coincide with

11  whatever the law firm wanted changed.

12            We generally acted as a go-between,

13  basically passing information between the client and the

14  lawyers, or getting -- having documents -- rather than

15  paying the cost of having a lawyer fly down for the

16  documents, we generally would help get documents signed,

17  once the law firm had prepared them.

18            We just made sure -- we just, you know,

19  helped the law firm button up the logistics.

20       Q.   Is that what Heritage did in connection with the

21  Sandwith transaction?

22       A.   Yes.

23       Q.   What did you tell the Sandwiths regarding the

24  risks of the estate planning strategy?

25       A.   Well, I told them that they were likely to be

1    audited.  They were going to save 90 to $100 million or

2    more, depending on how long Ron lived, and they may well

3    have to go to court to defend it.  And that we had done a

4    similar transaction, and I don't remember at that point in

5    time whether it had gone through -- whether the audit was

6    complete or not.

7                We had had another client that had a very

8    similar transaction in California that had died -- and I'm

9    not sure of the timing.  There may have been an audit

10   ongoing, or the audit may have been completed.  I have to

11   go back and check.  But I told them that parts of the

12   transaction had been audited and passed during his

13   lifetime, and that other parts were either still under

14   audit or had been passed.  They got a no change letter,

15   so...

16               I don't know the timing of it, but I told

17   them that part of the transaction -- I'm sure I told them

18   part of the transaction had already passed audit on a $400

19   million estate.

20        Q.    Okay.  When you said passed, that means it was

21   upheld --

22        A.    Yeah, no change.

23        Q.    -- by the taxing authority?

24        A.    No change.

25        Q.    Do you remember that -- who was the client in

1    that transaction?

2         A.    Yes.

3         Q.    And did you tell the Sandwiths who it was?

4         A.    No.

5         Q.    Okay.

6         A.    I did this -- early on, I did give the Sandwiths

7    that family's inside attorney, CPA, that they could verify

8    that there had been a transaction similar to the one we

9    were -- that we could really do what we said we could do.

10   We had had --

11        Q.    And who was that attorney, CPA?

12        A.    David Sarver.

13        Q.    David who?

14        A.    David Sarver.

15        Q.    S-A-R-V-E-R?

16        A.    Uh-huh.

17        Q.    Okay.  When were the -- were the Sandwiths told

18   that they were likely to be audited?

19        A.    When?

20        Q.    Yeah, was it early on or -- I mean, they started

21   in late 2001 -- excuse me, late 2002.  And were they told

22   in 2002, in early 2003?

23        A.    We couldn't record the conversation in Washington

24   because it was against the law, but I believe that if you

25   went back and listened to a variety of tapes of my --

1          MR. TILLOTSON:  He's not asking about that.

2     He's asking you if you recall when they would have been

3     told that.

4          THE WITNESS:  So, you want me just to answer

5     his questions?

6          MR. TILLOTSON:  Well, it's 5:00 O'clock.

7     Let's get this over with.

8     A.    Early on.

9          THE WITNESS:  Thank you.

10    Q.    Before they implemented the transaction?

11    A.    Well before.

12    Q.    Why did Heritage sell the Sandwith/Mikron note to

13    US Recovery?

14    A.    Basically, because we didn't want to be involved

15    in a suit against a client.

16          It was obvious to the public, showing of

17    public records.  I don't believe at that time we had ever

18    sued a client before.

19    Q.    What did Heritage get in return from US Recovery

20    for that almost $6 million note?

21    A.    When I say, never sued a client before, I think

22    we were in a suit with Jenkins, but that really didn't

23    count, because that was over a hotel.

24          I'm sorry, go ahead with your --

25    Q.    What did Heritage receive in return for that

1   almost $6 million note?

2       A.   Whatever the contract said.  You'd have to look

3   it up.  I don't remember specifically.

4       Q.   Do you remember what it was?

5       A.   No.  No.

6       Q.   Was it something along the lines of the $100,000

7   fixed payment and a $900,000 contingent payment?

8       A.   It was whatever the agreement said it was.

9       Q.   You just don't remember?

10      A.   Yeah, I'm not going to guess.

11      Q.   So if you don't remember what it was, you don't

12   remember why that number was negotiated?

13      A.   Right.

14      Q.   During the educational presentations to the

15   Sandwiths, what was Mr. Mulligan's role?  Did he do a lot

16   of the presentation?  Did he just sit there quietly?  Did

17   he occasionally comment?  What was his role?

18      A.   The presentation had been changed to whatever he

19   and the rest of his firm wanted.  And so, as -- as I had

20   always made the presentations in the past, I continued to

21   make the presentations.  And Mr. Mulligan would comment or

22   make -- he'd discuss particular things.  When something was

23   mentioned, he'd discuss it.

24           I mean, I was the one standing up, making

25   the presentation.  He was the one sitting down and giving

1    the explanation, is the best way to say it.

2        Q.   Okey dokey.

3        A.   Sorry.

4        Q.   I'm going to hand you what's been marked as

5    Exhibit 11, and ask you if you recognize that document?

6        A.   I don't know if this was ever executed.

7                MR. TILLOTSON:  Wait for a question.

8                THE WITNESS:  Okay.

9                MR. TILLOTSON:  All right.

10       Q.   Do you recognize it?  Can you tell me what that

11   document is?

12       A.   Looks like consent of the manager in lieu of a

13   special meeting.  It looks like something was drafted.  I

14   don't know if it was ever signed or executed.

15       Q.   Do you know who prepared that document?

16       A.   No, sir.

17       Q.   Okay.  If you go down about four paragraphs

18   there, it says:  It's noted that the representation --

19   representatives of the law firm of Lynn, Tillotson &

20   Pinker, LLP, have reviewed the note and demand and gave an

21   estimate of value for the note attached hereto as Exhibit

22   C, the value.

23                There is no Exhibit C on this document, is

24   there?

25       A.   Well, the document's not even executed.

Gary Kornman - 6/5/2007

211

1    Q.    Okay.  Do you recall what that value was?

2    A.    No.

3    Q.    Okay.  All right.  I'm going to hand you what's

4    been marked as Exhibit 12, and ask you if you recognize

5    that document?

6    A.    Looks like another consent.

7    Q.    Do you know who prepared that document?

8    A.    No, sir.

9    Q.    Did you ever see it before, to the best of your

10   recollection?

11   A.    Sorry?

12   Q.    Did you ever see this document, Exhibit 12,

13   before, to the best of your recollection?

14   A.    If I ever signed it, I probably saw it.  If I

15   didn't sign it, I can't speak to that.

16   Q.    Hand you what's been marked as Exhibit 13, ask if

17   you recognize that document?

18   A.    You asked me?

19   Q.    Do you recognize that document?

20   A.    I see it's a note purchase agreement.  I don't

21   know --

22   Q.    Do you know what note they're talking about

23   there?

24   A.    It says it's the Sandwith/Mikron note.

25   Q.    Do you know who prepared that document?

1        A.    No, sir.

2        Q.    Can you tell from the little numbers on the

3   bottom?

4        A.    It looks like -- no.  I see numbers and all kind

5   of -- note purchase agreement, I don't know.  Doesn't tell

6   me who --

7              MR. TILLOTSON:  You mean that computer --

8   that's what he's asking if you can identify.

9        A.    No.

10       Q.    Can you identify whether that's a Heritage

11  document number?

12       A.    I've never seen it.  Not to my knowledge, I don't

13  remember anything like that on here.

14       Q.    Going back to the first page, would you look at

15  62.1 and 2.2.

16       A.    2.1.  I'll tell you what, you got to have good

17  eyes.

18             Okay.

19       Q.    Does that refresh your recollection as to what

20  was paid for the Sandwith note?

21       A.    This is not an executed document, so I have no

22  reason to believe -- I don't know what this really means.

23       Q.    It means, does it refresh your recollection about

24  what was paid for the Sandwith/Mikron note?

25       A.    That would imply that this document was executed,

1    and I don't know whether it was executed or not.

2        Q.   No, it implies that it might refresh your

3    recollection regarding what was paid for the

4    Sandwith/Mikron note.

5        A.   Okay.  Then I can answer no.

6        Q.   No?

7        A.   No.

8        Q.   Okay.  Do you know who negotiated, on behalf of

9    Heritage, the compensation to be paid to Heritage by US

10   Recovery for the Sandwith/Mikron note?

11       A.   I presume whoever signed it for Heritage.

12            MR. TILLOTSON:  Well, he's just -- if you

13   recall, you do.  If you don't, you don't.

14       A.   I'm sorry, the question is -- I think the

15   answer's no.

16       Q.   Okay.  If it's no, it's no.

17            Just to clarify things, I think I asked

18   this, but Mr. Munisteri may not have heard it; and when he

19   asked me the question, I'm not sure I did ask.

20            The document I referred to, Exhibit 12,

21   refers to a valuation by the firm of Lynn, Tillotson &

22   Pinker.  Do you remember what that valuation was?

23       A.   No.

24       Q.   That's what I thought you said.  I just couldn't

25   remember.

1           All right.  I'm going to hand you what's

2    been marked as Exhibit 14, and ask you if you recognize

3    that document?

4         A.   I can see what it is.  I don't recognize it.

5         Q.   What is it?

6         A.   It looks to me like some kind of codicil to Ron

7    Sandwith's will.

8         Q.   Do you know who prepared that document, this

9    Exhibit Number 14?

10        A.   I would presume that Mulligan did, but I don't

11   know that to be fact.

12        Q.   Did you draft that document?

13        A.   No, sir.

14        Q.   I'm going to hand you what's been marked as

15   Exhibit 15, and ask you if you recognize that document?

16             MR. TILLOTSON:  We're going to teach you how

17   to operate your firm copier.

18             MR. PHELAN:  Did I miss something?

19             MR. TILLOTSON:  It's a whacky way you've got

20    it copied.

21             THE WITNESS:  The size of the print.

22             MR. PHELAN:  I'm not really asking you to

23   read this thing in detail.

