Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt

0001
```
 1                    CAUSE NO. 06-01394
    PAUL H. WOODRUFF, ET AL     ) IN THE DISTRICT COURT
 2  VS.                         ) DALLAS COUNTY, TEXAS
    AHRENS & DEANGELI,          )
 3  P.L.L.C., ET AL             ) 101ST JUDICIAL DISTRICT
    *******************************************************
 4      IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
                    STATE OF MISSOURI
 5  JOHN W. TROUTT, JR., ET AL  )
    VS.                         ) Cause No. 06CC-001173
 6  LEWIS, RICE & FINGERSH,     )   Division No. 1
    L.C., ET AL                 )
 7  *******************************************************
 8  LAWRENCE FLINN, JR.         )
    VS.                         ) Cause No. 06CC-002321
    LEWIS, RICE & FINGERSH,     )   Division No. 10
 9  L.C., ET AL                 )
    *******************************************************
10  L. ROSS LOVE, JR.           )
    VS.                         ) Cause No. 0622-CC-7221
11  LEWIS, RICE & FINGERSH,     )   Division No. 16
    L.C., ET AL                 )
12  *******************************************************
    PAUL H. WOODRUFF and KENT   )
13  E. PATTERSON                ) Cause No. 07-22-CC885
    VS.                         )   Division No. 16
14  LEWIS, RICE & FINGERSH,     )
    L.C., ET AL                 )
15  *******************************************************
    HERBERT L. FLUHARTY, et al  )
16  VS.                         ) Cause No. 06CC-001173
    LEWIS, RICE & FINGERSH,     )   Division No. 1
17  L.C., et al                 )
18
19  *******************************************************
20          ORAL AND VIDEOTAPED DEPOSITION OF
21               GARY MORTON KORNMAN
22                  AUGUST 10, 2007
23                  VOLUME 1 OF 2
24  *******************************************************
25
```
0002
```
 1          ORAL AND VIDEOTAPED DEPOSITION OF GARY MORTON
 2  KORNMAN, produced as a witness at the instance of the
 3  Plaintiffs, and duly sworn, was taken in the above-styled
 4  and numbered cause on the 10th of August, 2007, from 9:58
 5  a.m. to 4:23 p.m., before Jennifer L. Sanders, CSR in and
 6  for the State of Texas, reported by machine shorthand, at
 7  the offices of Lynn, Tillotson & Pinker, L.L.P., 750
 8  North St. Paul Street, Suite 1400, Dallas, Texas,
 9  pursuant to the Rules of Civil Procedure and the
10  provisions stated on the record or attached hereto.
11
12
13
14
15
16
17
18
19
20
```

**GOVERNMENT EXHIBIT**

**10**

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
21
22
23
24
25
0003
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3        MR. JAY A. BRANDT
          Jay A. Brandt, P.C.
 4        3811 Turtle Creek Boulevard
          Suite 1600
 5        Dallas, Texas 75219
          214-969-7373 (Office)
 6        214-969-7648 (Fax)
          jbrandt@smalouf.com
 7
 8   FOR THE DEFENDANTS LEWIS, RICE & FINGERSH, L.C., AND
     LEWIS, RICE & FINGERSH, L.C., D/B/A LEWIS, RICE &
 9   FINGERSH; AND MICHAEL D. MULLIGAN:
10        MS. ALLISON JACOBSEN
          Vinson & Elkins, L.L.P.
11        3700 Trammell Crow Center
          2001 Ross Avenue
12        Dallas, Texas 75201-2975
          214-220-7851 (Office)
13        214-999-7851 (Fax)
          ajacobsen@velaw.com
14
15   FOR THE DEFENDANTS GARY MORTON KORNMAN AND MICHAEL MARTIN
     KORNMAN:
16
          MR. CHRISTOPHER J. SCHWEGMANN
17        Lynn Tillotson & Pinker, L.L.P.
          750 N. St. Paul Street, Suite 1400
18        Dallas, Texas 75201
          214-981-3835 (Office)
19        214-981-3839 (Fax)
          cschwegmann@lynnllp.com
20
21   FOR THE DEFENDANTS AHRENS & DEANGELI, P.L.L.C., FWP
     TECHNOLOGIES, INC.; EDWARD D. AHRENS; AND DARIN DEANGELI:
22
          MR. PAUL KONING
23        Hughes & Luce, L.L.P.
          1717 Main Street, Suite 2800
24        Dallas, Texas 75201
          214-939-5564 (Direct)
25        214-939-5849 (Fax)
0004
 1   VIDEO TECHNICIAN:
 2        Mr. Tom Hansen
          214-215-3684 (Office)
 3        972-437-6126 (Fax)
 4
 5
 6
 7
 8
 9
10
11
12
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
13
14
15
16
17
18
19
20
21
22
23
24
25
```
0005
```
 1
 2                            I N D E X
                                                        PAGE
 3    Appearances.......................................   3
 4    Exhibit Index.....................................   6
 5    Agreements........................................   8
 6
 7
 8    Witness, GARY MORTON KORNMAN
 9         Examination by Mr. Brandt....................  9
10         Examination by Ms. Jacobsen.................151
11         Reexamination by Mr. Brandt.................221
12
13    Videotape Change:
14         Tape Two.....................................  76
15         Tape Three..................................139
16         Tape Four...................................211
17
18    Changes and Signature............................229
19    Reporter's Certificate...........................231
20
21
22
23
24
25
```
0006
```
 1                        E X H I B I T S
 2    NUMBER          DESCRIPTION                     PAGE
                                                      MARKED
 3     1       10/21/97 Letter to Mr. Kornman           47
               from Gerald Treacy, Jr.
 4
       2       1/6/98 Letter to Mr. Kornman from        47
 5             Gerald B. Treacy, Jr.
 6     3       4/7/99 Letter to Mr. Kornman from        47
               Edward D. Ahrens
 7
       4       10/21/03 to Elaine Harris from           47
 8             Claudia McElwee
 9     5       8/10/00 Fax to Gary Kornman &            47
               Ralph Canada from Ed Ahrens
10
       6       2/22/00 Memo to Gary Kornman from        47
11             Edward Ahrens
12     7       A&D Supp. 1.2 Tape Transcription         47
13     8       A&D Supp. 1.3 Tape Transcription         47
14     9       A&D Supp. 1.4 Tape Transcription         47
15     10      A&D Supp. 1.1 Tape Transcription         47
16     11      11/13/00 Letter to Eileen Ryan           89
```
Page 3

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt

```
17                from Edward Ahrens
        12    A&D Supp. 1.4 Audio CD                103
18
        13    5/2/01 Letter to The Heritage         147
19            Organization, LLC from the IRS
20      14    Advisor Agreement                     152
21      15    A Group of Strategies for Lawrence    187
              Flinn, Jr., (Authority), 10/16/00
22
        16    A Group of Strategies for The         190
23            Flinn Family (Basis Creation
              Model), 10/24/00
24
        17    Estate Planning Agreement             200
25
0007
 1                     E X H I B I T S
 2    NUMBER          DESCRIPTION                   PAGE
                                                   MARKED
 3      18    A Group of Strategies for The         204
              Flinn Family (Basis Creation
 4            Graphics), 10/30/00
 5      19    A Group of Strategies for The         207
              Flinn Family (Loss Creation
 6            Model), 10/24/00
 7      20    A Group of Strategies for The         208
              Flinn Family (LF Trading, LLC
 8            Model), 11/7/00
 9      21    A Family Split Dollar Group of        209
              Strategies for Larry Flinn, Jr.
10            (Split Dollar Analysis), 12/17/01
11      22    12/5/00 Handwritten Notes by Larry    209
              Flinn
12
        23    11/2/01 Meeting with Gary Kornman     209
13            typed notes
14      24    12/11/03 Lawrence Flinn, Jr./Gary     212
              Kornman Conversation regarding IRS
15            Audit typed notes
16
17
18
19
20
21
22
23
24
25
```

```
0008
 1                  A G R E E M E N T S
 2    DEPOSITION OF:  GARY MORTON KORNMAN
 3    DATE:  August 10, 2007
 4    CAUSE NO: 06-01394
                06CC-001173,  Division No. 1
 5              06CC-002321,  Division No. 10
                0622-CC-7221, Division No. 16
 6              07-22-CC885,  Division No. 16
 7
      THIS DEPOSITION SHALL BE TAKEN PURSUANT TO:
 8         (X)  Notice
           ( )  Agreement
```

```
       Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
 9          ( )  Court Order
            ( )  Subpoena
10          (X)  Rules of Civil Procedure
11
     ORIGINAL TO:
12
            ( )  Witness
13          ( )  Witness's attorney
            (X)  Producing attorney
14               (MR. CHRISTOPHER J. SCHWEGMANN)
            ( )  Signature waived
15
16   NUMBER OF DAYS FOR SIGNATURE:
17          ( )  20 days
            (X)  30 days (Due September 14, 2007)
18          ( )  other:
19
     MISCELLANEOUS:
20
            ( )  Any objection made by one party good for
21               all parties.
22          (X)  An unsigned copy may be used at any trial,
                 hearing, or arbitration proceeding.
23
24
25
0009
 1                   P R O C E E D I N G S
 2                   GARY MORTON KORNMAN,
 3   having been first duly sworn, testified as follows:
 4                   EXAMINATION
 5   BY MR. BRANDT:
 6       Q.  Would you please state your name for the
 7   record.
 8       A.  Gary Kornman.
 9               MR. KONING:  Jay, do you want to, before we
10   get started, get our agreement on the record as to the
11   use of this deposition in the various cases?
12               MR. BRANDT:  Do you want to state it?
13               MR. KONING:  Yeah, let me see if I can
14   state it, and you can correct me.  I'm Paul Koning.  I
15   represent Ahrens & DeAngeli, Ed Ahrens, FWP and Darin
16   DeAngeli in the Woodruff and Patterson case.  The
17   deposition has been noticed, as I understand it, in both
18   the Woodruff and Patterson Dallas case, as well as a
19   number of cases in Missouri.
20               In order to accommodate the witness and
21   counsel for the plaintiff, I've agreed to appear despite
22   the multiple notices with the understanding that
23   questioning regarding the Missouri case by counsel for
24   Lewis Rice will not be admissible in the Dallas case and
25   that hopefully at the end of the questions regard -- that
0010
 1   Mr. Brandt has regarding the Dallas case, I'll be able to
 2   ask whatever questions I have briefly.  And then once
 3   that is through, I'll be able to leave and the rest of
 4   the deposition will only be admissible in the Missouri
 5   case.
 6               Is that agreeable to everybody?
 7               MR. BRANDT:  That accurately states the
 8   agreements that I've made with you.
 9               MR. KONING:  Is everybody else okay with
10   that?
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
11                  THE WITNESS:  May I see the deposition
12      notice where I've been noticed, please?
13                  MR. SCHWEGMANN:  We understand that you've
14      made that agreement.  However, we have not made that
15      agreement.  We can only reserve all our rights to object
16      to the agreement.  And Mr. Kornman has been noticed, as
17      we talked about before the deposition started, in the
18      Dallas case, which we believe is the only properly issued
19      notice.  That and pursuant to an order by Judge Cortez is
20      the reason we're here today.
21                  As a result, we don't believe that either
22      of you, respectfully, have any standing to ask any
23      questions today anyway.  If such questions happen, we
24      reserve the right to object to all of them, because the
25      depositions for the St. Louis cases are improperly
0011
1      noticed.  In any event, he's not a party to those cases.
2      But we are here for the deposition notice that's been
3      issued by the Dallas court for which Mr. Brandt noticed
4      and we'll answer his questions today.
5                  MR. KONING:  When you say either of us --
6                  MR. SCHWEGMANN:  Mr. Koning and
7      Ms. Jacobsen.
8                  MR. KONING:  I represent a party in the
9      Dallas case.
10                  MR. SCHWEGMANN:  I see.  Well, in that case
11      we'll talk at a break about that.  But as far as
12      Ms. Jacobsen --
13                  MR. BRANDT:  Now, Chris, that is different
14      from the way Jeff and I discussed doing Mr. Kornman's
15      deposition.  We don't have to do this on the record, do
16      we?
17                  MS. JACOBSEN:  Probably not.
18                  MR. BRANDT:  Do you want to do it on the
19      record?
20                  MR. SCHWEGMANN:  I don't much care one way
21      or the other.  But we're here.  Certainly you should get
22      through your questions.  If we have a fight about
23      questions and who gets to ask them, I'd suggest that we
24      do that later.  Just so we're here, it's 10:00.  Let's
25      get the ball rolling with respect to your questions and
0012
1      see where we are when we get to that.
2                  MR. BRANDT:  Frankly, I think the bulk of
3      my examination is going to be not case specific.  Okay.
4      And I mean that in the sense that, yes, I'm going to ask
5      him a few questions about Woodruff and Patterson.  If
6      what I believe is correct, I think we'll move through
7      that very quickly.
8                  MR. SCHWEGMANN:  I think you're probably
9      correct.
10                  THE WITNESS:  Since I've never met those
11      people.
12                  MR. SCHWEGMANN:  But we can go off the
13      record now and discuss it, if you want.
14                  THE WITNESS:  No.  I want to stay on the
15      record.
16                  MR. SCHWEGMANN:  Let's stay on.
17                  MR. BRANDT:  Let's stay on the record.
18      Maybe at a break -- Jeff asked me to do them all at once.
19                  MR. SCHWEGMANN:  I understand that.  And at
20      a break we can discuss that, if you want.  But in the
21      meantime, since we're on the record and he's here, I

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
22   suggest we proceed with whatever questions you have in
23   the deposition that you noticed.
24                  MR. KONING:  Allison, was my agreement okay
25   with you?
0013
1                   MS. JACOBSEN:  Yes.
2                   THE WITNESS:  And my understanding, for
3    everybody's benefit, since I seem to be the star of this
4    show, this is what I'm here about.
5                   MR. BRANDT:  Yes, sir.
6                   THE WITNESS:  Okay.
7         Q.  (By Mr. Brandt)  "This" meaning the deposition
8    notices that you have in front of you?
9         A.   This in front of me, yes, sir.
10        Q.   Okay.  I got you to say your name.
11        A.   We made some progress.
12        Q.   We got that far already.  Would you tell me
13   your address, sir.
14        A.   My home address is 3640 Haynie Avenue, 75205,
15   City of University Park, Texas.
16        Q.   All right.  And what is your age, Mr. Kornman?
17        A.   63.  Soon to be 64.
18        Q.   How are you employed today?
19        A.   I have a small compensation with a company
20   called Flagstone Management.
21        Q.   All right.  Would you tell us, sir, your
22   educational background starting with your graduation from
23   high school?
24        A.   From 1961 to 1965, I attended Vanderbilt
25   University.  After graduating from Vanderbilt, I attended
0014
1    University of Alabama Law School from 1965 to 1969.
2         Q.   Okay.  Any other education after that?
3         A.   No, sir.
4         Q.   Are you licensed to practice law in any
5    jurisdiction?
6         A.   Yes, sir.
7         Q.   Please tell me the jurisdictions where you're
8    so licensed.
9         A.   You said licensed.  Let me rephrase.  Let me
10   rephrase my answer to that question.  I am a member of
11   the Alabama Bar in good standing at the present.  I do
12   not have a license to practice law -- an occupational
13   license to practice law anywhere in the country,
14   including Alabama.
15        Q.   Have you ever had such a license, sir?
16        A.   I might have had one many, many years ago.  I
17   just don't remember.
18        Q.   All right.  How would you describe your
19   professional occupation over your adult lifetime?
20        A.   Sales.
21        Q.   Sales of what?
22        A.   A variety of different things.  That's a long,
23   long list.
24        Q.   Okay.  Can you give me some examples?
25        A.   Life insurance, disability insurance,
0015
1    participating whole life contracts.  I'll break it down a
2    little more specifically.  Nonparticipating whole life
3    insurance contracts, variable life insurance contracts,
4    some small amount of annuities, mutual funds, services of
5    various kinds.  That's as general as I can be.  There's,
6    you know, lots of different things.
                              Page 7

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 7        Q.   All right.
 8        A.   I've sold potholders.  I've sold magazines.
 9   I've sold lots of different things.
10        Q.   Okay.
11        A.   Sold parsley when I was seven years old.
12        Q.   All right.  Would you describe for me,
13   Mr. Kornman, your relationship, if any, with a company
14   called The Heritage Organization, L.L.C.?
15        A.   I was the chief executive of The Heritage
16   Organization, L.L.C.  I was an employee and chief
17   executive.
18        Q.   And approximately during what time frame, sir?
19        A.   That company, I believe, was formed in 1995.  I
20   don't remember whether it was formed in January or March.
21   I think it began its operations -- its primary operations
22   in March of '95, so that is when I think I became an
23   employee.  I don't know what my position was before that.
24        Q.   Okay.  Do you have an ownership interest in
25   that company?
0016
 1        A.   No, sir.
 2        Q.   Do you know who does own the majority of the
 3   equity in that company?
 4        A.   Yes, sir.
 5        Q.   Who owns the majority of the equity of the
 6   company?
 7        A.   A partnership by the name of Steadfast
 8   Investments, L.P.
 9        Q.   All right.  Are there any other owners of that
10   entity, Heritage Organization, L.L.C.?
11        A.   Yes.
12        Q.   Who are the other owners?
13        A.   A company called Tick Chick, and I don't know
14   the complete name of it.  It's a partnership.  And a
15   company called GMK Family Holdings.
16        Q.   All right.  These entities you've just listed
17   for me, Steadfast, Tick Chick and GMK Family Holdings, do
18   you personally hold any interest in any of those
19   entities?
20        A.   I own the equity in GMK Family Holdings.
21        Q.   All right.  What was the business of The
22   Heritage Organization, L.L.C. while it was operating?
23        A.   Well, it had lots of different businesses.  It
24   performed management services for a number of other
25   companies.  It sold services, educational services.  I'm
0017
 1   sure there's others.  That's just the broadest thing.
 2        Q.   Educational services relating to estate
 3   planning, for example?
 4        A.   That was one of the areas.
 5        Q.   Did it sell educational services regarding tax
 6   shelters?
 7             MS. JACOBSEN:  Objection; form.
 8             MR. SCHWEGMANN:  Same objection.
 9        A.   What do you mean by that?  I mean what do you
10   mean by -- the term tax shelters can be a marital
11   deduction trust.  That's a form of a tax shelter.  I mean
12   an IRA can be a form of a tax shelter.  I don't know the
13   answer to your question.
14        Q.   (By Mr. Brandt)  Okay.  So you're uncomfortable
15   with my use of the term tax shelter because --
16        A.   It's a very generic --
17        Q.   -- it's too -- too generic?
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
18        A.   It's a very broad term.
19        Q.   All right.  Well, along with me, you've sat
20   through some hearings in the bankruptcy of Heritage,
21   right?
22        A.   Painful though they were, yes, I have sat
23   through them.
24        Q.   All right.  And you've heard reference in some
25   of those hearings to so-called 752 transactions?  Have
0018
1    you heard those referenced during testimony in the
2    Heritage bankruptcy case?
3         A.   While I may have heard them, I don't
4    necessarily agree with them.  But I've heard that term.
5         Q.   Okay.  Can you tell me, though, sir, what in
6    your understanding does that refer to, a 752 transaction?
7         A.   You mean you want me to tell you what I believe
8    it would refer to?
9         Q.   Let's start with that.
10        A.   Okay.  I just believe it would involve any
11   partnership transaction where 752 was a relevant
12   provision of the Internal Revenue Code as far as taxation
13   of the partnership.
14        Q.   Okay.  Did Heritage get involved in selling 752
15   transactions to clients?
16        A.   No, sir.
17        Q.   Okay.  Why not?
18        A.   I don't understand your question.  You'll have
19   to rephrase it.
20        Q.   One of the cases we're here on today involves a
21   guy named Larry Flinn.  Do you know Mr. Flinn?
22        A.   Yes, I do.
23        Q.   I'm going to come back to his case later, but
24   he got involved in a tax transaction promoted by
25   Heritage, didn't he?
0019
1              MR. SCHWEGMANN:  Objection; form.
2         A.   No, sir.
3         Q.   (By Mr. Brandt)  In the --
4         A.   The way you framed that question is incorrect.
5         Q.   Okay.
6         A.   That's the reason -- I'm answering your
7    question, not what you may be trying to get to.
8         Q.   You're doing a good job so far.  I appreciate
9    you telling me if you can't answer my questions.
10        A.   All right.
11        Q.   What do you understand the -- the label Son of
12   BOSS has been used in this Heritage bankruptcy as well,
13   hasn't it, sir?
14        A.   I have heard that term used.
15        Q.   What is your understanding of what that refers
16   to?
17        A.   To be honest with you, I have no idea.  It's
18   been thrown around so generally that it could apply to a
19   guy named Boss walking down the street with his son.
20        Q.   Okay.  Well, did The Heritage Organization ever
21   promote to clients tax transactions that would involve
22   Section 752 of the Internal Revenue Code?
23             MR. SCHWEGMANN:  Objection to form.
24             MR. BRANDT:  What's the grounds for the
25   objection?
0020
1              MR. SCHWEGMANN:  I think the term promote
2    is --
                          Page 9

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 3        A.   Yes, that's exactly the objection.
 4        Q.   (By Mr. Brandt)  That's what the problem we're
 5   having with the word promote?
 6        A.   We educate people about various tax strategies.
 7   The term promote has a totally different meaning and I
 8   don't agree with it.
 9        Q.   So to use your language, Mr. Kornman, what you
10   think Heritage did was sell educational services to
11   clients concerning tax transactions that may involve
12   Section 752 of the Internal Revenue Code; would that be
13   correct?
14        A.   Could you restate that?  Let me be sure I got
15   all the pieces of it.
16        Q.   Let me do my best.
17        A.   Okay.  Thank you.
18        Q.   To use what -- I think a term you used a moment
19   ago, in your view Heritage sold educational services to
20   clients concerning tax transactions, some of which may
21   have involved Section 752 of the Internal Revenue Code;
22   is that correct?
23        A.   Well, every time there's a partnership, it
24   could involve 752.  So, we educate people many times on
25   partnerships for either estate tax purposes, investment
0021
 1   purposes or other purposes.  And any partnership could
 2   involve Section 752.  That's what I said before.
 3        Q.   Well, did Heritage get involved in selling
 4   services on specific transactions that did involve
 5   Section 752 of the Internal Revenue Code?
 6        A.   We educated clients on transactions that
 7   involved partnerships.  Therefore, they may have involved
 8   Section 752.
 9        Q.   And was one of those Mr. Flinn?
10        A.   Yes, sir, it was.
11        Q.   Okay.  To your knowledge, does Heritage -- The
12   Heritage Organization, L.L.C., which for the balance of
13   my questions I'm just going to call Heritage.  Is that
14   okay?
15        A.   Well, you know there's three different
16   Heritages, but we'll assume when you say Heritage you
17   mean the L.L.C.
18        Q.   That's the only one I'm referring to.
19        A.   Okay.
20        Q.   Okay.  Does it operate today?
21        A.   Under -- well, does it operate?  There's a
22   bankruptcy trustee.  I don't know whether that's
23   considered operations or not.
24        Q.   You --
25        A.   It has no ongoing business, if that's your
0022
 1   question.  I think that would be your question.
 2        Q.   I'm sorry, I didn't mean to interrupt your
 3   answer.
 4        A.   That's fine.
 5        Q.   Do you remember when Heritage sought protection
 6   under the bankruptcy laws?
 7        A.   I remember that it did happen.
 8        Q.   Who made the decision that Heritage should seek
 9   protection under the federal bankruptcy laws?
10        A.   I don't know.
11        Q.   Did you have any role in that decision?
12        A.   I might have known about it.
13        Q.   Can you identify who did make the decision?
```
Page 10

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
14        A.   No, sir.
15        Q.   How would you describe your role, Mr. Kornman,
16   at Heritage between the years 1998 and 2002?
17        A.   Well, as I said earlier, I was an employee and
18   the chief executive.
19        Q.   All right.  Did you work actively in the
20   business most of the time?
21        A.   Could you define actively?
22        Q.   Every day.
23        A.   Most days, yes, sir.
24        Q.   Okay.  Did you consider that your full-time
25   employment during those years, 1998 through 2002?
0023
1         A.   Well, I was pretty busy.  I did some other
2    things.  I was involved in some other things, but I spent
3    the majority of my time in my activities with Heritage.
4         Q.   Okay.  How would you describe the role of Ralph
5    Canada at Heritage during those same years?
6         A.   Ralph Canada was general counsel from the time
7    he came there.  Acted in the role of general counsel.  He
8    didn't have a card that said general counsel, but that is
9    what he was hired to do, and he advised Heritage on legal
10   matters.  And he was also -- shortly after he came there,
11   he was also the president and the chief operating
12   executive, and he was also a principal and employee of
13   Heritage.
14        Q.   Okay.  In other depositions that I've attended,
15   Mr. Kornman, I've heard that term used, principal of
16   Heritage, and I want to see if you agree with this or
17   not.
18        A.   Okay.
19        Q.   Some other witnesses who were affiliated with
20   Heritage have stated to me under oath that the three
21   principals of Heritage between roughly 1998 and 2002 were
22   Mr. Canada, yourself --
23        A.   Right.
24        Q.   -- and Anthony Bird.  Would you agree with
25   that?
0024
1         A.   That's correct.
2         Q.   Okay.  So Anthony Bird was also a principal.
3    What other role did he have in Heritage during those
4    years, if any?
5         A.   He had a title of executive vice president and
6    he participated in the management of the company.
7         Q.   Okay.  Approximately how many full-time
8    employees did Heritage have between the years 1998
9    through 2002?
10        A.   Very -- greatly fluctuating number.  I couldn't
11   give you an accurate answer.
12        Q.   Could you give me a range?
13        A.   I couldn't give you -- I wouldn't know what the
14   bottom of the range was.  I wouldn't know what the top of
15   range was.  I'm sorry.
16        Q.   All right.  Can you identify who could answer
17   that question?
18        A.   Whoever has the payroll records I'm sure could
19   identify it.
20        Q.   Have those been turned over to the trustee at
21   this point?
22        A.   I believe they have.  I didn't do it, but I
23   think the trustee has got virtually everything.
24        Q.   Ms. Vickie Walker, was she ever employed by

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
25  Heritage?
0025
1          A.   Yes.
2          Q.   How would you describe her role at the company
3  between the years 1998 through 2002?
4          A.   She was the chief financial executive.
5          Q.   All right.  And Ms. Claudia McElwee, was she
6  also employed by Heritage during those years?
7          A.   Yes, she was.
8          Q.   And what was her role at the company?
9          A.   I don't remember what her title was.  I mean
10  I'm not sure.  She may have had a title.  She acted in a
11  high administrative capacity.
12          Q.   Did she ever get involved in assisting you with
13  your work at the company?
14          A.   Only in a minor way.  I mean not -- she -- her
15  primary function with the company was dealing with
16  life -- with certain administrative things, but primarily
17  life insurance underwriting.  And so to the extent I was
18  doing life insurance, I would interact with her.
19          Q.   All right.  Did you have a personal secretary
20  at Heritage between 1998 and 2002?
21          A.   I'm sure I had several assistants.
22          Q.   Can you tell me their names?
23          A.   Barbara Gerry was my primary assistant.  There
24  were some others.  I had people who traveled with me from
25  time to time.  I kind of pulled people in when I needed
0026
1  them.  It was a pretty diverse group.
2          Q.   Can you name any others, sir, that helped you
3  with secretarial services during those years at Heritage?
4          A.   There were quite a few of them.  It's been at
5  least five years, Jay.  I just don't remember all those
6  names.
7          Q.   Okay.  Fair enough.  Why did Heritage file
8  bankruptcy, if you know?
9          A.   I didn't make the decision, so I really don't
10  know.
11          Q.   And you don't know who made the decision?
12          A.   No, sir.
13          Q.   You've recently been convicted of a felony; is
14  that true, Mr. Kornman?
15          A.   I pled guilty to a felony.
16          Q.   Tell us just for the record what the nature of
17  that charge was.
18          A.   I made a statement to the SEC that I didn't
19  know and they claimed that that was a false statement and
20  that's what I pled guilty to.
21          Q.   Okay.  Let me go back to one other -- actually
22  two other persons.  Joseph Von Borghese [phonetic], was
23  he ever employed by Heritage?
24          A.   Yes.
25          Q.   What was his role during the years 1998 through
0027
1  2002?
2          A.   I believe during that period of time he was
3  what we called a contractor.  That's kind of a junior
4  salesman.
5          Q.   Okay.  Is he still employed by Heritage, if you
6  know?
7          A.   I have no idea, but I don't think so.
8          Q.   Do you have any professional relationship with
9  Mr. Von Borghese at the present time?

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
10          A.   No, sir.
11          Q.   Your son Michael Kornman, did he ever work at
12     Heritage?
13          A.   Yes, sir.
14          Q.   Do you remember approximately when?
15          A.   I'm sorry, I don't.
16          Q.   All right.  Can you describe for us what his
17     role at the company was?
18          A.   Kind of chief troubleshooter.  For a while he
19     assisted Mr. Canada in operating the company, special
20     projects, things like that.
21          Q.   Did the law firm of Ahrens & DeAngeli ever
22     provide legal services to Heritage?
23          A.   Yes, sir.
24          Q.   Over what period of time?
25          A.   It was quite a long period of time.  I don't
0028
1      remember exactly when it started.
2           Q.   Okay.
3           A.   I'm sorry, I just don't remember.
4           Q.   Would it be back sometime in the 1990s?
5           A.   Yes.
6           Q.   All right.  Did Ahrens & DeAngeli continue to
7      provide legal services to Heritage up through 2002, if
8      you know?
9           A.   Again, I don't have a clear recollection of the
10     exact time period.  Maybe if I thought about it, reviewed
11     some records, I could figure it out.
12          Q.   Okay.  Can -- I don't want to get into specific
13     matters necessarily, Mr. Kornman, but can you give me a
14     general description of the types of matters that Heritage
15     would seek legal advice on from Ahrens & DeAngeli?
16          A.   I'm sorry, it's been a long time.  I mean just
17     all kinds of matters.  Just whatever -- whenever we
18     needed some legal advice, a lot of times we'd go to them
19     for one of our answers.
20          Q.   Okay.  On estate planning matters?
21          A.   It could have been on estate planning.  It
22     could have been on lots of things.
23          Q.   On income tax strategies?
24          A.   This is a hard question because we had a
25     relationship with Ed Ahrens through another entity, which
0029
1      you're familiar with, FW -- I think it's FWP
2      Technologies.
3           Q.   Yes, sir.
4           A.   And it's hard to distinguish in my mind when he
5      was talking to us and it was related to something we
6      asked him to do for Ahrens & DeAngeli and when he was
7      talking to us related to his functions with FWP.  So
8      that's the confusion I have.
9           Q.   Fair enough.  We're going to look at a couple
10     of exhibits in a few moments that might help us hone in a
11     little bit better about what types of things they did for
12     Heritage.
13               Let's just back up for just a moment.  Tell me,
14     if you would, how long have you had a relationship with
15     Ed Ahrens?
16          A.   Can I rephrase the question myself and ask how
17     long I've known Ed Ahrens?
18          Q.   Yeah, that's fine.
19          A.   I met Ed a long, long time ago on a case in
20     Oakland, California where he was working with Arthur
```
Page 13

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
21  Andersen.  And the San Francisco office of Arthur
22  Andersen brought Ed in to consult with the client on a
23  case in which we were involved in educating them on some
24  estate planning matters.
25     Q.  Okay.
0030
 1     A.  That was the first time I met Ed.
 2     Q.  Do you remember approximately when that was?
 3     A.  I'm sorry, it's been a long, long time ago.
 4     Q.  Back in approximately the 1990s or would it be
 5  earlier than that?
 6     A.  Yeah, it would have been -- well, I'm sorry, I
 7  just don't remember, Jay.  I mean I -- again, this is,
 8  you know, maybe 10 years ago.  So it's hard to remember
 9  the dates and stuff.
10     Q.  All right.
11     A.  I'm sure if I spend the next three days
12  thinking about some of this stuff -- you know, you're
13  hitting me cold with some of these questions and I just
14  don't know the answers to them off the top of my head.
15        MR. SCHWEGMANN:  Jay, do you want to stop
16  for three days and let us think about it?
17        MR. BRANDT:  No, let's not spend three days
18  on it.  I don't think we need to do that.
19     Q.  (By Mr. Brandt)  Did you work on other matters
20  with Mr. Ahrens while he was still at Arthur Andersen?
21     A.  Yes, sir.
22     Q.  Do you remember about when he left Arthur
23  Andersen?
24     A.  No, sir.
25     Q.  When he did leave Arthur Andersen, is that when
0031
 1  he established his firm Ahrens & DeAngeli?
 2     A.  No, sir.  There were some other relationships
 3  in between.
 4     Q.  All right.  Did he go back into a private law
 5  practice after he left Arthur Andersen?
 6     A.  As far as I know he did.
 7     Q.  Okay.  Can you tell us on how many different
 8  matters for clients you worked on those along with
 9  Mr. Ahrens over the years?
10     A.  I'm sorry, I just have no idea.  Never thought
11  about it.
12     Q.  Okay.  Would it be more than 10?
13     A.  Again, I just don't have an answer for you.  I
14  just -- just -- it's not one of those facts I've ever
15  thought about.
16     Q.  Did Lewis, Rice & Fingersh ever perform legal
17  services for Heritage?
18     A.  I believe they did.
19     Q.  Can you tell me approximately over what period
20  of time?
21     A.  Again, I'm sorry, I just don't -- don't
22  remember.
23     Q.  All right.  Can you describe the general nature
24  of the matters for which Heritage would seek legal advice
25  from Lewis, Rice & Fingersh?
0032
 1        MS. JACOBSEN:  Objection; form.
 2        MR. BRANDT:  What's the -- what's the
 3  grounds of the objection?
 4        MS. JACOBSEN:  I don't think he testified
 5  there were several matters.