24             MR. TILLOTSON:  All right.  Let's get back

25    to --

Gary Kornman - 6/5/2007

215

1      Q.    The question is:  Do you recognize the document?

2      A.    I don't know.  I may have seen it before, but I

3  don't --

4      Q.    What is that document?

5      A.    It's a power of attorney for Ron Sandwith.

6      Q.    Okay.  And do you know who prepared that

7  document?

8      A.    I do not.

9      Q.    Did you prepare that document?

10     A.    I do not remember.

11     Q.    All right.  I'm going to hand you what's been

12  marked as Exhibit 16, and ask if you recognize that

13  document?

14          THE WITNESS:  Can I talk to you a second?

15          MR. TILLOTSON:  Sure.

16          We're going to take a short break.

17          MR. PHELAN:  Yes.

18          MR. TILLOTSON:  Excuse me.

19          (Recess 5:19 to 5:21.)

20     Q.    I've handed you what's been marked as Exhibit

21  Number 16.  Do you recognize that document?

22     A.    No, sir.

23     Q.    Can you tell me what it is?

24     A.    It's a power of attorney, looks like, a durable

25  power of attorney.

216

```
 1          Q.   For who?

 2          A.   William -- Ron Sandwith.

 3          Q.   Okay.

 4          A.   Well, now, wait a minute.  It's wrong.  It says

 5     William S. Sandwith, but it says William Ronald Sandwith at

 6     the top.

 7          Q.   Maybe that's why it's a draft.

 8          A.   I don't know.

 9          Q.   Do you know who prepared this document?

10          A.   No, sir, I don't.

11          Q.   Okay.  Did you prepare that document?

12          A.   No, sir.

13          Q.   All right.  I want to hand you what's been marked

14     as Exhibit 17, and ask if you recognize that document?

15          A.   It looks like a draft of a note for Ron Sandwith

16     and Mikron to Heritage.  It's all screwed up, but that's

17     beside the point.

18               It just looks like a draft that somebody

19     prepared.

20          Q.   Sounds right.  It's a draft of a note, right?

21          A.   I'm sorry.

22          Q.   Do you know who prepared that document?

23          A.   I would guess somebody at Heritage, but I don't

24     know who.

25          Q.   Okay.  I'm going to hand you what's been marked
```

1  as Exhibit 18, and ask you if you recognize that document?

2      A.   Looks like another draft of a note between Ron

3  Sandwith, Mikron, and Heritage.

4      Q.   Okay.  If you look at exhibits -- do you know who

5  prepared Exhibit Number 18?

6      A.   No, sir.

7      Q.   If you look at Exhibits 17 and 18, you look at

8  the top, you notice they don't say initial note amount,

9  $5,386,919, which was added to -- or is on the note that

10  was executed.

11         When was that term initial note amount added

12  to the drafts of the promissory note, to the best of your

13  recollection?

14      A.   I have no knowledge.  Obviously, there must have

15  been a series of these things drafted by somebody, and they

16  put it on there.

17         Do we have the note that was signed?

18      Q.   Yeah.  I don't have an extra exhibit copy, but I

19  have a copy.

20         MR. TILLOTSON:  The answer is, no, he didn't

21  recall, to the question you wrote out.

22      A.   I see the word initial, but it doesn't have --

23  but, I mean, so what.  That means that the note --

24         MR. TILLOTSON:  He's just simply asking

25  you -- ask what the question is.

1    A.    What was the question?

2    Q.    The question is:  Why was that put on there?

3          MR. TILLOTSON:  Why was the word initial

4    added -- or I guess, initial note added.

5    A.    I didn't do this, so I have no idea.

6    Q.    Okay.  Who negotiated the form of the note with

7    this -- with whoever it was negotiated with on the Sandwith

8    side?

9    A.    Who negotiated the note?

10   Q.    Uh-huh.

11   A.    Well, I can tell you -- Ron and Jeff and probably

12   Gary Crane were at least present.

13         The other sons came and went, so I don't --

14   they would come into a meeting, stay a while, and then

15   leave.  So I don't know whether they were there or not.

16         And they had showed us -- they were in the

17   process of getting a loan to build a plant expansion, I

18   believe, in Kentucky, and they asked us if we would take a

19   note for part of our fee.  And I said we would, but I

20   wanted it to be payable at the later -- I wanted Mikron to

21   be a co-maker, because Ron Sandwith wasn't going to have

22   anything left after we did our job.  And that I wanted

23   Mikron and Ron to be co-makers, and I wanted to be -- I

24   wanted it to be payable, in the event of Ron's death, or

25   two years later.

1          And I wanted an -- well, actually, I wanted

2     a 36 percent default rate, which kind of stopped them.  And

3     I said, if you don't default on it, don't worry about that.

4          So, you know, I agreed to take the note.

5     Jeff and Ron were sitting there.  They agreed to do it, and

6     that was the end of that.

7          Q.   And when was this note executed?

8          A.   What's the date on it?  Where is it?

9          Q.   What were the circumstances surrounding the date

10    of its execution.  January 2003.  Where was it executed,

11    and where were --

12              MR. MORRIS:  Hang on.  Can we start with one

13    question at a time.  Let's start with when.

14         Q.   Let's start with when.

15         A.   Could I have that back, please?

16         Q.   Sure.  I think it's on the first page.

17         A.   Okay.  Well, it says it was January 2nd.

18         Q.   2003?

19         A.   Yeah, that's what it says.

20         Q.   Okay.  Is that your recollection of when it was

21    executed?

22         A.   I'll be honest with you, I just don't remember.

23    I just know we were at their offices.

24         Q.   Were you -- were you present at the execution of

25    that note?

1       A.    Very definitely.

2       Q.    All right.  And where was that at?

3       A.    The Mikron boardroom in Kent, Washington.

4       Q.    Were the prior drafts of the note sent to any

5    representatives of the Sandwiths?

6       A.    No, because they were screwed up.  I mean, they

7    obviously didn't reflect what were the final terms of the

8    note.

9       Q.    Was the -- were the terms of that note negotiated

10   with Ron Sandwith or Jeff Sandwith?

11      A.    I think I just answered that question.

12      Q.    I didn't understand it.  Could you answer it

13   again?

14      A.    Yeah.  Yes, we discussed it, they asked me if I

15   would take a note.  I said, yes, under these terms.  They

16   said, okay.

17      Q.    Did either Ron or Jeff Sandwith see any prior --

18   any drafts of the note prior to its execution on

19   January 2nd of 2003?

20      A.    Not to my knowledge.  I wouldn't swear to that.

21   I don't know why we would have sent -- this was probably

22   done by somebody in Heritage's office.  They wouldn't just

23   be sending out drafts of notes for the fun of it.

24      Q.    Was either Ron Sandwith or Mikron represented by

25   counsel in connection with that -- execution of that note,

1    to your knowledge?

2         A.    Gary Crane was there.   What's his -- what's his

3    role?   He was an inside CPA.

4         Q.    Yeah, I think I asked for counsel.

5         A.    Hum?

6         Q.    I think I asked for counsel.

7         A.    You mean, legal counsel?

8         Q.    Legal counsel.

9         A.    CPA's can give counsel, too.

10                MR. TILLOTSON:   Let's --

11        Q.    I'll clarify.   Were they represented by a lawyer?

12        A.    Not unless Paul Warner, who was the co-CEO, is

13   also an attorney, which I don't know to be true.

14        Q.    All right.   The last one I'm going to give you is

15   what's been marked as Exhibit 19.   Ask you if you can

16   identify that document?

17        A.    I've seen this before, but just very recently.   I

18   was told --

19                MR. TILLOTSON:   Well, hold on.   That's --

20                THE WITNESS:   Okay.

21                MR. TILLOTSON:   -- let's stick with

22   recollection and then have an explanation.

23        Q.    Do you know what it is?

24        A.    I wouldn't have known if it hadn't been

25   identified to me.

Gary Kornman - 6/5/2007

222

```
 1        Q.    Who identified it to you?
 2        A.    I believe --
 3              THE WITNESS:  Did you?
 4              MR. TILLOTSON:  Well --
 5        Q.    I'm not going to ask you for that, if you and
 6   your lawyer discussed it.
 7        A.    Okay.
 8              MR. TILLOTSON:  If he says -- do you know
 9   what your question is?
10        Q.    Can you identify it?
11              MR. TILLOTSON:  He's asking you, do you have
12   an independent recollection or knowledge as to who created
13   this document and what it is.  Not what you and I may have
14   discussed about it, is what he's asking.
15              THE WITNESS:  Okay.
16        A.    Independent.  I don't remember when this was
17   created or who created it, if that's your question.
18        Q.    Is that a debriefing memo similar to the other
19   ones that Heritage customarily prepared?
20        A.    Let me --
21              THE WITNESS:  Let me talk to you just a
22   second, please.
23              May I go off the record just a second?
24              MR. PHELAN:  It's up to him.
25              MR. TILLOTSON:  No, yeah --
```

1          MR. PHELAN:  It's okay with me.

2          (Recess 5:35 to 5:38.)

3     Q.    Is this one of the debrief memos that was

4  routinely done by Heritage?

5     A.    No.

6     Q.    What is it?

7     A.    It looks like to me that it's a -- some kind of

8  typed-up something that Brian Czerwinski did from notes he

9  took at a meeting.

10         The date, for example, strikes me as very

11  strange.

12         MR. TILLOTSON:  He's just asking you what it

13  is, before you're going into substance.

14    A.    It just looks like a summary of what Brian needs

15  to do and what Claudia needs to do and that type thing,

16  so... I mean, that's --

17    Q.    So maybe I can summarize what you said there.

18  This is a memo prepared by Brian Czerwinski for --

19  apparently from his notes?

20    A.    Yeah, for his use, to tell him what he needs to

21  do.

22    Q.    All right.  I think you indicated that the date

23  didn't make any sense.