Page 14

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt

```
 6         Q.  (By Mr. Brandt)  Let's back up.
 7         A.  I think that's privileged information.
 8         Q.  I'm going to try very hard not to get into the
 9    privileged part of it, Mr. Kornman.
10         A.  Well, that would, in my opinion, step over that
11    line.
12         Q.  Okay.  Let me give you a precise question and
13    we'll see.  Do you know how many matters Heritage engaged
14    the firm of Lewis, Rice & Fingersh to provide legal
15    services?
16         A.  Not at this time.
17         Q.  Was it more than one?
18         A.  Probably.
19         Q.  Can you give me a general description, without
20    getting into the substance of the legal advice, what
21    types of matters Heritage would have sought legal advice
22    from Lewis Rice on?
23         A.  I don't believe I can do that.
24         Q.  Why not?
25         A.  Because I believe it's privileged.
0033
 1         Q.  All right.  You're refusing to answer that
 2    question on the grounds of what privilege?
 3         A.  Attorney-client privilege.
 4         Q.  All right.  Do you remember Michael Kornman's
 5    testimony quoted in the Heritage bankruptcy proceeding to
 6    the effect that Lewis, Rice & Fingersh performed legal
 7    services for Heritage up through 2004?
 8              MS. JACOBSEN:  Objection; form.
 9         A.  No, I don't remember that.
10         Q.  (By Mr. Brandt)  All right.  What about
11    Jonathan Blattmachr and the law firm of Milbank Tweed,
12    did Heritage ever seek legal advice from Mr. Blattmachr
13    and his firm?
14         A.  Yes, sir.
15         Q.  Do you know on how many occasions?
16         A.  I have no recollection of that at the present
17    time.
18         Q.  Would it be more than one?
19         A.  Yes, sir.
20         Q.  Do you know over what period of time Heritage
21    may have obtained legal services from Milbank Tweed?
22         A.  I have known Jonathan Blattmachr for many, many
23    years; and it well could have started before Heritage.
24    It -- I've known Jonathan Blattmachr, I believe, from
25    before Heritage was even formed.  So, it could well have
0034
 1    been any time from the beginning of Heritage forward.
 2    And it could have been -- I mean he's a personal friend
 3    of mine as well as an attorney.
 4         Q.  What is his area of legal practice?
 5         A.  Tax and estate planning.
 6         Q.  All right.  Can you give me some idea of the
 7    general nature of matters on which Heritage sought legal
 8    advice from Milbank Tweed?
 9         A.  No, sir.  I mean, again, if it was Jonathan
10    Blattmachr it was -- you know, other than the fact it was
11    in those general categories of estate planning, tax
12    matters, those types of things.
13         Q.  Did Heritage ever get Michael Mulligan from
14    Lewis Rice and Mr. Blattmachr from Milbank Tweed involved
15    to work jointly for a client?
16              MS. JACOBSEN:  Objection; form.
```

Page 15

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
17        A.   I don't remember what may have been all
18   instances.  I know that Larry Flinn hired both of those
19   gentlemen to work on his matters that he wanted to be --
20   he wanted to get opinions on, on legal matters that
21   Heritage was -- had educated him on, he wanted other
22   opinions.  He hired Mike Mulligan who, I believe, gave
23   him written opinions; and Jonathan Blattmachr, I believe,
24   gave him verbal opinions.
25        Q.   (By Mr. Brandt)  Okay.  Do you know of any
0035
 1   other instances where both of those lawyers, Mr. Mulligan
 2   and Mr. Blattmachr, were involved working on a matter for
 3   a client?
 4        A.   Another one now comes to mind.  There was a
 5   gentleman by the name of Dan Koshland, and I remember him
 6   because he was our first billion dollar customer.  And
 7   Jonathan Blattmachr was the primary lawyer.  And then
 8   after he had talked to Jonathan Blattmachr, he hired Mike
 9   Mulligan to give him a second opinion.  I believe Mike
10   gave him a written opinion.  I don't believe -- I don't
11   believe Blattmachr ever gave him a written opinion.  He
12   didn't think -- he also hired some other attorneys, by
13   the way.  Those weren't the only two he hired.
14        Q.   Okay.  Over the years, Mr. Kornman, has Michael
15   Mulligan or the law firm of Lewis, Rice & Fingersh ever
16   done legal work for you personally or other members of
17   your family?
18        A.   I vaguely remember that they -- I may have
19   either asked them some questions or they may have done
20   some legal work relative to other members of my family;
21   my mother or something like that.
22        Q.   Okay.  How about Jonathan Blattmachr and
23   Milbank Tweed, have they ever done legal work for you
24   personally or maybe other members of your family?
25        A.   Again, same kind of thing.  I believe that they
0036
 1   may well have.
 2        Q.   All right.
 3        A.   But that's a period of 15 or 20 years, so who
 4   knows.
 5        Q.   Has Ed Ahrens ever done any legal work for you
 6   personally?
 7        A.   Again, I just don't remember, Jay.  It wouldn't
 8   have been impossible for any of those people who I talked
 9   to on a fairly regular basis for me to say, This is for
10   me personally or some family member.  It's just too long
11   a time to know what they actually did and for whom.
12        Q.   Okay.
13        A.   So my answer is definitely maybe.
14        Q.   Mr. Kornman, we're going to take a break in a
15   minute and I'm going to get my exhibits organized and
16   show them to you.  But some of the things I'm getting
17   ready to show you appear to be transcripts of tape
18   recorded conversations.  Okay?
19        A.   Okay.
20        Q.   Before we get into the specific ones, I wanted
21   to talk with you for a few moments about what practices
22   Heritage followed about taping the conversations.  Okay?
23        A.   Okay.
24        Q.   Do you have any knowledge of any regular
25   practices of Heritage in that regard?
0037
 1                 (Outside interruption.)
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt

```
 2              THE WITNESS:  Excuse me.
 3              MR. SCHWEGMANN:  Let me --
 4       A.  You used the term "regular"?
 5       Q.  (By Mr. Brandt)  Yes, sir.
 6       A.  I think that's a real loose term.  I have some
 7  idea of what happened some time.  I don't think there was
 8  a "regular" practice of anything.
 9       Q.  Would you tell me then, sir, at Heritage -- and
10  we can focus on 1998 through 2002.  And then if it
11  changed at some point, we'll talk about that in a moment.
12  But what is was your understanding about practices of
13  Heritage about taping telephone conversations during that
14  time?
15       A.  Heritage had some very strict policies about
16  not recording in states where you could not record
17  without the permission of both parties.  The better way
18  to say it is -- and that's the reason I say it wasn't
19  regular.  Sometimes Heritage recorded in states where you
20  could record with both parties' permission, with -- and
21  they had their permission.  Sometimes they recorded in
22  states where you could record with one party's knowledge.
23  And, unfortunately, I couldn't say anything was regular.
24  Different people did different things at different times.
25       Q.  Well, did you ever get involved, Mr. Kornman,
0038
 1  in establishing any policies for Heritage about how
 2  telephone conversations would be taped?
 3       A.  I got involved in the policies I've just
 4  outlined to you.
 5       Q.  Okay.  Specifically some states don't allow
 6  it --
 7       A.  Right.
 8       Q.  -- without consentable parties?
 9       A.  Right.
10       Q.  Could you identify those states?
11       A.  I could have at one time, Jay, but that's not
12  one of those things that I've kept in my -- cluttered my
13  mind with in five years.
14       Q.  Okay.  I can understand that.  Was there ever a
15  list prepared of the state jurisdictions where that would
16  be prohibited unless both parties consented?
17       A.  I believe there was somebody at Heritage
18  responsible for keeping such a list and making sure it
19  was up-to-date.
20       Q.  And who would that have been?
21       A.  I don't remember at this point.
22       Q.  Physically can -- where Heritage would tape
23  telephone conversations without the consent of the other
24  party on the telephone, how physically was that
25  accomplished?
0039
 1              MR. SCHWEGMANN:  Objection; form.  You can
 2  answer.
 3       A.  I don't know.  You're saying Heritage.  You
 4  know, different individuals did what they did in
 5  different ways, so I have no idea.
 6       Q.  (By Mr. Brandt)  Well, let's talk about how you
 7  did it.  Okay?
 8       A.  Now there's a real variable.  Go ahead.
 9       Q.  How did you usually do it?
10       A.  I didn't usually do it.  Okay.
11       Q.  I take from your -- and I don't mean to
12  interrupt you.  But I take from your answer so far you're
```

Page 17

Kornman Gary 08-10-07 Vol 1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
13   saying you didn't have any regular practice?
14        A.   Well, when you say regular, that's the point.
15   Many times -- I had the ability to record a lot of
16   different phone calls.  For example, from my home I had a
17   tape recorder there and I could turn it on, if I wanted
18   to.  Sometimes I did.  Sometimes I didn't.
19             I threw -- if you've seen all these tapes,
20   there's thousands of them and many of them are unlabeled.
21   I would throw them in a box or a drawer or something and
22   never listen to them again, never even know who they were
23   with.
24             So it was very irregular procedures.  I mean it
25   wasn't a procedure.  It was a very irregular practice.
0040
1    And I might have done the same thing at my office from
2    time to time, but it was very rare that I did that.  If I
3    did it, it was primarily with attorneys that were trying
4    to tell us something and they were dealing with very
5    technical matters.  And I would sometimes record those
6    conversations and sometimes keep them and sometimes not.
7         Q.   When you did record them, Mr. Kornman, did it
8    always involve a physical tape?
9         A.   No, sir.
10        Q.   Did you ever use some other mechanism to record
11   those conversations other than a tape?
12        A.   Yes, sir.
13        Q.   What would the other mechanism be?
14        A.   I don't remember when it was, but Sony came out
15   with a memory chip.  In fact, I happen to have one right
16   here if you want to see what one looks like.
17        Q.   Sure.
18        A.   This is a later -- later thing.  That's what I
19   call a Sony memory stick.
20        Q.   Okay.  And that device you've just showed me in
21   that --
22        A.   Dictating unit.
23        Q.   -- dictating unit works off a memory card.
24   It's very similar to what you might see in a digital
25   camera or some other application?
0041
1         A.   It's a variation of that, yes, sir.
2         Q.   Okay.  Are you recording us here today?
3         A.   He is, I hope.  She is.  I don't need to do
4    that.
5         Q.   So you don't need to?
6         A.   No.  I already know what I'm going to say and I
7    figure you'll tell me the questions.
8         Q.   All right.  Let's -- how long have you used
9    this device with a memory card?
10        A.   Sony came out with those -- this is about third
11   generation equipment.  Jay, I don't know.  Maybe -- maybe
12   it started in '98, '99, 2000, somewhere along in there.
13        Q.   Okay.  Let me now turn to the notion of
14   transcribing tapes.
15        A.   Okay.
16        Q.   Let's just focus on what you did and then I'll
17   try to see if we can extrapolate from there.  Okay?
18        A.   Okay.
19        Q.   How would you go about deciding which taped
20   phone conversations you wanted to have a transcript
21   prepared of?
22        A.   I almost never did that.  If you'll pardon me
23   for being -- adding a little levity, I had a friend when
```
Page 18

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
24    I was very active in the insurance industry.  And when he
25    would see me recording somebody at a seminar or something
0042
 1    to that nature, he would pick up my recorder and say, If
 2    you ever listen to this recording at any time, day or
 3    night, please call me at the following numbers; and so
 4    far he's never had a call.
 5         So that gives you an idea of while I developed
 6    a habit in law school of taping because I didn't take
 7    notes -- not very many notes, let's put it that way.
 8    It's just something -- it's a security blanket.  It's my
 9    teddy bear.
10    Q.   Okay.
11    A.   But sometimes you -- you know, you have your
12    teddy bear and it's just sitting there on the bed and you
13    don't use it.  I never really used it very much.
14    Q.   So I take from your answer -- in the first part
15    of your answer, sir, you said you almost never had
16    transcripts prepared of these taped conversations; is
17    that fair?
18    A.   It would be a relatively -- not never.  But it
19    would be a real, real, real small percentage.
20    Q.   Okay.  The ones that you did have transcripts
21    prepared of, I've got some of them.  Okay?
22    A.   Good.
23    Q.   And why would you select certain conversations
24    to transcribe and not others?  That's what I'm trying to
25    get at.
0043
 1              MR. SCHWEGMANN:  Let me object to form.
 2    You can answer.
 3    A.   There was something I was interested in.
 4    Q.   (By Mr. Brandt)  All right.  Did you ever give
 5    any instructions to other representatives of Heritage
 6    about how they should tape telephone conversations?
 7    A.   I mean the general policies?  I just said what
 8    we -- I gave you the general policies about not recording
 9    in states where you weren't supposed to record without
10    permission from both parties.  I think that's pretty much
11    it.
12    Q.   Well, other than those states where consent was
13    required by the other party on the phone, did Heritage
14    have any policy about recording conversations in other
15    states?
16              MR. SCHWEGMANN:  Objection to form.  You
17    can answer.
18    A.   You keep say policies.  I'm telling you that
19    this -- that -- we would -- we would have liked to have
20    things recorded where it might have been beneficial.  For
21    example, if an initiator went out to a meeting or a
22    principal went out to a meeting, like Ralph Canada or
23    Anthony Bird, and it was a pre-client meeting, in other
24    words it was a marketing meeting, we tried to get people
25    to record those meetings where it was legal.  They
0044
 1    invariably sporadically did and sporadically didn't.
 2    Q.   (By Mr. Brandt)  Okay.  I've been trying to
 3    focus so far on telephone conversations and then I was
 4    going to come to meetings next.  Okay.
 5         Going back to just telephone conversations, did
 6    Heritage have a policy that required taping of telephone
 7    conversations with prospective clients in states where
 8    that was permitted without consent of the other party?
                            Page 19

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 9              MR. SCHWEGMANN:  Objection; form.
10     A.  Okay.  First of all, you had different people
11 at Heritage doing different functions.  And there was
12 more taping of conversations by a group of telemarketers
13 than there was anybody else.
14     Q.  (By Mr. Brandt)  All right.
15     A.  There was no hard and firm policy for any
16 other -- not policy, but procedure, availability, I would
17 say, for anybody else in the company.  In other words, we
18 wanted to make sure that people were not saying something
19 that was untrue or puffing and so we recorded -- the
20 group that had the most conversations recorded would have
21 been the telemarketers.
22     Q.  Okay.  And it sounds --
23     A.  There was no -- there was no definite
24 arrangement.  In other words, the telemarketers all had
25 tape recorders on their desks.
0045
 1     Q.  Yes, sir.
 2     A.  So they were supposed to use those.  Now,
 3 sometimes they didn't, sometimes they did.  But that
 4 was -- the theory was they were supposed to use those
 5 when they were following the various state rules.  To my
 6 knowledge, nobody else was so definitely -- their
 7 physical arrangements were not so definite that they did
 8 that.  They could have done it at any time, because
 9 everybody in the company had recorders.
10          So if somebody choose for whatever reason to
11 themselves -- just like I did.  I had a recorder.  I
12 could use it, I could not use it.  It was up to me.  They
13 were -- everybody else was in the same position.
14     Q.  Okay.  Well, let's focus on the telemarketers
15 for just a moment.  It sounds as part of your answer,
16 Mr. Kornman, like this was used as a quality control
17 procedure.  Is that fair?
18     A.  That's fair.
19     Q.  Okay.  What was the practice about transcribing
20 the telemarketers' calls?  Would they all be transcribed
21 or just certain select ones?
22     A.  I don't remember to be honest with you.  I know
23 there was some selection.  I don't know what that
24 criteria was.
25     Q.  Do you know who was responsible for formulating
0046
 1 that criteria?
 2     A.  No, sir, I don't.  I wasn't responsible for
 3 those types of -- there were people way down in the
 4 company that was involved in that.
 5     Q.  Do you know if Claudia McElwee had any
 6 involvement in that part of the business?
 7     A.  I really don't.
 8     Q.  Okay.  Do you know who would know the answer to
 9 the question who was the person that formulated the
10 criteria about which tapes would be transcribed?
11     A.  Whoever did it would probably know.  I don't
12 know who that was.
13     Q.  In the -- we had a hearing in bankruptcy in
14 June.  We were all down there for a week, right?
15     A.  Great fun.
16     Q.  And you were there most every day, right?
17     A.  Uh-huh.
18     Q.  As part of that proceeding, some taped
19 conversations were played in court, weren't they?
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
20        A.   They may have been.  I -- it was kind of a
21   blur.
22        Q.   Do you recall that some transcripts were also
23   offered in evidence?
24        A.   I believe so.
25        Q.   And counsel for GMK Holdings stipulated to the
0047
1    authenticity of those transcripts, didn't it?
2                   MR. SCHWEGMANN:  Object to the form.
3                   MS. JACOBSEN:  Objection; form.
4         A.   I don't remember.  I don't know what counsel
5    stipulated to.  It's just not something I was involved
6    in.
7                   MR. SCHWEGMANN:  Do you have that with you,
8    Jay?
9                   MR. BRANDT:  I don't.  I'm just trying to
10   see if he remembers.
11                  MR. SCHWEGMANN:  Sure.  I was just curious.
12        Q.   (By Mr. Brandt)  You don't remember that?
13        A.   No.  That's what we had lawyers for.
14                  MR. BRANDT:  Okay.  Why don't we take about
15   a five-minute break here?  Let me get some of these
16   stapled and organized and then we'll continue.
17                  MR. SCHWEGMANN:  I need 10 because I need
18   to sign a pleading.
19                  MR. BRANDT:  Ten is fine.
20                  THE VIDEOGRAPHER:  We're off the video
21   record, 10:45.
22                  (Recess from 10:45 to 11:05.)
23                  (Exhibit Nos. 1 through 10 marked.)
24                  THE VIDEOGRAPHER:  Back on the video
25   record, 11:05.
0048
1         A.   Did you get everything stapled, Jay?
2         Q.   (By Mr. Brandt)  I think I did.  We'll see how
3    it works out here.
4         A.   Okay.
5         Q.   Okay.  Mr. Kornman --
6         A.   You can call me Gary.  We've been around long
7    enough we don't have to be very formal here.
8         Q.   We've resumed your deposition.  Let me hand you
9    what I've marked for identification as Exhibit 1 to your
10   deposition.
11        A.   Okay.
12                  MR. BRANDT:  And, counsel, these -- I
13   haven't marked your copies, but they should be in the
14   proper order.
15        Q.   (By Mr. Brandt)  And take all the time you
16   would like to review it.  I'm going to ask you a few
17   questions about it.
18        A.   Sure.
19        Q.   This is dated back in October 1997, correct?
20        A.   Yes, sir.
21        Q.   And do you remember receiving this letter?
22        A.   Yes, sir.
23        Q.   Okay.  It's actually from Mr. Gerald Treacy,
24   correct?
25        A.   Uh-huh.
0049
1         Q.   Am I pronouncing his name right?
2         A.   Yes, Treacy.  Jerry Treacy is what he went by.
3         Q.   It looks like he and Mr. Ahrens were partners
4    in a law firm at the time; is that correct?
Page 21

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 5       A.   Yeah.  That's what I said earlier when I said
 6  there were several iterations of his law firm.
 7       Q.   Does this letter generally address a strategy
 8  involving a basis bump involving partnerships in Section
 9  752?
10       A.   I don't know what this involved.  And the
11  reason I don't know is this -- we never got anywhere on
12  this.
13       Q.   And what do you mean by that, Mr. Kornman, that
14  you never got anywhere on the matters referenced in
15  Exhibit 1?
16       A.   May I read this just a second?
17       Q.   Yes, sir.
18       A.   I don't know what this involved.  I think it
19  involved -- my best recollection -- that's all I can give
20  you.  It's been 10 years ago -- was that this involved
21  some estate-type transaction and Jerry Treacy --
22            THE WITNESS:  This isn't privileged, is it.
23       A.   Let's just say he wasn't terribly reliable and
24  he had a lot of far-out ideas.  And after looking at this
25  idea in greater detail, we thought it was unusual and
0050
 1  ineffective.  Are those polite terms?
 2       Q.   (By Mr. Brandt)  Okay.
 3       A.   I don't even remember what this was, but I just
 4  remember we never -- we never got anywhere with him.  He
 5  was trying to sell us various ideas.  This was one of
 6  them and nothing ever came of this at all.  It was not --
 7  to my best recollection, it had nothing to do with income
 8  tax.  It was an estate tax transaction.
 9       Q.   Okay.  The letter summarizes a meeting you had
10  with Mr. Treacy and Mr. Ahrens, doesn't it?
11       A.   I don't think so.  I think it was a telephone
12  conversation.  Well, no -- by phone.  See on the very
13  first line?
14       Q.   Okay.  It does say by phone.  You're right.
15  There's a reference in the second paragraph, Mr. Kornman,
16  to a price of $50,000.  Do you see that?
17       A.   Right.
18       Q.   To your knowledge, did Heritage ever pay --
19       A.   No.
20       Q.   -- these guys $50,000 for what is addressed
21  here?
22       A.   I don't remember paying it.
23       Q.   Okay.  On the second page of this exhibit,
24  right towards the end --
25       A.   Like I said, Treacy sometimes exaggerated the
0051
 1  facts.
 2       Q.   Do you think he did so in this exhibit?
 3       A.   Yes.
 4       Q.   Which facts in particular?
 5       A.   Well, I mean this thing that I agreed to pay
 6  $50,000.  It wasn't my nature to pay $50,000 for people
 7  just to tell me something.  If -- because we never knew
 8  whether it was going to be any good.  They could tell us
 9  the sun was coming up tomorrow and that was for certain.
10  And, you know, you didn't know what you were getting for
11  that kind of money.  So we would -- many times we would
12  tell people if we use something, we will pay you for it.
13  But we never used this.  Never even got close.
14       Q.   The redactions on the document, by the way,
15  Mr. Kornman, were apparently placed on there by counsel
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
16   for the bankruptcy trustee in the Heritage bankruptcy.
17       A.   Whatever.
18       Q.   All right.  Right above that sentence where it
19   talks about -- if I understand correctly from your
20   answer, you don't think you ever agreed to pay $50,000
21   for whatever ideas addressed by this letter.  Is that
22   correct?
23       A.   That's absolutely correct.
24       Q.   All right.  In the sentence right before the
25   reference to --
0052
1        A.   I don't remember doing it, Jay.  I mean that's
2    the basic thing.  It's 10 years ago.
3        Q.   Yeah.
4        A.   And I don't remember and that's about all I can
5    say.  I'm not really sure.  I'm not really not sure.  But
6    it just doesn't sound like something I would have done.
7        Q.   Okay.  Did Mr. Treacy ever have any involvement
8    in the transaction involving partnerships and the basis
9    bump?
10       A.   Well, don't use the term basis bump.  If you
11   want to know did he have -- did he ever give us any ideas
12   regarding partnerships, the answer -- the answer to that
13   part of your question -- I'm not going to chastise you
14   for a compound question.  But the answer to that part of
15   the question is:  He had nothing to do with part -- we
16   never discussed anything to do with -- to my recollection
17   to do with partnerships.
18       Q.   With Mr. Treacy?
19       A.   Yes.
20       Q.   All right.  Now, you didn't like my use of the
21   term basis bump.  Tell me why.
22       A.   Because it's just a -- nobody knows what it's
23   -- it's like tax shelter.  What the hell does it mean?
24       Q.   Did -- you were acquainted with Ed Ahrens by
25   the time of this letter, weren't you?
0053
1        A.   Sure.  Sure.
2        Q.   Had you known him for a number of years by
3    1997?
4        A.   It goes back to what I said earlier, Jay.  I
5    just don't remember.  I mean I know when I first met him.
6    I don't remember when that was.  I'm sure we could go
7    look through a bunch of documents and figure that out,
8    but I just don't have an idea off the top of my head.
9        Q.   Okay.
10       A.   It was longer than 10 years ago.
11       Q.   Well, let me just finish this off, Mr. Kornman.
12   Here is what I've marked as Exhibit 2 to your deposition.
13       A.   Could you please go to Gary?  I can't keep
14   calling you Jay if you keep calling me Mr. Kornman.  He
15   was father.  He was a great guy.
16       Q.   All right.  I'll -- I'll give it a try.
17       A.   Thank you.
18       Q.   Okay.
19       A.   You'll find out I'm not half as bad and mean
20   and terrible as all those people said in bankruptcy
21   court.  I'm sorry to disappoint you.
22       Q.   Exhibit 2 --
23       A.   Okay.
24       Q.   -- is -- at the top of the page it says
25   Fermata, right, on the first page?
0054

Page 23

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
1        A.   Yeah, I see that.
2        Q.   Yeah.  And I -- this appears to be from
3   Mr. Treacy as well, doesn't it?
4        A.   Uh-huh.
5        Q.   Do you have any recollection of this document?
6        A.   All I can say is this strikes me as one of
7   Treacy -- I mean Jerry Treacy's pie-in-the-sky deals.
8   This again --
9        Q.   Well, let me back up, okay, Gary.  It's dated
10  January 6 of 1998, correct?
11       A.   Yeah.
12       Q.   Do you know if you ever received this letter
13  from Mr. Treacy?
14       A.   It's likely that we did.
15       Q.   In the second line, sir --
16       A.   It looks like it was faxed to somebody.
17       Q.   Yeah.  In the second line there's a reference
18  to marketing Ed's capital gains strategy.  Do you see
19  that?
20       A.   Right.
21       Q.   And it goes on to propose a -- giving Heritage
22  an exclusive right to market a strategy, correct, sir?
23       A.   Uh-huh.
24       Q.   And this proposed that there be a $350,000
25  payment to Fermata, Inc. for that right to market
0055
1   whatever strategy he's discussing; is that correct, sir?
2        A.   Uh-huh.
3             MR. SCHWEGMANN:  Is that correct in the
4   sense it's written here?
5        A.   It's written -- yes, it is written here.
6   That's -- yes, it is written here.  This whole letter is
7   -- pardon me for saying -- using a Texas term.  It's
8   nothing but BS.  Nothing ever happened, again.  To my
9   knowledge, none of these payments were ever made.
10            This is absolutely preposterous, because there
11  was a nonrefundable royalty payment for the use of the
12  strategy in paragraph two of 20 percent of the gross fees
13  we charged.  Well, that's absurd.  I would have never
14  paid that kind of money.
15            I mean this whole letter is just Jerry's pie in
16  the sky.  It's just absolute fiction.  As far as me
17  agreeing to anything like this, it is absolute fiction.
18       Q.   So your testimony is you never agreed to any of
19  this?
20       A.   No, absolutely not.  I mean many times he would
21  give us -- Jerry Treacy -- ideas flew off him like sparks
22  off a grinding wheel, and many times they had the same
23  life expectancy.  In other words, his -- his ideas just
24  flamed out very quickly when they were put under a
25  microscope.  Are we through with this?
0056
1        Q.   Yes, sir.
2        A.   I know I was about 10 years ago.
3        Q.   But you're quite definite you never agreed to
4   anything in Exhibit 2?
5        A.   Quite definite.
6        Q.   All right.  Let me next hand you what I've next
7   marked as Exhibit No. 3.  And take a look at that --
8        A.   Let me put it this way.  It's been 10 years,
9   but I was demented at the time if any of that really
10  happened.  Okay.  So does mental incompetency count?
11       Q.   All right.  Let's take a look at what I've
                           Page 24

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
12  marked as Exhibit 3, Mr. Kornman -- Gary.
13      A.   Thank you.  I appreciate that, Jay.
14      Q.   And this is dated April 7, 1999, correct?
15      A.   Yes.
16      Q.   Do you think you received it shortly after
17  that?
18      A.   Probably.
19      Q.   There's a draft purchase agreement attached to
20  the letter, correct, sir?
21      A.   Uh-huh.
22      Q.   Do you remember reading this agreement before?
23      A.   I've seen it.
24      Q.   And it involves Heritage and FWP Technologies;
25  is that correct?
0057
 1      A.   Uh-huh.
 2      Q.   And did you understand back then that FWP
 3  Technologies was an entity that had been created by
 4  Mr. Ahrens?
 5      A.   Uh-huh.  Yes, sir.  I'm sorry, I don't mean to
 6  shake my head.
 7      Q.   Do you know if this agreement ever got signed?
 8      A.   I'm sure it didn't.
 9      Q.   You said sure it did not?
10      A.   To my -- let me put it this way.  To my best
11  recollection, it never got signed.
12      Q.   Do you know why?
13      A.   Again, because the techniques were either
14  already known -- if this cash realization trust is what I
15  think it is, it was a short-term charitable remainder
16  trust that I already knew about.  And the S corporation
17  CRT didn't have much applicability.
18           And, again, I mean people came to us.  This was
19  not uncommon.  Ed, Jerry and other people came to us
20  frequently and tried to give us -- tried to sell us
21  ideas.  And as typical of this, they usually involved a
22  big front-end payment.  Here this one is $400,000.  They
23  involved a big front-end payment.
24           And we would talk to them and then we would
25  look at the things and see if we either -- there were
0058
 1  basically two or three things we did.  We checked to see,
 2  first of all, if we thought it had any validity, if we
 3  wanted to use it, if we thought it was a reasonable
 4  transaction.  And then, second of all, we wanted to see
 5  if there was any market for it.
 6           So consequently people sent out agreements and
 7  stuff like this.  Obviously Treacy was more prolific than
 8  anybody else, but -- for many things that we never even
 9  got involved in, other than just here it is, look at it.
10      Q.   Okay.  So you don't think Exhibit 3 ever got
11  signed with FWP Technologies, right?
12      A.   Not to my knowledge.  Not to my remembrance.
13      Q.   Well, did Heritage make some payments to this
14  entity, FWP Technologies, over time?
15      A.   Yes, sir.
16      Q.   What was that for?
17      A.   It was for an investment transaction.
18      Q.   And what was the nature of that investment
19  transaction?
20      A.   Ed was the fellow who introduced us to the
21  short sale investment transaction, which in addition to
22  having economic substance, had some tax benefits.  And he
                          Page 25

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
23   was the first one that brought it to our attention and
24   then we vetted it and that's when we came across the
25   Turner Communications/Fulcrum case and the Florida Power
0059
1    & Lights Case/Salina case.
2            And my understanding from him was that that was
3    originally done by Arthur Andersen in some way.
4    Although, those cases seem to me to be both generated out
5    of King & Spaulding, but Arthur Andersen may have been
6    involved.  So that's -- Ed brought us the idea and we
7    used it.  We used it to educate clients and we paid him
8    for it.
9       Q.   Okay.  And let me hand you the next exhibit,
10   Mr. Kornman, which I've marked as Exhibit 4.
11      A.   And sometimes the payments went to Ahrens &
12   DeAngeli early on and sometimes they went to FWP, to
13   answer your question.
14      Q.   And I think that's what's going to be confirmed
15   by Exhibit 4, if you'd take a look at that.  For the
16   record, it's a letter dated October 21, 2003; is that
17   correct, sir?
18      A.   Yes, sir, that's what it says.
19      Q.   It's got a schedule.  The second page of
20   Exhibit 4 is a schedule of legal fees paid by The
21   Heritage Organization to both Ahrens & DeAngeli and FWP
22   Technologies; is that correct?
23      A.   Yes, sir, that is what it looks like.
24      Q.   And is this a summary of the payments that you
25   just referenced to Mr. Ahrens or FWP?
0060
1       A.   Yes, sir, that's correct.
2       Q.   So, if I understand your testimony correctly,
3    Heritage would have paid these sums of money to Ahrens &
4    DeAngeli or FWP.  Would it have each time it had a client
5    implement one of these short sale transactions?
6       A.   No, sir.  You can see there are very many.
7    There are some large transactions of a lump sum nature.
8    And I basically tried to figure out, on a very loose
9    basis, what was fair and sent them a check.
10      Q.   Okay.  And would these funds have come out of
11   whatever fees were paid to Heritage by clients who did
12   one of these short sale transactions?
13      A.   No, not directly.  That was what was taken into
14   account in determining the fee or other matters.  As you
15   can see, there's a lot of different things.  You asked
16   whether they did legal work for us.  Obviously there's a
17   lot of fees that you don't get a 27 cent fee for a client
18   transaction.  I mean you see one about three-quarters of
19   the way down, $121,531.27?
20      Q.   Yes, sir.
21      A.   That obviously had nothing to do with a client.
22      Q.   Okay.  There are several on here a million
23   dollars or more, aren't there?
24      A.   Yeah.  And that's when I determined it was
25   appropriate to make that kind of payment based on what
0061
1    had happened.
2       Q.   Is there a reason why some of the payments are
3    to FWP and some of the other payments are to Ahrens &
4    DeAngeli?
5       A.   Yeah.  That's what they told us they wanted --
6    where they wanted the payments to go.  That's where Ed
7    told us he wanted the payments to go.
                          Page 26

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt

```
 8         Q.   Ed being Ed Ahrens?
 9         A.   Yes.
10         Q.   This letter was sent to the Internal Revenue
11   Service by Heritage, right, Mr. Kornman?
12         A.   I don't know anything about it other than the
13   fact it's got Claudia McElwee's signature on it and I
14   presume it's correct.  You know, I didn't do anything
15   about -- I mean didn't -- see, I don't know that I've
16   even seen this letter since -- other than this particular
17   time.
18         Q.   You don't think you've seen this before?
19         A.   I don't remember it, but it's not -- I mean I
20   could have.  I may have.  I may not have.  I don't want
21   to be specific one way or the other, Jay.  It's just -- I
22   mean we've sent so much stuff to the service it's
23   literally boxes full.
24         Q.   Did you review this letter before it was sent
25   out?
0062
 1         A.   I don't remember doing that.
 2         Q.   Do you have any reason to believe the summary
 3   attached to page two of Exhibit 4 is incorrect?
 4         A.   I would have no knowledge.  I wouldn't --
 5   that's not information I would have knowledge of.  I mean
 6   did we send them money?  Yes.  I know that to be a fact.
 7   Did we send them the amounts that are shown there?  I do
 8   not know.
 9         Q.   You don't have any reason to believe that
10   Ms. McElwee would supply incorrect information to the
11   Internal Revenue Service, do you?
12         A.   Definitely not.
13         Q.   Before we move on, let me ask you a few
14   specific questions about Paul Woodruff and Kent
15   Patterson.  They -- do you know that they got involved in
16   doing a short sale of treasury notes?
17         A.   I know that Heritage -- the only thing I know
18   as a positive fact is that Heritage received some fees
19   from those gentlemen.
20         Q.   Okay.  Have you ever met either Paul Woodruff
21   or Kent Patterson?
22         A.   No, sir.
23         Q.   Do you know if you've ever spoken to either one
24   of them?
25         A.   I don't believe I have.
0063
 1         Q.   Can you identify the principal at Heritage who
 2   worked on their transaction?
 3         A.   I believe it was Mr. Canada; Ralph Canada.
 4         Q.   And what's the basis for that belief?
 5         A.   He received compensation on that case.
 6         Q.   Okay.  And you don't think you ever had any
 7   contact with either Paul Woodruff or Kent Patterson?
 8         A.   If they walked in the room today, I wouldn't
 9   know them.
10         Q.   Do you know if they were referred to Ed Ahrens
11   to get legal advice in connection with their transaction?
12         A.   I'm sorry, Jay, I know nothing about that case.
13         Q.   Right.
14         A.   Other than we were paid some fees.
15         Q.   Did Mr. Canada ever discuss with you their
16   inquiry made -- their meaning Paul Woodruff and Kent
17   Patterson, inquiry made to Mr. Canada to refer them to a
18   second law firm for a second opinion on the transaction?
```

Page 27

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
19      A.   No, sir.
20      Q.   You never heard that before?
21      A.   No.
22      Q.   All right.
23      A.   I really don't.  I mean I was out busy doing my
24   own cases and I didn't get involved in Canada's case
25   unless he asked me to.  He never -- other than the fact I
0064
 1   knew he was working on it and they sent us a fee, I knew
 2   nothing else.
 3      Q.   As between you and Mr. Canada and Mr. Bird, was
 4   there any formal understanding about which principal
 5   would approach which clients?
 6      A.   Formal, no.  I think we had an informal
 7   arrangement that obviously I took the largest ones or
 8   sometimes we would allocate them based on geography.  If
 9   somebody was going -- already had a client in a certain
10   area and it was a -- you know, sometimes that would be a
11   factor.  That's -- those kinds of things.  Or if somebody
12   got a referral from somebody they knew, then they would
13   do the case.
14          Just various factors went into it.  Nothing
15   very formal.  In other words, nothing -- absolutely
16   nothing formal is a better way of putting it.
17      Q.   Okay.  I want to go back to the tape recordings
18   for just a moment.
19      A.   You're not going to make me listen to 10,000
20   tapes, are you?
21      Q.   I'm going to make you listen to one in a little
22   while, but I'm not there yet.  Okay?
23      A.   Okay.
24      Q.   But just one.  Okay?
25      A.   Okay.
0065
 1      Q.   Let's focus for a moment not on telephone
 2   conversations but on personal meetings.
 3      A.   Okay.
 4      Q.   Did you ever have a practice while involved
 5   with Heritage of taping personal meetings you had with
 6   prospective clients?
 7      A.   The reason I'm hesitating, Jay, is because it
 8   was almost nonexistent.  I won't say -- if I went to a
 9   meeting by myself, which was extremely rare with a
10   potential client, I might have recorded in a state where
11   it was allowed.  If I went to a meeting with a potential
12   client in a state where it was allowed, I would almost
13   never -- I won't say -- I used the word almost never.  I
14   can't remember recording a conversation.  I might have.
15   But it was usually the responsibility of the contractor
16   who was with me to do that, if it was allowed in that
17   state.
18      Q.   Now, did Mr. Czerwinski ever fulfill that role
19   as a contractor who would go with you?
20      A.   He was never a contractor.
21      Q.   Okay.  How about Mr. Turchi?
22      A.   No.
23      Q.   Who were the contractors that would travel with
24   you?
25      A.   Well, they varied over time.  I can give you
0066
 1   Joe Von Borghese, who you mentioned, Andy Williams, Jim
 2   Edwards, Tim Seaberg, Colin Moore.  There's another
 3   gentleman I know who was a friend of Andy's that I just
                              Page 28

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 4  can't remember his name right now.  Drew Shank.  There
 5  were -- maybe there were a total of 15 or 20 people that
 6  served in that role over a period of time.
 7     Q.  Did --
 8     A.  That wasn't a complete list I gave you.
 9     Q.  Okay.  In the states where you thought it was
10  permitted to tape personal meetings, would you typically
11  instruct them to do that regularly?
12     A.  No.  In that case, contractors -- it was part
13  of a general policy that contractors were supposed to
14  record their meetings where it was legal.  Whether or not
15  they ever got transcribed is a whole other issue.  But
16  they were supposed -- were supposed to record those
17  meetings and turn them back in.
18     Q.  Okay.  Would they be transcribed on just a
19  sporadic basis or were they fairly regular?
20     A.  Yeah.  Well, you know, we never -- I don't
21  think in our entire existence we never had enough people
22  doing the transcription that we transcribed everything
23  without exception.  There were many times -- for example,
24  if you go to a meeting and a guy says, I don't want to
25  ever talk to you again now or in the future -- you're
0067
 1  familiar with the thing that the contractors were
 2  supposed to do, memorandums called debriefs?
 3     Q.  Yes, sir.
 4     A.  Okay.  If they did the debrief and it sounded
 5  like a -- what we refer to as a dead case, then there was
 6  no sense in the people in the transcription department
 7  transcribing a conversation which told us to get lost.
 8  So those usually were never transcribed.
 9     Q.  Okay.
10     A.  And, again, even if it was a good conversation,
11  sometimes the contractors lost their tapes, sometimes
12  they just didn't get transcribed because of the volume.
13  A lot of the same things happened with the initiator
14  calls.  There was no definite system that said something
15  happened regularly every time.  That's the point I'm
16  trying to make.
17     Q.  All right.  It sounds from your answer, though,
18  if there was a belief by the contractor or you that this
19  client might be a meaningful prospect, you would try to
20  make sure that the conversation got transcribed; is that
21  fair?
22     A.  Let me put it this way.  It was the company
23  hope -- I never had anything to do with it.  Okay.  I
24  wasn't involved in any of this.  I was usually out on the
25  road myself.  So I don't know what happened.  But it was
0068
 1  the company hope -- that's the best way to describe it --
 2  that if it was a decent prospect and that we -- and there
 3  was -- that there would be a debrief and a transcript of
 4  the conversation.  Whether there was or not on any
 5  individual case, I have no idea.
 6     Q.  Okay.  Did you ever become aware, Mr. Kornman,
 7  that Anthony Bird in particular generally did not tape
 8  any of his meetings or phone conversations?
 9     A.  Yes.
10     Q.  Did you ever have any discussions with Mr. Bird
11  about his failure to do that?
12     A.  Yes.
13     Q.  What were the nature of those discussions?
14     A.  Just voicing my displeasure with that.
```
Page 29

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
15        Q.   All right.  Why were you displeased with that
16   practice, that he did not?
17        A.   I just told you.  Going to a meeting cost --
18   getting the meeting cost a lot of money due to the
19   efforts of the marketing, the research people, the
20   telemarketers.  And if he came away from the meeting
21   without information that could be perpetuated, it was not
22   a good use of our resources.
23        Q.   Did you ever tell Mr. Bird that if he didn't
24   comply with your wishes he might face some kind of
25   disciplinary action?
0069
 1        A.   I'm sure I did.  I never exercised any
 2   disciplinary action against him.
 3        Q.   I would like to turn your attention now,
 4   Mr. Kornman, to -- let me -- let me try to do this in
 5   sequence.  You're familiar with the published decision by
 6   Judge Godbey in the case called COLM Producer versus
 7   United States of America?
 8        A.   Sure, yeah.
 9        Q.   That involved one of these short sales of
10   treasury notes that you got one of your entities to do,
11   right?
12        A.   A family entity that did a transaction like
13   that, yes, sir.
14        Q.   And then that lawsuit was filed at your
15   direction to have the transaction declared legal, right;
16   that was one of the things you sought?
17             MS. JACOBSEN:  Objection; form.
18        A.   Well, I don't know at whose direction it was
19   filed at, but, yes, it was filed.  Somebody made that
20   decision; and yes, it was filed.
21        Q.   (By Mr. Brandt)  Okay.
22        A.   Just to establish the validity of the
23   transaction.
24        Q.   Okay.  Is that case on appeal right now?
25        A.   Yes, sir.
0070
 1        Q.   All right.  I've read the opinion, but I don't
 2   think it reveals what lawyer prepared the legal opinion
 3   on that transaction.  Can you identify the lawyer who
 4   prepared the legal opinion supporting that transaction?
 5        A.   I don't think I should based on privilege.
 6        Q.   You think even the identity of the lawyer who
 7   prepared the tax opinion in that case is subject to some
 8   privilege?
 9        A.   I'm going to say it is and we'll worry about it
10   later.
11        Q.   And are you refusing to answer my question on
12   that basis?
13        A.   Yes, sir, I am.
14        Q.   And, for the record, what is the specific
15   privilege you're relying on?
16        A.   Attorney-client privilege.
17        Q.   Okay.  To your knowledge, Mr. Kornman --
18        A.   And attorney work product, also, I'm sure.
19        Q.   All right.  To your knowledge, Mr. Kornman, was
20   the tax opinion written by whatever -- whoever prepared
21   it --
22        A.   Right.
23        Q.   -- offered into evidence in that COLM Producer
24   case?
25        A.   I'll be honest with you.  I don't know.  I
                          Page 30

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
0071
1  don't remember.  It's not that I don't know.  I just
2  don't remember.
3       Q.   Did Lewis, Rice & Fingersh prepare the tax
4  opinion supporting the transaction in the COLM Producer
5  case?
6       A.   Privileged.
7       Q.   You're refusing to answer?
8       A.   Yes, sir.
9       Q.   Did Ahrens & DeAngeli prepare the tax opinion
10 supporting the transaction in the COLM Producer case?
11      A.   Again, same answer; privileged.
12      Q.   And you're refusing to answer, correct?
13      A.   Yes, sir.
14      Q.   Did there come a time when -- well, let me back
15 up.  Did Mr. -- did Ahrens & DeAngeli ever write tax
16 opinions on any of these transactions involving the short
17 sale of treasury notes?
18      A.   I believe they did.
19      Q.   Do you know how many?
20      A.   No, sir, I don't.
21      Q.   Did there come a time when Mr. Ahrens or
22 Mr. DeAngeli, for that matter, advised you that they
23 didn't want to write opinions on those matters anymore?
24      A.   Yes, sir.
25      Q.   When did that happen?
0072
1       A.   Sometime either -- I'm not sure.  Those dates
2  fade together.  I just don't know, Jay.  I'm sorry, I
3  can't remember the dates.
4       Q.   That's fair.  In a minute I'm going to show you
5  something that might help pinpoint a little bit better.
6       A.   Okay.
7       Q.   At some point did you go up to St. Louis and
8  meet with several lawyers from Lewis, Rice & Fingersh to
9  see if they might be willing to write supporting tax
10 opinions on these transactions that would involve short
11 sales of treasury notes?
12           MS. JACOBSEN:  Objection; form.
13      A.   I'm sorry, did --
14           MR. SCHWEGMANN:  She objected to the form
15 of his question.
16           THE WITNESS:  Okay.  Sorry.
17      A.   Yes, I did.
18      Q.   (By Mr. Brandt)  Do you remember when that
19 occurred?
20      A.   It was sometime -- maybe a few months after or
21 shortly thereafter Ahrens & DeAngeli said they
22 didn't want to -- no.  Actually I think it may have even
23 been before.  I'm not sure, Jay.  I'm sorry.
24      Q.   Okay.  Tell me the best you can, Mr. Kornman,
25 about this meeting with lawyers from Lewis Rice, who was
0073
1  present and what you remember being discussed.
2       A.   The people I think were present -- again, it
3  was a long time ago -- was Mike Mulligan, Bill Falk,
4  Larry -- I'm sorry, I don't remember Larry's last name.
5  He was head of their tax department.
6       Q.   Weltman?
7       A.   Yes, Larry Weltman.  Thank you.  And I don't
8  know if Jaime Mendez was in the meeting or not.  He could
9  have been.
10      Q.   Who attended that initial meeting with Lewis
                          Page 31

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
11   Rice from Heritage, other than yourself?
12         A.   I believe Mr. Canada, but I'm not real sure
13   about any of that.  It's been a long time ago.
14         Q.   Okay.  During the course of this meeting,
15   Mr. Kornman, did you make use of any materials to make a
16   presentation to the lawyers at Lewis Rice?
17         A.   I'm sorry, I just don't remember.
18         Q.   All right.  Was there any discussion --
19         A.   I've been in hundreds of presentations, Jay.
20   Who I made them to I have no idea.
21         Q.   All right.  At some point did the lawyers from
22   Lewis Rice advise you that they would be willing, under
23   certain circumstances, to write tax opinions on these
24   transactions involving short sales of treasury notes?
25         A.   At some point they did.  I don't necessarily
0074
1    know if it was -- whether it was at that meeting or not.
2    It was probably after that, but I'm not really sure.
3          Q.   All right.  In fact, Lewis Rice wrote opinions
4    on a number of these transactions, right?
5          A.   Correct.
6          Q.   And after the meeting and they indicated their
7    willingness to do so, would it be fair to say that
8    Heritage referred a number of clients to Lewis Rice for
9    purposes of getting a legal opinion on these transactions
10   involving short sales of treasury notes?
11         A.   Say that one more time.
12         Q.   I know it was rather long.  After they
13   indicated they would write these opinions, did Heritage
14   refer --
15         A.   Not at that meeting, but at some point in time.
16         Q.   Yes, sir.  Did Heritage refer clients to them
17   for that purpose?
18         A.   Yes, sir.
19         Q.   Do you know how many times?
20         A.   I have no idea.
21         Q.   Did you personally refer some clients to Lewis
22   Rice?
23         A.   I did.
24         Q.   Can you identify the clients that you know you
25   referred to Lewis Rice?
0075
1          A.   I would have to have a list, Jay.  I just -- I
2    mean we referred -- when you say referred to Lewis Rice,
3    after that very first time that Dan Koshland hired Mike
4    Mulligan to do an opinion on an estate transaction for
5    him, we -- that's the first time I ever met Mike in
6    person.
7               And we may have referred -- I know we probably
8    referred him some estate cases.  And I don't remember the
9    time sequence of what came first or what, but we referred
10   both estate cases and investment cases to Lewis Rice.
11         Q.   Okay.  You don't remember the name of any
12   specific client that you referred to Lewis Rice on an
13   investment case to get a tax opinion?
14         A.   Well, I mean I know that -- I can tell you that
15   many times we would try to get the -- whoever the
16   client's existing tax counsel was to do this, if they
17   would sign our -- I think you are aware now we had an
18   advisor agreement?
19         Q.   Yes, sir.
20         A.   If they would sign our advisor agreement, we
21   would try to get them to do it.  And then if they didn't

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
22  do it and the client asked who else could do it, many
23  times we told them Lewis Rice.  But, you know, that's --
24  I mean I know, for example, Larry Flinn hired Lewis Rice
25  and Milbank Tweed.
0076
 1       Q.  Yes, sir.
 2       A.  So, I mean that's -- we sent them to people who
 3  had done it before and who weren't going to have to
 4  reinvent the wheel.
 5           THE VIDEOGRAPHER:  Excuse me.  I need to
 6  change tape.
 7           MR. BRANDT:  Okay.
 8           (Off the record.)
 9           THE VIDEOGRAPHER:  We're back on tape two.
10       Q.  (By Mr. Brandt)  In your answer a moment ago,
11  Mr. Kornman, you referenced an advisor agreement -- I'm
12  sorry, Gary.
13       A.  Thanks.
14       Q.  I don't want to make you uncomfortable.
15       A.  It doesn't make me uncomfortable.  It just
16  makes me feel old.
17       Q.  The advisor agreement you referenced a moment
18  ago, a number of lawyers at Lewis Rice signed one of
19  those, didn't they?
20       A.  Yes.
21       Q.  Did you ask them to sign them?
22       A.  I'm sure somebody at Heritage did.  Whether it
23  was me particularly or Mr. Canada, I'm not sure.
24       Q.  Do you know whether they signed those
25  agreements in your presence?
0077
 1       A.  I don't remember.
 2       Q.  What was the purpose in having lawyers like the
 3  members of Lewis Rice sign those advisor agreements from
 4  Heritage's perspective?
 5       A.  Trying to protect our business.
 6       Q.  Any other purposes?
 7       A.  That's the broad purpose.
 8       Q.  All right.  Do you know if Mr. Blattmachr ever
 9  signed one of those agreements?
10       A.  I have no idea.
11       Q.  This meeting that you had with lawyers at Lewis
12  Rice to determine if they would write tax opinions on
13  what you call the investment strategy, were they paid for
14  their time to attend the meeting?
15       A.  I'm sorry, I just don't have any recollection
16  that far back.
17       Q.  Let me next hand you what I've marked as
18  Exhibit No. 5 --
19       A.  Okay.
20       Q.  -- to your deposition.  On the first page of
21  this somebody has written on this in a marker, Notice
22  2000-44, correct?
23       A.  Uh-huh.
24       Q.  And then the next page is a fax cover sheet
25  dated August 10 of 2000; is that correct?
0078
 1       A.  Uh-huh.  Yes, sir.  I'm sorry.
 2       Q.  Okay.  And I'm really just going to ask you
 3  some simple questions about this communication,
 4  Mr. Kornman, but feel free to read it and review it as
 5  much as you like.  Apparently this Notice 2000-44 -- does
 6  it appear Mr. Ahrens faxed it to you and Mr. Canada about

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 7  the day it came out?
 8      A.  I don't know when it came out, so I don't know
 9  whether that's correct or not.
10      Q.  All right.  Do you remember receiving it from
11  Mr. Ahrens back in the middle of August of 2000?
12      A.  I don't remember it specifically, but I'm sure
13  I did.
14      Q.  Okay.  Do you remember any conversations you
15  had with Mr. Ahrens about this communication?
16      A.  I'm sure we had some.  I don't remember them.
17      Q.  Was there any perception that this might relate
18  to these investment strategies that you referenced?
19          MR. SCHWEGMANN:  Objection; form.
20      A.  Say that one more time, Jay.
21      Q.  (By Mr. Brandt)  Was there any perception by
22  you or Mr. Ahrens, if you know, that this notice might
23  relate to these investment strategies that you've talked
24  about?
25      A.  I don't know what Mr. Ahrens' perception was or
0079
 1  I don't remember.  I don't --
 2      Q.  Okay.
 3      A.  I'm not sure this -- is this the -- is this an
 4  advance notice or is this the actual 2000-44?  I don't
 5  know what it is here.
 6      Q.  To the best of my knowledge, this is the actual
 7  notice.
 8      A.  Okay.  I'm not going to read it to --
 9          MR. SCHWEGMANN:  Just so we're careful,
10  though, on the fourth page of the document, it says,
11  Advance Copy of Internal Revenue Code item.
12          MR. BRANDT:  Okay.
13          THE WITNESS:  I'm not sure this is --
14          MR. SCHWEGMANN:  I don't know what that
15  means.
16          MR. BRANDT:  Okay.
17      A.  It says it will appear, which means it has not.
18  So I don't know if this is what finally came out, Jay.
19      Q.  (By Mr. Brandt)  Okay.
20      A.  But let me -- what finally came out -- first of
21  all, notices are not authority of any shape or form.  Are
22  you aware of that?
23      Q.  Well, we'll come to that.  I'm really just
24  trying to find out why it was sent to you in the middle
25  of August and what you thought it applied to.  That's
0080
 1  where I'm starting from.
 2          MR. SCHWEGMANN:  Objection; form.
 3      A.  Well, start your question again.
 4      Q.  (By Mr. Brandt)  You remember Mr. Ahrens
 5  sending this to you back in the middle of August of 2000?
 6      A.  I've already said I didn't remember it
 7  specifically, but I'm sure I got it.
 8      Q.  All right.
 9      A.  It's the kind of thing I would look at, if
10  somebody gave it to me.
11      Q.  Did you form any impression that it might
12  relate to these investment strategies you've talked
13  about?
14          MR. SCHWEGMANN:  Objection; form.
15      A.  Did I form any impression that this might
16  relate?  The answer is:  I specifically came to the
17  conclusion that this did not relate to the transactions
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
18  we were dealing with.
19       Q.  (By Mr. Brandt)  Okay.  And why not?
20       A.  It didn't deal with them.  These transactions
21  were not statutory.  A short sale was based on a
22  statutory transaction, Section 1233.
23       Q.  All right.  Did you ever have any discussions
24  with representatives of Lewis Rice about Notice 2000-44?
25       A.  Well, it would be common sense that since we
0081
1  discussed about everything related to these types of
2  matters that we did discuss it at some point some time or
3  another.  I don't remember anything specific.
4       Q.  Do you know if you were involved in that
5  discussion?
6       A.  What I'm saying to you is, Jay, if we were
7  looking at opinion letters and talking about various
8  things, it would be common sense that we discussed
9  everything that was out there; and this is part of what
10  was out there.
11       Q.  Did you review any opinion letters that Lewis
12  Rice prepared on any of these transactions?
13       A.  Did I -- when you say review, that's a
14  different term.  Did I ever read them?
15       Q.  Let's start with read them.
16       A.  I'm sure I did somewhere, somehow.
17       Q.  Do you remember for which clients?
18       A.  No.
19       Q.  Do you know how many you read?
20       A.  No.
21       Q.  Were you ever asked to comment on any legal
22  opinions prepared by Lewis Rice?
23       A.  Not to my recollection.
24       Q.  Do you know if Lewis Rice, after it expressed
25  to Heritage it might be willing to write some of these
0082
1  opinions on these investment strategies, did it ever
2  receive any material that had been authored by Mr. Ahrens
3  or his firm on those transactions?
4            MR. SCHWEGMANN:  Objection; form.
5            MR. BRANDT:  What's the grounds to your
6  objection?  I'll fix it, if I can.
7            MR. SCHWEGMANN:  I think you can.  The "it"
8  in your question, I wasn't sure what the antecedent was.
9  I wasn't sure if that was Lewis Rice or Heritage.
10       Q.  (By Mr. Brandt)  Let me try it again.  Do you
11  know, Mr. Kornman, if Lewis Rice ever received any
12  materials that had been authored by Ed Ahrens in
13  connection with these investment transactions you've
14  talked about?
15            MS. JACOBSEN:  Objection; form.
16       A.  I don't know whether they did specifically.  It
17  would not have been impossible.
18       Q.  (By Mr. Brandt)  Okay.  And if they did, is it
19  fair that you're saying you didn't provide it to them?
20       A.  I just don't remember.
21       Q.  All right.  Let me next hand you what I've
22  marked as number -- Exhibit 6 to your deposition today.
23            MR. BRANDT:  Have I kept them in order so
24  far with your copies?
25            MS. JACOBSEN:  I think so.
0083
1       Q.  (By Mr. Brandt)  Exhibit 6, Mr. Kornman, is a
2  memo and it's dated February 22 of 2000.  Take all the
                              Page 35

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
3   time you'd like to review it.  Is this the memo that
4   Mr. Ahrens sent to you and Mr. Canada ultimately advising
5   that they did not want to write tax opinions on these
6   capital gain matters anymore?
7        A.   That's what it appears to be.  Again, since it
8   was seven years ago -- I mean I remember Ed told us that
9   they didn't want to do it anymore.  I don't remember the
10  specific memo.  I'm sure I -- it looks, again, like
11  something I probably would have gotten since it was
12  specifically addressed to me.
13       Q.   What do you remember Mr. Ahrens telling you as
14  to the reason why he didn't want to write these opinions
15  anymore?
16       A.   Basically the last paragraph on the first page
17  that they were so time intensive in keeping up with the
18  changes in the law.  This was a fast changing area.  They
19  were concerned that they wanted to make -- that they
20  didn't want to do something that they weren't completely
21  up-to-date on.  It was very time consuming to write these
22  letters and work with the clients.
23            They were just -- they were more intense cases
24  I guess is the best way to say it.  And that was -- his
25  partners wanted to stick to estate planning.  They didn't
0084
1   want to try to be -- continue to try to be experts in
2   more areas.
3        Q.   Okay.  Did you ever discuss this development
4   with Mr. Canada?
5        A.   Would not have been unusual that we talked
6   about this.  Yeah, I'm sure we did.  Again, I don't
7   remember specific conversations, Jay, but logically we
8   did discuss it.
9            I mean if you know of a specific conversation
10  and you want to refresh my memory, I might be able to say
11  something else.  I don't know.
12       Q.   Well, at or near this time, Mr. Kornman, did
13  Mr. Canada ever convey to you that he'd had discussions
14  with Ahrens and McBain and they were expressing some
15  concern about continuing to write these opinions?
16       A.   When you say concern, you mean -- you mean the
17  reasons they didn't want to do it or -- no, we didn't --
18  we didn't -- they never expressed concerns that the law
19  was bad or that there was some reason relative to the
20  technicals of anything.
21            It was that they didn't -- primarily the time
22  intensity.  I mean this was something that was a
23  full-time endeavor to keep up with this stuff.  I mean
24  you saw 2000-44.  This was stuff that was -- when did
25  this come out?  August.  I mean you had to -- there was
0085
1   stuff constantly happening in this area.  The Fulcrum
2   case and the Salina case were moving along.  I mean it
3   wasn't -- you couldn't go to sleep at the switch here.
4   And they just didn't want to keep -- and then writing
5   opinions were time consuming.
6        Q.   Okay.  I'm going to hand you a series of some
7   transcripts of audio recordings.  I'm not going to go
8   through each one in detail, but I do want to ask you some
9   questions about several of them.  The first one has got
10  three different exhibit stickers on it.
11       A.   It must be popular.
12       Q.   For our purposes it's Kornman Exhibit 7.  Okay.
13  And on the front page of this, just so everybody can
                              Page 36

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
14  follow along, it's -- one of the indicators is A&D
15  Supplement 1.2.  Okay.
16          This conversation -- Mr. Kornman, I'm going to
17  ask just some basic, you know, simple questions to start
18  with.
19      A.  Okay.
20      Q.  Is there any way to identify who transcribed
21  this, what appears to be this conversation between you
22  and Mr. Ahrens?
23      A.  Other than guessing, I can't see any.  I mean
24  it says Trustee Jenkins down here at the bottom.  I
25  presume that was put on there at the time.  It looks --
0086
1  well, no.  It's a -- it's a -- it's a Bates stamp kind of
2  thing.  I don't -- I don't see anything that would tell
3  you who transcribed it.
4      Q.  Okay.  And then I didn't want to start
5  guessing.  I really wanted to ask you is there any way
6  from looking at this for us to tell who transcribed it?
7      A.  Do you see one?  I don't.
8      Q.  I don't.
9      A.  Okay.
10     Q.  It's my belief, Gary, that TEE JENK is a Bates
11  numbering system adopted by lawyers for the bankruptcy
12  trustee.
13     A.  That's what it looks like to me.
14     Q.  Is this an example of an audio recording that
15  would have been transcribed by Heritage as part of its
16  business?
17     A.  I don't think so.
18     Q.  What makes you say that?
19     A.  It just doesn't look like it.  I mean if you're
20  talking about this specifically, all the -- this is not a
21  format that I've ever seen Heritage use.
22     Q.  Okay.  Well, I may not have one in the format
23  Heritage used.  Can you describe for me what their
24  appearance was?
25     A.  Different from this.  That's all I can tell
0087
1  you.
2      Q.  Okay.  Let me hand you, just for purposes of
3  comparison -- they're really going to be all the same I
4  think.  But I'm going to hand you Exhibits 8 and 9.
5          MR. BRANDT:  For everybody to follow along,
6  these are 1.3 and 1.4, again, of A&D Supplement.
7      Q.  (By Mr. Brandt)  Would you say that for all
8  three of these exhibits, Gary, that they don't appear to
9  be in the format that would indicate to you that Heritage
10  transcribed them?
11     A.  Assuming that they all look the same.  I'll
12  look through them briefly.
13     Q.  Yeah, just look through them and let me know
14  what you --
15     A.  Yeah, this doesn't look like anything Heritage
16  did.
17     Q.  All right.
18         MR. KONING:  You skipped one.  I have it
19  going up to 10.
20     A.  There's three here.
21         MR. KONING:  8, 9, 10.
22         MR. SCHWEGMANN:  I have one that's
23  labeled --
24         THE WITNESS:  I have 7, 8, 9.  There's no
Page 37