24    A.    Well, if the -- and again, you asked me if I knew

25  when the note was signed.  If the note was signed on the

Gary Kornman - 6/5/2007

224

1    second --

2         Q.   Of 2003.

3         A.   Well, this is -- the date is totally screwed up.

4         Q.   Yeah, I will agree with you.

5              Going on to my next question, do you have

6    any idea what that date should have been?

7         A.   Maybe 11/15.

8         Q.   It couldn't have been January of 2002, because

9    the Heritage didn't know the Sandwiths.

10        A.   That's why I was going --

11        Q.   It wouldn't have been after the note was signed.

12   So, best guess would be 11/15/2002, would be a good guess?

13        A.   That would be the best guess I've got.

14        Q.   Okay.

15             MR. PHELAN:  I'm done.

16             MR. TILLOTSON:  All right.  We'll move to

17   the next.

18             MR. LEWIS:  I promised to go last, Jeff.

19             MR. TILLOTSON:  All right.

20             MR. LEWIS:  Which may mean I don't ask any

21   questions.

22             THE WITNESS:  Jay, good to see you again.

23             MR. MUNISTERI:  Nice to see you.

24                       EXAMINATION

25   BY MR. MUNISTERI:

1    Q.    Mr. Kornman, we met the other day, did we not?

2    A.    Yes, we did.

3    Q.    I've got some questions that follow up on

4    questions that Mr. Phelan asked.  I will try not to ask you

5    questions that overlap with questions from the other day.

6    I'm sure I will, that there will be some; and if I do, it

7    is as a predicate question.

8              Why do you object to the proposed settlement

9    with Jenkins?

10   A.    As I understand it, the settlement with

11   Jenkins -- stop me if I'm wrong about this, please --

12   involves giving him a claim for the interest he paid to

13   Heritage and 65 percent of the fee he paid to Heritage.  Am

14   I correct?

15             Okay.  Thank you.

16             MR. LEWIS:  Get your stories together.  One

17   had the head shaking no, and one had shaking yes.

18   A.    Am I correct?

19   Q.    You're correct in your statement:  I'm not

20   telling you whether or not you're correct.

21             All I can tell you -- just answer the

22   question.  If you have an understanding -- what is your

23   understanding of the Jenkins proposed settlement?

24   A.    I just told you my understanding.

25   Q.    And what I want to know is what you -- is what

1   your objection is to the settlement, as you understand it.

2       A.   Okay.

3             MR. MUNISTERI:  Does that help, Robin?

4             MR. PHELAN:  It helps me.  He had me

5   confused.

6             THE WITNESS:  Excuse me, I need to confer

7   with my counsel.

8             (Witness and counsel confer.)

9       A.   Starting with the interest -- the claim for

10  interest, Meralex borrowed $26 million from Heritage, the

11  Heritage Organization, LLC, I'll use the same assumptions

12  that we did the other day, and paid Heritage interest at 9

13  percent, and got 9 percent interest from the development

14  company, Premier Integral Resorts.  So they had absolutely

15  no loss.

16            In fact, they paid the last payment.  They

17  paid less interest to Heritage than Heritage -- than they

18  got from Premier.  They actually shorted Heritage interest.

19  So actually, Heritage took a loss on the transaction.

20  That's the first part.

21            So I can see no reason why any claims

22  allowed for something that they've already been -- been

23  paid for once; and in fact, paid more than they paid out.

24            Second of all, the fee --

25      Q.   Which fee?

1      A.    The $15 million fee that is a claim that's being

2    allowed as -- for 65 percent, I believe.

3      Q.    The education fee?

4      A.    Yes.

5            Howard Jenkins is one of the two people

6    that, if he had not, pardon me for saying it, ruined the

7    transaction, would have gotten his allowance.

8      Q.    Who is the other?

9      A.    David Weyrick, who you saw the California tax

10   receipt for.  He was -- he was done after Jenkins, I

11   believe.

12           And he got past the statute of limitations,

13   and my recollection is, I wouldn't -- I'm pretty sure that

14   he got his full benefits, as far as the federal tax savings

15   go.

16     Q.    And why do you put Mr. Weyrick and Mr. Jenkins in

17   the same category?

18     A.    Well, because the transactions were similar, the

19   timing -- Howard Jenkins was done before Mr. Weyrick.  So,

20   with everything that I know, the transaction would have

21   gotten easily past the statute of limitations.

22           To make it even stranger, when the

23   government came out with retroactive regulations, which

24   have since been declared invalid by the Western District of

25   Texas, they backdated them until October of 1999; and

1    Howard Jenkins' transaction was done in, I believe, April

2    or May of '99.

3              So the point of it is, those regulations

4    wouldn't have even applied to him.  They were overruled as

5    being invalid.  But even if they hadn't been overruled,

6    they would have been -- they wouldn't have applied to him.

7       Q.    Because the economic substance doctrine and the

8    business purpose doctrine apply to Mr. Jenkins?

9       A.    Yes, I'm going to come to that.

10      Q.    Okay.  And to Mr. Weyrick?

11      A.    Yes.  Howard Jenkins is a sophisticated

12   businessman who has done tax-advantaged investments before.

13      Q.    Which investments?

14      A.    He was involved -- according to his marital

15   disclosures, he was involved in oil and gas -- in oil

16   shelters and gas shelters during the middle '80s, and he

17   readily understood what was required.

18              And he told me that the public stock was

19   sensitive to interest rates, in that it was valued based on

20   the stock of public companies in the market.  And that to

21   the extent that interest rates went up and the market went

22   down, that would affect the value of his public stock.

23      Q.    Did he tell you that out of the blue, or did he

24   tell you that in response to questions from you?

25      A.    We talked about this many times.

1    Q.   Okay.  Well, tell me the context in which the

2    issue came up.

3    A.   It was a discussion of this entire thing.

4    Q.   Of the 752 strategy?

5    A.   That's right.  Howard --

6    Q.   So the question --

7             MR. TILLOTSON:  Let him -- I don't think he

8    was finished.  Were you?

9             THE WITNESS:  No, I wasn't finished.

10   A.   I'm trying to give you -- let me go for a second.

11   Okay?

12            On more than one occasion, we discussed it.

13   He verified that there was economic substance in that the

14   stock in publics was affected by interest rates.

15            He verified that he was trying to make a

16   profit, and he did make a profit.  He instructed me to pass

17   that information on to Ed Ahrens, which I did.

18            Mr. Jenkins ran a company that at the time,

19   I believe, was doing sales of approximately $12 billion a

20   year, and had -- I believe there was EBITDA in the range of

21   $600 million.  And he had been well acquainted with tax

22   matters.  In fact, he asked for a tax transaction, and we

23   proposed the short-term charitable remainder annuity trust.

24            So this is not a man that was

25   unsophisticated and didn't know that he was going to be

1    required to tell the Internal Revenue Service that he did

2    this for a business purpose; that it had economic

3    substance, in that he made money.

4         Q.   Did the comment about passing on information to

5    Mr. Ahrens take place after the December 1998 meeting?

6         A.   December 1998.

7         Q.   Well, I'll back up.  I'll withdraw the question.

8         A.   Okay.  I don't understand.

9         Q.   The first meeting with Mr. Ahrens and yourself

10   and Mr. Jenkins, along with Mr. Czerwinski and Mr. Canada,

11   was in mid-December 1998, correct?

12        A.   That's right.

13        Q.   And to your knowledge, Mr. Ahrens had never met

14   Mr. Jenkins prior to December 1998?

15        A.   That's right.

16        Q.   Was it after that December 1998 meeting that Mr.

17   Jenkins supposedly told you to pass on information to

18   Mr. Ahrens?

19        A.   Yes.

20        Q.   And was it before the tax shelter was implemented

21   in May 1999?

22        A.   Yes.

23        Q.   Okay.  So we've got this period between

24   December 1998 and May 1999, and is that -- is that time

25   period the context in which Mr. Jenkins made the statement

1    about passing on information to Mr. Ahrens?

2        A.   Yes.

3        Q.   And made statements to you about interest rate

4    sensitive of publics?

5        A.   Right.

6        Q.   And made statements to you about trying to make a

7    profit on these trades?

8        A.   Yes.

9        Q.   Okay.  Were any of those statements made in the

10   December 1998 meeting, or were the statements conversely

11   said after that meeting with you personally, alone?

12       A.   Howard may have said --

13       Q.   Wait.  Let me ask it differently.

14            Do you recall whether any of those

15   statements, that there was interest rate sensitivity to

16   public stock, that information needed to be passed on to

17   Mr. Ahrens, or that he was trying to make a profit on these

18   trades, being stated in the December 1998 meeting?

19       A.   I feel pretty comfortable saying that because

20   Howard -- we had worked on Howard's estate matters before

21   with Milbank.  He had us pass on information in that

22   transaction, and I'm sure he said, Ed, just work with Gary

23   and let's get this done, or educate me, or whatever.

24            And that is further backed up by the fact

25   that -- it was obviously a casual conversation, but I think

1    Ed's letter said we would work jointly on that.  So,

2    that's --

3        Q.    Now, I understand that, from your testimony

4    today, that at some point in discussing this 752 technique

5    or shortly before, Mr. Jenkins made a comment to you about

6    his brother-in-law.

7        A.    Yes.

8        Q.    Okay.  Tell me what that comment was.

9        A.    Just that he had gotten information from his

10   brother-in-law that there were transactions out there that

11   could avoid capital gains taxes, and he wanted us to go

12   find them.

13       Q.    Is this the brother-in-law that was working for

14   Arthur Andersen?

15       A.    I believe his -- I believe he had worked for AA.

16   I don't -- believe he wasn't then.

17       Q.    When was this -- I'm sorry, say that again.

18       A.    I don't believe he was working for Arthur

19   Andersen at the time, but I'm not sure.

20       Q.    Okay.  Have you ever met his brother-in-law?

21       A.    Yes.

22       Q.    What's his name?

23       A.    Now you're asking the hard questions.  I don't

24   know.