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
25   10 here.
0088
 1                  MR. SCHWEGMANN:  I have 7, 8, 9 and then my
 2   tenth one, I assume it's Exhibit 10, is A&D Supp. 1.1.
 3                  MR. BRANDT:  Let me catch up here.  No. 10
 4   is 1.1.
 5                  MR. KONING:  Yeah.
 6                  THE REPORTER:  We marked a 10.
 7                  MR. BRANDT:  We did?  The issue is going to
 8   be what did I do with it.
 9                  MR. SCHWEGMANN:  Here's my stack if you
10   want to use it as comparison.
11                  MR. BRANDT:  Give me just a second.  I'm
12   sorry.
13        A.   Sure.  That's all right.  I'll give you all the
14   time you want.  I'll make a deal with you.  If you call
15   me Gary, you can have all the time you want.
16                  THE WITNESS:  Can you turn the tape off for
17   a second while he's doing that?
18                  MR. SCHWEGMANN:  We can go off the record
19   entirely, if that's all right.
20                  MR. BRANDT:  Sure.
21                  THE VIDEOGRAPHER:  We're off.
22                  (Discussion off the record.)
23                  THE VIDEOGRAPHER:  Back on.
24        Q.   (By Mr. Brandt)  Okay.  Mr. Kornman, I've now
25   located Exhibit No. 10 and just -- this is --
0089
 1        A.   Did your wife ever tell you, you were
 2   incorrigible?
 3        Q.   Yes.  This is A&D Supplement 1.1.
 4        A.   Okay.
 5        Q.   Similar to the other ones we've looked at, 7, 8
 6   and 9, would it be your testimony that the format of this
 7   transcript makes you believe that it was not transcribed
 8   by Heritage?
 9        A.   Exactly.
10        Q.   All right.  Thank you.
11        A.   You're welcome.
12        Q.   Okay.  Let me next hand you, Gary, what we'll
13   mark as Exhibit No. 11.
14                  (Exhibit No. 11 marked.)
15        Q.   (By Mr. Brandt)  Take a moment to look at that.
16   My first question is going to be:  Have you ever seen
17   this before?
18                  MR. BRANDT:  I'm sorry, Paul, I had limited
19   copies.
20                  MR. KONING:  I didn't need that one.
21        A.   I believe I have.
22        Q.   (By Mr. Brandt)  Okay.  Do you remember when
23   you saw it?
24        A.   Yeah.  I believe this was prepared in an answer
25   to a request by DOJ about certain powers of the entities
0090
 1   involved.
 2        Q.   And this is connected to Larry Flinn's
 3   transaction, right?
 4        A.   Yes, sir.
 5        Q.   All right.  Why was -- what involvement, to
 6   your knowledge, did Mr. Ahrens have in the Larry Flinn
 7   transaction?
 8        A.   I don't know of -- I don't know of any other
 9   than this.  Mr. Canada handled this.  And all I know is

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
10  that there were some questions about whether or not the
11  documents could undertake certain actions.  And I think
12  Canada got Ed involved somehow for this purpose, to give
13  an opinion on the documents themselves.
14        Q.   Okay.  Do you know if Mr. Flinn retained
15  Mr. Ahrens?
16        A.   I don't know how that happened.
17        Q.   Okay.  Do you know if Mr. Flinn ever had any
18  contact or communications with Mr. Ahrens?
19        A.   I have no idea.
20        Q.   Okay.  You said earlier that as part of one of
21  your answers that Larry Flinn had retained Lewis Rice and
22  Mr. Blattmachr in connection with his transaction; is
23  that correct?
24        A.   Yes.
25        Q.   Do you have any reason to believe that
0091
 1  Mr. Ahrens provided any legal advice to Mr. Flinn
 2  directly concerning his transaction?
 3        A.   I don't think so.  But, again, I wasn't
 4  involved.  I don't know whether Larry saw that.  I just
 5  don't know.
 6        Q.   Okay.  And to the best of your knowledge,
 7  Mr. Canada got Mr. Ahrens to prepared Exhibit 11; is that
 8  correct?
 9        A.   That's my understanding.
10        Q.   All right.
11        A.   I was involved in a telephone conversation with
12  DOJ where they asked for this and then Mr. Canada handled
13  it after that.  I mean he was there too.  Both of us were
14  involved, but he handled it.
15        Q.   Okay.  I am going to make you listen to one
16  tape recording.
17        A.   Are there any screams?
18        Q.   No.  This is pretty mundane.
19        A.   Okay.
20             MR. SCHWEGMANN:  Is it a recording that we
21  have a transcript for?
22             MR. BRANDT:  It is.  This is 1.4, which
23  would have been Exhibit 9.  I'm going to end up marking
24  this as an exhibit and then I will furnish a copy of it
25  to everybody.  I don't have a copy right now, but I will
0092
 1  deliver one to all of you.
 2             THE WITNESS:  Do we have copies of this?
 3             MR. SCHWEGMANN:  We do now.
 4             THE WITNESS:  Okay.
 5             MR. BRANDT:  As soon as I get this started,
 6  I will let you listen to it for a few minutes.
 7             MR. SCHWEGMANN:  Jay, let me just say in
 8  looking at the exhibit --
 9             THE WITNESS:  Can I write on this?
10             MR. BRANDT:  You can write on your
11  counsel's copy.
12             MR. SCHWEGMANN:  In looking at the exhibit,
13  it just on its face doesn't appear to be a complete
14  transcription.  And it also -- I think there are various
15  other objections that all the parties have with respect
16  to these tapes.  And rather than object for each of your
17  questions going forward, if we can just have a running
18  objection.  I don't know that they're form objections,
19  but I need to object anyway.
20             But to the extent you're asking about the
                    Page 39

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
21   content and whether they're complete or accurate, I think
22   on the face we can tell some aren't and some have been
23   changed in some material way.
24               MR. BRANDT:  I can tell on their face
25   they've all been redacted by counsel for the trustee.
0093
1   And I agree with you.  I think this one in particular is
2   incomplete and there are obviously pages missing from the
3   transcript.  And make -- anybody can make whatever
4   objections they want to.  I'm not going to try to cut
5   anybody off on that.
6               MR. SCHWEGMANN:  Agreed.  I think rather
7   than interrupt the flow of your questions by doing it
8   after each one, if we can just have a continuing
9   objection that we can all join --
10              MS. JACOBSEN:  Or just an agreement that we
11   don't waive any objections by failing to make a form
12   objection now.
13              MR. BRANDT:  That's fine.
14              MR. KONING:  That will be good.
15              MR. BRANDT:  You're only going to hear
16   about two questions anyway.  This isn't going to take
17   long.
18              MR. SCHWEGMANN:  We'll keep the agreement
19   that Ms. Jacobsen suggested and more forward from there.
20              MR. BRANDT:  That's acceptable with me.
21      Q.  (By Mr. Brandt)  Let me ask you to listen to
22   this, Gary.
23              (Audio recording played.)
24      Q.  (By Mr. Brandt)  I going to stop it here, Gary,
25   because the transcript has ended.  Okay.  If you want to
0094
1   hear more of it, you're certainly free to.  My first --
2   we've just listened to this audiotape and read along in
3   Exhibit 9 --
4      A.  Right.
5      Q.  -- that purports to be a transcript of it.  My
6   first question to you is:  Do you recognize your voice on
7   that audio recording?
8      A.  This is a hard question, Jay.  I would say it's
9   very -- I'm joking.  Yes, I recognize my voice.
10     Q.  All right.
11     A.  Is that the hardest question you've got for me
12   today?
13     Q.  No.  I'm going to see if I can make them
14   tougher than that.  Do you recognize Mr. Ahrens' voice as
15   well?
16     A.  Yes, I do.
17     Q.  Okay.  We don't know the exact date of this
18   conversation and we don't have anything in front of us
19   that will tell us that.  But would you agree with me from
20   the transcript of what we just heard, it appears that
21   Mr. Ahrens is at least acquainted with Mike Mulligan
22   whenever this conversation occurred; is that fair?
23              MS. JACOBSEN:  Objection; form.
24     A.  You mean that he knows of him?
25     Q.  (By Mr. Brandt)  Yes, sir.
0095
1      A.  I would say that's a fair assumption.
2      Q.  Okay.  Can -- and can you add anything in that
3   regard?  Did you know for a fact that they were
4   acquainted with one another or whether they had ever
5   worked together before?
                        Page 40

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
 6          A.   I don't know anything about that.  I mean this
 7     is totally out of context.  I don't know whether we're
 8     talking -- I haven't heard the rest of this.  I don't
 9     know what the context of it is.  At least it appears to
10     be -- what we've heard appears to be an accurate
11     transcription.
12               For example, some of the things I've said, when
13     I talk about world class, I'm talk -- I don't know what
14     this was coming out of, but we may have been talking
15     about S corporations.  You know, this was not in any way
16     intended to be a gee, whiz -- well, I said, They're
17     generally decent tax people.  I wouldn't call them world
18     class.  The department is not that big.  There were other
19     firms.  I didn't know what Ed was going -- he was talking
20     -- we were talking about S corps.  We were talking about
21     a very specific tax issue.  That was the context of what
22     I see here.
23          Q.   Yes, sir.
24          A.   And corporate taxation.  And one of my general
25     philosophies, which I put forth here, is that if I have a
0096
 1     specific question to try to get the best people in the
 2     country, the most expert people in the country to deal
 3     with it.  So I don't -- don't take this in a way that we
 4     didn't think that they were competent.  We sure did.
 5     This is just -- it's totally out of context.  I don't
 6     know what the time of it is.
 7          Q.   No, I don't mean to interrupt your answer.
 8          A.   There's statements made here that could be
 9     misinterpreted very easily in a different context and I
10     want to make sure they're not, because -- for example, if
11     I needed brain surgery, I wouldn't -- well, let me give
12     you an example.  It's a real simple example.
13               My wife had a back problem, a disk problem.
14     And every orthopedist in the United States could do this
15     and there's some damn good ones that do these types of
16     procedures.  Well, I took her to the Mayo Clinic where
17     there was the one guy in the country that started doing
18     them in the United States and he had been doing them for
19     10 years.  Now, was there somebody else in the United
20     States that was competent?  Well, I'm sure there were.
21     Were there some orthopedic organizations?  I'm sure there
22     were.
23               But when I say world class, that's what I mean
24     by world class.  The guy that did it from the inception
25     that is the, you know, one that is recognized and has the
0097
 1     experience.  And, in fact, we had two doctors here in
 2     Dallas say they wanted to do it immediately and the guy
 3     at the Mayo Clinic said, I wouldn't touch this on a bet.
 4     Not because of my wife's age, but because of what she
 5     had.
 6               So understand when I'm saying this, we're
 7     talking about what may be one or two people in the world
 8     literally versus perfectly adequate people to do
 9     something else.  And we're talking about a specific
10     subject here.
11          Q.   Well, let's move away from doctors and bring it
12     back to --
13          A.   Same principle.
14          Q.   -- one of these transactions that utilized the
15     short sale of treasury notes.  You've said as part of
16     your answer, Gary, you think this is out of context.
                              Page 41

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
17  Okay.  Does this conversation you had with Mr. Ahrens
18  have any relationship to these transactions that involve
19  a short sale of treasury notes?
20      A.  No, I don't think it did.  But I don't know,
21  because I don't know the context of the rest of this
22  conversation.  I don't know when it was had.  I don't
23  know anything about it.  I mean I couldn't -- all I can
24  tell you is we were -- you've showed me something.  I've
25  listened to something.  And we're talking about S corps
0098
1  and Section 338(h)(10).  Maybe Ed was feeling
2  uncomfortable, you know, that he wanted somebody who was
3  an expert on S corps.
4      Q.  Well, that's what it sounds like, doesn't it?
5      A.  Yeah, that's what it sounds.  And that's what I
6  was probably referring to, if we need an S corps expert,
7  let's go get somebody who is world class.
8      Q.  Were any S corp entities used in any of these
9  tax transactions that involved a short sale of treasury
10  notes?
11      A.  I can't tell you that because it would be
12  involving some privileged -- attorney-client privileged
13  information.
14      Q.  Well, whose privilege would that be, sir?
15      A.  Mine.
16      Q.  So if there's a legal opinion from Lewis Rice
17  to Mr. Woodruff, just to pick one of the names who you
18  never met --
19      A.  Right.
20      Q.  -- that talks about an S corporation in his
21  transaction, you're claiming some attorney-client
22  privilege in regard to that opinion?
23      A.  I don't know anything about that.
24          MR. SCHWEGMANN:  I think the problem, if I
25  could jump in, is you said any of these transactions at
0099
1  all.  If you perhaps were more specific about a
2  particular transaction, such as the one you referenced
3  Mr. -- Gary would be better able to answer your question.
4      Q.  (By Mr. Brandt)  Do you think S corps were used
5  in any of these transactions or not?
6          MR. KONING:  Object to the form.
7          MR. SCHWEGMANN:  Same objection.
8      A.  I don't know what you mean by any of these
9  transactions.  Can you try to narrow it down?
10      Q.  (By Mr. Brandt)  Flinn, Woodruff, Patterson.
11      A.  First of all, I don't know anything about
12  Woodruff and Patterson.  So I can't answer anything about
13  that.  So go back a second, Jay.
14      Q.  Let's go back to Larry Flinn.  You do know
15  about his transaction, don't know?
16      A.  I do.  I do.
17      Q.  Were any S corporation entities involved in his
18  tax transaction that used a short sale of treasury notes?
19      A.  That's a general question.  There may have been
20  an S corporation involved somehow.  I don't remember the
21  S corporation -- any S corporations doing any type of
22  transactions of a short sale of treasury notes.
23      Q.  And what basis do you have for claiming some
24  attorney-client privilege with regard to that issue?
25          MR. SCHWEGMANN:  I'm not sure he did.
0100
1      A.  I didn't.
              Page 42

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
2        Q.   (By Mr. Brandt)  All right.  Did you ever ask
3   any of the lawyers at Lewis Rice to take a personality
4   test?
5        A.   Yes.
6        Q.   Did they all take one?
7        A.   You want to rephrase the question?  All is a
8   very broad term.
9        Q.   Well, I can change it.  Did any of them take
10  the test?
11       A.   I remember Mike Mulligan taking it for sure.
12       Q.   Do you remember any others?
13       A.   Not at this time.
14       Q.   Did Mr. Ahrens ever take one of those tests?
15       A.   I believe he did.
16       Q.   Okay.  How about Mr. Blattmachr?
17       A.   I believe he did.
18       Q.   I've heard these tests talked about for so
19  long, I'm just curious why do you ask people to take
20  them?
21       A.   It tells me how they like to communicate.  Both
22  how they like to get information and how they like to
23  give it.
24       Q.   Okay.  At the time when Ahrens & DeAngeli sent
25  you that memo outlining their reasons for not wanting to
0101
1   take on new opinion writing responsibilities on the
2   capital gains transactions, did Heritage go interview any
3   other law firms other than Lewis Rice to see if they
4   would be willing to write such opinions?
5        A.   Jay, I can't remember timing, but we did talk
6   with one or more other law firms.  I don't remember who
7   they were or when we did it, but yes, I believe we did.
8        Q.   So I make my record, Gary, what other law firms
9   did you talk to?  Do you remember any names of them?
10       A.   No, I'm sorry, I don't.
11       Q.   Do you know how many that you talked to?
12       A.   Again, that's been so long ago, I just don't
13  remember.
14       Q.   Do you have any memory of any of them declining
15  to write opinions on capital gains transactions?
16       A.   No, I don't remember any of them declining.  In
17  fact, I do remember at least one other saying they could,
18  but they -- the concern was that they felt uncomfortable
19  signing some of our agreements.
20       Q.   And which firm was that?
21       A.   I don't remember.  I just remember that there
22  was one.  Firms change names.  These firms change names
23  so much today, Jay, it's just impossible to know who they
24  were when.
25            MR. BRANDT:  I'm at a point, I think, where
0102
1   it may be appropriate to allow Paul to ask his questions
2   before I really get into the Flinn case.
3            MR. SCHWEGMANN:  It's about 12:30, so I
4   think now is a good point for us to take our break.
5            MR. KONING:  Well, let me just say on the
6   record that I'm not going to have any questions for this
7   witness.  So if it's -- in keeping with our agreement,
8   can we agree that the deposition in the Woodruff
9   Patterson case is closed, unless that's going to give you
10  guys some problems?
11            MS. JACOBSEN:  You mean the Texas Woodruff
12  case?
                          Page 43

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
13                    MR. KONING:  The Texas Woodruff Patterson
14        case.
15                    MR. SCHWEGMANN:  I'm not going to ask any
16        questions.  So I'm perfectly happy to close the
17        deposition.
18                    MR. KONING:  Okay.  So to make the record
19        clear, at this point the record in the Texas Woodruff
20        Patterson case is closed.  I'm going to leave.  I'm not
21        going to return after lunch.  The deposition is going to
22        continue, but nothing after this point is going to be
23        admissible in the Texas Woodruff and Patterson case.  Is
24        that correct, Jay?
25                    MR. BRANDT:  That's correct.  Let me ask
0103
1         one other question just to make sure I'm finished.  I
2         think I know the answer.
3                    MR. KONING:  Okay.
4             Q.   (By Mr. Brandt)  In regard to Woodruff and
5         Patterson, to your knowledge, did Jonathan Blattmachr or
6         Milbank Tweed have any involvement?
7             A.   I couldn't say one way or the other.  I just
8         don't know.
9                    MR. BRANDT:  All right.  I just needed to
10        ask that question to make it clear.
11                   MR. KONING:  So what I said --
12                   MR. BRANDT:  What you said is now correct.
13        We can close this record in connection with the Dallas
14        Woodruff and Patterson case.
15                   MR. KONING:  Excellent.
16                   MR. SCHWEGMANN:  Although, we'll miss you.
17                   MR. KONING:  Thank you.
18                   THE VIDEOGRAPHER:  We're off the video
19        record at 12:26.
20                   (Recess from 12:26 to 1:34.)
21                   (Exhibit No. 12 marked.)
22                   THE VIDEOGRAPHER:  We're back on the video
23        record at 1:34.
24                   MR. SCHWEGMANN:  Before you get started, I
25        just wanted to say that I had the opportunity to confer
0104
1         with Gary over the break and also with you and we've
2         agreed, despite my objections this morning, to answer
3         questions in response to the subpoenas that we received
4         for the St. Louis cases in the hope that let's get this
5         over with today.
6                    MR. BRANDT:  Yeah, okay.  Good.  And I'm
7         hopeful that we can.  I'll keep questioning then.
8             Q.   (By Mr. Brandt)  And I'm going to turn our
9         attention, Gary, to Larry Flinn's transaction.
10            A.   Sure.
11            Q.   Okay.  And you've obviously met Mr. Flinn,
12        correct?
13            A.   Yes, I have, many times.
14            Q.   Do you remember when you first had any
15        communication with him?
16            A.   I'm sorry, I don't, Jay.  It's been a long,
17        long time ago.
18            Q.   Could you tell us maybe how many different
19        meetings you've had with Larry Flinn?
20            A.   That's a hard question.  Let me think a second.
21        Somewhere between 10 and 20.  Because not only did we
22        make presentations to him on an investment transaction,
23        we also educated him on some estate transactions.
                                Page 44

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
24       Q.   Okay.  Do you remember if the meetings
25   concerning estate issues preceded those that were focused
0105
1    on what you call the investment transaction?
2        A.   Well, yes.  The first meetings were on estate
3    transactions.  As I remember it -- and, boy, it's been a
4    long time ago -- Larry was about to do a GRAT, a grantor
5    retained annuity trust.
6        Q.   All right.
7        A.   And he was going to do that.  He had been using
8    a fellow by the name of Dick Covey in New York, who is --
9    he's recognized as one of the world class people.  I'm
10   going to use that term world class again.
11       Q.   Okay.
12       A.   He's been the principle speaker -- Covey has
13   been the principle speaker at the University of Miami
14   Institute on Estate Planning on new ideas, changes in the
15   law for the last 20, 25 years.  I've been going -- I was
16   going down there for at least that long.  And he always
17   spoke.
18            And he -- Larry had used him for literally 20
19   years and he had done virtually nothing.  All he had done
20   is transfer some stock in trust to his children and he
21   did that himself.  It wasn't something -- Covey is a
22   very, very bright guy, but he is -- he can be so
23   complicated you don't know what the hell he's talking
24   about.  Pardon my profanity.  It just comes with the
25   territory.
0106
1        Q.   When you first had contact with Mr. Flinn, he
2    was considering this grantor trust that you've described?
3        A.   Yes.
4        Q.   And was this a meeting where Mr. Covey was also
5    involved?
6        A.   No.  No.  He was -- it's Covey.
7        Q.   Covey, I'm sorry.
8        A.   Yeah, I think that's how it's pronounced.  He
9    was not there.  Larry was considering this trust and he
10   was going to pay more in gift taxes -- if I -- boy, it's
11   been a long time ago.  I guess it was about 2000 or '99,
12   somewhere -- '99, I guess.  Do you know when we first met
13   with him, Jay?
14       Q.   I don't know exactly.
15       A.   Okay.  Well, I think it was '99.  And he was
16   going to do this grantor retained annuity trust and pay
17   as much in gift taxes as our fee would have been for
18   educating him to eliminate virtually -- how he could have
19   eliminated virtually all of his estate taxes, and he was
20   very interested in that.
21            And then he had -- boy, again.  When we first
22   started talking to him, he had about north of $2 billion
23   worth of stock in AT&T and -- oh, what's the -- one of
24   the spinoffs from -- what is it?  Tele -- what was the
25   big cable company that John Malone owned.
0107
1        Q.   TeleCable.
2        A.   Yeah, TeleCable.  That's what it was.
3            MS. JACOBSEN:  Did you say billion or
4    million?  I'm sorry.
5            THE WITNESS:  Billion.
6            MS. JACOBSEN:  Billion with a B?
7            THE WITNESS:  With a B.
8        A.   And he had gotten AT&T stock when -- when that
                         Page 45

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 9   cable company merged with AT&T, he got a bunch of AT&T
10   stock.
11        Q.   (By Mr. Brandt)  Okay.
12        A.   And it was a different class of AT&T stock.
13   They had a class -- a special class of AT&T stock.  He
14   also got, I think, Liberty Media stock.  So between those
15   two he had, like I said, north of $2 billion worth.  And
16   we started talking to him.  And then he said I've got --
17   I'm going to start selling this AT&T and this Liberty
18   Media stock.  He had already collared -- if I remember
19   correctly, he had collared some of it.  And the question
20   was could you still do any kind of planning with the
21   collar in place, and we had to spend a lot of time on
22   that.
23        But, anyhow, so we talked about estates for a
24   long time.  And then he said, Well, I'm going to sell
25   some of them, have you got anything that might help me
0108
 1   with some income tax problems.  And I said, Well, you
 2   know, we've got this transaction.  It's -- I think at
 3   that time the transaction for Fulcrum and Salina were
 4   still pending, were still moving along.  And I said, you
 5   know, it's being contested in the tax court right now and
 6   told him about that and --
 7        Q.   Can I interrupt you right there --
 8        A.   Sure.
 9        Q.   -- for just a minute?
10        A.   Sure.
11        Q.   You mentioned in part of your answer just a
12   moment ago that on some of the stock he had put a collar
13   in place.
14        A.   Uh-huh.
15        Q.   Describe what that means.
16        A.   Basically a collar is where you pay a fee and
17   it's kind of like a -- it's literally what it says.  The
18   investment bank gets the -- if the stock goes above that
19   price, the gain belongs to the investment bank.  If it
20   goes below that price, the loss is made up by the
21   investment bank.
22        Q.   Okay.
23        A.   It's a way -- I don't know if you remember when
24   Mark Cuban collared a lot of his Yahoo stock.
25        Q.   Yeah.
0109
 1        A.   The market was going down.  He said, Well, they
 2   can call me anything, but they'll never be able to call
 3   me anything but a billionaire, because I'm secured.
 4        Q.   I remember reading that about that.  Yeah.
 5   Okay.  Now, in your initial meetings with Larry Flinn,
 6   were you the only representative of Heritage that
 7   attended those?
 8        A.   No.  Tim Seaberg had gone to one or two
 9   meetings before I attended any of them.  I believe I
10   remember our first meeting taking place at his place in
11   Vail.  He had a lot there and he was going to build
12   there.  I don't think he ever did.  But he was going to
13   build there.  And we met with -- I believe we met there
14   twice at his condo in Vail.
15        Q.   Okay.
16        A.   And, so, we had a lot of discussions and he got
17   interested in doing something about the huge capital
18   gains tax he was facing.  And we kind of shifted gears
19   and said, Well, before I do the estate planning, I'd like
```
Page 46

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
20    to be able to do something about the capital gains tax
21    and, you know, I'm very -- he's a very, very, very
22    sophisticated investor.  He was a former investment
23    banker before he got in the cable TV business.  I don't
24    know what you know about him.
25        Q.   Right.
0110
 1        A.   Extremely sophisticated.  And he had told us
 2    that he had looked at numerous -- it was the largest
 3    amount of transactions that any -- of strategies of
 4    anybody that we ever worked with had already looked at.
 5        Q.   When you say he looked at them, he personally
 6    looked at them?
 7        A.   Yeah, he'd analyzed them.  He'd had a couple --
 8    I don't know.  Two or three investment banks, maybe one
 9    or two law firms, maybe one or two banks.  I mean he had
10    looked at somewhere north of four or five various
11    transactions.
12        Q.   And were these all capital gains strategies?
13        A.   Yes.
14        Q.   Okay.  Can you identify, Gary, any -- either by
15    law firm or name or bank name, any of the other ones that
16    he told you he looked at?
17        A.   It may well be in our files, but I just can't
18    remember them offhand.
19        Q.   Okay.  Did he have -- do you know if he had any
20    independent advisors assisting him in that process?
21        A.   He had -- I think he must have.  I think he
22    might have had Covey's law firm.  The reason I say that
23    is because Covey basically -- we tried to get Covey's law
24    firm to sign our agreement.  We never could get there.
25        Q.   And I'm going to interrupt you, if I may.  When
0111
 1    you say "sign our agreement," does that have reference to
 2    the advisor agreement --
 3        A.   Yes.
 4        Q.   -- that Heritage would ask lawyers and other
 5    professionals to sign?
 6        A.   Right.
 7        Q.   Okay.
 8        A.   Basically to protect our business.  Then we
 9    would have been happy to work with them.  We were --
10    contrary to what people were painting of -- pardon me for
11    saying it -- Ahrens & DeAngeli and Lewis Rice, we were
12    always looking for law firms to add to the people who
13    could do this.  It was not a very -- in my opinion, not a
14    very complicated transaction.
15            So, we were happy to work with any other law
16    firm that was, you know, competent to do the work.  I
17    mean we weren't looking for criminal law firms to do tax
18    opinions, but, you know, any of these good-sized firms.
19            I'm trying to think of this New York firm Covey
20    was with.  It's not Kravet [phonetic].  I'll think of it
21    in a minute.  But, anyhow, it's a well-known, prestigious
22    law firm.
23        Q.   Yes, sir.  At some point in your meetings with
24    Mr. Flinn about this capital gains matter, did he say to
25    you that he wanted to involve another lawyer or another
0112
 1    advisor to help him evaluate it?
 2        A.   Oh, yeah.  He -- well, two things happened.
 3    First, we spent a lot of time trying to develop a
 4    relationship with his -- God, it was on the tip of my
                              Page 47

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
5   tongue.  It almost came out.  I'll think of it in a
6   minute.  I've got parts of the name, but not all of it.
7   Anyway, he wanted us to work with them and we were happy
8   to.  Ledyard -- what's the rest of it?
9             MR. SCHWEGMANN:   There's a C in it.
10  Collier or something.
11            THE WITNESS:   Yeah, something like that.
12    A.   Ledyard something.  Anyhow, well-known New York
13  law firm.  And we were happy to work with them and we
14  went and met with his -- he set up a meeting for us with
15  his -- with his -- Covey had semi-retired and there was
16  another gentleman who had taken over Flinn's account and
17  he was best described as passive-aggressive.  He was very
18  cordial with us when we got there.
19    Q.   Was he a lawyer with the same law firm?
20    A.   Yes.  Carter Ledyard.
21            MR. SCHWEGMANN:   That's it.
22    A.   Carter Ledyard is the firm.
23    Q.   (By Mr. Brandt)  All right.
24    A.   And we tried our best to make friends with him,
25  but we didn't get anywhere.
0113
1     Q.   Now, did you ask this man, this other lawyer at
2   that Carter Ledyard firm, to sign an advisor agreement?
3     A.   That's who we worked with.  We never worked
4   with Covey himself.
5     Q.   Okay.
6     A.   Larry was pretty much -- disgusted is the best
7   word, with Dick Covey.  Simply because he -- you know,
8   here's a guy that's supposedly one of the best guys in
9   the United States.  I think if you'd asked anybody in the
10  United States in the estate planning field who were the
11  five best people, I think Covey would have been named as
12  one of them every time.  And he -- his estate was as if
13  he didn't have anybody virtually.
14    Q.   Well, so this other lawyer --
15    A.   Yeah, who I don't remember his name.
16    Q.   -- from Mr. Covey's firm, apparently he gets
17  involved.  And you said, We tried to make friends with
18  him.  But I take it that never occurred?
19    A.   No.  He -- no, that never occurred.  Let's just
20  leave it at that.
21    Q.   Did he ever sign an advisor agreement?
22    A.   No.
23    Q.   So, did you or anyone at Heritage ever reveal
24  to this lawyer --
25    A.   No.
0114
1     Q.   -- the details of the capital gains plan?
2     A.   No, no.  What Flinn did is he was friendly with
3   one of the -- I can't think of the name.  With one of the
4   estate planning attorneys at Milbank.  He was friendly
5   with her parents, I'm sorry.
6     Q.   Yes, sir.
7     A.   Georgina was her first name.  I'll think of it
8   in a minute.  Very nice, very bright lady.  And she
9   suggested to -- what I gather is that he came and met
10  with her through her parents' contact and then she
11  referred him to Blattmachr is I think what happened.
12    Q.   And was that during the same time that he's
13  talking with you about the capital gains strategy?
14    A.   Yes.  Yes.
15    Q.   All right.
                    Page 48

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
16       A.   He hired Blattmachr and Blattmachr -- are you
17  familiar with -- were you there during all the -- during
18  all Canada's thing where there was all this discussion
19  about the contract and everything?
20       Q.   No, sir, I was not.
21       A.   Okay.  Well, there was a ton of discussion
22  about what Canada did.  But basically Canada and
23  Blattmachr negotiated some changes to our contract so
24  that approximately one-third of our fee was deferred
25  until the transaction had passed either audit or the
0115
1   statute of limitations.  And Canada negotiated that with
2   Blattmachr and they made some changes to the contract.  I
3   don't know if you -- have you got our contract?
4        Q.   I do.  I didn't bring with me today.  But I
5   think I agree with you there were changes made --
6        A.   Right.
7        Q.   -- to that standard agreement that are
8   certainly different from the rest of these clients.
9        A.   Exactly.  Exactly.
10       Q.   Were you ever -- since we've gotten into
11  that --
12       A.   That's fine.
13       Q.   -- were you ever asked to approve those
14  changes?
15       A.   Yes.  I was there at the time.
16       Q.   Okay.  And did you approve of them?
17       A.   Yes, I did.  And then Larry -- later on we made
18  some changes.  He asked -- Larry is an interesting guy.
19  Anyhow, he asked to make some changes because he was
20  afraid that we were going to tell him how to avoid estate
21  taxes by telling him about the marital deduction.  And so
22  we had to exclude the marital deduction from our
23  agreement.  We had to exclude that.  We had to exclude, I
24  believe, charitable bequests.  He was concerned that we
25  weren't going to give him anything special.
0116
1        Q.   Okay.  Did Mr. -- I think from your answer this
2   is correct, but tell me if I'm wrong.  Mr. Blattmachr got
3   involved on his behalf in negotiating these changes to
4   the contract?
5        A.   He negotiated all the changes to the
6   educational matters that dealt with investments, capital
7   gains, hedging, asset protection, all these things.  And
8   then he -- I don't believe he was present when Larry and
9   I agreed to and we made the changes to the contracts on
10  estate matters.  I believe they were fairly simple and
11  there wasn't a lot of --
12       Q.   And did Larry Flinn and his wife sign a
13  separate agreement with Heritage relating to estate
14  issues?
15       A.   Yes.
16       Q.   Okay.  These changes to the capital gains
17  contract that Mr. Blattmachr was involved in --
18       A.   Well, Larry and I negotiated a lot of those.
19       Q.   Yes, sir.
20       A.   And then Mr. Blattmachr and Mr. Canada put them
21  on paper is the best way to say it.
22       Q.   All right.  Was one of those changes that
23  Heritage would undertake an affirmative obligation to
24  tell Larry Flinn if the laws changed while he was in the
25  process of implementing --
0117
                          Page 49

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 1        A.   Absolutely not.
 2        Q.   -- the capital gains?
 3        A.   Absolutely not.
 4        Q.   It was not?
 5        A.   No.   In fact, there's a specific provision in
 6   the agreement that says we have no obligation to notify
 7   them of changes in the law.
 8        Q.   That final agreement that was negotiated, do
 9   you remember if you signed it for Heritage or Mr. Canada
10   did?
11        A.   I'm sorry, Jay, I just don't remember.
12        Q.   All right.
13        A.   I think it was Canada, but I'm not sure.  It
14   may have been me.  I really don't know.  Don't know.
15        Q.   Did Mr. Blattmachr come on the scene before
16   Larry Flinn was ever introduced to Mike Mulligan?
17        A.   Yes.
18        Q.   Okay.  I'm going to come to that and we'll get
19   into it a little more thoroughly.
20        A.   Sure.
21        Q.   Let me kind of get some more structural
22   questions addressed.  You said you met with Mr. Flinn
23   maybe 10 to 20 times?
24        A.   At least.  Yeah, somewhere in that range.
25        Q.   Can you target how many of those dealt with the
0118
 1   capital gains issues as opposed to estate planning?
 2        A.   No.  Because it varied.  I mean it started off
 3   with estate planning and then it went back to -- then it
 4   switched over to capital gains, then there was some
 5   estate planning again, then he went back to capital gains
 6   and then he went back to estate planning.  So it just --
 7   it was kind of -- it was one of those things that at any
 8   given meeting we could be talking about a different
 9   topic.
10        Q.   Okay.  You mentioned two of those meetings
11   occurred at his place in Vail.  Can you tell me the
12   locations of the other meetings, to the best of your
13   memory?
14        A.   Yes.  Some of the meetings were at the Hilton.
15   No, not the Hilton.  The Hyatt hotel in -- I believe he
16   lived -- his home was in Stamford.  It's one of the --
17   one of the Connecticut towns.
18        Q.   Greenwich, I think.
19        A.   Greenwich, yes.  Thank you.  I'm sorry.  It was
20   in Greenwich.  He had a beautiful home there.  And then
21   some other -- some other meetings were at his home in
22   Florida and Jupiter Island.  And some other meetings were
23   at the fixed base operation at the airport outside of
24   Jupiter where we actually just got a conference room out
25   there.  Let's see if there's anything else I can
0119
 1   remember.  Those are the, I think, three or four
 2   places we -- oh, his home in New York.
 3        Q.   Okay.
 4        A.   We met there.  His home on -- in the Hamptons.
 5        Q.   All right.  I wasn't in any of the Canada
 6   hearings that you've been involved in, but I did hear
 7   reference to this evidence.  At some point I've seen it
 8   claimed that you decided you were not going to be able to
 9   get Flinn talked into this transaction by yourself and
10   you got --
11        A.   That's Mr. Canada's version.  It's not my
```
Page 50