25                    He's married to his dark-headed sister.

1    That's all I remember.  I'll maybe give you another -- give

2    me a while, and I'll think of that.

3                     MR. TILLOTSON:  That's enough for a search

4    party.

5         Q.   And what discussions did you have with the

6    brother-in-law married to the dark-headed sister about tax

7    strategies?

8         A.   This should have been videoed.

9                     MR. PHELAN:  You're right.

10        A.   I don't -- I don't remember any discussions I had

11   with his brother-in-law about that.

12                    I have talked to -- I did talk to his

13   brother-in-law and met his brother-in-law after we did

14   Howard's estate planning, but I don't remember that I

15   discussed that with him.  This strictly came from Howard.

16                    I'm sorry, what was your question again?

17        Q.   That was the question, and you gave an answer.

18        A.   Okay.

19        Q.   At the meetings with Mr. Jenkins that took place

20   between -- or after -- let me withdraw.

21                    At the meetings with Mr. Jenkins that took

22   place after the December 1998 meeting, where you talked

23   about interest rate sensitivity supposedly, and you

24   supposedly talked about the interest in making a profit on

25   these trades, do you recall anyone present besides you and

1    Mr. Jenkins?

2        A.   Mr. Canada may have been there.  He was at some

3    meetings.  I don't believe he was at all of them.

4        Q.   Do you -- do you recall Mr. Canada being present

5    at those meetings?

6             His testimony, I'll represent to you, is

7    that he did not meet with Mr. Jenkins after December 1998.

8        A.   Okay.  Well, since I'm not sure of it, I would

9    have to say that I'd have to go with his testimony,

10   because --

11            MR. TILLOTSON:  No.

12       A.   -- I don't remember it specifically.

13       Q.   Then I'll ask the question again.

14            Do you -- do you today remember anything

15   about Ralph Canada being present at a discussion with you

16   and Mr. Jenkins after December 1998, discussing the 752 tax

17   shelter?

18       A.   Let me say this.  I could be certain of that if I

19   reviewed calendars and company documents.  I haven't done

20   that, and I don't want to speculate.

21            But it would be sensible to me that he was

22   there.  I remember him being in some other meetings besides

23   that December meeting.

24       Q.   Okay.  Well, having not read any documents --

25       A.   I can't --

1    Q.   -- and sitting here today, do you recall Mr.

2  Canada present at any meetings after December 1998 with

3  Howard Jenkins, discussing the 752 tax shelter?

4    A.   I'm not going to speculate.  I can't be certain.

5  I would have to look at documents to find out.

6    Q.   I don't want you to speculate, sir.

7         So without speculating, do you remember, one

8  way or the other?

9    A.   No, I said I couldn't be certain.

10   Q.   At what meeting, datewise, was it decided that

11  $300 million of treasury securities would be borrowed?

12   A.   Again, I'd have to try to look at calendars to

13  get dates.  That's been eight, nine years ago.  I can't

14  remember that far back.

15   Q.   Okay.  Do you recall any discussions with Mr.

16  Jenkins about the short sale, within the week before the

17  short sale?

18   A.   I just -- I wish I could remember nine years ago.

19   Q.   Do you recall any discussions with Mr. Jenkins

20  during -- during the period April 30, when the treasury

21  securities were borrowed, and April (sic) 11th, when the

22  position was closed?

23   A.   Yes.

24   Q.   Okay.  Tell me those discussions, to the extent

25  they relate to the 752 tax shelter.

236

1      A.    Give me the time period again.

2      Q.    April 30, 1999, which is when the position is

3  opened.

4      A.    Right.

5      Q.    May 11, 1999, when the position is closed.

6      A.    Okay.  I'm sorry, because I -- I don't have a

7  specific recollection.  I would have to go back and look at

8  my records of that time period.

9            I remember discussions with Howard prior to

10 that, so that's -- so I can't tell you about -- you're

11 talking about a very specific time period there that I

12 don't -- I can't identify a specific conversation, without

13 looking at records.  So that's -- I can't be certain.  I'm

14 not going to speculate.

15     Q.    So just to summarize, you do recall a discussion

16 with Mr. Jenkins sometime shortly before the short sale

17 that occurred on April 30?

18     A.    Sure.

19     Q.    But you don't recall today any discussions that

20 took place between April 30, when the position was opened,

21 and May 11, when the position was closed, fair statement?

22     A.    I can't be certain.  I believe there were, but I

23 can't be certain, until I consult some documents.

24     Q.    Okay.  Under oath today, do you have any --

25     A.    I just gave you my answer under oath.

237

1      Q.   Yeah.  And under oath today, do you have any

2   personal knowledge where you can recall discussions that

3   took place before April 30 and May 11, 1999?

4           THE WITNESS:  Would you please read him back

5   my last answer?  It's still the same answer.

6           MR. MUNISTERI:  If there's a yes or no in

7   his answer, you can read it back.

8           MR. TILLOTSON:  Well, are you able to answer

9   his question?

10          And if you can't, tell him.  If you don't

11   recall, yes, no.

12          MR. MUNISTERI:  He's able.  It's a "do you

13   recall" question.

14          MR. TILLOTSON:  Well, the witness determines

15   whether he's able to answer it or not, so...

16          THE WITNESS:  I'm not certain.  I would have

17   to consult some records to find out.

18      A.   If you're not certain, you're not certain.

19      Q.   I'm asking if you recall, without consulting

20   records, any discussions with Mr. Jenkins --

21      A.   I can't --

22      Q.   -- between April 30 and May 11.  Yes or no.

23      A.   Jay, I've given you my answer.  Go to the next

24   question, because you're not going to get any more than

25   that.

1          I told you I can't tell you, sir.

2      Q.   Then tell me what you recall, if any, regarding

3  discussions with Howard Jenkins between April 30 and May

4  11.

5      A.   That seems to be the same question you just asked

6  me.

7          I told you I can't give you a certain answer

8  without looking at some records.  Okay?  Now, I've said

9  that --

10     Q.   Is that the extent of what you recall?

11     A.   I'm not going to speculate, because I believe we

12 talked, but I'm not going to say we did or we didn't

13 because I'm not certain.

14         Now, I don't know how much plainer I can

15 make that.

16     Q.   You could be plainer.  Is that the extent of what

17 you recall?

18         MR. TILLOTSON:  I think we covered this in

19 his deposition for six hours.

20     A.   I'm done with that question, if you'd like to go

21 to the next one.

22         MR. PHELAN:  How about I beat it out of you?

23     Q.   What -- what securities did you educate Mr.

24 Jenkins about as options for the short sale?

25     A.   The same type of securities that were used in

239

1    Fulcrum and Salina, short-term treasuries.

2        Q.   And that was the only security you educated Mr.

3    Jenkins about; is that correct?

4        A.   That's correct.

5        Q.   And is it -- withdraw.

6                What discussion did you have with Mr.

7    Jenkins, in educating him about the options for cash

8    management, to maximize profit on the $300 million?

9        A.   I just don't remember any conversation like that.

10       Q.   Did you participate in any discussions with

11   anyone at Heritage, with Mr. Jenkins, at Ahrens & DeAngeli,

12   about -- about what to do with the $300 million in cash

13   once the securities were sold?

14       A.   I can't -- I can't be certain.  I'd have to go

15   back and look at the documents, the records.  But I

16   believe -- and I don't know whether I discussed that with

17   Howard or not.  I don't believe we did.

18               I believe I might have discussed with the

19   fellow in our company that -- that was executing these

20   trades for Howard, using repos to reinvest -- to reinvest

21   the money.  I just don't remember.  I'd have to go back and

22   look.

23               I mean, it's not that I don't remember.  I'm

24   not certain.  It's been too long ago.

25       Q.   What other options existed to --

1    A.    Short-term repos were the best option out there.

2    Q.    Why?

3    A.    Got the best rates.

4    Q.    And what other options existed?

5    A.    I don't remember at the time.  Again, that was

6    nine years ago.

7    Q.    How did you or Heritage select the particular

8    repos that were supposedly being used for cash management?

9    A.    I don't -- I don't believe we did.  I believe the

10   broker selected those.

11   Q.    Who did the broker work for?

12   A.    I -- I don't even remember the broker we used.

13   That's why I say, I've got to go back and look at records.

14   I just can't remember all this stuff at this late date.

15   Q.    Let me ask you a series of questions, and I

16   suspect your answer is going to be that you don't remember

17   at this late date.  But I do need to go through this.

18        Who decided to purchase repos at the same

19   time as the treasury securities were borrowed, at the same

20   coupon rate and maturity date, if you recall?

21   A.    Again, I just need to go back and look at the

22   documents.

23   Q.    Who decided to close $180 million of the $300

24   million short sale on May 3?

25   A.    Have to go back and look.  Don't remember.  I

1    can't be certain.

2            I can tell you Howard told me, I can tell

3    you that the broker thought that the -- I could tell you

4    all kinds of things, but I'd have to go back and look.  I

5    just don't have present memory.

6        Q.   Who decided to borrow those same securities and

7    the same amount later that same day on May 3?

8        A.   I've got to refresh my memory on all this by

9    looking at the documents.  I cannot give you the specific

10   information.

11       Q.   To make money, did any of these client claimants

12   have to have their short sale conducted through a

13   particular type business entity?

14       A.   You'll have to rephrase the question.

15       Q.   Sure.  Could -- could the client claimants have

16   made money with their short sales by conducting the trade

17   through a corporation?

18       A.   They couldn't have used the partnership tax

19   rules.

20       Q.   My question is whether or not a corporation which

21   they owned an interest in could have owned the brokerage

22   account and borrowed the obligations and supposedly made

23   a -- made money off the short sale?

24       A.   I think I answered your question.  We were

25   dealing with the partnership tax rules, so...  The

1    corporation didn't have those rules.

2        Q.   Well did the partnership tax rules allow the

3    entity to make money?