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
12  version, as you're well aware.
13            MR. SCHWEGMANN:  I was going to object to
14  form, but go ahead.
15       Q.  (By Mr. Brandt)  Well, I would like to hear
16  your version of it.  How did it come about that Ralph
17  Canada and Anthony Bird started getting involved with
18  meetings with Larry Flinn?
19       A.  So you want to hear the truth?
20       Q.  Well, I want to hear your version of it, yes.
21       A.  Tim Seaberg and I had met with Flinn and we
22  knew that he had Carter Ledyard as his attorneys and we
23  knew that we were going to have to basically play nice,
24  make friends with them and hopefully get the case.
25            The way our offices were structured, mine was
0120
1  on a corner here, Canada's was on a corner there and
2  Bird's was on a corner here.  Well, the way we did
3  compensation was something that came from the life
4  insurance industry.
5            In the life insurance industry, because there
6  are different types of positions, like there's an agent,
7  there's a broker, there's an agent that's housed in an
8  agency, there's an agent that's housed outside of an
9  agency.  All these people have different compensation
10  arrangements as a percentage of premium typically or
11  commissionable premium.
12            So I -- and then if two guys -- and let's say
13  one was a housed agent and one was an outside agent and
14  one typically -- let's just use some numbers.  An agent
15  that was housed in an agency would typically have a 50
16  percent contract.  And an agent that was housed outside
17  of -- outside of the agency would typically have a
18  70 percent contract, because he was paying his own
19  expenses.
20            So -- but then those two people may -- would
21  very likely split a case.  In other words, they would go
22  work an insured jointly and they would go on the app
23  50/50.  Okay.  Now, that's how our compensation system
24  was set up, in that Canada had a 20 percent bonus rate
25  and Bird had a 10 percent bonus rate.  Okay.
0121
1            Does that make sense?
2       Q.  Yes, sir.
3       A.  Just as if it were a commission.  And then I
4  determined what percentage of the case they got
5  production credit for, and that would be like they went
6  on the application.
7            So when Canada and I split a case 50/50, he
8  would get 10 percent of -- he would get 50 percent
9  production credit times his 20 percent bonus rate, which
10  means his bonus was 10 percent of the amount after other
11  expenses, which I determined.  And that was -- for
12  example, if we had paid Ed Ahrens anything, that came off
13  the top.
14       Q.  All right.
15       A.  So I went into Canada's office -- now, do you
16  have any questions about that?  Because that's what it
17  really was.
18       Q.  I'm following along.
19       A.  You understand what I'm -- what I'm saying?
20       Q.  Yes, sir.
21       A.  Okay.  So Canada had -- because he was -- I
22  gave him a 20 percent bonus rate because he was also
                          Page 51

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
23   acting as legal counsel for the company; and I gave Bird
24   a 10 percent bonus rate because he wasn't.  And that
25   didn't have anything to do with the Flinn case.  That was
0122
 1   just their arrangement they were on as far as bonus
 2   percentages.
 3          So I went to Canada and I said, Do you want to
 4   work on this case with me and I'll give you a 15 percent
 5   production bonus.  And he said, No, I want 25.  And I
 6   said something like, People in hell want ice water.  And
 7   then I went to Bird and I said to Bird, Do you want to
 8   work this case on a 15 percent production credit; and he
 9   said sure.
10          So I went back to Canada and I said, Do you
11   work this case?  Bird says he's going to work it.  Do you
12   want to go with us or not?  We're going up to see this
13   guy this weekend, whenever it was.  And -- on a Sunday --
14   I think we were meeting with him on a Monday, but we had
15   to go there on a Sunday.  And he said, Okay, I'll do it
16   for that.
17          So, basically Canada's share of the case was
18   three percent of the gross revenue.  That's the
19   20 percent times the 15 percent.  And Bird's share of the
20   case was the 10 percent times the 15 percent.
21      Q.  Okay.
22      A.  And that's what our deal was.  Now, then they
23   went with me and we went up to New York and met with
24   Larry Flinn at his home in the Hamptons.
25      Q.  Okay.  Let me interject a few questions here to
0123
 1   make sure I understand the sequence of events.  It sounds
 2   like by the time you approached Canada and Bird to get
 3   involved, you had already met with Mr. Flinn what,
 4   several times?
 5      A.  At least two, maybe four.
 6      Q.  Okay.
 7      A.  Tim had met with him at least one or two before
 8   that.  So there was somewhere between three and five
 9   meetings that had already happened.
10      Q.  When you approached Mr. Canada and Mr. Bird to
11   get involved, regardless of how the compensation was
12   going to be structured, did you perceive an advantage to
13   having them involved?
14      A.  Yes.  I perceived two advantages.  First of
15   all, I thought there was strength in numbers when you're
16   dealing with a Wall Street law firm.  And I thought the
17   fact that Mr. Canada had a Harvard law degree would be
18   helpful as well.
19      Q.  Okay.  By the time they both agreed to go make
20   that trip with you and met -- had either of them met
21   Mr. Flinn before that time?
22      A.  No.  No.
23      Q.  Okay.  So by the time they agreed to do that,
24   was Mr. Blattmachr already on the scene on Mr. Flinn's
25   behalf?
0124
 1      A.  No.
 2      Q.  So he came in later?
 3      A.  Yes.  After the Carter Ledyard fellow basically
 4   went by the wayside.
 5      Q.  Okay.  To your knowledge did the Carter Ledyard
 6   lawyer that worked with Mr. Covey ever give Flinn advice
 7   that he shouldn't look at your transaction or deal with
                                Page 52

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
8    Heritage?
9        A.   I would have no knowledge of what they said
10   between the two of them.
11       Q.   Okay.  It does sound from your testimony,
12   though, that you perceived he was somewhat hostile
13   towards Heritage; is that fair?
14       A.   Yeah.  Because -- because, number one, we were
15   also talking about estate planning, which was his
16   specialty, and we were -- I mean, yeah, we were -- we
17   definitely were, in his view, a threat to his
18   relationship with Flinn.
19       Q.   Okay.  Once Mr. Canada and Mr. Bird get
20   involved, how many more meetings occurred with Larry
21   Flinn before he decided he would pursue one of these
22   capital gains strategies that would involve a short sale
23   of treasury securities?
24       A.   You mean after that first meeting at his home
25   in the Hamptons?
0125
1        Q.   After the meeting where Mr. Canada and Bird got
2    involved the first time.
3        A.   That would have been the meeting in the
4    Hamptons.
5        Q.   Yes, sir.
6        A.   Boy, Jay, that's hard -- just hard to recall.
7    I can't remember whether we -- we might have met with him
8    again at his home in the Hamptons.  You asked me -- I
9    forgot there was one other place.  Some meetings occurred
10   at his office in -- whichever Connecticut you were
11   saying.
12       Q.   Greenwich?
13       A.   Greenwich.  Thank you.  I forgot we had
14   meetings there, too.
15       Q.   All right.
16       A.   Because I remember Jonathan Blattmachr and Mike
17   Mulligan sitting at a table there.  I couldn't tell you,
18   Jay.
19       Q.   Okay.
20       A.   There were --
21       Q.   It sounds like there was more than one?
22       A.   Oh, yeah.  Because we would -- we showed up at
23   his home on, I think, at least two occasions and he
24   wanted to have other changes made to the estate planning
25   agreement.  And so we thought we were going there to sign
0126
1    and start -- sign and start going forward and we were
2    prepared to start moving forward.  And every time we --
3    he'd want some more changes, so we would have to go back
4    and redo the agreement.
5        Q.   All right.
6        A.   That happened, I think, twice.
7        Q.   What do you remember telling Mr. Flinn about
8    this capital gains strategy in order to persuade him it's
9    something he ought to get involved in?
10             MR. SCHWEGMANN:  Objection to the form of
11   the question.
12             MS. JACOBSEN:  Objection; form.
13             MR. BRANDT:  What's the grounds of the
14   objection?
15             MS. JACOBSEN:  Misstates his answers to
16   prior testimony, prior questions.
17             MR. SCHWEGMANN:  I can be more specific.
18   He's testified about any number of meetings.  And I mean
                              Page 53

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
19  it's a general question.  If you can answer that in that
20  way, I don't have any objection to the question in
21  general.  But given the number of meetings he's testified
22  about, I think it would be difficult to answer on any
23  specific basis.
24              MR. BRANDT:  Let me -- it is a broad
25  question.  I agree with that.  And I'm happy to get more
0127
1  focused as we move along.
2      Q.  (By Mr. Brandt)  I do want to get a handle on
3  what you told Larry Flinn about this capital gains
4  strategy to persuade him to do it.
5      A.  Well, it wasn't specifically about the capital
6  gains strategy.  You have to remember we started off
7  talking about estate planning.
8      Q.  I understand.
9      A.  And we -- I think we clearly demonstrated to
10  him -- and I may be wrong, but it seemed that way to me
11  -- that he -- that what his existing counsel was
12  recommending was inappropriate to the verge of -- to the
13  point of being foolish.  If somebody can -- for the same
14  money you're going to pay -- you're going to lose either
15  way, one way paying a gift tax or the other way paying
16  us, it doesn't make sense, because his -- I don't know if
17  you're familiar, and I doubt you are, Jay, with what a
18  GRAT does.  But a GRAT doesn't get the assets outside of
19  your taxable estate.  It only gets the growth in the
20  assets outside of your taxable estate.
21      Q.  All right.
22      A.  And so, consequently, he was going to pay
23  approximately the same thing to get just the growth on
24  the assets outside of his taxable estate as he could with
25  us getting the assets themselves and the growth.  And we
0128
1  showed him -- we showed him certain rulings and cases
2  that he hadn't -- he wasn't aware of that showed what had
3  to be done and showed the taxes that had to be paid.  And
4  he -- I think we built credibility with him by showing
5  him -- just by educating him.  Just educating him on what
6  he was about to do as compared to what we said we could
7  do.
8              And obviously for a guy worth $2 billion, our
9  initial fee of 22,5 was not an issue.  So if he wanted to
10  look at it for 22,5, he didn't have to do anything at
11  all.  So I think it was more of a thing of building
12  credibility than, you know, specifically saying anything
13  else.
14              I mean we didn't -- as you well know, we don't
15  give anybody much information about a particular thing
16  we're going to educate them about other than what might
17  be a -- if they decide to do it and get, you know, other
18  counsel what might be something they might be able to
19  accomplish.  But there's always risk in every transaction
20  and we tell them that.
21      Q.  Well, you mentioned earlier that when Mr. Flinn
22  inquired about a strategy to help him with capital gains
23  issues that you mentioned to him it had been challenged
24  in the courts.  I guess did you make specific mention of
25  the Fulcrum case and the Salina Partnership case?
0129
1      A.  No.  You're talking about a different thing.
2  We don't tell people, Jay.  Until he signs our engagement
3  agreement, we didn't -- to get him to sign, we didn't

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
 4   tell him any of that.
 5        Q.  Yeah.  That comes after he --
 6        A.  Right.
 7        Q.  -- pays the initial fee --
 8        A.  Exactly.
 9        Q.  -- and you have him sign the confidentiality
10   agreement, among other provisions, right?
11        A.  Right.  It's not really a confidentiality
12   provision, but let's just say our agreement.
13        Q.  All right.  Well, it does include a -- it has a
14   provision in it that purports to penalize people if
15   they --
16        A.  You can tell everybody not.  Just pay up.
17        Q.  But if they don't pay, it has a provision that
18   purports to be a penalty, doesn't it?
19        A.  No.  No.  There's a -- we've educated them.  If
20   they want to go out and resale our services, they're free
21   to do so.  But they have to pay us for what they've
22   learned if they're going to remarket it.
23        Q.  Okay.  And that's not involved with Flinn
24   anyway, right?
25        A.  No.  I don't think he's been in our business.
0130
 1        Q.  So after he signs the agreement is when you
 2   would have discussed with him there are challenges in the
 3   courts and talked to him about those things.  I've seen a
 4   number of these PowerPoint presentations.  Were those
 5   shown to Mr. Flinn at some point?
 6             MR. SCHWEGMANN:  Objection; form, but you
 7   can answer.
 8        A.  I would have to look at the files.  There were
 9   PowerPoint presentations.  I don't know whether they were
10   the ones you've seen.
11             THE WITNESS:  But I think that deals --
12             MR. SCHWEGMANN:  That's my objection.
13             THE WITNESS:  -- with your objection.
14        A.  We used PowerPoint presentations with him to
15   educate him.
16        Q.  (By Mr. Brandt)  Yeah.  You mentioned a few
17   moments ago you remember one meeting with Larry Flinn at
18   his office in Greenwich, Connecticut, and I think you
19   mentioned that both Mr. Blattmachr and Michael Mulligan
20   were present.  Is that correct?
21        A.  It was either at his office or at the Hyatt
22   hotel.  I'm not sure which.
23        Q.  All right.  Was it a meeting, though, where
24   both Mr. Blattmachr --
25        A.  Yes.
0131
 1        Q.  -- and Mr. Mulligan were there?
 2        A.  Yes.
 3        Q.  Was that before he signed the Heritage
 4   agreement or after?
 5        A.  No.  It was after.
 6        Q.  All right.
 7        A.  He didn't hire Mulligan until after he signed
 8   the agreement, because he actually checked with
 9   Blattmachr to see if he thought Mulligan was competent
10   and if he thought Lewis Rice was competent and Blattmachr
11   approved Flinn hiring them.
12        Q.  Did -- who referred Larry Flinn to Mr. Mulligan
13   and Lewis Rice, to your knowledge?
14        A.  I'm sure we brought up their name and then he
                              Page 55

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
15  went to Blattmachr and said, What do you know about these
16  people.
17      Q.   Okay.
18      A.   So I'm sure we -- I mean he probably heard the
19  name the first time from us and Blattmachr probably said,
20  Yeah, they're really good people, checked out people.
21      Q.   And how is it that you know Mr. Blattmachr
22  approved of Michael Mulligan and Lewis Rice?
23      A.   Conversation --
24      Q.   Someone tell you that?
25      A.   No.  I had conversations with Blattmachr
0132
1  himself.
2      Q.   Okay.  Was there ever a time where Heritage had
3  asked Mr. Blattmachr's firm if it would write legal
4  opinions on these capital gains transactions?
5      A.   Casual conversation maybe, maybe not.  I just
6  don't remember.
7      Q.   All right.  Were you ever present in any
8  meetings or conferences with Larry Flinn where Michael
9  Mulligan gave him any legal advice?
10      A.   Say that again.  I don't really understand the
11  question.
12      Q.   Okay.  Let me see if I can make it a better
13  question.
14      A.   Okay.
15      Q.   And let me just broaden it and make it a little
16  bit easier.
17      A.   Okay.
18      Q.   Were you ever present at any meetings or
19  conferences with Larry Flinn where Michael Mulligan was
20  also present where he made any statements to Mr. Flinn
21  about the merits of this capital gains strategy?
22      A.   Yes.
23      Q.   Do you know when that occurred or where you-all
24  were when that occurred?
25      A.   I don't know.  But you asked me if we were in
0133
1  any and ever.  There were several meetings where
2  Mr. Mulligan said, If you do it this way and, you know,
3  if you meet these criteria and we're involved in it and
4  we approve it, they -- you can't write an opinion letter
5  after -- until you know what the facts are, what really
6  happened.
7      Q.   Right.
8      A.   But where -- there were several meetings where
9  Mr. Mulligan said, Well, if you do it in this matter and
10  we're comfortable with it and we do it and you make these
11  representations to us and you have these reasons for
12  doing it, you know, we can give you a more likely than
13  not opinion on this type of transaction, assuming the law
14  doesn't change between now and the time you do it.
15      Q.   Okay.  Did Mr. Mulligan say words to that
16  effect more than once?
17      A.   Yes, sir.
18      Q.   Okay.  Do you ever recall him expressing an
19  opinion to Mr. Flinn that if you do it this way and
20  structure it accordingly this should work?
21          MS. JACOBSEN:  Objection; form.
22      A.   No.
23      Q.   (By Mr. Brandt)  Okay.  Did any other lawyers
24  from Lewis Rice ever get involved in any meetings with
25  Mr. Flinn when you were present?
Page 56

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
0134
1        A.  I don't believe so, because I believe all the
2   meetings were with either -- the two lawyers that were
3   there, as I remember it, were either Jonathan or Mike.
4        Q.  Okay.  Did Mr. Blattmachr comment on what he
5   thought about this capital gains strategy?
6        A.  Yes.
7        Q.  What do you remember him saying about it?
8        A.  He thought it was a reasonable risk and that
9   you were protected from penalties if you had a more
10  likely than not opinion.  And he had seen -- he, in fact,
11  reviewed Mulligan's opinion.  I don't remember exactly
12  when that was, but I know the opinion went to Blattmachr
13  and I believe Mike made some changes after that, some
14  very slight changes.  I'm not absolutely sure about that,
15  but I know Blattmachr reviewed it.
16       Q.  Okay.  Was anybody from the accounting firm of
17  Whitley Penn ever introduced to Larry Flinn personally?
18       A.  Not that I remember.
19       Q.  Okay.  Other than these personal meetings,
20  Gary, did you also have additional telephone
21  communications with Larry Flinn about these matters?
22       A.  Many times.
23       Q.  Any way to estimate how many?
24       A.  I'm sorry, no.
25       Q.  Okay.  Would the Heritage file contain records
0135
1   of those conversations?
2        A.  No, I didn't ever make notes or anything like
3   that.
4        Q.  Do you have any memory of ever tape recording
5   any of your meetings with Mr. Flinn?
6        A.  I don't -- I mean I don't remember that.  I was
7   just thinking about the places where we met.  For
8   example, Tim Seaberg could have recorded a meeting in
9   Colorado.  I believe it's a one-party state.  New York is
10  a one-party state.  I believe Connecticut is a two-party
11  state, but I'm not sure.  Florida is a one-party state.
12  No, it's a two-party state.  I'm sorry.  So I don't know
13  if anybody else recorded them.  I just don't know.
14       Q.  Okay.
15       A.  I'm just saying in any one-party state, it
16  could have easily happened.
17       Q.  Have you ever seen any transcripts of any
18  recordings of meetings with Larry Flinn?
19       A.  Have I seen any?
20       Q.  Yes, sir.
21       A.  I don't know.  I could have seen one years ago.
22  I don't know.
23       Q.  Okay.  You don't have any specific recollection
24  of it today, though?
25       A.  None at all.
0136
1        Q.  Other than Mr. Blattmachr, maybe Mr. Mulligan a
2   couple of times, did Larry Flinn ever have any other
3   third-party advisors at any of these meetings?
4        A.  I'm just laughing.  He had two of the smartest
5   attorneys in the country.  I think he felt like he was
6   well protected.
7        Q.  And that's a reference to Mr. Blattmachr and
8   Mr. Mulligan, correct?
9        A.  Exactly.
10       Q.  Okay.  So is the answer you don't remember any
                              Page 57

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
11  other advisor?
12      A.  I don't remember any others.
13      Q.  Okay.  Do you remember if any other third-party
14  advisor signed the Heritage advisor agreement other than
15  Mr. Mulligan and Mr. Blattmachr?
16      A.  I don't remember.  You're talking about for
17  Larry Flinn?
18      Q.  Yes, sir.
19      A.  No, not to my -- I don't -- there was nobody
20  else involved to my knowledge.  I don't know what
21  happened with Whitley Penn.  I didn't -- when those tax
22  returns were filed, I wasn't involved in that at all.
23      Q.  Okay.  Once Mr. Canada and Mr. Bird got
24  involved with Larry Flinn -- and let's take them one at a
25  time.  Kind of describe what Canada's role was in
0137
1   getting -- moving forward.  I know you told me he
2   negotiated some changes to the contract.  What else did
3   he do?
4       A.  Virtually nothing.  I mean we went -- we had at
5   least two meetings at Larry Flinn's home in his office
6   above his garage.  And I -- Larry and I went back and
7   forth on whatever the issues were and I remember
8   Mr. Canada might have said a couple of sentences and I
9   remember him making some copies of something.
10      Q.  Okay.  Let's talk about Mr. Bird.
11      A.  That's my version.  Mr. Canada's version would
12  be that Mr. Flinn turned to him every time and he told
13  Mr. Flinn everything.  So there's two conflicting
14  versions.
15      Q.  I understand.  Let's talk about Mr. Bird.  Once
16  he goes involved with Larry Flinn, how would you describe
17  his efforts?
18      A.  Oh, excuse me.  Let me give Mr. Canada some
19  credit where credit is due.  He had most of the
20  conversation with the Carter Ledyard attorney.  He and
21  Mr. Bird had most of those conversations.  I had very
22  little to do with that.  I'm sorry, what was your
23  question again?
24      Q.  Okay.  How else would you describe Anthony
25  Bird's efforts with regard to Mr. Flinn once he got
0138
1   involved?
2       A.  He, again, was more involved in the
3   interactions with the Carter Ledyard attorney and that
4   would have been the extent of it.  He said even less than
5   Mr. Canada did at some of those meetings or most of them.
6   In fact, all of them.
7       Q.  Did Heritage end up paying any bonus to
8   Mr. Canada or Mr. Bird as a result of the Larry Flinn
9   matter?
10      A.  Yes, we paid them exactly what we expected to
11  pay them; and that was -- we paid Mr. Bird approximately
12  one-and-a-half percent of the gross revenue minus the
13  allocated expenses and we paid Mr. Canada three percent
14  of the gross revenue minus the allocated expenses.
15      Q.  As you've alluded to here today, Canada
16  disputed that and Heritage ended up in litigation; is
17  that right?
18      A.  Yes.
19      Q.  Is that still on appeal?
20      A.  Yes.  It goes to the 5th Circuit sometime next
21  month, I believe.  Or no, maybe it's this month.  I don't
                            Page 58

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
22  know.
23          MR. SCHWEGMANN:  September 6th.
24      A.  September 6th.
25      Q.  (By Mr. Brandt)  Did Mr. Bird commence
0139
1   litigation over his bonus on the Flinn matter?
2       A.  Yes.
3       Q.  I think that's been terminated, though, hasn't
4   it?
5       A.  All the way to the Texas Supreme Court.
6       Q.  Okay.  It's over, though, today?
7       A.  Yeah.  He's done.  He lost.
8           THE VIDEOGRAPHER:  I need to change tape.
9           MR. BRANDT:  Why don't we take a short
10  break?
11          MR. SCHWEGMANN:  Sure.
12          (Recess from 2:20 to 2:27.)
13          THE VIDEOGRAPHER:  We're back on tape three
14  at 2:27.
15      Q.  (By Mr. Brandt)  Mr. Kornman, once Larry Flinn
16  decided to do this capital gains transaction, as with all
17  of them, there are a number of steps he had to take to
18  actually put it in place, right?
19      A.  Yes, sir.
20      Q.  What role did you play in any of those efforts,
21  if any?
22      A.  Other than maybe listening to what someone else
23  was doing -- for example, you had that DOJ matter there
24  that they wanted some kind of information to show that
25  the entities could do the transaction.  I was probably
0140
1   listening to those conversations when Canada was involved
2   in talking to them.
3           And then, you know, we -- I said, you know, he
4   suggested Ed Ahrens and they knew Ed, so they were
5   comfortable with Ed doing it.  So I didn't -- once
6   Mulligan -- once Lewis Rice took over, I didn't have
7   anything to do with the implementation.
8       Q.  Okay.  Do you know if Mr. Canada or Mr. Bird
9   got involved in that?
10      A.  Only in an information passalong.  I mean if
11  Lewis Rice needed to get something signed or needed some
12  information that Mr. Flinn had.  I know there were some
13  questions in dealing with the collared stock.  Lewis
14  Rice -- I mean there was passing information back and
15  forth.  There was passing information.  Just various --
16  like I said, Lewis Rice did it.
17          And as far as I know, what Mr. Canada and
18  Mr. Czerwinski did was just pass documents back and forth
19  between Larry and they or get information back and forth
20  between the two of them.
21      Q.  Once Larry Flinn started implementing his
22  trades and setting up this capital gains transaction, did
23  you have additional communications with Mr. Flinn?
24      A.  I had -- I mean, you know, the idea was to make
25  money on the short sale.  So he was talking to me
0141
1   frequently about what -- what he thought the markets were
2   going to do, and this was the point in time when the fed
3   was tightening up the interest rates.  And unfortunately
4   he didn't stay in it long enough to make money.  He
5   actually lost money, but he was trying his best to make
6   money.
                        Page 59

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 7        Q.   But he did lose money on his short sale,
 8   though, didn't he?
 9        A.   Yes, he did.
10        Q.   Do you remember how much money he lost?
11        A.   I think it was between $10 and $15 million.
12        Q.   Okay.
13        A.   That wasn't because he wasn't trying really
14   hard, though.  He doesn't like to lose money.
15        Q.   Okay.  The fee he paid to Heritage ultimately
16   was about $29 million; is that correct?
17        A.   That's correct.
18        Q.   Is that the largest single fee that Heritage
19   received on any of these capital gains transactions?
20        A.   I think it is on any type of investment
21   transaction.
22        Q.   Okay.  And then as his agreement with Heritage
23   got modified between Mr. Canada and Mr. Blattmachr, Flinn
24   was effectively given credit for about a million dollars
25   so that he could use that million to pay his legal fees
0142
 1   to Lewis Rice and to Mr. Blattmachr's firm.  Do you
 2   recall that?
 3        A.   Are you sure it was to Lewis Rice?
 4        Q.   Well, my understanding of it -- and if you
 5   don't know or you disagree, please tell me.
 6        A.   I'm not sure.
 7        Q.   My reading of it shows he got a credit of a
 8   total of a million dollars.
 9        A.   I remember that.
10        Q.   And 750 -- 750,000 was used to pay Lewis Rice
11   with about 200 or 250,000 going to Mr. Blattmachr's firm.
12   Do you have any knowledge of any of that?
13        A.   I don't remember, but that sounds right.  I
14   know it was a total of a million.  I didn't remember how
15   it was split up.
16        Q.   Okay.  And do you know if Heritage paid the law
17   firms for Flinn or he wrote checks himself?
18        A.   He wrote checks himself, I'm sure.
19        Q.   All right.  So after all the fees were paid,
20   did you have any further communications with Mr. Flinn
21   after the short sale had closed?
22        A.   Oh, yeah.  I mean that's -- we went back in and
23   that's when we were doing the estate planning education.
24        Q.   Okay.  Did Mr. Flinn ever implement any of the
25   estate planning concepts that you presented to him?
0143
 1        A.   Not to my knowledge.
 2        Q.   Okay.  Do you know if Mr. Blattmachr did other
 3   estate planning work for him after that time?
 4        A.   Not to my knowledge.
 5        Q.   All right.  Did there come a point where your
 6   contacts with Larry Flinn ceased?
 7        A.   Well, I guess you could say when he sued me.
 8        Q.   Okay.
 9        A.   I would have taken his calls up to that point
10   in time.
11        Q.   Well, did -- for example, when he got notice
12   that he was being audited on the capital gains
13   transaction, did he ever contact you or anyone else at
14   Heritage and seek your assistance?
15        A.   That's two questions.  Did he contact us?  I
16   don't remember whether he did or didn't.  But I don't
17   remember him ever expecting our assistance, because we
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
18    don't practice law.  We don't do those kinds of things.
19    So as far as seeking our assistance, I'm relatively sure
20    he never did that, because we made it perfectly clear we
21    just didn't render that kind of assistance.
22         Q.   Okay.  Well, are you aware, Mr. Kornman, that
23    Mr. Ralph Canada promised the Fluharty family in writing
24    that if they ever had an audit, Heritage would devote a
25    certain number of man hours in assisting them?
0144
 1         A.   No, sir, I'm not.
 2         Q.   Never seen that before?
 3         A.   I don't know if I've seen it.  I don't remember
 4    it.  I don't think -- I know real -- I'm real certain I
 5    didn't approve it.
 6         Q.   Okay.  You say you're real certain that you
 7    didn't approve it.
 8         A.   I might have --
 9         Q.   Does that mean you were never asked to approve
10    it?
11         A.   Yes.
12         Q.   All right.  Let me refocus my question and make
13    sure I get an answer to it.  Did Mr. Flinn ever contact
14    Heritage when he got notice of audit from the Internal
15    Revenue Service --
16              MR. SCHWEGMANN:   Objection; form.
17         Q.   -- on this transaction?
18         A.   Say that again.
19         Q.   (By Mr. Brandt)  Okay.  Let me -- I can make it
20    a better question.
21         A.   Okay.
22         Q.   Did Mr. Flinn ever contact you --
23         A.   Okay.
24         Q.   -- to help him in dealing with the IRS when he
25    got notice of an audit on his capital gains matter?
0145
 1         A.   I talked to Larry after I believe -- I believe
 2    I spoke to him after he got an audit notice.  It wasn't
 3    any request for anything but telling me what was going
 4    on.  I mean he wasn't asking me to do anything.
 5         Q.   Okay.
 6         A.   He hired another tax attorney.  Do you happen
 7    to know the guy's name that worked with him?  There was
 8    another fellow I don't remember.
 9         Q.   Well, there were several.  There were some guys
10    from Sutherland, Asbill & Brennan got involved at one
11    point.
12         A.   Okay.
13         Q.   Okay.  Did you ever have any contact with them?
14         A.   No.  I didn't even know he had hired them.
15         Q.   Okay.  Has Heritage ever hired them for tax
16    work?
17         A.   Yes.
18         Q.   All right.  So did Mr. Flinn tell you the name
19    of the tax lawyer he had hired?
20         A.   I was on a conference call with a -- I think a
21    sole practitioner or not a very big firm.  Gosh, I can't
22    remember that guy's name.  Do you know the other fellow
23    he hired besides Sutherland Asbill?
24         Q.   I'll find it.
25         A.   It was an independent -- pretty independent
0146
 1    guy.  And I remember being on a conference call with him
 2    and Larry.  I don't really remember the gist of the