4        A.   No.

5             Let me make this clear.  There were -- there

6    was more than one purpose to these transactions.  There was

7    the business purpose, there was economic reality, they were

8    making a profit.  There was hedging, and there was getting

9    a tax benefit that is permissible under the law.

10       Q.   Absolutely.  And my question is, is this supposed

11   purpose of making money, could it have been achieved

12   through conducting a short sale through a corporation?

13            MR. TILLOTSON:  He's merely asking if a

14   corporation can conduct a short sale to make money.

15       Q.   That's it.

16            MR. TILLOTSON:  That's all he's asking you.

17       A.   Is that what you're asking?

18       Q.   That's all I'm asking.

19       A.   If that's the question, the answer's yes.

20       Q.   Nothing special about a partnership entity versus

21   a corporate entity that allows one or the other to make

22   money through a short sale, correct?

23       A.   That's correct.

24            THE WITNESS:  Thank you for explaining it.

25            MR. MUNISTERI:  Thank you.

1              MR. TILLOTSON:   No problem.   I'm happy to

2     issue rulings.   And judgments, too.

3          Q.    Does any documentation exist of what Heritage

4     instructed the broker for the Jenkins tax shelter?

5          A.    Again, I'd have to go back and look at the

6     documents.   I don't --

7          Q.    I'm just asking whether any documents exist

8     that --

9          A.    I said, I don't know.   I'd have to go look.

10         Q.    What documents did Heritage typically maintain to

11    document the assumptions and the decisions and the

12    instructions for these short sale trades?

13         A.    Well, usually there was a file on the

14    transactions.

15         Q.    And what documents were kept in the file on the

16    transactions?

17         A.    Trade tickets, instructions, whatever.

18         Q.    Anything other than trade tickets and

19    instructions?

20         A.    Probably account agreements, things like that.

21    Margin agreements.

22         Q.    What do you know about the duration of the open

23    short sale for each of the client claimants?

24         A.    As I said earlier, nothing.

25         Q.    Okay.   Like with Howard Jenkins, your client?

1   A.   I can't remember what happened that far back.

2   Q.   Well, do you -- do you recall what the -- what

3   the duration of the position was in general terms, when it

4   was opened?

5   A.   No, no.

6   Q.   Okay.  Do you recall whether the duration of the

7   open position was sufficiently long to permit making a

8   profit?

9   A.   You can make a profit in a few hours.  So the

10   answer to your question would have been yes.

11   Q.   Do you recall whether the duration was

12   sufficiently long for -- to make -- to achieve a profit if

13   the $15 million fee was included in costs?

14   A.   We went all through that before.

15   Q.   That's not my question.

16   A.   That was not --

17              MR. TILLOTSON:  We did go through this

18   extensively in connection with his deposition last week.

19   Q.   We did talk about whether you include the $15

20   million fee or not, and I'm not asking you those questions.

21   Got your answers, don't need to ask you that anymore.

22              My question was a different question.  And

23   that is:  Do you recall whether the duration was

24   sufficiently long to achieve a profit should you include

25   the $15 million fee in costs?

Gary Kornman - 6/5/2007

245

1      A.   We didn't consider that fact.

2      Q.   What did you consider when the short sale was

3  opened?

4      A.   Excuse me?

5      Q.   You said you didn't consider the fact of -- of

6  how long it would take to make money, should you pay a $15

7  million fee.

8           So my question was, what facts did you

9  consider?

10     A.   All the things we've discussed, is the best way

11  to describe it.

12     Q.   What duration did you anticipate that the short

13  sale position would remain open?

14     A.   I don't even remember how long it stayed open, so

15  I can't remember what -- did we set up a particular time

16  that it would stay open.  It doesn't make -- it's just

17  impossible.  You know, that was 1999.

18     Q.   Was it intentional or mere coincidence that all

19  the tax claimants had short sales that were opened and

20  closed within less than two weeks?

21     A.   I have no idea.

22     Q.   Coincidence?

23     A.   I said I have no idea.  What part of -- I've

24  never met these people.  I don't know what they said.  I

25  don't know what was said to them.

1          Q.    And you have no idea what your other principals,

2     Mr. Canada and Mr. Bird, were doing?

3          A.    Well, I had a general idea what they were doing.

4          Q.    And so, generally, understanding the other 752

5     transactions, that they were --

6          A.    Jay, listen --

7                MR. TILLOTSON:   Hold on.

8          Q.    -- that you were implementing and that you were

9     making millions of dollars from, was it intentional or

10    coincidental that all the short sale positions were opened

11    and closed within two weeks?

12         A.    Okay.   And I'm going to tell you this one more

13    time, and let's get it straight.

14               I've told you when you talked to me before

15    not to badger me.   I told you I didn't know about these

16    transactions.   I knew that these other people were handling

17    it.

18               I don't know how long their transactions

19    were.   I don't know what was discussed.   I have no

20    knowledge of those situations.   That's the best answer

21    you're going to get.

22         Q.    You have no knowledge of the investment

23    objectives of any of the tax claimants, besides the

24    Sandwiths and Mr. Jenkins?

25         A.    That would be correct.

1       Q.    Of your 6.5 million dollar proof of claim, Mr.

2   Kornman, $5,196,620.56 are attributed to the legal fees,

3   costs and expenses incurred to law firms and/or those

4   retained by them from May 18, '04 to the present in

5   connection with the SEC matters, correct?

6       A.    That's what it says.

7       Q.    And then to the right it says, basis for the

8   claim.  And the first sentence says that Mr. Kornman was

9   alleged to have obtained what the government asserted was

10  material, nonpublic information in connection with

11  soliciting prospective clients.

12              Were any of the allegations -- were any of

13  the charges against you asserted because you had met with a

14  prospective client?

15              MR. TILLOTSON:  Answer that yes or no.

16      A.    Yes.

17      Q.    Okay.  Were you actually charged for meeting with

18  a client?

19              MR. TILLOTSON:  Well --

20      Q.    That's my question, and maybe you didn't

21  understand the first one.  Were you charged for meeting

22  with a client?

23      A.    If I hadn't met with the clients, I wouldn't have

24  been charged.

25      Q.    Was the offense the meeting with the client

1    itself?

2         A.   I answered your question.

3         Q.   What was the charge that was asserted against you

4    merely for meeting with the client?

5                   MR. TILLOTSON:  Well --

6                   MR. MUNISTERI:  He made an indemnification

7    claim.  And if the claim is for meeting with the client, in

8    his capacity as an employee, you know, I understand his

9    indemnification claim.

10                  MR. TILLOTSON:  We will stipulate that the

11   claim is not -- that the charge for which the

12   indemnification claim is based is not simply for meeting

13   with a client.

14                  MR. MUNISTERI:  Will you stipulate that the

15   charge for which the indemnification claim was made was

16   for --

17                  MR. TILLOTSON:  Insider --

18                  MR. MUNISTERI:  -- the insider trading and

19   for misstating facts to the government?

20                  MR. TILLOTSON:  No.

21        A.   No.

22                  MR. MUNISTERI:  Tell me what you can

23   stipulate to, because I think we can cut short a lot of

24   questions.

25                  MR. TILLOTSON:  We've produced the

1   indictment and the SEC lawsuit, along with documents

2   prepared by both governmental agencies, that state what the

3   nature of the charge was, as it relates to his meetings

4   with prospective clients of Heritage.

5           That's what we'll stipulate to.  That's what

6   they alleged.

7           MR. MUNISTERI:  Okay.  That doesn't save the

8   time, but I can do it quickly.

9       Q.   Did your duties --

10      A.   As far as I can go with it.  I'm not going to

11  answer anything else.

12          MR. TILLOTSON:  Gary, he needs to ask a

13  question, and if it's appropriate not to answer, I'll

14  instruct you.

15      Q.   Did your duties to the Heritage Organization

16  include conducting security trades based on information

17  learned from clients, where the trades were for your own

18  personal interests and not for the clients' interests?

19      A.   I'm not going to answer it.  I'm not going there.

20      Q.   And did your --

21          MR. MORRIS:  Wait, wait.  I'm sorry.  What

22  was the answer?

23          MR. TILLOTSON:  I think he said, I'm not

24  going there.

25          MR. MORRIS:  Can we get a stipulation that

1   that portion of the claims can be withdrawn, then?

2           MR. TILLOTSON:   No.   I'll consider -- let me

3   talk to him for a second.

4           MR. MUNISTERI:   Sure.

5           MR. TILLOTSON:   We're not attempting to be

6   difficult.   He didn't want to comment on matters on which

7   there's a pending hearing.

8           I understand this is part of the

9   indemnification claim.   If you'll give us a minute, we'll

10  try to get you the information, if we can.   If you're happy

11  with it, fine; if not, we can take it up with the judge.

12          Give us two seconds.

13          (Recess 6:18 to 6:22.)

14  Q.   We're back on the record, Mr. Kornman.   Did you

15  have anything to add to his answer?

16          MR. TILLOTSON:   No, but I'm prepared to

17  stipulate on his behalf that it was not his job duty or

18  within the scope of his job duties to engage in trades in

19  connection with the Heritage Capital Opportunities Fund,

20  which was the fund at issue in the insider trading case.

21          MR. MUNISTERI:   And would you also

22  stipulate, obviously, that it wasn't within his scope and

23  duties to make misstatements to the SEC?

24          MR. TILLOTSON:   Well, that sounds like a

25  trick question, but --

1          THE WITNESS:  No, we will not stipulate

2     that.

3          (Witness and counsel confer.)

4          MR. TILLOTSON:  I don't think it's in the

5     course and scope of anyone's job to make misstatements to

6     the SEC.

7          MR. MUNISTERI:  Including -- fair enough.

8          MR. TILLOTSON:  So, I mean...

9     Q.   Mr. Kornman, you -- you testified earlier that

10    when you were educating your students, that you were very

11    careful about stating the Salina as a fact, correct?

12         MR. TILLOTSON:  The client claimants, not

13    students.