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
3    conversation.  I just remember the call.
4         Q.   Do you remember why you were asked to
5    participate?
6         A.   No, I'm sorry, I don't, Jay.
7         Q.   Do you remember what input you provided during
8    the conference call?
9         A.   No.  No.
10        Q.   During that same time period, were you still
11   talking to Larry Flinn about estate planning concepts?
12        A.   Jay, I'm just not sure of the timing.  I think
13   the conversation that was -- that we were discussing was
14   whether or not -- and this is -- this is really vague and
15   I'm not sure this -- I don't want to speculate.  Let me
16   just leave that alone.  Because if you can't remember it
17   for sure, no sense speculating.
18        Q.   That's right.  I want to just know what you
19   remember --
20        A.   Right.
21        Q.   -- in terms of these conversations with Larry
22   Flinn.
23        A.   But, I mean, the one thing I'm sure of is he
24   never expected us to do anything for him because our
25   agreement said we weren't responsible.  He knew that we
0147
1    said that a thousand times.  So I mean that was --
2              MS. JACOBSEN:  Regarding the audit you're
3    saying?
4              THE WITNESS:  Yeah.
5         Q.   (By Mr. Brandt)  Okay.  Do you know if Larry
6    Flinn ever contacted Lewis Rice to seek its legal
7    assistance with the audit?
8         A.   I have no idea.
9         Q.   Do you know -- do you have any knowledge about
10   how Larry Flinn got referred to Whitley Penn to assist in
11   preparation of some of the tax returns?
12        A.   No, not really.  Canada and Bird did almost
13   everything with Whitley Penn.  I think I may have met the
14   people maybe once or twice.
15             (Exhibit No. 13 marked.)
16        Q.   (By Mr. Brandt)  Okay.  Let me hand you what
17   I've marked as Exhibit 13 to your deposition.
18        A.   Okay.
19        Q.   Take a moment to look at that, please.  It's
20   got other stickers on it too, exhibit stickers, but for
21   our purposes today, it's Kornman Exhibit 13.
22             My first question to you, Mr. Kornman is going
23   to be:  When did you first see this letter?
24        A.   The first time I saw this letter was in the
25   litigation that's arisen out of all this.
0148
1         Q.   Okay.  I'm going to have to -- can you tell me
2    what litigation you're referring to?
3         A.   Somebody showed it to me in a deposition.  I've
4    been in the bank -- I've been in a bankruptcy deposition.
5    I've been in a deposition with Howard Jenkins.  So it
6    must have been one of those two.
7         Q.   Okay.
8         A.   I think that's the first time I saw it.
9         Q.   This is dated May 2 of 2001, correct?
10        A.   Uh-huh.
11        Q.   Is it your testimony you did not see it shortly
12   after that date?
13        A.   That's correct.  The first thing I remember
Page 62

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
14   getting from the IRS was the -- was a summons and we
15   immediately geared up, bought extra copiers and started
16   copying stuff.
17      Q.   Okay.  And so the record is clear, you think
18   the first time you saw Exhibit 13 was when somebody was
19   taking your deposition in litigation that's arisen out of
20   these capital gains matters; is that right?
21      A.   Yes, that's correct.
22      Q.   You can't give me a date?
23      A.   It's been a perpetual matter, for the last five
24   years anyhow.
25      Q.   Do you know -- do you have any knowledge
0149
1   whether this letter marked as Exhibit 13 was ever
2   received by The Heritage Organization?
3      A.   I have no way of knowing.
4      Q.   Can you --
5      A.   Now let me say one thing.  Who produced it?
6   Does this mean that the trustee produced it?
7      Q.   To me, Mr. Kornman, the trustee produced it.
8   Okay.
9      A.   Okay.  So what was your question?  I'm sorry,
10   again, Jay.
11      Q.   Do you know who at Heritage would know whether
12   this was ever received by Heritage or not?
13      A.   I'm sorry, I don't.
14      Q.   In 2001 was there any one person who was in
15   charge of receiving the mail?
16      A.   The reason I'm smiling is you would think I
17   would at least know who that is, but I don't remember.
18      Q.   Was any person given the responsibility of
19   accepting hand deliveries of documents back in 2001?
20      A.   No.  I know that we had a policy that the
21   receptionist wasn't allowed to accept anything, but other
22   than -- because she didn't know what she was doing
23   most -- you know, what was -- she could have accepted a
24   hand grenade.  Nothing personal.  But you don't know
25   what's in a package.  So, I mean other than that, I don't
0150
1   know who would have gotten what.
2      Q.   To your knowledge, did your son Michael Kornman
3   ever have any contact or communication with Larry Flinn?
4      A.   Not to my knowledge, no.
5      Q.   Did he --
6      A.   Let me just think.  Did he ever -- I can't
7   remember.  It's not impossible, but I just don't
8   remember.
9      Q.   Did he ever make any of the trips to go meet
10   with Mr. Flinn?
11      A.   He was learning to fly our airplane at the
12   time, so he may well have been one of the pilots on the
13   trip just in that function.  But to my knowledge, I don't
14   remember any meetings where he ever attended.
15      Q.   Okay.  Is he a pilot today?
16      A.   Yes.
17      Q.   And back then Heritage had its own company
18   plane, right?
19      A.   Well, no.  We leased planes and pilots and
20   other things from various different entities.
21      Q.   Okay.  Do you ever remember any occasions where
22   you got on your leased plane and left and picked up
23   Michael Mulligan in St. Louis and then ended up meeting
24   with Mr. Flinn?
Page 63

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
25        A.  I can't remember anything like that, Jay.  I'm
0151
 1    not saying it didn't happen or did happen.  I just don't
 2    remember.  It would be one of those things that's just
 3    inconsequential.
 4        Q.  Okay.  Fair enough.
 5              MR. BRANDT:  I'll pass the witness.
 6              MS. JACOBSEN:  I think I need a microphone.
 7              MR. SCHWEGMANN:  While they're switching
 8    microphones, do you need a break or would you rather just
 9    keep going?
10              THE WITNESS:  I'm ready to keep going.
11              MR. SCHWEGMANN:  Okay.
12                    EXAMINATION
13    BY MS. JACOBSEN:
14        Q.  Good afternoon, Mr. Kornman.  My name is
15    Allison Jacobsen.  We met earlier.  I represent the law
16    firm Lewis, Rice & Fingersh --
17        A.  Allison, I hate to ask you to do this, but
18    could you swap seats with Jay?  You talk soft and I've
19    got a slight hearing problem, all those airplanes.
20        Q.  Okay.
21              MR. BRANDT:  No problem.
22              THE WITNESS:  Thanks, Jay.
23        Q.  (By Ms. Jacobsen)  All right.
24        A.  Can I get you to call me Gary?
25        Q.  I'll try.
0152
 1        A.  It will be hard, but you'll try.
 2        Q.  I'll try.
 3        A.  May I call you Allison?
 4        Q.  Yes, you may, of course.
 5        A.  Thank you.
 6        Q.  We met earlier and I represent the law firm
 7    Lewis, Rice & Fingersh and Michael Mulligan.  When I
 8    reference Lewis Rice, I'm usually asking questions about
 9    both.
10        A.  Okay.
11        Q.  If I want to talk about Mr. Mulligan
12    individually, then I will say that.
13        A.  Okay.
14        Q.  I want to go back and just ask you a few
15    questions about some of the topics you were asked about
16    earlier.
17        A.  Okay.
18        Q.  One was a certain advisor agreement.  Do you
19    remember that?
20        A.  Uh-huh.  Yes, I do.
21              (Exhibit No. 14 marked.)
22        Q.  (By Ms. Jacobsen)  I'm handing you what's been
23    marked as Kornman Exhibit 14.  Will you look at that and
24    tell me if you recognize that to be the type of advisor
25    agreement that you were testifying about earlier in your
0153
 1    deposition?
 2        A.  It changed after this.  When was this signed?
 3    Let me look at the date.  Hold on a second.  This was
 4    January of 2000 -- January 21, 2000, according to the
 5    notary.  Let's see when it was signed.  January 24th.
 6    Later on there was a different agreement, but this was
 7    the first version of it or early version, I should say.
 8    I'm not sure if it was the first.
 9        Q.  Okay.  And the broad purpose of those
```
                              Page 64

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
10  agreements, though they may have had minor changes, was
11  to protect the confidentiality of the development of the
12  ideas that you had come up with that you were then
13  educating clients about; is that right?
14      A.   Well, it was basically to protect people from
15  going around us to protect our business.  They were
16  welcome to go around us, but if they did we wanted to be
17  paid for it.
18      Q.   Okay.  And when you say "going around us," you
19  mean if they had the information that you had provided
20  them, they weren't supposed to provide it to somebody
21  else who didn't already have the information without
22  paying you a fee?
23      A.   That's exactly right.
24      Q.   Okay.
25      A.   It was to protect our business.
0154
1       Q.   And Mr. Ahrens testified that he did not sign
2   an agreement like that.  My question is:  Was that
3   because he already had the information?
4       A.   That's exactly right.
5       Q.   He had already developed it?
6       A.   Well, I don't know whether he developed it or
7   not, but he gave it to -- he provided the basic
8   information to us.  So it didn't make sense to have him
9   sign something that he already knew about.
10      Q.   Right.  But anyone that didn't already know
11  about these -- this information would need to sign an
12  advisor agreement to go forward and learn about it?
13      A.   That's right.
14      Q.   Okay.  And it has been argued that through some
15  construction of this agreement, somehow an attorney who
16  worked for a Heritage-referred client and revealed
17  information to that client would be in violation of this
18  agreement.  That's not the way the agreement works,
19  right?
20      A.   It's absolutely absurd.
21      Q.   Okay.  Because, of course, you would have
22  already given the information --
23      A.   Right.
24      Q.   -- to the client when you referred them and
25  then --
0155
1       A.   Wait.  Say that one more time.  I want to make
2   sure I heard it right.
3       Q.   That somehow by revealing the information to a
4   Heritage-referred client, the advisor would be in
5   violation of this agreement.
6       A.   That's absolutely absurd, because we've
7   already -- at that time we would have already revealed it
8   to the client and we would have told the law firm we had
9   revealed it to the client.
10      Q.   And actually when signing this agreement, the
11  law firm is working for the client and you're working for
12  the client.  So you're actually both working with the
13  same purposes of helping the client with regard to this
14  plan that they're developing?
15           MR. BRANDT:  Objection; form.  Excuse me.
16      A.   That's exactly right.  We were trying to
17  educate the client.  And then the law firm was typically
18  brought in after the fact to give the client an
19  independent opinion on whatever we had educated them
20  about.  And if the client said, Okay, I want to do it,
                          Page 65

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
21   then typically the law firm would implement it.
22       Q.   (By Ms. Jacobsen)  Okay.  And this was your
23   company's agreement, correct, Exhibit 14?
24       A.   This was The Heritage Organization's agreement.
25   The term "your company," I didn't own the company so I --
0156
 1       Q.   And I understand that.  You did discuss exactly
 2   the ownership.  But you were the -- you were the boss of
 3   the company, wouldn't you say that?
 4       A.   If you want call the chief executive the boss,
 5   I was the boss.
 6       Q.   You were -- I mean the buck stopped here,
 7   right?
 8       A.   I hate to say it -- well, not totally.  There
 9   were people underneath me that many times made decisions.
10   That's a general statement.  But, I mean, Ralph Canada
11   made a lot of decisions.  People in the various
12   departments made a lot of decisions that I never even
13   knew existed.
14       Q.   But in terms of enforcing this agreement, you
15   would know the way the company would use the agreement
16   and how they would enforce it?
17       A.   Yeah, I would be the last authority.  I would
18   make the final decision on how this agreement was
19   enforced.  Yes, I would.
20       Q.   And you did not understand that this agreement
21   created some secret agency relationship between you and a
22   law firm against the clients that you were referring to
23   the firm, that the company was referring to the firm?
24       A.   Absolutely not.
25       Q.   There is no obligation in this agreement for
0157
 1   the law firm to provide information to you that could
 2   hurt the client that you referred to the law firm?
 3       A.   Absolutely not.
 4       Q.   Okay.  And, additionally, it's been argued that
 5   this confidentiality agreement somehow was a
 6   prequalification, where the law firm was secretly telling
 7   your -- I don't want to say your company.  Let me start
 8   over.
 9            That this agreement was somehow a
10   prequalification where there was a secret deal that the
11   law firm was telling you and The Heritage Organization
12   that it will always provide a positive opinion for every
13   client you refer.
14            MR. BRANDT:  Objection; form.
15       A.   Absolutely not.
16       Q.   (By Ms. Jacobsen)  That's not the way this
17   worked?
18       A.   No.
19       Q.   So can you please explain how it actually does
20   work in terms of getting an opinion from the law firm?
21       A.   Okay.  Just what I said.  The law firm had an
22   independent responsibility, having nothing to do with us,
23   to advise the client on their best judgment of what the
24   -- about the matters which we had educated them about.
25            I mean our whole concept is -- my theory of
0158
 1   business is I would never ask a client to do something I
 2   wouldn't do myself in the same situation.  And I would
 3   never take the advise, so to speak, or implement
 4   something based on someone who was going to make the kind
 5   of fees we were going to make.
                          Page 66

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt

6          So our agreement with the clients required them
7     to get an independent advisor.  And in Larry Flinn's
8     case, he got two.  Two of the best law firms in the
9     United States as far as their matters go.
10         So, I mean I -- it was -- no.  No.  It's just
11    like I said about Carter Ledyard.  I would have been
12    happy to work with them if they had signed the agreement
13    to protect our business -- our business or pay us if they
14    reused the information.  So no.
15         And I think the answer to -- if I understand
16    your question, it's an emphatic no.
17    Q.   And in each instance that a law firm like Lewis
18    Rice received a referral from Heritage, I think you said
19    earlier they would wait until the transaction was
20    completed to be able to analyze the facts to be sure that
21    they could actually provide the opinion, correct?
22    A.   That's right.  And they -- I mean it would have
23    been unusual if they couldn't, because they were involved
24    in it.  If the client agreed that he wanted to implement
25    it, they basically did the implementation.  All we did
0159
1     was act as a go between.
2     Q.   And they would then do the due diligence with
3     the client --
4     A.   Exactly.
5     Q.   -- to make sure that as the client went
6     forward, they had the right intentions, correct?
7     A.   Right, exactly.
8     Q.   And they were doing this for reasons other than
9     merely tax-savings reasons?
10    A.   Exactly.
11    Q.   And that they were structuring it in a way that
12    met with the requirements as the opinion would interpret
13    them under the code?
14              MR. BRANDT:  Objection; form.
15    A.   Exactly.
16    Q.   (By Ms. Jacobsen)  And the law firm would not
17    provide that opinion before all of those details and all
18    of that due diligence was done, correct?
19    A.   That's correct.
20    Q.   And you're not aware of Lewis Rice ever
21    providing an opinion before doing that type of due
22    diligence, are you?
23    A.   Not at all.  Not once.
24    Q.   And you're not aware of Michael Mulligan
25    providing any opinion before that kind of due diligence
0160
1     was done?
2     A.   Let me just explain one other thing to you.  In
3     the very first -- the very first time I met Michael
4     Mulligan -- Mike Mulligan was on this estate planning
5     case in California, and we didn't know him.  Literally I
6     called him up.
7          The circumstances -- if you don't mind me going
8     into it.  The circumstances were the client said, Who
9     else in the United States knows something about this that
10    you've never worked with.  And Mulligan had written some
11    -- an article about it.  And I called Mulligan up -- I
12    knew a mutual friend -- and said -- literally he thought
13    it was a joke.
14         I said, If you will get on a plane and fly to
15    California, we need to -- we have a client that wants to
16    get an opinion on what we're recommending and he will pay

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
17   you $150,000.  This was many years -- maybe '98, maybe
18   even '97.  He'll pay you $150,000 to get on a plane, come
19   out here and tell you what this -- tell what this is
20   about.
21          Now, the way -- you mentioned due diligence.
22   The way that client wanted to do it was he put Mike in a
23   room by himself.  He wouldn't let Jonathan Blattmachr,
24   who was already in the case, he wouldn't let us explain
25   anything to Mike.  He gave him all the documents and
0161
 1   said, I want you to read all these, I want you to tell me
 2   what they do and then I want you to tell me if it has a
 3   high probability of working.  And that's exactly what
 4   Mike did.
 5          So his due diligence was not with the client
 6   like it was in the investment transactions.  It was on
 7   the structure.  So I just wanted to explain to you.  You
 8   asked me if I didn't know of any time that he didn't do
 9   that.  So the best way to say it is he didn't do it the
10   same way in the estate matter as he would in an
11   investment transaction matter.
12              MS. JACOBSEN:  Okay.  And I'm just going to
13   object to the extent your answer is nonresponsive.
14       Q.  (By Ms. Jacobsen)  I think I asked in any
15   Heritage-referred client dealing with this advisor
16   agreement.  And if I was --
17       A.  All of our clients -- all of our clients signed
18   three agreements.
19       Q.  Right.  But that's an estate planning matter,
20   correct, that you're discussing?
21       A.  Yes.
22       Q.  And I'm talking about the Heritage-referred
23   clients on -- and let's develop common terminology.
24       A.  Let's just say investment transactions.
25       Q.  Investment transactions.  I've called it the
0162
 1   Heritage financial plan, but I guess here there are many
 2   financial plans.
 3       A.  Right.
 4       Q.  So I'm asking about the investment
 5   transactions.
 6       A.  That's fine.
 7       Q.  Okay.  You're not aware of --
 8       A.  I'm sorry if I make you qualify it.
 9       Q.  Oh, no, no, no.  I'm glad that we make sure
10   we're -- and if you have any question about -- if you
11   have any question that needs any clarification that you
12   need about my questions, just let me know.
13       A.  Thank you.
14       Q.  But, no.  I'm saying you're not aware of any
15   time that Mike Mulligan gave an opinion before doing that
16   kind of due diligence process on an investment
17   transaction?
18       A.  Right.  A written opinion, yes, that's correct.
19       Q.  And the only oral opinion that he would have
20   given, if you can call it that, would have been what you
21   described earlier, which would be if the transactions are
22   correct and the law hasn't changed by the time you finish
23   the transaction and if our due diligence shows that you
24   have the right purposes, then we can provide an opinion?
25              MR. BRANDT:  Objection; form.
0163
 1       A.  That's correct.
                        Page 68

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
2        Q.   (By Ms. Jacobsen)  And have I stated your
3   previous testimony accurately?
4        A.   Correctly, yes, ma'am.
5        Q.   Okay.
6        A.   Can I give this back to you?
7        Q.   Yes.  The other -- another area that you
8   previously testified about was that meeting that you
9   attended where -- early on after Ahrens & DeAngeli
10  stopped providing opinions for Heritage-referred clients,
11  you met with, I think you said, Mike Mulligan, Bill Falk
12  and Larry Weltman to discuss whether Lewis Rice would be
13  able to investigate and potentially give opinions to
14  Heritage-referred clients?
15       A.   I'm not sure that was before Ed stopped giving
16  -- I'm not sure that it was after Ed stopped giving
17  opinions.  I'm not sure of the time frame of it.  And
18  there were other people involved possibly.  I'm not sure
19  those were the only people at the meeting.
20       Q.   Okay.  Well, I'm just trying to put you back
21  into reference of where you were talking about before,
22  which was that early meeting with Lewis Rice.
23       A.   That's fine.
24       Q.   That has been argued, again, as a
25  prequalification meeting where there was some
0164
1   understanding between The Heritage Organization and Lewis
2   Rice that from moving on -- going forward with these
3   clients Lewis Rice would always give an positive opinion.
4   Is that true?
5                MR. BRANDT:  Objection; form.
6        A.   Nothing could be further from the truth.  I
7   don't -- I would have to go back and really think hard
8   about this.  But I think that was a preliminary meeting
9   where we kind of discussed what we were doing and what
10  the strategy -- I'm not even sure we disclosed the
11  strategy.  Maybe it was just a thing of -- I don't
12  remember whether they signed the advisor agreements at
13  that meeting.  I don't remember exactly what happen.
14           But I don't think they -- here's what I'm
15  trying to say.  I'm stuttering around about it.  I don't
16  think they agreed to even do it at that meeting.  I think
17  they agreed to look at it or we agreed to disclose it to
18  them and then they were going to analyze it and see what
19  they thought.
20           There's never been any agreement whatsoever
21  that they would always give an opinion letter.  I mean I
22  think if -- I think if a client just walked up to them
23  and said, Well, I'm doing this for tax reasons and I
24  don't give a toot about the rest of it, I think they
25  would say, Thank you very much, but we can't give you an
0165
1   opinion letter.
2        Q.   Okay.  So you never had any facts or
3   information to give you any concern that Lewis Rice would
4   not do an independent analysis on behalf of clients you
5   referred to the firm?
6                MR. BRANDT:  Objection; form.
7        A.   Absolutely not.  And, in fact, I don't believe
8   -- if I had ever even felt that, we wouldn't have used
9   them at all.
10       Q.   (By Ms. Jacobsen)  I also had a question
11  regarding when you referred clients to firms like Ahrens
12  & DeAngeli or Lewis Rice, was it -- and I believe Canada
                          Page 69

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
13  testified that this was the case, but I want to know if
14  you think so, too.
15          Was it typical that you would say we've done --
16  they have done work for us before and we endorse them
17  because we can, we have experience with them, they've
18  worked for us and we think they do a good job?
19          MR. BRANDT:  Objection; form.
20          MR. SCHWEGMANN:  Objection; form.
21  A.  Do you want to rephrase your --
22          MR. SCHWEGMANN:  I think it's probably best
23  just to rephrase, if that's all right.
24  Q.  (By Ms. Jacobsen)  Okay.
25  A.  When you get two out of two --
0166
1   Q.  Yeah.  Was it the typical practice of The
2   Heritage Organization to tell clients who were referred
3   to like Lewis Rice, that Lewis Rice had done work for The
4   Heritage Organization previously and you had had a good
5   experience with them?
6   A.  Yes.  What we told -- typically what we told
7   clients was that we met these people doing work for us,
8   they have done work for us, they continue to do work for
9   us and they've also, depending on what -- what time the
10  reference was given, as far as the date, they've done
11  this for other clients.
12          For example, we had a client that wanted to get
13  something done very quickly.  That would be the Sandwith
14  family.  And we referred Mike Mulligan and Lewis Rice to
15  them, because they said, Who can get this done the
16  quickest?  And we said, Here's a guy who is one of the
17  best in the United States at this and he will -- they
18  will get it done quickly.
19  Q.  Let me interrupt you.  Did you, in fact, when
20  you met with Mr. Flinn and mentioned Mr. Mulligan and
21  Lewis Rice, did you tell him that the Lewis Rice firm had
22  done work for The Heritage Organization previously?
23  A.  Yes.  That's how we -- I mean that's just a
24  matter of course.  I mean we never -- the best thing to
25  say is we never recommended anybody to our clients that
0167
1   we hadn't used first.
2   Q.  And they understood that?
3   A.  Sure.  Sure.  And, I mean, Mr. Ahrens, as you
4   know -- I don't know if you do know.  But Mr. Ahrens, in
5   his letters with the -- his engagement letters, he
6   spelled that out.
7   Q.  I'm jumping from topic to topic here --
8   A.  That's fine.
9   Q.  -- just because I'm trying not to -- I'm trying
10  to just ask questions on things that Mr. Brandt hasn't
11  already covered.
12          You said you did not know why The Heritage
13  Organization took bankruptcy, correct?
14  A.  Yes, that's correct.
15  Q.  It has been argued that the reason that The
16  Heritage Organization took bankruptcy was because of an
17  IRS audit of these investment plans.  Can you at least
18  say that that was not the reason The Heritage
19  Organization took bankruptcy?
20          MR. BRANDT:  Objection; form.
21          MR. SCHWEGMANN:  Gary, also, if you have an
22  understanding with respect to that, keep in mind the
23  possible privilege that may be involved in answering that
Page 70

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
24   question.
25        A.   If you want to rephrase the question and let me
0168
1    think about it a little bit more to see if I can give you
2    an intelligent answer?
3        Q.   (By Ms. Jacobsen)  Sure.  It has been argued
4    that the reason that The Heritage Organization took
5    bankruptcy was because of the IRS audits of these
6    investment plans.  Is that true?
7             MR. BRANDT:  Objection; form.
8        A.   You want my belief?  Because my belief is that
9    is absolutely not true, because that started -- The
10   Heritage Organization had very, very good financial
11   results in 2002.  The company was in good shape.  There
12   was nothing to believe -- these lawsuits were not -- to
13   my knowledge, not happening with the exception of the
14   Canada matter.  None of these people had either
15   threatened litigation or filed litigation at the time
16   that they took Chapter 11; or at least while I was there,
17   I never saw it.
18            So the fact that the IRS was challenging these,
19   they've been challenged -- they were challenging these in
20   '98.  Nothing had changed.  They've been challenging
21   these.  People keep saying what happened about this
22   letter or what happened about this.
23            Well, we knew from day one that the IRS didn't
24   like this.  We told every client, Expect to be audited,
25   expect to have to go to court to defend it.  If you don't
0169
1    feel like you want to go to court and defend it, don't do
2    it.  Because if you get audited, which is likely, you are
3    going to have to defend it in court.
4             They're not just going to say -- for example,
5    Larry Flinn may have had a $300 million tax savings.
6    It's not -- it wasn't likely at all the IRS would just
7    come in and say great.  We'd already seen Florida Power &
8    Light and Turner Communications be challenged on similar
9    type transactions.
10       Q.   And you disclosed those to Mr. Flinn?
11       A.   Absolutely.
12       Q.   And it was a matter of course that you would
13   disclose that kind of information to all of the clients
14   that signed up with the Heritage plan?
15       A.   As far as I know, every client that I dealt
16   with, that was totally disclosed.  I can't speak for
17   Mr. Canada or Mr. Bird.
18       Q.   Well, you can speak --
19       A.   They were supposed to.
20       Q.   You can speak for your agreements that
21   certainly say that?
22       A.   Exactly.
23       Q.   And every client was required to sign an
24   agreement so that you could make sure that they were
25   properly informed, correct?
0170
1        A.   Exactly.
2        Q.   And just to back up a little bit.  What kinds
3    of clients did The Heritage Organization typically deal
4    with?
5        A.   The most sophisticated in the United States.
6        Q.   They were not the kind of clients that would
7    sign things without reading them?
8             MR. BRANDT:  Objection; form.
                         Page 71

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt

```
 9        A.   No.   They -- they read them.  Most of the time,
10   almost, I would say, 90 to -- 80 to 90 percent of the
11   time they gave them to their lawyers to review.  It got
12   to the point we would tell them, If you give it to your
13   lawyer, just expect he's going to tell you not to sign
14   it.  We've never -- and we used to joke and say, If your
15   attorney tells you to sign it, you need a new attorney.
16             But, yeah, we expected them to give them to
17   other attorneys and we expected their attorneys to tell
18   them not to sign them.
19        Q.   And that's because these were risky deals,
20   weren't they?
21        A.   Exactly.  And the agreement spelled out the
22   risk.
23        Q.   And these clients knew they were taking those
24   risks?
25             MR. BRANDT:  Objection; form.
0171
 1        A.   Absolutely.
 2        Q.   (By Ms. Jacobsen)  You told them about the
 3   risks?
 4        A.   Absolutely.  And not only did we tell them, but
 5   whoever the attorneys they had hired.  For example, in
 6   Larry Flinn's case, both Mike Mulligan and Jonathan
 7   Blattmachr told him about the risk.  These are
 8   businessmen.  They're people who used -- they're used to
 9   taking risks.
10        Q.   And typically how wealthy were the clients that
11   The Heritage Organization dealt with?
12             MR. BRANDT:  Objection; form.
13        Q.   (By Ms. Jacobsen)  Why were they shopping for
14   ways to save taxes?
15             MR. SCHWEGMANN:  Objection to form.
16        A.   Let me answer the first question.  They were
17   the wealthiest -- some of the wealthiest people in
18   America.  As I said, Larry Flinn was worth over
19   $2 billion at the time.  It was rare that we had a client
20   that was worthless than $50 million.  There were a few
21   that Mr. Bird took and Mr. Canada that might have been
22   slightly less, but it was rare.
23        Q.   (By Ms. Jacobsen)  And Mr. Flinn, where is he
24   in the spectrum of wealth and sophisticated among The
25   Heritage Organization clients?
0172
 1             MR. BRANDT:  Objection; form.
 2        A.   In both wealth and sophistication, he would be
 3   right at the top.
 4        Q.   (By Ms. Jacobsen)  And in terms --
 5        A.   He was a former investment banker.  He did all
 6   kinds of deals.  He was on the board of lots of
 7   companies.  He was a very sophisticated guy.
 8        Q.   So he never gave you any indication during the
 9   times you met with him he didn't understand the way the
10   plan worked?
11        A.   No, not at all.  I'm sorry for laughing.  But
12   if you knew Larry Flinn, he has one of the most
13   sophisticated, detailed-oriented, inquiring minds.  Every
14   -- we literally had -- he literally checked every number
15   on our computer models.
16        Q.   How many times did he change the various fee
17   agreements that you were negotiating with him?
18        A.   At least three.
19        Q.   And were those changes rather significant?
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
20      A.   Very significant.
21      Q.   And reviewed by Mr. Blattmachr?
22      A.   Yes.
23      Q.   And that's just the fee agreement?
24      A.   Right.
25      Q.   That's just the, okay, let's get started
0173
 1  agreement?
 2      A.   Right.
 3      Q.   And then down the road, as you were going
 4  through the plan, you said you had numerous meetings and
 5  telephone conversations.  Was he active in those?
 6      A.   Mr. Flinn?
 7      Q.   Yes.
 8      A.   I'm sorry, but his -- this would be so out of
 9  character for Larry Flinn to not be active that it's
10  laughable.  Yes, he was the guy making the decisions all
11  the time.
12      Q.   And was he making changes to the plan to suit
13  his particular business purposes?
14      A.   He was always asking questions because his plan
15  was unique because he had certain -- he had certain
16  things already in place, such as a partnership, such as
17  these collars I spoke of, and we -- we had to meet his
18  satisfaction on each one of these issues.
19      Q.   And that made -- suiting his needs made the
20  entire transaction more time consuming, correct?
21      A.   Oh, yeah.
22      Q.   And more costly for people serving him,
23  correct?
24      A.   Yes.
25      Q.   And he was able to specify what he wanted and
0174
 1  what he didn't and make changes and ultimately come up
 2  with a resolution as to what to move forward with on his
 3  own?
 4           MR. BRANDT:  Objection; form.
 5      A.   Absolutely.  Absolutely.
 6      Q.   (By Ms. Jacobsen)  I'm going to jump to another
 7  topic now.  During the tape recorded conversation we
 8  heard, there was a reference where Mr. Ahrens said, Maybe
 9  he'd be a good person to join the team, so to speak.  Do
10  you remember that?
11      A.   Yes.
12      Q.   It has been argued and you've already stated
13  that that -- that that tape recorded conversation and the
14  transcript certainly could be taken out of context,
15  correct?
16      A.   Very much so, yes.
17      Q.   Well, it has been argued that by saying he
18  should join, quote, the team, somehow there was a team of
19  people at The Heritage Organization that were plotting
20  together to hide information from clients.  Is that
21  correct?
22           MR. BRANDT:  Objection; form.
23      A.   Absolutely not.
24      Q.   (By Ms. Jacobsen)  And --
25      A.   I have a little saying and I've -- this has
0175
 1  gone all my life.  I would rather hears the world's worst
 2  truth than the world's best lie.  And an omission --
 3  there can be a lie of omission or there can be a lie of
 4  commission.  Either one of them is still a lie.
                          Page 73