14    Q.   Oh, I'm sorry.

15    A.   Say that again.

16    Q.   When you were --

17         MR. TILLOTSON:  Or included the principal

18    and who the master is in the presentations.

19    A.   We are going to send you to the corner, if you

20    keep that up.

21    Q.   In your earlier testimony, as I understand it,

22    you were very clear with your clients that the description

23    of the facts and the holding in Salina were presented as a

24    fact, not an opinion, correct?

25    A.   In each, yes, I think that would be the best way

1    to describe it.  We said, this is what the holdings were,

2    the fact.

3        Q.   You described the legal authorities as a fact and

4    not as an advice or opinion, correct?

5        A.   Well, the judge makes the opinion, so whatever

6    the court said was what we communicated.

7        Q.   And when you described the 752 tax shelter's

8    effect of creating basis, did you describe that as a fact

9    or as an opinion?

10       A.   Excuse me?

11       Q.   Sure.  When you described the 752 tax shelter's

12   effect of increasing basis, did you describe that as a fact

13   or as your opinion?

14       A.   Neither.

15       Q.   Okay.  How did you describe it?

16       A.   We explained what was happening in Fulcrum.  We

17   explained what was -- we explained what was happening in

18   Salina.  We explained what happened in a number of cases.

19            We explained -- I mean, I say explained,

20   made known these matters that -- to these people.  I.e.,

21   Turner Communications, Florida Power & Light and their law

22   firms thought that this was based on good law, or they

23   wouldn't have done it.

24       Q.   And did you in any way distinguish for Mr.

25   Jenkins his 752 tax shelter from the facts in Salina?

253

1      A.    Salina wasn't even there then.

2      Q.    So you did not?

3      A.    It had not -- it was just pending in the courts.

4    There was no decision, there was no anything.

5      Q.    And did you distinguish the facts of Mr. Jenkins'

6    752 shelter from the facts in Fulcrum?

7      A.    I don't have a clue what your question is.

8      Q.    Did you distinguish Mr. Jenkins' 752 tax shelter

9    from -- well, withdraw.

10           You were aware, in December 1998, of the ACM

11   opinion, correct?

12     A.    Yeah.

13     Q.    And did you make an effort to factually educate

14   Mr. Jenkins about the distinction that you believe existed

15   between the principals in ACM and Mr. Jenkins' 752 tax

16   shelter that you were presenting?

17     A.    I don't believe ACM had any relevance, and I

18   don't believe it does today.  But that's beside the point.

19     Q.    So that was not a topic of discussion with Mr.

20   Jenkins?

21     A.    No, no, it was not.

22           MR. MUNISTERI:  No further questions.

23           THE WITNESS:  Okay.

24           MR. TILLOTSON:  Did you want to pick up?

25           MR. MORRIS:  Yes.

1           THE WITNESS:  He'll be polite.

2               FURTHER EXAMINATION

3   BY MR. MORRIS:

4       Q.   I am going to be -- try to be brief, and I want

5   to just run through some names.

6               Mr. Kornman, have you ever met John Trout?

7       A.   No, sir.

8               Let me just say this, I'm going to answer

9   these to the best of my recollection.  They could have been

10  in our office and I -- they introduced me to somebody

11  walking down the hall.

12              Now, that doesn't -- I can tell you that

13  I've had no substantial dealings with the people you're

14  naming.

15      Q.   Okay.  Well, my next question was going to be,

16  have you had a conversation, to your recollection, with

17  John Trout?

18      A.   No.  With the assumption I just told you.

19      Q.   Okay.  Do you have any memory of any conversation

20  with anyone else within Heritage concerning John Trout?

21      A.   I'm sure I had conversation with Mr. Canada or

22  Mr. Czerwinski.  I mean, we find -- we try to see what's

23  going on.

24      Q.   Did you have any conversations with anyone within

25  Heritage that -- in relation to which you recall any

1   discussion about what John Trout may have said with respect

2   to the 752 strategy?

3       A.   Not that I recall.

4       Q.   Okay.  Do you have any knowledge of any

5   statements about what Mr. Canada or anyone else within

6   Heritage would have said to John Trout concerning the 752

7   strategy?

8       A.   I'm sorry, Lee, I don't understand the question.

9   Could you rephrase it?

10      Q.   Well, I'm just trying to understand if you have

11  any knowledge about any information that relates to the

12  affidavit that John Trout submitted in this bankruptcy

13  case.

14      A.   Would you show me the affidavit?

15      Q.   Well, let me ask this:  Have you reviewed the

16  affidavit of John Trout filed in the bankruptcy case?

17      A.   I might have.  I haven't done it recently, that I

18  remember.

19               (Recess 6:30 to 6:34.)

20      Q.   Mr. Kornman, as you sit here today, do you recall

21  ever having a conversation with John Trout?

22      A.   As I said, nothing but, at most, a casual

23  conversation.

24      Q.   Okay.  And John Trout was not one of the client

25  claimants that you dealt with directly with respect to the

1    752 transaction, correct?

2        A.   That's correct.

3        Q.   I'm going to ask the same thing with respect to a

4    number of individuals.  Okay?  Starting with Robert Trout,

5    did you --

6        A.   Same -- same answer.

7        Q.   Okay.

8        A.   Is it okay if I just say same answer?  You

9    understood --

10       Q.   As long as we both understand that that means you

11   don't have a recollection of a conversation with that

12   person.

13       A.   Other than a casual meeting.

14       Q.   And it wasn't a client that you were directly

15   involved with, with the 752 transaction --

16       A.   That's fine.

17       Q.   -- okay.

18            Betty Joan Rainwater?

19       A.   Same answer.

20       Q.   David Powell?

21       A.   Same answer.

22       Q.   Herbert Fluharty?

23       A.   Same answer.

24       Q.   Scott Fluharty?

25       A.   Same answer.

Gary Kornman - 6/5/2007

257

1  Q. John Fluharty?

2  A. Same answer.

3  Q. Ross Love?

4  A. Same answer.

5  Q. Anthony Schwier?

6  A. Was he an advisor?

7  Q. He was not a client.

8  A. I don't remember that name as being a client of

9 Heritage.

10  Q. But you don't recall having any conversations

11 with Mr. Schwier?

12  A. Who was he?

13  Q. Well, could you just answer my question?

14  A. I -- no, I don't recall any conversations.

15  Q. Okay.  Kent Patterson?

16  A. Same answer as before.

17  Q. Paul Woodruff?

18  A. Same answer.

19  Q. Carl Behnke?

20  A. Same answer.

21  Q. John Behnke?

22  A. Same answer.

23  Q. Let's talk about Carl Berg for a moment.  Carl

24 Berg is a client that you had direct dealings with; is that

25 correct?

1      A.    Correct.

2      Q.    Carl Berg was or is probably still a California

3   resident, correct?

4      A.    So far as I know.  He was at the time.

5      Q.    Okay.  And his -- after implementing the 752

6   transaction, his tax -- his state tax return was a

7   California tax return, correct?

8      A.    That's correct.

9      Q.    Okay.  Mr. Berg has stated to the trustee that

10  Gary assured Mr. Berg that none of his plans had ever been

11  challenged by the IRS or the Franchise Tax Board for

12  California.

13            Is that a true or false statement?

14     A.    Absolutely false.

15     Q.    He also states that he had agreed to pay 1.5

16  million of his transaction fee plus the balance through a

17  note by October 1st, 2004, if the 752 transaction he

18  implemented was not challenged by the IRS or the Franchise

19  Tax Board prior to that October 1st, 2004 date.

20            Do you recall that agreement at all?

21     A.    We never had any such agreement.

22     Q.    Okay.

23     A.    That note was not in any way contingent on

24  anything.

25            He owed us that note.  It was due.  It's a

1    good note.  He's worth a billion dollars.  He needs to pay

2    it.

3        Q.   Did you disclose to Mr. Berg the existence of the

4    Weyrick audit?

5        A.   I just -- I said earlier today, I -- everybody in

6    California I told that the -- that California was the most

7    active place, and they could almost be assured of an audit.

8             I don't know that I told him Mr. Weyrick's

9    name.  I probably said another client.

10       Q.   Well --

11       A.   And I don't --

12       Q.   Probably, or do you have a specific recollection?

13       A.   No, I don't -- I'd have to check on the times, as

14   far as when that was in relation to Berg.

15            But I had -- I knew from -- from other

16   discussions, even if Weyrick had not been audited, that --

17   that California was by far the most active Department of

18   Finance.

19            Carl Berg himself had -- was in the process

20   of a series of audits on prior years that he was fighting

21   with the California Department of Revenue.  So there is no

22   doubt in my mind that Carl Berg knew that this was subject

23   to audit, and he was going to have to defend it.  And he

24   readily agreed that he understood that.

25       Q.   Is it a problem for a -- well, is there any

1    disadvantage to a client making payment for a tax strategy

2    contingent on its success?

3        A.    You bet.

4        Q.    Tell me why.

5        A.    There have been some cases in the corporate

6    environment where fees were contingent on success, and that

7    implies that there was no economic substance or business

8    purpose to the transaction, other than the tax benefits.

9              We would never -- we never have, we never

10   would enter into any transaction that was in any way

11   contingent, because that's the kiss of death.

12       Q.    Okay.  Mr. Berg states that -- well, let me back

13   up.

14             Did you prepare the promissory note for

15   Mr. Berg?

16       A.    It was prepared in our office.  I'm not sure I

17   did it.

18             (Mr. Michael Kornman entered the room.)

19       Q.    Okay.  Mr. Berg claims that in discussing the

20   note that was presented to him for execution --

21             MR. MICHAEL KORNMAN:  Did you guys miss me?

22       Q.    -- he complained that it did not have language in

23   it that made it contingent on no audit having occurred

24   prior to October 2004.

25             Is that a false statement?

Gary Kornman - 6/5/2007

261

1      A.    You betcha.

2      Q.    He also indicates that you told him it would

3  be -- it was your -- let me strike that.