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
5        There was never any attempt -- and that's the
6   reason why we were as successful as we were.  The people
7   we were dealing with knew that we were giving them the
8   straight story, and they were not stupid.  These are the
9   smartest people in America and they could hire the best
10  advisors in America.
11       And they -- the reason we were able to do what
12  we were able to do was because we had their confidence,
13  because they knew they could verify anything we ever told
14  them and it would be right.  It would be -- what we told
15  them would be what they learned.
16       Q.   So when you were talking about the team in that
17  conversation, you were talking about teaming with the
18  client, not against the client; is that right?
19       A.   What Ed was talking about was part of the team
20  to analyze things.  In other words, they were constantly
21  analyzing strategies.  We were constantly analyzing
22  strategies.  And somebody else, they could add a new
23  dimension, like S corporations or es bits [phonetic], to
24  the team effort to analyze things.  That's what he was
25  talking about.
0176
1        Q.   Okay.  So there isn't sort of a competitive
2   team, like a soccer team thought --
3        A.   No.
4        Q.   -- in that --
5        A.   No.  No.
6        Q.   -- discussion?  Okay.  Going back to you were
7   talking about -- just before talking about the team, you
8   were talking about --
9        A.   It would be like a surgical team where
10  everybody had their position and they were all trying to
11  help the patient.
12       Q.   Okay.
13            MS. JACOBSEN:  Let's go off the record just
14  a second, if you don't mind.
15            (Off the record.)
16            THE VIDEOGRAPHER:  Back on.
17       Q.   (By Ms. Jacobsen)  I'm sorry, Mr. Kornman, I
18  wanted to also follow-up on something you had just said
19  about an omission versus a commission and you were as
20  fully above board as you could be with clients.  Isn't it
21  true also that clients like Mr. Flinn would even
22  negotiate the risk with The Heritage Organization?
23       A.   Well, obviously he did, because his fee was
24  adjusted to where we carried the risk of the disallowance
25  on a third of it.
0177
1        Q.   So in other words, it's not only that they knew
2   about the risk, but they're so savvy they're trying to
3   get you to take some of it, right?
4            MR. BRANDT:  Objection; form.
5        A.   Exactly.
6        Q.   (By Ms. Jacobsen)  And Mr. Flinn successfully
7   did that?
8        A.   He was big enough that we were willing to take
9   that risk, because what he left us without the risk was
10  sufficient.
11       Q.   And that was 30 percent, correct, is what you
12  took?
13       A.   A third, yes.
14       Q.   And so he was able to not only negotiate your
15  fee agreement, but he was also able to negotiate that you
Page 74

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
16   would take some of the risk of audit, correct?
17          MR. BRANDT:  Objection; form.
18      A.  Exactly.
19      Q.  (By Ms. Jacobsen)  And ultimately he decided --
20   he sued you, correct, in Texas, right?
21      A.  Correct.
22      Q.  Ultimately he decided to settle with the IRS
23   and sue you rather than litigate with the IRS; is that
24   correct?
25          MR. BRANDT:  Objection; form.
0178
1      A.  That's my understanding.
2      Q.  (By Ms. Jacobsen)  And that was a business
3   decision?
4          MR. BRANDT:  Objection; form.
5      A.  Yes.  And I think a bad one.  Not because he
6   sued us, because I thought he had a good -- I still
7   believe to this day that our transaction is valid.  And
8   the 5th Circuit may agree with us on part of it.  We're
9   still defending the one my family did.
10      Q.  (By Ms. Jacobsen)  And others are defending
11   them across the country, correct?
12      A.  That's correct.
13      Q.  And are you familiar with the Klamath case in
14   the Eastern District?
15      A.  Yes.
16      Q.  Their Judge Ward actually found that there was
17   no reason to penalize the taxpayer, correct?
18      A.  He ruled that everything we did, every
19   statement we made, was valid.  The case finally ended on
20   lack of economic substance and the taxpayer lost on that
21   basis and we had to agree with Judge Ward.  We saw that
22   transaction a long time ago and we didn't think it had
23   any economic substance either.
24      Q.  And that was a different type of transaction in
25   terms of the --
0179
1      A.  Totally different.
2      Q.  -- economic substance portion of it?
3      A.  Totally different.  Did not have any statutory
4   basis whatsoever.  And, in fact, in the -- oh, what case?
5   -- Salina case, the judge held that it was not a sham
6   transaction, that it had -- that the transaction itself
7   had economic substance, which is the transaction we did,
8   the investment short sale we did.
9      Q.  So there's pretty good law both from when you
10   were giving the opinions and even today that a taxpayer
11   can litigate these deals?
12          MR. BRANDT:  Objection; form.
13      A.  Exactly.
14      Q.  (By Ms. Jacobsen)  And they're doing that?
15          MR. BRANDT:  Objection; form.
16      A.  Exactly.
17      Q.  (By Ms. Jacobsen)  And you're doing that?
18      A.  Yes.
19      Q.  And Mr. Flinn just made a business decision to
20   sue you instead of litigate himself?
21          MR. BRANDT:  Objection; form.
22      A.  Whatever his decision was made, that's what
23   happened.
24      Q.  (By Ms. Jacobsen)  And some could say that was
25   another way of putting the risk on you instead of taking
0180

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
1    it himself?
2                MR. BRANDT:  Objection; form.
3         A.   Yes.
4         Q.   (By Ms. Jacobsen)  That was the way Mr. Flinn
5    did business?
6         A.   Yes.
7         Q.   He shifted risk?
8         A.   Exactly.
9         Q.   In fact, that's what a collar does, doesn't it?
10        A.   Exactly.
11        Q.   That's how he does business?
12        A.   As far as I know.  That's how he did it there.
13        Q.   And how did the collar shift risk?
14        A.   If the stock depreciates, you have a floor.  So
15   it can't go down beyond a certain point.
16        Q.   Somebody else takes the risk of it going down?
17        A.   Exactly.
18        Q.   You're taking the risk of Mr. Flinn going down,
19   aren't you?
20        A.   Yeah.
21        Q.   Okay.  I would like to ask you about,
22   generally, the background of The Heritage Organization.
23   When was The Heritage Organization formed?
24        A.   I think it was formed right around the first of
25   '95.  Either that or -- it was either January of '95 or
0181
1    early March of '95.  I'm not sure.  I know we started
2    operations in March of '95, but I'm not sure if it was
3    set up before that.
4         Q.   And initially was the business primarily estate
5    planning type of strategies?
6         A.   Yes.  It was -- it was all estate.  It was --
7    it was the -- we made our money primarily from the
8    brokerage of life insurance.  It was life -- it was the
9    management service fee paid to us by life insurance
10   producers that were the bulk of our revenues.
11        Q.   And the estate planning that you did was tested
12   by the IRS and survived, correct?
13        A.   It's never been -- to my knowledge, to this day
14   there has never been a complete disallowance of any
15   estate transaction we've ever done.  And the most recent
16   case was a fellow who died five months after the
17   transaction was done.
18             Mike Mulligan gave a should opinion on the
19   transaction and they saved $80 million because he had a
20   $200 million estate.  He died five months after we put
21   the -- Mulligan implemented the transaction and they paid
22   $20 million instead of a hundred million.
23        Q.   So if someone tried to argue that The Heritage
24   Organization was some sham organization selling sham
25   strategies that didn't work, that wouldn't really be true
0182
1    if you looked at your track record, would it?
2         A.   It would be the most gross overstatement in the
3    world.  In other words, shortly before -- on the estate
4    matters, we never had a case overturned in our history,
5    to my knowledge.
6         Q.   Could you estimate the amount of taxes you
7    saved your clients in estate planning matters?
8                MR. BRANDT:  Objection; form.
9         A.   Many billions.  And I don't know how many, but
10   a lot.
11        Q.   (By Ms. Jacobsen)  Billion with a B?
                           Page 76

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
12        A.   B, billions.
13        Q.   And Mr. Flinn actually picked your brain on
14   estate planning, didn't he?
15        A.   Yes, he did.
16        Q.   Do you know if he's used any of your ideas?
17        A.   I do not.
18        Q.   Do you know how much money you might have saved
19   him with some of your ideas?
20            MR. BRANDT:   Objection; form.
21        A.   If he -- we would have saved him $500 million
22   on a billion dollar transaction.
23        Q.   (By Ms. Jacobsen)  $500 million?
24        A.   Uh-huh.
25        Q.   So to the extent he's saying you didn't give
0183
 1   him any valuable services, do you think it would be
 2   relevant to see what his estate planning ideas are right
 3   now?
 4            MR. BRANDT:   Objection; form.
 5        A.   I think it would be very relevant.
 6        Q.   (By Ms. Jacobsen)  Do you know what
 7   Mr. Blattmachr has advised him about estate planning?
 8            MR. BRANDT:   Objection; form.
 9        A.   No, I don't.
10        Q.   (By Ms. Jacobsen)  Do you know if it comes from
11   any of the advice Mr. Blattmachr might have learned from
12   you?
13        A.   Very possibly.
14        Q.   Do you know if Mr. Flinn is using a defective
15   trust in any way in his estate plan?
16            MR. BRANDT:   Objection; form.
17        A.   I do not know.
18        Q.   (By Ms. Jacobsen) Do you know if he's using a
19   CRT in any way in his estate plan?
20            MR. BRANDT:   Objection; form.
21        A.   I do not know.
22        Q.   (By Ms. Jacobsen)  If he were, would you have
23   developed the use of any of those by giving him more
24   information about them?
25            MR. BRANDT:   Objection; form.
0184
 1        A.   Yes.
 2        Q.   (By Ms. Jacobsen)  Yes?
 3        A.   (Moving head up and down.)
 4        Q.   Mr. Flinn was very aware that he could be
 5   audited, he could be penalized and he would have to
 6   litigate against the IRS in order to defend that
 7   determination, correct?
 8            MR. BRANDT:   Objection; form.
 9        A.   Absolutely.  Just like every other client I
10   worked with.
11        Q.   (By Ms. Jacobsen)  You told him that?
12        A.   Yes.
13        Q.   You told him that the law could change?
14        A.   Yes.
15        Q.   You told him that these were predictions and
16   they weren't guarantees at all?
17        A.   Yes.  And our agreements say that.
18        Q.   But you told him?
19        A.   Yes, absolutely.
20        Q.   And you looked at him straight eye to eye and
21   he understood it?
22            MR. BRANDT:   Objection; form.
                            Page 77

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
23    A.   Yes.
24    Q.   (By Ms. Jacobsen)  What kind of caveats do
25 investment bankers typically tell their clients when
0185
1  they're investing for them?
2     A.   I'm sorry, I've never been in that business.  I
3  really don't know.
4     Q.   Do you think they guarantee investments?
5               MR. BRANDT:  Objection; form.
6     A.   I don't believe they guarantee anything.
7     Q.   (By Ms. Jacobsen)  So he probably understood --
8  when you were telling him that these were limitations, he
9  probably understood what the limits were?
10              MR. BRANDT:  Objection; form.
11    A.   There's no probably to it.  He knew exactly.
12 And he was taking a businessman's risk based on what he
13 learned from the attorneys and from us.
14    Q.   He knew that there could be changes in the law
15 and that they could be retroactive?
16              MR. BRANDT:  Objection; form.
17    A.   Yes.
18    Q.   (By Ms. Jacobsen)  He knew that you were not
19 going to advise him about changes in law, correct?
20              MR. BRANDT:  Objection; form.
21    A.   Yes.
22    Q.   (By Ms. Jacobsen)  And he knew that Lewis Rice
23 wasn't going to advise him about changes in law?
24              MR. BRANDT:  Same objection.
25    A.   I don't know what he knew about Lewis Rice.  I
0186
1  don't -- I don't know about that.
2     Q.   (By Ms. Jacobsen)  Well, to the extent the
3  Lewis Rice opinion said that, you're sure he would have
4  been the kind of man that would have read it --
5               MR. BRANDT:  Objection; form.
6     Q.   -- and reviewed it before moving forward,
7  correct?
8               MR. BRANDT:  Same objection.
9     A.   Yes, if the Lewis Rice read that.  Larry Flinn
10 read that opinion from cover to cover.  And, in fact,
11 Jonathan Blattmachr read it from cover to cover.
12    Q.   (By Ms. Jacobsen)  And do you know if
13 Mr. Blattmachr agreed to advise Mr. Flinn about changes
14 in law?
15              MR. BRANDT:  Objection; form.
16    A.   I have no idea.
17    Q.   (By Ms. Jacobsen)  He also understood that
18 what --
19              MR. SCHWEGMANN:  He being Flinn?
20    Q.   (By Ms. Jacobsen)  Mr. Flinn also understood
21 that the Heritage plan relied on an interpretation of
22 existing authority, correct?
23              MR. BRANDT:  Objection; form.
24    A.   It's my understanding that Mr. Flinn knew that.
25    Q.   (By Ms. Jacobsen)  Okay.  And he understood
0187
1  that that was a subjective interpretation, correct?
2               MR. BRANDT:  Objection; form.
3     A.   Mr. Flinn understood that -- he knew.  He saw
4  the cases.  He saw the revenue rulings.  He saw the --
5  I'm pretty sure he saw the motions for summary judgment
6  filed by the government, filed by the taxpayer in the
7  Fulcrum case.  He saw the Salina case.  Mr. Flinn was
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
8   fully educated.  He saw -- the 2000-44 had not come out
9   at that time.  But he saw everything there was on the
10  subject matter and he made his own decision after
11  discussing with legal counsel.
12                (Exhibit No. 15 marked.)
13       Q.  (By Ms. Jacobsen)  I'm now handing you what's
14  been marked as Kornman Exhibit 15.  Does this refresh
15  your recollection that on October 16, 2000 you provided
16  Mr. Flinn with the authorities related to the investment
17  transaction, including Notice 2000-44?
18       A.  Yes, it does.
19       Q.  And number nine in this group of materials is
20  actually a Wall Street Journal article about the treasury
21  moving to squash tax shelter schemes.  You were even
22  telling Mr. Flinn about the treasury taking actions
23  against certain tax shelter devices, correct?
24       A.  Exactly.
25       Q.  And Notice 2000-44, if you look behind tab 10,
0188
1   it actually apprises a person who would be concerned with
2   any transaction that if the IRS determined it was taken
3   in bad faith or willfully, they could be criminally
4   prosecuted?
5       A.  Exactly.  You can see exactly what I've
6   highlighted.
7       Q.  And so to the extent that -- and we don't
8   really know if Mr. Flinn was willful in his conduct, do
9   we?
10            MR. BRANDT:  Objection; form.
11      A.  No.
12      Q.  (By Ms. Jacobsen)  The only person who knows if
13  Mr. Flinn was willful is Mr. Flinn, correct?
14      A.  Exactly.
15      Q.  At least he told you that he was moving forward
16  in good faith, correct?
17      A.  Yes.  He told us he had strong investment
18  reasons for doing it.
19      Q.  And so to the extent you showed this to
20  Mr. Flinn, if there was any risk of criminal prosecution,
21  he'd be the only one that would know, because he'd be the
22  only one to know whether he had the proper intent,
23  correct?
24            MR. BRANDT:  Objection; form.
25      A.  Exactly.
0189
1       Q.  (By Ms. Jacobsen)  You certainly wouldn't think
2   he had a willful intent to tell him he might be
3   criminally prosecuted, correct?
4       A.  No.
5       Q.  You had no reason to believe that he would have
6   willful bad faith?
7       A.  Let me put it this way.  If I had the slightest
8   idea that he wasn't -- that he didn't meet the proper
9   intentions of making a profit -- that if he didn't meet
10  the economic substance test, let's just use that one as
11  an example, by what he believed, we would have run like a
12  scalded dog, if you'll pardon me for using a southern
13  expression.
14      Q.  And he gave you no indication that he didn't
15  have good faith?
16      A.  Absolutely not.
17      Q.  And he understood these authorities in this
18  Exhibit 15?
                            Page 79

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
19                MR. BRANDT:  Objection; form.
20        A.   Yes.  I mean he read every one of them.  He
21   read everything we gave him.  Like I said, he checked our
22   numbers.
23        Q.   (By Ms. Jacobsen)  And to the extent he didn't
24   understand these authorities, he had Mr. Blattmachr
25   review them, too, didn't he?
0190
 1        A.   Yes.
 2        Q.   And Mr. Blattmachr separately allowed him to
 3   ask whatever questions he might have of Mr. Blattmachr,
 4   correct?
 5                MR. BRANDT:  Objection; form.
 6        A.   That's exactly right.  And, interestingly
 7   enough, these cases are the same ones that were cited in
 8   the Klamath case.
 9        Q.   (By Ms. Jacobsen)  And that's the case that
10   held the taxpayer was in good faith and shouldn't be
11   penalized?
12        A.   Right.
13        Q.   I wanted to ask you about --
14        A.   Don't hurt yourself there.
15        Q.   I know.  I think I lost my microphone.  -- the
16   types of plans that Mr. Flinn reviewed, because they are
17   numerous and there are numerous changes.  So I wanted to
18   try to get a sense of all of the different complex things
19   he was considering.
20                MS. JACOBSEN:  May I have this marked as
21   the first exhibit, please?
22                (Exhibit Nos. 16 marked.)
23        Q.   (By Ms. Jacobsen)  Now I'm handing you what's
24   been marked as Deposition Exhibit 16.  Do you recognize
25   this as a group of strategies that Mr. Flinn saw called
0191
 1   the basis creation model?
 2        A.   Uh-huh.
 3        Q.   And this would be based on sort of this
 4   investment plan that you were educating him about; is
 5   that right?
 6        A.   It was the -- it was the tax part of the
 7   investment plan.
 8        Q.   And if you look to the third page of this plan,
 9   it's signed by Mr. Flinn, correct?
10        A.   I'm almost there.
11        Q.   Sorry.
12        A.   Not on my -- oh, the third page.
13        Q.   The third page.
14        A.   I'm sorry.  I went to the back.  I'm sorry, I
15   was looking at the wrong place.  Yes, signed and
16   witnessed by his assistant.
17        Q.   Okay.  And he's basically signing this by and
18   acknowledging all the things we discussed earlier in
19   terms of risk, of audit, penalties, possible changes in
20   the law and the like, correct?
21                MR. BRANDT:  Objection; form.
22        A.   Exactly.
23        Q.   (By Ms. Jacobsen)  So it wasn't just like you
24   said this early on and forgot it later.  Each time you
25   provided Mr. Flinn additional information, you'd again
0192
 1   apprise him of the risk?
 2        A.   Exactly.
 3        Q.   And he'd sign off on it?
                       Page 80

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 4        A.   Yes.
 5        Q.   Did he typically, as you provided him this
 6   information, sign things without reading them?
 7        A.   Never.
 8        Q.   He signed both an estate planning agreement and
 9   a capital gains agreement with The Heritage Organization;
10   is that right?
11        A.   That's right.
12             THE WITNESS:   Can we go off the record one
13   minute?  I need some more water.
14             MS. JACOBSEN:   Sure.
15             THE VIDEOGRAPHER:   We're off.
16             (Recess from 3:31 to 3:38.)
17             THE VIDEOGRAPHER:   Back on at 3:38.
18        Q.   (By Ms. Jacobsen)  I was asking you about the
19   capital gains and the estate planning agreements
20   Mr. Flinn signed.  But before I do that, as we were on
21   the break, I went through my notes and found a couple of
22   housekeeping questions I wanted to ask you about.
23             You said Mike Mulligan took a personality test.
24   He does not remember taking that.  Do you remember when
25   he took it?
0193
 1        A.   I have no idea.  He did, though.
 2        Q.   He did.  But it might have been so long ago he
 3   wouldn't remember?
 4        A.   Oh, easily.
 5        Q.   Okay.  And --
 6        A.   What's the significance of that, if you don't
 7   mind me asking?
 8        Q.   I don't know.
 9             MR. SCHWEGMANN:   I think it's jealousy.  I
10   think they want to take it.  We ought to give it to them.
11             THE WITNESS:   We're very particular about
12   who we give it to now.  Let's not make any rash
13   commitments here.
14             MR. SCHWEGMANN:   All right.
15        Q.   (By Ms. Jacobsen)  Well, let me ask.  There is
16   no -- I mean if you take a personality test, not any part
17   of the test has some agreement that they will act some
18   certain way for you, correct?
19        A.   Absolutely not.  It is merely a way to give
20   people information -- I have a couple of theories.  First
21   of all, the best way to give people information is the
22   way they want it.  The other thing is the best way to
23   take their information is the way they normally feel
24   comfortable giving it.
25             And then I have another theory that people
0194
 1   don't do things to each other, they do things to meet
 2   their own needs.  And if you understand what they're
 3   doing, you don't get into the ping pong effect.  So
 4   that's the purpose of it.
 5        Q.   Sort of if you say things four different times,
 6   eventually four different people will hear it?
 7        A.   Well, I used to -- that's right.  I used to say
 8   that if we gave a client who was an conceptualist a whole
 9   bunch of numbers, they would never look at them.  And
10   then on the other hand, if we gave an engineer a one-page
11   summary, he would want to know where all the back up was.
12   And we wanted to know what they wanted before we did it.
13   So that was the purpose.
14        Q.   So Flinn was more like an engineer?
```
                          Page 81

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
15        A.   Yes.  Definitely.  He never took the test,
16   though.  He wouldn't do it.  I don't know what he was
17   afraid of.
18        Q.   Did some of your clients take the test?
19        A.   Oh, most of them did.
20        Q.   Oh, really.
21        A.   Yeah.
22        Q.   Okay.
23        A.   It's not really a test.  It's a -- and we would
24   show them the results.  Nobody ever argued with it.  It
25   was just a way to get to know somebody very quickly.  I
0195
1    had an assistant that said, Well, what's the perfect
2    profile?  I said, I'll show you the perfect profile when
3    you show me the perfect sunset.
4         Q.   Another question I had is it's been argued in
5    these cases that there is some association between
6    Jenkens & Gilchrist's Chicago office and The Heritage
7    Organization.  Is there any association whatsoever?
8         A.   Can I ask what the basis of that was?  That's
9    so preposterous.
10        Q.   I'm asking you.
11        A.   It's the most preposterous thing I've ever
12   heard.  It didn't exist.  I wouldn't know Paul Daugerdas
13   if he walked in other than I've seen his picture in a
14   magazine.  And we thought what they were doing was
15   absolute crap.
16        Q.   And different from what The Heritage
17   Organization provided?
18        A.   Very different.
19        Q.   You did not have 1,100 to 3,000 clients that
20   you provided opinions for without ever meeting them?
21        A.   No.  We didn't provide any opinions, but no.
22   I --
23        Q.   And that's another difference.  Jenkens &
24   Gilchrist provided opinions while they were also giving
25   the presentation?
0196
1         A.   Exactly.  We never -- I mean we would -- we
2    stayed as far away -- we discussed concepts conceptually
3    with lawyers, but we never edited opinion letters or
4    anything like that.
5         Q.   So if someone were to testify you referred one
6    of The Heritage Organization clients to Jenkens &
7    Gilchrist to get an opinion, that would just be wrong?
8                   MR. BRANDT:  Objection; form.
9         A.   That would be absurd.
10        Q.   (By Ms. Jacobsen)  And why would that be?
11        A.   Because we got clients who had done
12   transactions with Jenkens & Gilchrist and were so upset
13   with it that -- we had one client who did a $20 million
14   transaction with Jenkens & Gilchrist and did a $400
15   million transaction with us afterwards because he was so
16   disturbed by what they did.
17        Q.   So you would not recommend that anyone go to
18   Jenkens & Gilchrist that you spoke with?
19        A.   No.
20        Q.   Okay.  And what about Sidley Austin, did The
21   Heritage Organization have any relationship whatsoever
22   with Sidley Austin?
23        A.   No.  I once went early on and talked to R.J.
24   Rule.  And to be honest with you, he was too much of a
25   cowboy for me.  He just -- I'm real conservative and he
                              Page 82

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
0197
1    wasn't.
2         Q.   So not a good fit?
3         A.   That's right.
4         Q.   Didn't work with him?
5         A.   Right.
6         Q.   How about KPMG, did you do any strategies with
7    KPMG?
8         A.   Absolutely not.  We didn't like their -- we saw
9    almost all -- that's where Canada got all his knowledge.
10   He didn't know anything about taxes before he joined us.
11   And we reviewed -- The Heritage Organization -- and if I
12   get too far off track, stop me.
13        But The Heritage Organization required that
14   people take three IQ tests and average 140 on three IQ
15   tests to be the receptionist.  And we had people in our
16   analytical department who we didn't know what their IQs
17   were because our tests didn't go beyond 160.  So we had
18   some very, very smart people.  And they would look at all
19   these transactions that we were competitive with.  And we
20   looked at them for two reasons.
21        One, since we were in competition with them, we
22   wanted to be able to know what was wrong with them.  And,
23   two, we wanted to see if there were any other good ones
24   out there that we were comfortable with.  We never found
25   another transaction that we were comfortable with.
0198
1         By and large, there were three problems.
2    Number one, they didn't have the technical authority.
3    Number two, they didn't have economic substance, which
4    was a problem with some of the KPMG transactions.  Or,
5    number three, they had too much economic substance.  You
6    could lose 30 percent of your money to avoid a 20 percent
7    tax.  And so, consequently, we never, ever did anything
8    else remotely with anyone else or any other transactions
9    that anyone did.
10        Q.   And just to explain to the jury, economic
11   substance is a test that the courts will use often when
12   considering the validity of certain strategies?
13        A.   That's exactly right.  We had clients that made
14   money.  We had clients that lost money.  Mr. Flinn
15   unfortunately lost money.  That's not because we weren't
16   trying to make money.
17        Q.   But you were very aware of the prospect of
18   litigation, the prospect of your clients litigating and
19   you wanted to give them something that had a good
20   opportunity of standing up in court?
21        A.   And I still think today it should stand up in
22   court.
23        Q.   Another question that I haven't -- another
24   topic that you were asked about previously was
25   third-party advisors that Mr. Flinn used and you
0199
1    mentioned Mr. Blattmachr and Mr. Mulligan.  Do you also
2    remember that he had working with him a man named Frank
3    Zack?
4         A.   Oh, yeah.  That was his inside CFO or
5    investment advisor.
6         Q.   And did he analyze The Heritage Organization
7    plan?
8         A.   He was involved -- Frank was involved in the
9    estate planning part of it.  I don't know exactly when
10   Frank joined him.  I don't -- I couldn't tell you the
                              Page 83

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
11  answer to that, because I don't know the timing between
12  the time we did the transaction.  I don't think Frank was
13  there at this point in time.  I think Frank came later.
14      Q.  Okay.  Do you know if Frank was involved with
15  advising Mr. Flinn on the tax returns that related to the
16  investment strategy?
17      A.  I'm sure Frank advised him or gave him his
18  opinion after he got there.
19      Q.  Okay.
20      A.  That would just be natural.  Larry relied on
21  him a lot.
22      Q.  Okay.  So you just don't know when he got there
23  to be able to say?
24      A.  That's right.
25      Q.  Okay.  He also had accountants like Charles
0200
1   Serowitz [phonetic].  Do you remember that?
2       A.  I've just heard the name.
3       Q.  Okay.  And he also had a man named Michael
4   Haney.  Do you remember that?
5       A.  That was the other attorney.  That was the
6   single practitioner tax attorney that I was on the phone
7   with.
8       Q.  And you allowed him to review the materials
9   that were the basis of the investment strategy --
10      A.  Yes.
11      Q.  -- to be able to defend Mr. Flinn, correct?
12      A.  Exactly.
13      Q.  Okay.
14      A.  I told Larry I would not go against -- I
15  wouldn't go -- the agreement wouldn't count, that he was
16  free to look at it.
17      Q.  So he could defend the audit?
18      A.  Yes.
19      Q.  Then he sued you?
20      A.  Yes.
21      Q.  Okay.  I would like to go back and talk about
22  where we were before.
23      A.  What was his name again, Michael?
24      Q.  Michael Haney?
25      A.  Haney.  Okay.  Thank you.
0201
1       Q.  Mr. Flinn signed a capital gains agreement.
2       A.  Are you through with this one?
3           (Exhibit No. 17 marked.)
4       Q.  (By Ms. Jacobsen)  I'm now handing you what's
5   been marked as Deposition Exhibit No. 17.
6       A.  Okay.
7       Q.  And see if you recognize that as the agreement
8   he signed that was the capital gains agreement.
9       A.  No.  This is the estate agreement.
10      Q.  Okay.  Did -- then he did sign a separate
11  capital gains contract other than this one?
12      A.  Uh-huh.  This -- this took us at least two
13  meetings to get this, because he wanted -- we would -- he
14  wanted to exclude these various strategies on the back on
15  Exhibit B.
16      Q.  On page 15?
17      A.  Yes.
18      Q.  Okay.
19      A.  And so then we also had this Rider A and we
20  changed these either once or twice.  The first time we
21  came there was no Exhibit B on the agreement.  We
                            Page 84

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
22   negotiated that.  These were things that he had seen
23   before, cascading GRATs, Q-TIP gifting and discounts.
24   And then -- and then after we got through this, another
25   time we came back and he wanted it changed again and we
0202
1    just added these two in writing.  So it was quite a
2    negotiation.
3         Q.   Okay.  And this was signed -- this estate
4    planning agreement was signed around the same time that
5    he also signed a capital gains agreement.  Does that
6    comport with your recollection?
7         A.   I think so.
8         Q.   And were they signed --
9         A.   I'm not sure of that, but I think so.
10        Q.   Were they signed together because the estate
11   planning and the capital gains planning were supposed to
12   work together as a plan?
13        A.   No.  We just, as a matter of course, have
14   clients sign at least two agreements, sometimes as many
15   as four.  Larry was absolutely certain he was never going
16   to buy any life insurance.  He absolutely refused to sign
17   our exclusive brokerage agreement.  So that's why these
18   two were done.  And I think they were, like I said,
19   pretty much done at the same time.
20             But this was the thing.  After we got the
21   income tax and the investment and all -- the agreement
22   that was involved in the investment transaction, after we
23   got that done, then we had -- we thought there was no
24   dispute about this, but it still took us three other
25   meetings to get this signed.
0203
1         Q.   Okay.  Well, often what will happen is when
2    there's a large capital gain, estate planning will go
3    hand-in-hand with it so someone can take the wealth
4    they've made and share it with their family.
5             MR. BRANDT:  Objection; form.
6         Q.   (By Ms. Jacobsen)  Is that your experience,
7    your business experience?
8             MR. BRANDT:  Same objection.
9         A.   Yes.
10        Q.   (By Ms. Jacobsen)  Is that one of the
11   objectives that Mr. Flinn had as he was moving forward
12   with the capital gains portion of the transaction?
13             MR. BRANDT:  Objection; form.
14        A.   Okay.  Let me -- that's what I said earlier.
15   It started out as he was most interested in estate
16   transactions.  That's how we got into the whole thing.
17   Then we explained that he was about to make a mistake.
18   He stepped aside from the estate planning and we went
19   into -- he said, Well, wait, let's stop and do this
20   capital gains and the investment stuff first; and so we
21   said fine.
22             Because if you'll notice here, he had -- there
23   was some estate plan.  He had the Lawrence Flinn Master
24   Partnership I and the Lawrence Flinn, Jr. Growth Master
25   Partnership.  Those were both estate planning structures
0204
1    that he already had in place.
2             So basically it was all combined and we -- we
3    had to take everything into consideration.  There was an
4    existing GRAT that we had to take into consideration.  So
5    it was -- it was -- everything was kind of hodgepodged
6    together.  So, yes, estate planning was as much a part of
                              Page 85

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 7    it as anything else.
 8            And he -- do you have any information that he
 9    did the estate planning?  Did he ever do that?
10        Q.   I'm trying to get those documents.
11        A.   Okay.  Well, that would be good.
12        Q.   So in terms of the spectrum of complication of
13    plans, Mr. Flinn's would be on the high end of the
14    complicated side of the spectrum?
15        A.   Yes, very much so.  With the collars and
16    everything, I would say he had the most complicated plan
17    we ever worked on.
18        Q.   I just -- I'm not going to mark all these
19    exhibits, but I wanted to ask you he looked at several
20    different types of plans.  And maybe it's because his
21    deal was so complicated, but I'm trying to figure out the
22    differences between them.  I mean he looked at a basis
23    creation graphics plus GRAT enhancement; is that right?
24        A.   Let me that, please.  I'm sorry, it's been so
25    long ago.  I've done so many of them.
0205
 1        Q.   I better mark it then.  Well, go ahead and look
 2    at it.
 3        A.   Yeah, see, this was part of it.  This was where
 4    there was a purchase of the GRAT remainder interest.
 5        Q.   Let's mark it then.
 6        A.   Yeah, let's.  Yeah, it was all -- you say it
 7    was the most complicated one.  Yes, I would agree with
 8    you 100 percent.
 9            (Exhibit No. 18 marked.)
10        Q.   (By Ms. Jacobsen)  And that was part of the
11    capital gains discussion?
12        A.   Yes.
13            MR. SCHWEGMANN:  You just marked 18; is
14    that right?
15            MS. JACOBSEN:  I think so.
16        Q.   (By Ms. Jacobsen)  Okay.  If I could see 18
17    again?
18        A.   Sure.
19        Q.   On the third page of 18, there is a signature
20    block for Mr. Blattmachr to sign as Mr. Flinn's advisor;
21    is that right?
22        A.   Uh-huh.
23        Q.   Is it your recollection that Mr. Blattmachr
24    would sign as Mr. Flinn's advisor?
25            MR. BRANDT:  Objection; form.
0206
 1        A.   I don't remember.
 2        Q.   (By Ms. Jacobsen)  Okay.
 3        A.   That's all I can tell you.
 4        Q.   But there's no question he was there as
 5    Mr. Flinn's advisor --
 6        A.   No question.
 7        Q.   -- and not in any other capacity?
 8        A.   Yeah, exactly.  No question about it.  I mean
 9    literally Larry found him without us.  I mean we
10    didn't -- as much as we've known Jonathan and as many
11    cases as we've worked on with him, because he's a real
12    smart guy, we didn't refer him to Jonathan.
13        Q.   Did Mr. Flinn tell you that he had
14    Mr. Blattmachr review Michael Mulligan and Lewis Rice and
15    recommend the firm?
16        A.   Yes.
17        Q.   So Mr. Flinn didn't just rely on your referral,
```
Page 86