4            Mr. Berg states that you informed him that

5  putting the contingency information in the note would be

6  adverse to the tax planning credibility that he was

7  implementing.

8            Is that true or false?

9      A.    False.  He never asked.  We -- I would never have

10 agreed to that.  Never even came up.

11           MR. MICHAEL KORNMAN:  Have you gone yet,

12 Jay?

13     Q.    Mr. Kornman, you indicated earlier that the

14 objective of tax planning was to make money and to possibly

15 also save taxes.  Do you remember that testimony?

16     A.    I said that a transaction has to have either --

17 and again, they're somewhat related, either economic

18 substance or business purpose; and once it has that, the

19 fact that you may arrange it and manage to have tax

20 advantages is completely valid.  Okay?

21     Q.    Okay.  Could you tell me which of the Heritage

22 clients made a profit on the short sale transaction, when

23 you take into account the fees that were paid to Heritage?

24     A.    The law was such that you didn't have to do that.

25     Q.    Okay.  Could you tell me which of those clients

1    did, though?

2        A.   It was irrelevant.  I didn't even think about it,

3    because the law was clear that you did not have to make a

4    profit after taking into account fees.

5        Q.   And was that based upon your analysis of cases

6    that were out there?

7        A.   It's based on what lawyers told me, and it was

8    based on cases I looked at.

9        Q.   Okay.  Are you aware, sitting here today, of any

10   Heritage client that made a profit on their short sale

11   transaction, taking into account the implementation fee

12   they paid to Heritage?

13       A.   Well, since I don't know what profit they made, I

14   don't have any indication of how that might work out.

15       Q.   Can you answer the question yes or no, or is that

16   impossible?

17       A.   Say it again, Lee.  I'll -- I'm sorry, I'm not

18   sure what the question is.

19       Q.   As you're sitting here today, are you aware of

20   any Heritage client that made a profit on the short sale

21   transaction, when you take into account the implementation

22   fee charged by Heritage?

23       A.   I can't answer that.  That's -- if that's the

24   question, I can't say yes or no.  I don't know.

25                MR. MORRIS:  Can you read the question to

1    him one more time.

2              (Record read.)

3        Q.   Let me restate it.  Let me try to be as fine as

4    possible.

5              Can you state the name of any Heritage

6    client that you have knowledge of, sitting here today, who

7    made a profit on their short sale transaction, when you

8    take into account the implementation fee charged by

9    Heritage?

10       A.   And my answer to you is, I don't know what the

11   economic position was on whether they made a profit or

12   whether they had a loss.

13             So the answer to your question is, I can't

14   answer your question, because I don't have either -- either

15   the fee they paid or whether or not they made a profit or

16   loss.

17       Q.   You don't have a name to provide right now, right

18   here, though, correct?

19       A.   I don't have any information.

20       Q.   You can't state a client's name right now?

21             I understand that you might want to go look

22   at something.  I'm simply asking the question:  Based on

23   your knowledge right now --

24       A.   I don't have any knowledge.

25       Q.   Okay.

1          MR. MORRIS:  I think the Court will get the

2     point.

3          Q.   You talked about that there might have been other

4     investment vehicles other than treasury bills that were

5     used by certain of the clients in connection with their 752

6     transaction.

7               Do you remember that?

8          A.   You say clients.  Now, are you talking about

9     Heritage clients or client claimants?

10         Q.   Heritage clients.

11         A.   Okay.  Yes, I did say there were some others that

12    may have used something else.

13         Q.   Okay.  And would -- if that were the case, would

14    those other investment vehicles have been reflected in the

15    graphics put together for those clients?

16         A.   One, I don't know, because it wasn't my client.

17    And the other one, it was a second transaction that this

18    person did, and I'm not sure how detailed the presentation

19    was.  So the answer is, I just don't know, don't remember.

20         Q.   Okay.  There was also some discussion about the

21    authorities' books that were --

22         A.   By the way, let me just say one other thing.

23    That person who did the transaction using something other

24    than treasury -- or did a transaction, a foreign

25    transaction, was Carl Berg.

1      We did not charge him a fee for that

2  transaction because he promised us that he did not use that

3  transaction.  Which, to me, is perfect evidence of the fact

4  that we did a very convoluted, very complicated

5  transaction, and did not even bill him a fee.  Which meant

6  that if we didn't intend to collect a fee, he would have

7  never signed that note.  We would have never asked him to

8  sign that note.

9      He did not sign a note on his other

10  transaction to say, if I decide to use it, I'll pay.  So

11  that's, to me, the best evidence of the fact that Mr. Berg

12  well understood that that note was a certain note, and he

13  owed it when it was due.

14      Q.   Was that other transaction before or after the

15  752 transaction he did?

16      A.   It was after.

17      Q.   Okay.  On the authorities' books that were

18  provided to clients, do you know what I'm talking about?

19      A.   Sure.

20      Q.   I think you had talked about, you know, how that

21  was basically just a compilation of different cases and

22  publications and just facts and holdings.

23      A.   Yeah, a lot of articles and stuff, a lot of

24  review articles and whatever.

25      Q.   Were those materials enhanced from time to time

Gary Kornman - 6/5/2007

1    to change the font of some of the language?

2        A.    To change the language?  No.

3        Q.    To change the font.

4        A.    Yeah, we had -- we had very -- a lot of very old

5    patient clients, and many times we would enlarge so they

6    could see the type.

7                Many times, in these articles, it's very

8    small.  And when you're dealing with some people that may

9    be older -- and many times, it was done just to show them

10   the part that was relevant.  The article might have had 15

11   pages, but only two pages were relevant.

12       Q.    And the same idea, that certain portions would be

13   underlined to emphasize the relevant sections?

14       A.    I can't be specific it was done the same way

15   every time.  It might have been bolded, it might have been

16   underlined, it might have been colored, it might have been

17   larger.  I don't know.

18       Q.    Okay.  You indicated that, with respect to the

19   Sandwith transaction, that Mr. Mulligan had developed the

20   Sandwith plan; is that right?

21       A.    That he was the final decision-maker, because he

22   was the one that had to render the opinion.  And so, we did

23   whatever he wanted to do, however he felt comfortable with

24   it.

25       Q.    Did -- did that estate planning technique relate

1    back to the work that Mr. Mulligan did for Heritage in

2    1999?

3          A.    I'm trying to think what work Mr. Mulligan did

4    for Heritage in 1999.  I just don't remember what he did.

5                If you would like to know -- do you know how

6    Mr. -- how I met Mr. Mulligan?

7                MR. TILLOTSON:  That's not what he's asking

8    you.

9                THE WITNESS:  Okay.

10               MR. TILLOTSON:  See if you can answer his

11   question.

12         Q.    Just because we're running a little short on time

13   here, let me just tell you that among the records of

14   Heritage, there is evidence of a $100,000 payment to Lewis

15   Rice in 1999, and it's in relation to estate planning.

16         A.    Okay.

17         Q.    And I believe Mr. Mulligan said that it was in

18   relation to analysis or assistance in developing an estate

19   plan.

20               We don't have anything in the records that

21   tells us what that estate plan was.  So I'm trying to

22   understand if that's the same plan that was just in

23   connection with the Sandwith transaction.

24         A.    I'm having trouble -- I'm trying to figure out

25   what he just did in '99, and that's -- I don't know what he

1    researched in '99.  But I can tell you that the Sandwith

2    plan was primarily developed by us on an original case with

3    Jonathan Blatmachr.

4              I don't believe it had anything to do with

5    Mulligan, but I can't -- since I don't know, I can't swear

6    to that.

7         Q.   Okay.

8         A.   That was the case that went through audit with no

9    change after the fellow died.

10        Q.   I know there's going to be some sensitivity to

11   this, but I have to ask.

12             With respect to the tapes that have just

13   recently been delivered to us, which are a mere 3,000 or

14   so, do you know where those were?

15        A.   I have no idea.  Didn't know they existed.

16        Q.   Do you know why we didn't receive them earlier?

17        A.   I didn't even know they existed until somebody

18   brought them to Jeff's attention.

19        Q.   Okay.  There is reference to an agreement that

20   was made with the U.S. Attorney's office for those tapes to

21   be delivered to the trustee.

22             Can you fill me in on what exactly that

23   agreement is?

24        A.   I'll have to let Mr. Tillotson deal with that.

25   It would have to be privileged, relating to me.

1           But if Mr. Tillotson wants to tell you, he

2    can tell you whatever he wants.  I knew about it.  I don't

3    know the details.

4        Q.    Did you have any direct conversations with

5    Mr. Ansley about the agreement?

6        A.    No.

7        Q.    Okay.  So this was all between Mr. Ansley and

8    your counsel?

9        A.    Yes.

10       Q.    Okay.

11       A.    As far as I know.

12       Q.    Are you aware of any other tapes in existence

13   that have not been turned over to the trustee?

14       A.    I don't know of what's been turned over.  I never

15   have touched any of the tapes, to my recollection.

16           Jeff -- I was told I couldn't even go in the

17   room when the FBI delivered the stuff, so the most I ever

18   did was peak in the door.

19       Q.    Okay.  And my question is really a lot simpler,

20   which is just, are you aware of any tapes involving

21   Heritage that have not been turned over?

22       A.    I'm not aware of what's been turned over or what

23   hadn't been turned over, so I can't say that I would be --

24   I would know that this pile over here had been and this

25   pile over here hadn't been.  I just don't know.

Gary Kornman - 6/5/2007

270

1          I mean, I would have every reason to believe

2     that Mr. Tillotson turned over whatever he was supposed to

3     turn over.

4          Q.    Let me try one more time.

5               You indicated earlier that you didn't have

6     any involvement with the tapes.

7          A.    That's right.

8          Q.    Okay.  So my question now is very simple, which

9     is:  Are you aware of any tapes involving Heritage that

10    have not been turned over to the trustee?

11         A.    The reason I'm hesitating, Lee, is, I don't know

12    what there was and haven't been involved with them at all.