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
18   he independently had his own advisor --
19       A.   Exactly.
20       Q.   -- check out the referral?
21       A.   Exactly.
22       Q.   Okay.  You also discussed with him a loss
23   creation model.  Do you remember that?
24       A.   Uh-huh.
25       Q.   And that related to the capital gains strategy?
0207
 1       A.   Uh-huh.  This was a question about -- I think,
 2   if I remember this correctly, this was a question about
 3   what happened if you already sold stock.  You had to --
 4   you couldn't attach basis to something that was already
 5   gone.  So this was for prior sales.  He ultimately, I
 6   don't think, decided -- I think he decided not to do
 7   this.
 8       Q.   Okay.  And, again, there's, on the third page,
 9   his signature acknowledging the risk of these types of
10   transactions?
11       A.   Exactly.
12       Q.   And in this circumstance he decided he didn't
13   want to use it?
14       A.   That's my best recollection.  I would have to
15   go back and review it.
16       Q.   So he certainly felt free to pick and choose
17   among the different options that he had --
18       A.   Exactly.
19       Q.   -- for purposes of his plan?
20       A.   Exactly.  Do you want to mark that?
21       Q.   Did we not mark it?
22       A.   No.
23                (Exhibit No. 19 marked.)
24       Q.   (By Ms. Jacobsen)  Okay.  He also looked at an
25   L.L.C. model, can you remember?
0208
 1       A.   Let me see that.
 2                MR. SCHWEGMANN:   At least you won't have to
 3   carry it home.
 4                MS. JACOBSEN:   I was trying to avoid it,
 5   but I guess you're right, I don't have to carry it home.
 6       A.   Yes, this is a different thing.
 7       Q.   (By Ms. Jacobsen)  And is this estate planning
 8   or was this capital gain?
 9       A.   No.  This was the investment planning on a
10   different structure.
11       Q.   Okay.  Did he implement that one?
12       A.   I'll be honest, Allison, I just can't remember.
13       Q.   Okay.
14       A.   I mean you can see that there was a lot of
15   stuff and it was seven years ago.
16                (Exhibit No. 20 marked.)
17       Q.   (By Ms. Jacobsen)  Okay.  The last is a family
18   split dollar group of strategies.  Do you remember that?
19       A.   Uh-huh.
20       Q.   And did you discuss that with him as well?
21       A.   Uh-huh.
22       Q.   Is that more capital gains or --
23       A.   Let me see it.
24       Q.   -- that was estate planning?
25       A.   I'll tell you what it is.  Yeah, this was an
0209
 1   insurance-related estate plan model that -- there were
 2   some unusual things in the regulations regarding life
Page 87

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 3  insurance and this was designed to use those.  And it
 4  would have been highly -- you can see the rates of return
 5  here.  It would have been highly effective.  To my
 6  knowledge, he never did it with us.
 7      Q.  That you know?
 8      A.  That I know.  I mean I know he never did it
 9  with us.
10      Q.  Okay.
11      A.  But he may well have done it with somebody
12  else, in which case he hasn't honored our oral agreement.
13  Even though he didn't sign an insurance agreement, he
14  said that he would just count the insurance matters under
15  the estate agreement.  And I basically said we could
16  either get the insurance commissions or the fees he owed
17  us, either one.  So that's where this came under the
18  estate planning agreement.  But he never did either one
19  of these to my knowledge.
20      Q.  Okay.
21              THE WITNESS:  These are what some of the
22  later meetings were about, Jay.
23          (Exhibit Nos. 21, 22 and 23 marked.)
24      Q.  (By Ms. Jacobsen) I'm now going to hand you
25  what's been marked as Deposition Exhibit 22 and 23.  Do
0210
 1  you remember that Mr. Flinn was a pretty copious note
 2  taker?
 3      A.  Uh-huh.
 4      Q.  Sort of like you with tapes, but he wrote
 5  everything down?
 6      A.  Exactly.
 7              MR. SCHWEGMANN:  Objection; form, but you
 8  can answer.
 9      Q.  (By Ms. Jacobsen)  And these were a couple of
10  things -- if you look down in the bottom right-hand
11  corner of these documents, it says Flinn with a number?
12      A.  Yes, I see that.
13      Q.  That means they came from Mr. Flinn's files.
14      A.  Uh-huh.
15      Q.  Do these refresh your recollection that you
16  spoke with Mr. Flinn about a charitable remainder trust?
17      A.  Uh-huh.
18      Q.  And you went into great detail, as shown in
19  these several pages of notes, about how that charitable
20  remainder trust could help his estate plan?
21      A.  Yes, exactly.  That's what I'm saying.  This
22  was all combined many, many times.  I didn't mean to cut
23  you off, but that's just --
24      Q.  But you just don't know what his estate plan
25  looks like today?
0211
 1      A.  No.
 2      Q.  So he may have used these ideas, he may not
 3  have?
 4      A.  That's right.
 5              MR. BRANDT:  Which one is 22 and which one
 6  is 23?
 7              THE WITNESS:  22 is the handwritten notes
 8  and 23 is the other one.
 9              MR. BRANDT:  Okay.  Thank you.
10      Q.  (By Ms. Jacobsen) I'm now going to ask you
11  about 23.  This discusses the use of a defective trust?
12      A.  Uh-huh.
13      Q.  Do you remember talking to Mr. Flinn about
```
Page 88

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
14   that?
15        A.   Uh-huh.
16        Q.   And if you look at the second page, there's a
17   diagram here that discusses how he could save significant
18   estate taxes by using this method, correct?
19        A.   That was this.  That's what we showed him.
20        Q.   And you just don't know if he took advantage of
21   that advice or not?
22        A.   No.
23        Q.   But if he did, he may have saved significant
24   estate taxes?
25             MR. BRANDT:  Objection; form.
0212
1         A.   Hundred of millions of dollars.
2              THE VIDEOGRAPHER:  I need to change tape.
3              MS. JACOBSEN:  Good.  I need to review my
4    notes.
5              (Off the record.)
6              THE VIDEOGRAPHER:  Back on.
7         Q.   (By Ms. Jacobsen)  You were talking earlier
8    about a disagreement that you and Mr. Canada had relating
9    to percentages of the Flinn fee.  Do you remember that?
10        A.   Yes.
11        Q.   There are some notes that Mr. Flinn took in
12   which he writes that Canada may have spilled the beans to
13   the IRS and said, I guess, derogatory things to the IRS
14   in order to get The Heritage Organization in trouble.
15   Are you aware of any facts and information that would
16   substantiate that?
17        A.   No.  I would love to see those.  Do you have
18   them?  May I look at them?
19        Q.   I just have his notes.
20        A.   May I see those?
21        Q.   Let me finish -- well, let me see if I have
22   them.
23             (Exhibit No. 24 marked.)
24        Q.   (By Ms. Jacobsen)  This was produced, if you
25   look down in the bottom right-hand corner, by Sutherland
0213
1    Asbill.  And apparently they are notes that are sent from
2    Flinn Asset Management to, I guess, Sutherland Asbill
3    discussing the transaction and you saying there was an
4    IRS audit of The Heritage Organization and then Bird or
5    Canada must have turned us in, you can litigate and
6    basically one-third or one-half of Heritage's clients
7    have already been notified about the IRS strategy
8    because, I guess, of something derogatory that Mr. Canada
9    or Mr. Bird told the IRS about The Heritage Organization.
10             Does that comport with your recollection of
11   anything that happened?
12             MR. BRANDT:  Object to the form of the
13   question.
14        A.   May I just read this one second?  I just want
15   to -- okay.  This was -- this is his notes from a
16   conversation that I had with Larry referring him to Jerry
17   Cohen and Sutherland Asbill.  And at the time I thought
18   that Canada or Bird might have gone to the IRS, because
19   we were in great conflict with them.
20             I later learned that Howard Jenkins -- after
21   this, when Howard Jenkins filed a lawsuit, a tax lawsuit,
22   I found out that he was the first one to go to the IRS.
23   So I was wrong in this statement about who did it.  It
24   was speculation.

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
25            And I was explaining to him what I was doing,
0214
 1    that I was paying the tax, paying the interest, paying
 2    the 40 percent penalty and suing for a refund.   And
 3    that's what is going on in the 5th Circuit now.
 4        Q.   (By Ms. Jacobsen)   So your understanding is
 5    the --
 6        A.   This is not -- I'm sorry.   This is my
 7    conversation with Larry.
 8        Q.   Okay.   So your understanding is that The
 9    Heritage Organization audit was not started by any
10    independent evaluation by the IRS?
11        A.   No.   I'm pretty sure that -- with what I know
12    now, that it came about as a result of Jenkins --
13        Q.   Saying derogatory things about you to the IRS?
14        A.   Well, going to the IRS and saying, Here's what
15    I did and I want to settle this.   And it went up the
16    chain of command and they ended up coming after us.
17        Q.   Okay.
18        A.   That's the place I later found out they learned
19    it.
20        Q.   Okay.   I now want to take to you about the
21    transcripts and the tapes.
22        A.   Okay.
23        Q.   You do not know how many conversations or
24    meetings were taped, do you?
25        A.   I have no idea.
0215
 1        Q.   You don't know who taped them and when?
 2        A.   I have no idea.
 3        Q.   You don't know how many conversations are on
 4    each tape?
 5        A.   Absolutely not.
 6        Q.   You don't know if there are partial
 7    conversations on any tape?
 8        A.   Exactly.
 9        Q.   You don't know if there are partial
10    conversations on any particular topic in those tapes?
11        A.   Exactly.
12        Q.   You don't know if the tapes give only a
13    one-sided view of any particular conversation?
14        A.   I don't even know if the tapes were accurate
15    based on what the people thought.   Sometimes people would
16    say things in order to placate the other party.   I know
17    this will sound bad, but sometimes I try to placate my
18    wife.
19        Q.   You know women know that?
20        A.   I know.   She knows it all the time.
21        Q.   But you don't know if somebody, just at their
22    whim, turned on a tape and then turned it off and then
23    recorded another part of a --
24        A.   Absolutely not.
25        Q.   Okay.   So you don't know if these tape recorded
0216
 1    conversations are in any way comprehensive?
 2        A.   I have no idea.   And from what I've seen, what
 3    little I've seen, they've been very poorly transcribed.
 4        Q.   Do you know how these tapes were kept from the
 5    time they were created until today?
 6        A.   The answer is no.   In fact, neither I nor
 7    Michael Kornman even knew they existed.
 8        Q.   Okay.   So you do not have -- you cannot sit
 9    here and tell a judge or jury what the chain of custody
```
Page 90

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
10  would have been for those tapes?
11      A.  I have no idea.
12      Q.  You cannot sit here and tell a judge or jury
13  that no one tampered with the tapes?
14      A.  I cannot.
15      Q.  There's just no security as to what happened
16  with those tapes from the time they were created until
17  today?
18                  MR. BRANDT:  Objection; form.
19      Q.  (By Ms. Jacobsen)  That you can say.
20                  MR. BRANDT:  Same objection.
21      A.  I know nothing about the tapes.  I know they
22  were discovered in a storage area at some point in time
23  and we didn't even know they existed.
24      Q.  (By Ms. Jacobsen)  So you didn't know how the
25  tapes were necessarily transcribed?
0217
1       A.  No.
2       Q.  Some of these transcriptions don't look
3  familiar to you?
4       A.  Absolutely not.
5       Q.  You don't know if the dates on the tapes are
6  accurate?
7                   MR. BRANDT:  Objection; form.
8       A.  I have no idea.
9       Q.  (By Ms. Jacobsen)  You don't know if the
10  initials that are purported to be certain people speaking
11  are accurate?
12      A.  I absolutely don't.
13      Q.  You didn't redact the tapes?
14      A.  No.
15      Q.  Somebody else did?
16      A.  I haven't even seen the transcripts.
17      Q.  Okay.
18      A.  Except what you folks have shown me.
19      Q.  Do you know how many tapes related to the
20  Troutts?
21      A.  I have no idea.
22      Q.  Do you know how many tapes related to
23  Mr. Flinn?
24      A.  Absolutely not.
25      Q.  How about Mr. Woodruff?
0218
1       A.  No.
2       Q.  How about Mr. Patterson?
3       A.  No.
4       Q.  How about Mr. Love?
5       A.  No.
6       Q.  How about any of the Fluhartys?
7       A.  No.
8       Q.  How about Lewis Rice?
9       A.  No.
10      Q.  How about Mr. Mulligan?
11      A.  No.
12      Q.  How about Mr. Falk?
13      A.  No.
14      Q.  So if somebody were to try to tell a judge that
15  this accurately represents conversations on a totality of
16  any particular topic or with any particular person, you
17  just can't say?
18                  MR. BRANDT:  Objection; form.
19      A.  I have no knowledge whatsoever of any of those
20  facts.
                            Page 91

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
21        Q.   (By Ms. Jacobsen)  Somebody could have sort of
22   cherry picked this one conversation and is trying to
23   suggest that that's all the knowledge or all that was
24   ever said on a particular topic?
25              MR. BRANDT:  Objection; form.
0219
 1        A.   That's correct.
 2        Q.   (By Ms. Jacobsen)  And the transcriptions could
 3   actually be mis -- like you said, misinterpreted?
 4              MR. BRANDT:  Objection; form.
 5        A.   I've seen a lot of transcriptions that were
 6   very important to me in the criminal matter that were not
 7   correct.
 8        Q.   (By Ms. Jacobsen)  And they could be not only
 9   misinterpreted, they could be incomplete?
10        A.   Yes.
11        Q.   Or they could have been tampered with?
12              MR. BRANDT:  Objection; form.
13        A.   Yes.
14        Q.   (By Ms. Jacobsen)  And what you're saying is
15   you just came across them in a box in a storage room?
16        A.   I didn't come across them.  Someone else did.
17        Q.   Okay.  So you have no idea what happened to
18   those tapes that were just sitting somewhere, like in the
19   back of a garage?
20        A.   They were somewhere in storage.  That's all I
21   know.
22        Q.   No one was securing that storage to make sure
23   nothing happened to them?
24        A.   No.
25        Q.   Okay.
0220
 1        A.   They were not.
 2        Q.   Do you remember that you used Bob Troutt as a
 3   reference for The Heritage Organization?
 4        A.   I used him?
 5        Q.   That he was listed as a reference on a Heritage
 6   Organization letter, do you remember that?
 7        A.   It may well have been.  It wasn't one I sent
 8   out, though.
 9        Q.   Okay.  So you don't know, you know, what he
10   would have said or not said about The Heritage
11   Organization?
12        A.   Not at all.
13        Q.   Okay.  Did you have any contact at all with the
14   Troutts?
15        A.   No.  I just thought their name was spelled
16   funny.
17        Q.   Okay.  How about any contact whatsoever with
18   Mr. Woodruff?
19        A.   No contact whatsoever.
20        Q.   Any contact whatsoever with Mr. Patterson?
21        A.   None whatsoever.
22        Q.   How about Mr. Love?
23        A.   No, no contact.
24        Q.   How about any of the Fluhartys?
25        A.   No, no contact.
0221
 1              MS. JACOBSEN:  I have no further questions.
 2              MR. BRANDT:  I have a few just to
 3   follow-up.  Not many.
 4              MR. SCHWEGMANN:  Okay.  You pass the
 5   witness?
                           Page 92

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 6              MS. JACOBSEN:  I pass the witness.
 7              MR. SCHWEGMANN:  Gary, do you want a break
 8   or can he ask his questions?
 9              THE WITNESS:  Go ahead.
10              MS. JACOBSEN:  I mean if he -- I may have
11   follow-up.
12              MR. SCHWEGMANN:  I understand.  I
13   understand.
14              MR. BRANDT:  I've got three minute's worth.
15              THE WITNESS:  I don't know if I can stay
16   awake that long.  Okay.  The new deal is this late in the
17   day it's got to be Gary.  Mr. Kornman, I don't get all
18   that.
19              MR. BRANDT:  Okay.  I'll do that.
20              MR. SCHWEGMANN:  They're both incorrigible.
21              MS. JACOBSEN:  I don't even think about it.
22                   REEXAMINATION
23   BY MR. BRANDT:
24        Q.   Okay, Gary.
25        A.   Thank you.
0222
 1        Q.   Would you take a look --
 2        A.   I'm all ears now.
 3        Q.   Exhibit 14 that Allison marked is a copy of the
 4   advisor agreement.  I think that one is --
 5        A.   This statement, I think.
 6        Q.   -- signed by Mr. Mulligan.
 7        A.   Oh, yes.  Okay.
 8        Q.   Is that correct, that one is from Mike
 9   Mulligan?
10        A.   Yes.
11        Q.   Why did Heritage have individual lawyers at
12   Lewis Rice sign these agreements as opposed to the law
13   firm of Lewis, Rice & Fingersh?
14        A.   That's an interesting question.  It was a
15   broader issue than that, Jay.  We were trying to get
16   attorneys across the country to work with us, because
17   invariably once they worked with us, they saw how good we
18   were and they saw we weren't taking clients away from
19   them.  In fact, we were helping them generate business
20   from their clients.  The last thing we wanted to do was
21   take a client away from them.
22              And so, consequently, we were trying to get as
23   many attorneys to sign as we could.  I mean that was the
24   theory anyhow.  And to ask a whole firm of good size, to
25   try to bind a whole firm scared them to death.  So we
0223
 1   just asked the attorneys themselves to do it.  I don't
 2   believe there's anything in here that would bind the
 3   firm.  At least there wasn't supposed to be.  Other than
 4   maybe a definition of affiliates.
 5              But by and large, that was the whole purpose of
 6   it.  We were -- you know, you've heard that story about
 7   the camel getting the nose under the tent and pretty soon
 8   the camel has got the whole tent.  We were trying to get
 9   into as many law firms as we could as easy as we could,
10   because we got a lot of references from them once they
11   saw what we could do.
12        Q.   All right.  You mentioned a moment ago, when
13   you were asked about the statement about Bird or Canada
14   must have turned us in, in those notes?
15        A.   Yes.
16        Q.   You said -- in your testimony you said you
```
Page 93

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
17   think that the actions of Howard Jenkins caused the IRS
18   to start an investigation of Heritage.  Do you remember
19   that testimony?
20        A.   Right.  After I -- after I saw those earlier
21   letters, the -- what was it, 2001?  That wouldn't have
22   been Canada and Bird.  That would have been Jenkins.
23        Q.   Okay.
24        A.   And so once I saw those -- and I hadn't seen
25   those at the time I made that comment.  We were in
0224
1    conflict obviously with them.  And so my conclusion was
2    that what started earlier was Jenkins.
3         Q.   But I guess my point is --
4         A.   By the way, at the time I said that I didn't
5    see the Jenkins -- I didn't know that Jenkins -- I don't
6    think Jenkins had filed suit against us.  So we didn't
7    know he hadn't used the transaction.
8         Q.   Okay.  Now, my question simply is, Gary:  How
9    can you know that?  How can you know that his actions
10   caused the IRS to take other actions with regard to
11   Heritage?
12        A.   We don't know that, but they had to get
13   information from somewhere.  And as near as we could
14   tell, the earliest people that we know that -- know now
15   that went to the Internal Revenue Service was Howard
16   Jenkins and his group.
17        Q.   But that's a conclusion you've drawn?
18        A.   It's just -- yes, it's definitely a conclusion.
19        Q.   Okay.  I wanted to rule out nobody from the IRS
20   has told you that, is that the reason we started this
21   investigation --
22        A.   No.
23        Q.   -- because Howard Jenkins came to us --
24        A.   No.
25        Q.   -- and wanted to settle?
0225
1         A.   No one has told us that.  They don't -- they're
2    not very outgoing with information.
3         Q.   Okay.  Does Lewis, Rice & Fingersh do any legal
4    work today for you or any entity that you do business
5    with?
6         A.   No.
7         Q.   Do you know when the last time was they
8    performed legal services for some entity you had a
9    relationship with?
10        A.   It's been a long time.
11        Q.   You've testified now that when Lewis Rice would
12   refer these clients to Lewis -- I'm sorry.  Start over.
13        A.   Me too.  It's getting late.
14        Q.   I'm tired.  You've testified now that when
15   Heritage would refer these clients to Lewis Rice, you
16   would always say, We've worked with these lawyers before,
17   they've done work for us.  Is that what you testified
18   to --
19        A.   Yes.
20        Q.   -- a little bit ago?
21        A.   Sure.  I think I told you they even did work on
22   -- I think they did some work on my mother's estate.
23        Q.   But my point is you're saying now that you
24   would tell the clients this, we've gotten these lawyers
25   to do legal work for us, Heritage, right?
0226
1         A.   Right.

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
 2       Q.   Well, how could they be independent then?  I
 3  thought you wanted everybody to have their own
 4  independent lawyer.
 5                  MR. SCHWEGMANN:  Objection; form.
 6                  MS. JACOBSEN:  Objection; form.
 7       A.   No.   They were independent.  We expected them
 8  to give us their best advice and we expected them to give
 9  clients that we referred to them their best advice.  In
10  other words, they had no -- once we came into the picture
11  and we referred somebody to them -- I mean let's take the
12  Sandwiths.  You know those people well.
13            The Sandwiths said, Who do you know that can do
14  this for us and do it for us quickly?  And we said, Mike
15  Mulligan is one of the best guys in the country and they
16  get the work out quickly.  I could refer you to Jonathan
17  Blattmachr, but they're slow.  I mean, you know, in --
18  it's so -- I mean it's so offhand that -- you know.  And
19  they said, How long have you known them?  And we may have
20  said 15 years or whatever we said, they've done work for
21  us, they helped us develop strategies.  I mean we tell
22  people that.  There's no secrets.
23       Q.   All right.  When -- in your experience at
24  Heritage, Gary, when you ever told a client that, did you
25  ever have a client say to you, Well, if they've done
0227
 1  legal work for Heritage, I would rather go get another
 2  law firm that's not connected to Heritage?
 3       A.   Never.  Never.
 4       Q.   And you --
 5       A.   Larry Flinn did, though.
 6       Q.   Well, he got -- he got Mr. Blattmachr involved,
 7  correct?
 8       A.   Right.  Totally unrelated to us.  He came in
 9  through another attorney at Milbank that he knew the
10  lady's parents.
11       Q.   But since your firm had worked with
12  Mr. Blattmachr, you had no objection to his involvement?
13       A.   No.  I was friendly with Jonathan.
14       Q.   All right.
15       A.   We fished together.
16       Q.   Earlier you also were talking about Mr. Ahrens'
17  engagement letters.  You've testified already you never
18  had any contact with Woodruff or Patterson, correct?
19       A.   None.
20       Q.   Have you ever seen any engagement letter that
21  they had with Mr. Ahrens or his law firm?
22       A.   No, sir.
23       Q.   So you don't know what it says, do you?
24       A.   No, sir.
25       Q.   All right.  Do you have memory today of what
0228
 1  Heritage paid Lewis Rice a $100,000 for in January 2000,
 2  what legal work that was for?
 3       A.   My recollection was it was an estate tax
 4  strategy that they helped us develop.
 5       Q.   All right.
 6       A.   That did work and that we did use and it saved
 7  the Sandwiths $80 million.
 8       Q.   So that -- you're telling me that that
 9  particular strategy was actually used by the Sandwith
10  family?
11       A.   A variation of it, yes.
12       Q.   All right.
```
                          Page 95

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
13                    MR. BRANDT:  That's all I have.  I'll pass
14     the witness.
15                    MS. JACOBSEN:  Nothing further.
16                    MR. SCHWEGMANN:  You're passing as well?
17                    MS. JACOBSEN:  I am passing.
18                    THE WITNESS:  Thank you.
19                    MS. JACOBSEN:  Thank you.
20                    THE VIDEOGRAPHER:  We're off the video
21     record at 4:23.
22                    (Proceedings adjourned at 4:23 p.m.)
23
24
25
0229
 1                    CHANGES AND SIGNATURE
 2     WITNESS NAME:  GARY MORTON KORNMAN
 3     DATE OF DEPOSITION:  August 10, 2007
 4     PAGE LINE     CHANGE              REASON
 5     _____
 6     _____
 7     _____
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____
25     _____
0230
 1          I, GARY MORTON KORNMAN, have read the foregoing
 2     deposition and hereby affix my signature that same is
 3     true and correct, except as noted above.
 4
 5                    _____
 6                    GARY MORTON KORNMAN
 7
 8     THE STATE OF _____)
 9     COUNTY OF _____)
10
11          Before me, _____, on this
12     day personally appeared GARY MORTON KORNMAN, known to me
13     (or proved to me under oath or through
14     _____) (description of identity
15     card or other document) to be the person whose name is
16     subscribed to the foregoing instrument and acknowledged
17     to me that they executed the same for the purposes and
18     consideration therein expressed.
19          Given under my hand and seal of office this
20     _____ day of _____, _____.
21
22
23                    _____
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt

```
                         NOTARY PUBLIC IN AND FOR
24                       THE STATE OF _____
                         COMMISSION EXPIRES: _____
25
0231
 1                    CAUSE NO. 06-01394
    PAUL H. WOODRUFF, ET AL      ) IN THE DISTRICT COURT
 2  VS.                          ) DALLAS COUNTY, TEXAS
    AHRENS & DEANGELI,           )
 3  P.L.L.C., ET AL              ) 101ST JUDICIAL DISTRICT
    *************************************************************
 4     IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
                     STATE OF MISSOURI
 5  JOHN W. TROUTT, JR., ET AL   )
    VS.                          ) Cause No. 06CC-001173
 6  LEWIS, RICE & FINGERSH,      )   Division No. 1
    L.C., ET AL                  )
 7  *************************************************************
    LAWRENCE FLINN, JR.          )
 8  VS.                          ) Cause No. 06CC-002321
    LEWIS, RICE & FINGERSH,      )   Division No. 10
 9  L.C., ET AL                  )
    *************************************************************
10  L. ROSS LOVE, JR.            )
    VS.                          ) Cause No. 0622-CC-7221
11  LEWIS, RICE & FINGERSH,      )   Division No. 16
    L.C., ET AL                  )
12  *************************************************************
    PAUL H. WOODRUFF and KENT    )
13  E. PATTERSON                 ) Cause No. 07-22-CC885
    VS.                          )   Division No. 16
14  LEWIS, RICE & FINGERSH,      )
    L.C., ET AL                  )
15  *************************************************************
    HERBERT L. FLUHARTY, et al   )
16  VS.                          ) Cause No. 06CC-001173
    LEWIS, RICE & FINGERSH,      )   Division No. 1
17  L.C., et al                  )
18
19  *************************************************************
20                  REPORTER'S CERTIFICATION
21              DEPOSITION OF GARY MORTON KORNMAN
22                      August 10, 2007
23  *************************************************************
24     I, Jennifer L. Sanders, Certified Shorthand Reporter
25  in and for the State of Texas, hereby certify to the
0232
 1  following:
 2       That the witness, GARY MORTON KORNMAN, was duly
 3  sworn by the officer and that the transcript of the oral
 4  deposition is a true record of the testimony given by the
 5  witness;
 6       That the deposition transcript was submitted on
 7  August 15, 2007 to Mr. Christopher J. Schwegmann,
 8  attorney for Defendant Gary Morton Kornman and Michael
 9  Martin Kornman, for examination, signature and return to
10  me by September 14, 2007;
11       That the amount of time used by each party at the
12  deposition is as follows:
13     Mr. Jay A. Brandt........3 hours, 21 minutes
14     Ms. Allison Jacobsen.....1 hours, 20 minutes
15
16       That pursuant to information given to the deposition
```

Page 97

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
17  officer at the time said testimony was taken, the
18  following includes counsel for all parties of record:
19  FOR THE PLAINTIFFS:
20      MR. JAY A. BRANDT
        Jay A. Brandt, P.C.
21      3811 Turtle Creek Boulevard
        Suite 1600
22      Dallas, Texas 75219
        214-969-7373 (Office)
23      214-969-7648 (Fax)
        jbrandt@smalouf.com
24
25
0233
 1  FOR THE DEFENDANTS:
 2      MS. ALLISON JACOBSEN
        Vinson & Elkins, L.L.P.
 3      3700 Trammell Crow Center
        2001 Ross Avenue
 4      Dallas, Texas 75201-2975
        214-220-7851 (Office)
 5      214-999-7851 (Fax)
        ajacobsen@velaw.com
 6
 7  FOR THE DEFENDANTS GARY MORTON KORNMAN AND MICHAEL MARTIN
    KORNMAN:
 8
        MR. CHRISTOPHER J. SCHWEGMANN
 9      Lynn Tillotson & Pinker, L.L.P.
        750 N. St. Paul Street, Suite 1400
10      Dallas, Texas 75201
        214-981-3835 (Office)
11      214-981-3839 (Fax)
        cschwegmann@lynnllp.com
12
13  FOR THE DEFENDANTS AHRENS & DEANGELI, P.L.L.C., FWP
    TECHNOLOGIES, INC.; EDWARD D. AHRENS; AND DARIN DEANGELI:
14
        MR. PAUL KONING
15      Hughes & Luce, L.L.P.
        1717 Main Street
16      Suite 2800
        Dallas, Texas 75201
17      214-939-5564 (Direct)
        214-939-5849 (Fax)
18      paul.koning@hughesluce.com
19
20      I further certify that I am neither counsel for,
21  related to, nor employed by any of the parties or
22  attorneys in the action in which this proceeding was
23  taken, and further that I am not financially or otherwise
24  interested in the outcome of the action.
25
0234
 1      Certified to by me this 15th of August, 2007.
 2
 3
                    _____
 4                  Jennifer L. Sanders, CSR No. 5091
                    CORONA COURT REPORTING
 5                  7027 Hunters Glen Road
                    Dallas, Texas 75205
 6                  214-528-7912 (Office)
                            Page 98
```

Kornman Gary 08-10-07 Vol  1 of 2 (Wood-Pat Troutt Flinn Love Fluharty).txt
```
                          214-528-1313 (Fax)
  7                       Firm Registration No. 282
                          Certification Expires 12/31/07
  8
  9
 10
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
0235
  1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
  2        The original deposition was/was not returned to the
  3  deposition officer on September 14, 2007;
  4        If returned, the attached Changes and Signature page
  5  contains any changes and the reasons therefor;
  6        If returned, the original deposition was delivered
  7  to Mr. Jay A. Brandt, Custodial Attorney;
  8        That                is the deposition officer's
  9  charges to be paid by Mr. Jay A. Brandt, the Plaintiff,
 10  for preparing the original deposition transcript and any
 11  copies of exhibits;
 12        That the deposition was delivered in accordance with
 13  Rule 203.3, and that a copy of this certificate was
 14  served on all parties shown herein on and filed with the
 15  Clerk.
 16        Certified to by me this _____ day of
 17  _____, 2007.
 18
 19
 20                        _____
                          Jennifer L. Sanders, CSR No. 5091
 21                       CORONA COURT REPORTING
                          7027 Hunters Glen Road
 22                       Dallas, Texas 75205
                          214-528-7912 (Office)
 23                       214-528-1313 (Fax)
                          Firm Registration No. 282
 24                       Certification Expires 12/31/07
 25
```