13    I can't make a representation of anything like that

14    because, how do I know?  I mean, I have no idea.

15         Q.    To your personal knowledge -- let me try to

16    rephrase it a different way.

17         A.    Okay.

18         Q.    To your personal knowledge, are there any tapes

19    involving Heritage that are being withheld from the

20    trustee?

21         A.    I'm sorry, I'm in the same dilemma.  I don't know

22    what's there.  I don't know.  I didn't know what there was

23    to begin with.  I don't know what there is now.  I don't

24    know who's got anything.  I don't have any tapes that --

25    that -- that I would turn over if you asked me, that I know

1    of.

2              I mean, I -- if there's a tape in a

3    briefcase somewhere that I have no knowledge of, yeah,

4    there could be one.  I'm not saying there's not.

5              I got -- if you know, the FBI found

6    thousands of tapes.  They could have overlooked one.

7         Q.   Have you been provided a copy set of the tapes

8    that we've received?

9         A.   No.

10        Q.   Do you know if your counsel has kept a copy set?

11        A.   No, I don't know.

12             MR. TILLOTSON:  We have -- we have not

13   copied all those tapes.

14        Q.   Okay.  Are you aware of any records of Heritage

15   that have not been turned over to the trustee at this

16   point?

17        A.   Lee, I gave a certification that I think covers

18   this.

19             I didn't have a lot of this stuff.  A lot of

20   it came from my house to the FBI to Lynn, Tillotson.  I

21   authorized them to go through all this stuff, look at this

22   stuff.

23             People came to my house.  People came to my

24   office.  I mean, I've done the best I know how, and that's

25   all I can say.  I've authorized everybody to do everything

1    they're supposed to do, so...

2           You know.  They went through the computers,

3    two people I understand -- or three people went through the

4    computers.  I don't know what they found.  They wouldn't

5    let me look at them.  I didn't do any searches.

6      Q.    Let me just try it again.

7           To the best of your knowledge, sitting here

8    today, are there any records of Heritage that you're aware

9    of that have not been turned over to the trustee?

10     A.    Let me say it a different way.  I stand by my

11   verification.  That's the best way to say it.

12     Q.    And by the verification, you're referring to the

13   recent certification that's been filed in the adversary

14   that's pending, the 06-3377, I think?

15          MR. TILLOTSON:  This is correct.

16     A.    Yes.

17     Q.    Okay.

18          MR. MORRIS:  I think we'll reserve

19   everything else.

20          MR. TILLOTSON:  Okay.  All right.

21          MR. LEWIS:  Is it down to me?

22          MR. TILLOTSON:  Oh, John.

23          (Recess 7:01 to 7:09.)

24          MS. HARRIS:  At this point, I don't believe

25   anyone else has any further questions.

1          But I would like to go on the record, Jeff,

2     with regard to the discovery requests.

3          As you know, we've had the meet and confer.

4     You have told us that we would receive the backup for Mr.

5     Kornman's proof of claim.  You've made commitments to

6     produce those documents.  They've not been produced.

7          We have not received redacted billing

8     statements.  We have not received summaries.  We have not

9     received proofs of claim.  We have not received credit card

10    invoices.  We've received nothing that substantiates the

11    proof of claim.

12          I might have misunderstood, and I thought

13    you said earlier today we'd receive the summary by the end

14    of the deposition.  That might have been my

15    misunderstanding.

16          It's now after 7:00.  We've already deposed

17    Mr. Kornman, and we still don't have that information.

18          THE WITNESS:  May I talk to you?

19          MR. TILLOTSON:  I made it clear in my

20    proposal on your meeting to confer that I would produce

21    more information, a summary of the lawyers, what they did,

22    or redacted bills.  But only redacted bills if all the

23    client claimants were going to be producing all their

24    redacted bills that may be part of their claims.

25          No one ever responded to me.  So I then got

Gary Kornman - 6/5/2007

274

1    another request saying, what's your position?  So I

2    provided a response saying, I will provide some additional

3    information.  I haven't heard from anyone regarding my

4    proposals.

5           I'm happy to provide additional information

6    regarding which law firms and what they did; but there's no

7    way we can provide redacted bills, which is what was

8    indicated, credit card receipts or whatnot.

9           So, I'm happy to provide more information,

10   but I never made it -- I never said I would provide all of

11   that information because it would be an enormous amount of

12   material, and I don't understand the necessity of it.

13          So if there is -- I'm happy to agree on some

14   sort of information that will give you something to allow

15   you to evaluate the claim.  But literally, the legal bills,

16   credit card receipts, cost and expenses would require an

17   enormous amount of boxes, paperwork, and coordination.

18          So if you don't feel you have enough

19   information to evaluate his claim, I'm happy to work with

20   you, to give you that information.  I'm happy to make him

21   available to answer whatever requests regarding law firms,

22   bills, costs, expenses.

23          MS. HARRIS:  At this point, I think I

24   understand your position.  I appreciate the explanation,

25   and I don't think I have any further questions.

1          MR. TILLOTSON:  We are not -- I want to make

2     it clear, we are not refusing to provide information that

3     forms the back -- the basis of the claim.

4          MS. HARRIS:  It just hasn't been produced to

5     date?

6          MR. TILLOTSON:  I can't provide and I've

7     objected to providing legal bills redacted for $6 million.

8          MS. HARRIS:  I didn't see any objection as

9     to credit card receipts, explanations of the expenses.

10          MR. TILLOTSON:  I objected to both of those,

11     and initially said I wouldn't produce anything, because it

12     was overly burdensome.

13          I wrestled with John Borgman, and he told

14     me, tough, discovery is painful.

15          So I then made a proposal, which I thought

16     was reasonable.  Never heard from anyone.  And here we are.

17     We're not going to produce it.

18          I'll be happy to have a hearing with Judge

19     Hauser.  We're not going to produce bills prior to the

20     hearing.  There's no physical way we can do it.  It's

21     impossible.

22          You're free to question him until the time

23     of memorium regarding legal fees, costs, expenses.  There's

24     just no way we can provide that information, and I don't

25     think we would need to give it verbally.

Gary Kornman - 6/5/2007

276

1          If there's something other than subsection

2     one, other than trying to look like we're not cooperating,

3     some other subset of information you want, I will get it to

4     you.  If you want to have a telephonic deposition with him

5     on Thursday, after receiving that information tomorrow

6     morning, I'll be happy to provide it to you.  I'll make

7     that offer.  Some subset of information you want, some

8     categories, we'll work OT to get it to you.

9          When these depositions resume on Thursday,

10    you guys can question him regarding that.  Make him

11    available.

12          MS. HARRIS:  At this point, I think I

13    understand your point --

14          THE WITNESS:  I won't be here Thursday,

15    Jeff.

16          MS. HARRIS:  At this point, I think I

17    understand your position, and I appreciate the explanation.

18          And with that, I think we conclude the

19    deposition.

20          MR. LEWIS:  You didn't let me have a chance

21    to make my statement.

22          MR. TILLOTSON:  You're stealing his thunder.

23          MR. LEWIS:  Based upon the -- my

24    understanding that Mr. Kornman will be present at trial,

25    and may even be under a subpoena issued by one of the

1    parties, I will reserve all of my questions for trial,

2    unless that understanding is incorrect for some reason.

3                    MR. MORRIS:  Okay.  Are we done?

4                    MR. TILLOTSON:  We reserve our questions

5    until the hearing.

6                    (Deposition concluded at 7:14 p.m.)

Gary Kornman - 6/5/2007

278

<pre>
  1                    DEPOSITION CHANGES

  2    WITNESS NAME:  GARY M. KORNMAN

  3    PAGE  LINE  CHANGE              REASON

  4    _____

  5    _____

  6    _____

  7    _____

  8    _____

  9    _____

 10    _____

 11    _____

 12    _____

 13    _____

 14    _____

 15    _____

 16    _____

 17    _____

 18    _____

 19    _____

 20    _____

 21    _____

 22    _____

 23    _____

 24    _____

 25    _____
</pre>

Gary Kornman - 6/5/2007

279

1        I, GARY M. KORNMAN, have read the

2    foregoing deposition and hereby affix my signature that

3    same is true and correct, except as noted above.

4

5

6

7                          _____

8                          GARY M. KORNMAN

9    THE STATE OF _____ )
                                 )
10   COUNTY OF _____ )

11       Before me, _____, on this day
     personally appeared GARY M. KORNMAN, known to me (or proved
12   to me under oath or through [description of identity card
     or other document]) to be the person whose name is
13   subscribed to the foregoing instrument and acknowledged to
     me that they executed the same for the purposes and
14   consideration therein expressed.

15       Given under my hand and seal of office this
     _____ day of _____, 200___.

16

17                          _____

18                          Notary Public in and for the
                            State of Texas

19

20

21

22

23

24

25

1   STATE OF TEXAS      )
                        )
2   COUNTY OF DALLAS )

3        I, Linda A. Kaiser, Certified Shorthand

4   Reporter in and for the State of Texas, certify that

5   the foregoing deposition of GARY M. KORNMAN was

6   reported by me stenographically at the time and

7   place indicated, said witness having been placed

8   under oath by me, and that the transcript is a true

9   record of the testimony given by the witness.

10       I further certify that the time used by all

11  counsel is as follows:

12            MR. E. LEE MORRIS - 1:36

13            MS. HOLLY ANNE HARRIS - 1:57

14            MR. ROBIN PHELAN - 2:38

15            MR. JAMES MUNISTERI - 0:41

16       I further certify that I am neither counsel

17  for nor related to any party in this cause and am

18  not financially interested in its outcome.

19       Given under my hand on this the 8th day of

20  June, 2007.

21

22        _Linda A. Kaiser_____

          Linda A. Kaiser, CSR #2245
23        Firm Registration No. 59
          Collins Realtime Reporting
24        600 N. Pearl Street, Suite 640
          Dallas, Texas 75201
25        214-220-2449